**No. 24-1013**

———————————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

———————————————

**TINA PETERS,**

*Plaintiff-Appellant,*

**v.**

**UNITED STATES, MERRICK B. GARLAND**, Attorney General of the United States in his official capacity, **JENA GRISWOLD**, Colorado Secretary of State in her official capacity, and **DANIEL P. RUBINSTEIN**, District Attorney of the Twenty-First Judicial District in his official capacity,

*Defendants-Appellees.*

———————————————

On Appeal from the United States District Court for the District of Colorado
The Honorable Nina F. Wang
In No. 1:23-cv-03014

———————————————

**EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL
AND FOR EXPEDITED REVIEW**

———————————————

John Case
John Case, P.C.
6901 South Pierce St. #340
Littleton, CO 80128
(303) 667-7407
brief@johncaselaw.

Patrick M. McSweeney
Robert J. Cynkar
Christopher I. Kachouroff
Lyndsey L. Bisch
McSweeney, Cynkar & Kachouroff, PLLC
10506 Milkweed Drive
Great Falls, VA 22066
(703) 621-3300
rcynkar@mck-lawyers.com

*Counsel for Plaintiff-Appellant Tina Peters*

## INTRODUCTION

Plaintiff-Appellant, Tina Peters, moves for an emergency injunction pending appeal pursuant to Federal Rule of Appellate Procedure 8(a)(2) and Rule 8 of this Circuit and for expedited briefing and argument.

As the elected Clerk of Mesa County, Colorado, Peters in May 2021 engaged a computer consultant to make a forensic image of the County's election management server ("EMS") to preserve election records being erased by a "Trusted Build upgrade" installed at the direction of Colorado Secretary of State Jena Griswold. Peters acted in compliance with federal and Colorado statutes requiring such records to be preserved for specified periods following an election, 52 U.S.C. §20701 (22 months); C.R.S. 1-7-802 (25 months), to assure that audits can be conducted. 52 U.S.C. §21801(b)(1)(D). Ex.E, ¶¶6-19.[1] In having these images made, Peters broke no law nor breached any legally protected security or privacy interests. Expert analyses of the forensic images confirmed that Trusted Build deleted critical election records before the expiration of these required retention periods, *see* Ex.G, 7-9, and revealed the creation of unexpected databases moving batches of ballots and masking results from election officials. *See* Ex.F, ¶¶13-17.

---

[1] Citations to "Ex. __ " refer to exhibits to the accompanying Declaration of Robert J. Cynkar.

Peters raised concerns about the integrity of the County's voting system to Defendant-Appellee Daniel Rubinstein (Mesa County District Attorney), to Griswold's representatives, and to representatives of U.S. Attorney General Garland; twice petitioned the Board of County Commissioners to discontinue the use of such systems; and discussed her concerns in public forums of interested citizens.

Rubinstein, in coordination with Griswold and Garland, responded by retaliating against Peters in several ways, culminating in her indictment on March 8, 2022, in *People v. Peters,* Case No. 22CR371, for a variety of alleged offenses, but none including a claim that the making of the forensic images was illegal or violated security or privacy interests. *See* Ex.H. That prosecution seeks to publicly punish Peters for her compliance with federal and Colorado election record retention statutes, for her public discussion of the integrity of digital voting systems, and for her petitions to the County Board to abandon such systems.

Peters filed this action on November 14, 2023 (with her First Amended Complaint filed on December 22, 2023) against Rubinstein, Griswold, Garland and the United States to vindicate her immunity from such state prosecutions under Supremacy Clause and the Fourteenth Amendment's Privileges or Immunities Clause, and to protect her First Amendment rights to freedom of speech and association, and to petition her government for the redress of grievances. Because

the criminal trial set to begin on February 9, 2024, would irreparably injure her
privilege to administer federal law immune from punitive state proceedings and her
exercise of her First Amendment rights free from the chilling effect of punitive
state prosecution, on November 27, 2023, Peters moved for a preliminary
injunction to enjoin Rubinstein from conducting proceedings in *People v. Peters*.
Ex.A, at 5. On December 11, 2023, she moved to expedite adjudication of that
motion, *id.,* 6, which the district court denied. Rubinstein responded on December
13 with, among other filings, a motion to dismiss. *Id.*

On January 8, 2024, the district court dismissed Peters' claim against
Rubinstein without prejudice pursuant to FED.R.CIV.P. 12(b)(1) on the grounds that
abstention under *Younger v. Harris,* 401 U.S. 37 (1971) was appropriate, and
denied Peters' motion for a preliminary injunction as moot. Ex.A. Peters filed her
Notice of Appeal on January 10, 2024.

Peters asks this Court to enjoin proceedings in *People v. Peters* pending the
adjudication of this appeal and for expedited briefing and argument on the merits.
Rubinstein opposes this Motion.

## BACKGROUND

### A. The Controversy Over Preservation of Election Records.

### 1. The "Trusted Build" Upgrade

On April 30, 2021, Griswold's office issued a directive requiring local election officials to participate in installing Trusted Build in their EMS. Ex.I. While this directive required local election officials to back-up "election project" records, which Peters did, "election project" records did not include all the electronic information that was essential for a post-election audit such as audit logs, access logs, and an image of the hard drive of the County's EMS server. Ex.I; Ex.E, ¶¶ 12-13; Ex.J; Ex.K. The directive insisted that only state, county election, and Dominion staff be present for the installation. If anyone else was present, the Trusted Build team would move on, and the county's election equipment would be shipped to Denver, where the upgrade would be installed without any scrutiny beyond that of Dominion Voting Systems, Inc., the vendor of the County's EMS, and Griswold's staff. Ex.I, at 2.

That month, David Stahl from Dominion advised Peters that Trusted Build would make it impossible to read the digital election records used in the 2020 general election in Mesa County and the 2021 municipal election in Grand Junction, a fact subsequently confirmed to Peters by Griswold's staff. Ex.E, ¶¶7-8.

## 2. Peters' Forensic Images of the Election Records

(a) In April, 2021, the County denied Peters' request to make a copy of the Mesa County EMS hard drive. Peters was then confronted by the dilemma of (i) the erasing of election records by Trusted Build, (ii) its installation under tightly closed circumstances beyond any public scrutiny, and (iii) no official technical staff available to her to preserve the records as required by law. Peters engaged a consultant, Conan Hayes, to make a forensic image of the EMS hard drive, which does not modify any data, contain voter choices, or cause any harm to the voting system. Ex.E, ¶18.

Hayes made the first forensic image on May 23, 2021, thereby preserving election records from the 2020 and 2021 elections.[2] Trusted Build was installed on May 25, 2021. Peters' consultant was present solely to observe. On the following day, Hayes made a second forensic image of the EMS hard drive, which captured only the newly installed software. Ex.E, ¶26.

---

[2] Hayes' access to the facility was appropriate because Peters supervised him as provided by Election Rule 20.5.3(b), 8 CCR 1505-1. Peters also arranged for Hayes to use the access badge of another consultant, Gerald Wood. Access badges were used to allow vendors to enter secure areas to perform various services, and were often labeled simply "Temp 1," "Temp 2," and so on, with no other identifying information. Ex.E, ¶27. They functioned very much like electronic hotel room keys, not official identification cards.

(b) The forensic images secured by Peters were examined by experts. Cybersecurity expert Douglas Gould concluded that Trusted Build erased election records of the November 2020 election and the 2021 municipal election, overwriting records that were required to be preserved for future audits. Ex.G, 11. Another expert, Walter Daugherity, concluded that the forensic images revealed an unusual phenomenon: after some of the ballots were recorded in a database, no further ballot data was recorded in it even though ballot processing was not complete. Rather, data from processing additional ballots was entered into a separate, newly created database. Some, but not all, of the data from the first database were copied into the new database, and hidden from election official in violation of federal auditability requirements. Ex.F, ¶¶ 12-16.

(c) In August 2021, Peters participated in a Cyber Symposium where she began to voice her concerns publicly about the integrity of the County's computerized voting system.

Peters' associates also presented her concerns at a September 1, 2021, meeting in County offices attended in person or virtually by representatives of U.S. Attorney General Garland, Rubinstein and members of his staff, personnel from Griswold's office, representatives of the State Attorney General, officers of Dominion, an FBI Special Agent, and members of the County Board of County Commissioners, among others. Ex.P, ¶¶11-23. Nothing came of the meeting.

Peters presented two petitions to the Board to discontinue the use of computerized voting systems in Mesa County. Each petition was supported by a report prepared by Mr. Gould analyzing the forensic images of the County's EMS server. The reports concluded that election records that were required to be preserved pursuant to federal and Colorado law had been destroyed by Trusted Build, that any comprehensive forensic audit of the 2020 and 2021 elections would be impossible as a result, and that the certification by the Secretary of State of the Mesa County computerized voting system had been vitiated. Ex.G. The Board took no action.

On April 23, 2022, a third report analyzing the forensic images, prepared by Dr. Daugherity and another computer expert, Jeffrey O'Donnell, was submitted to Rubinstein by Peters' associates. Ex.F, ¶¶6-17. [3]

Rubinstein and his investigator, Michael Struwe, neither of whom have any expertise in cyber security matters, submitted a response to the Board purporting to challenge the analysis of the Daugherity/O'Donnell report. Ex.C, ¶¶87-91. Dr. Daugherity's declaration replies to Rubinstein/Struwe's claims. Ex.F ¶¶18-24.

---

[3] These three lengthy, highly technical reports are not included as exhibits here. The first two reports are summarized by Mr. Gould (Ex.G) and the third by Dr. Daugherity (Ex.F). These reports can be found in the record below at ECF Nos. 1-9 -- 1-10; 1-15 – 1-21; 1-22.

### 3. The Indictment of Peters

Making forensic images of the EMS server was not illegal, as Deputy Secretary of State Christopher Beall admitted under oath. *See* Ex.L. Peters' actions breached no legally protected security or privacy interests, as confirmed by the indictment of Peters, which strains to accuse her of a concatenation of alleged offenses, but which includes no charge that she acted illegally in making the forensic images.

• Counts 1, 2 and 5 charge violations of C.R.S. §18-8-306 (making an attempt to influence any public official by "deceit … with the intent thereby to alter or affect the public servant's decision, vote, opinion, or action" a Class 4 felony) with respect to two of Griswold's employees, and a Mesa County IT employee. Ex.H, 3,4. These counts do not allege any specific "decision, vote, opinion or action" within the meaning of the statute – *i.e.*, some "formal exercise of government power," *McDonnell v. United States*, 579 U.S. 550, 578 (2016) – that Peters was supposedly trying to influence, nor do they allege facts showing that Peters acted with "deceit," that is, to "obtain money or property by false or fraudulent pretenses, representations or promises." *United States v. Kalu*, 791 F.3d 1194, 1204 (10th Cir. 2015). *See also People v. Janousek*, 871 P.2d 1189, 1196 (Colo. 1994)("Deceit" means a false representation used to defraud.). Peters' actions sought no money or property, but to preserve election records pursuant to

federal and state law for public scrutiny in the face of obstacles improperly created by state officials desperately trying to remove any trace of them.

• Counts 4, 6, and 7 charge Peters with criminal impersonation and a conspiracy to commit criminal impersonation in violation of C.R.S. §§18-5-113(1)(B)(1) and 18-2-201. Ex.H, 4-5. Again, these counts fail to give the minimally required detail to describe what the charge really is. *See United States v. Hathaway*, 318 F.3d 1001, 1009 (10th Cir. 2003); *People v. Buckallew*, 848 P.2d 904, 909 (Colo. 1993). They appear to focus on Hayes' use of Wood's access badge, but fail to allege how this amounted to "impersonation" legally, instead cloaking their allegations in incendiary characterizations, such as the defendants' supposed "criminal scheme." Ex.H, 7.

Colorado law recognizes that "there are lawful uses of assumed fictitious identities" and they are proscribed only when "undertaken to accomplish *unlawful* purposes." *People v. Gonzales*, 534 P.2d 626, 628 (Colo. 1975)(emphasis in original). *See also People v. Brown*, 562 P.2d 754, 756 (Colo. 1977)( Criminal impersonation requires assuming a false identity "to unlawfully gain a benefit or injure or defraud another."); *People v. Johnson*, 30 P.3d 718, 723 (Colo. App. 2000)(giving a false name to an arresting officer did not constitute criminal impersonation when there was no evidence "that the use of the false name would result in a benefit to the defendant.").

9

These counts allege no facts suggesting that Peters acted to secure some unlawful benefit or to injure or defraud.

• Count 8 arises from the use of Wood's access badge and a "Yubikey," charging Peters with "identity theft" in violation of C.R.S. §18-5-902(1)(A), which makes it a crime to use the "personal identifying information, financial identifying information or financial device of another without permission or lawful authority with the intent to obtain cash, credit, property, services, or any other thing of value or to make a financial payment." Ex.H, 5. *See also* C.R.S. §18-1-901 ("'Thing of value' includes real property, tangible and intangible personal property, contract rights, choses in action, services, confidential information, medical records information, and any rights of use or enjoyment connected therewith."). No allegation suggests that Peters acted to acquire cash or anything else of value. Indeed, no "personal identifying information" was involved in making the forensic images. The Yubikey is like a thumb drive, and was not used by anyone. And the access cards are not identification cards of the bearer, but temporary permission slips to enter certain facilities. *See* n.2, *supra.*

• Count 9 charges Peters with official misconduct in violation of C.R.S. §18-8-404(1), which makes it an offense for an official to knowingly engage in conduct relating to his office, to refuse to perform a duty required by his office, or to violate any law relating to his office "with intent to obtain a benefit for the

10

public servant or another or maliciously to cause harm to another." Ex.H, 5. *See People v. Dilger,* 585 P.2d 918, 919-20 (Colo. 1978); B. Covington, *State Official Misconduct Statutes and Anticorruption Federalism After Kelly v. United States*, 121 COLUM.L.REV.F. 273, 283 & n. 63 (2021)(Acting in good faith for the public benefit, but mistakenly, is a valid defense."). Allegations that Peters acted from any of the required corrupt motives are absent, which is not surprising, as there is no evidence that Peters had the forensic image of the election records made for any reason other than to comply with federal and Colorado law.

• Count 10 charges a violation of C.R.S. §1-13-107(1), alleging that Peters was an official "who … violated, neglected, or failed to perform [a] duty [imposed by the Colorado Code] or is guilty of corrupt conduct in the discharge of the same." Ex.H, 5.The indictment does not specify what "duty" is at issue, much less whether Peters "violated, neglected, or failed to perform" it, or actually did discharge the unidentified duty, but engaged in unnamed "corrupt conduct" in doing so. Since making the forensic image was not unlawful, and Peters accompanied the consultant whenever he was in a secure area, *see* Rule 20.5.3(b), 8 CCR 1505-1, there was no basis for considering Peters' effort to stymie the illegal destruction of election records "corrupt."

• Finally, Count 11 charges a violation of C.R.S. §1-13-114, alleging that Peters interfered or refused to comply with the Secretary of State's rules. Ex.H, 5.

11

The indictment does not specify the rules Peters refused to obey, but no allegation challenges the fact that all of Peters' acts were directed at ensuring election records were preserved as required by statutes that are superior to the Secretary's rules. *See Hanlen v. Gessler*, 333 P.3d 41, 49 (Colo. 2014) ("[T]he Secretary lacks authority to promulgate rules that conflict with statutory provisions."); C.R.S. §24-2-103(8)(a) ("Any rule … which conflicts with a statute shall be void."). Any rule arguably violated by Peters was void as applied.

## JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction under 28 U.S.C. §§1331, 1343(a)(3), and 1346(a)(2) because Peters' claims raise a federal question, seek to redress the deprivation under color of State law of rights, privileges, and immunities secured by the U.S. Constitution, and in part are made against the United States. This Court has jurisdiction under 28 U.S.C. §1291 because the district court entered final judgment dismissing Peters' claims against Rubinstein.

The district court's decision to abstain pursuant to *Younger* is reviewed *de novo. Courthouse News Serv. v. New Mexico Admin. Off. of Cts.*, 53 F.4th 1245, 1254 (10th Cir. 2022).

## ARGUMENT

I.    **An Injunction Pending Appeal Is Warranted.**

    **A. Peters Has a Substantial Likelihood of Success on Appeal.**

Dismissal on *Younger* abstention grounds was error because (i) abstention was not a permissible option for the district court in adjudicating Peters' immunity claim, and (ii) *Younger* abstention on its own terms does not apply.

### 1. Peters is entitled to immunity from state prosecution under the Supremacy Clause and the Fourteenth Amendment's Privileges or Immunities Clause.

The privilege of a county official to faithfully comply with a federal law that is part of a federal regime advancing secure federal elections, immune from state prosecution punishing that compliance, is no novelty, but is a well-recognized, logical application of the principles of the Supremacy Clause. In *Cunningham v. Neagle,* 135 U.S. 1 (1890), the Supreme Court established that federal officers are immune from state prosecution for acts committed within the reasonable scope of their duties. This Court has likewise recognized that "Supremacy Clause immunity governs the extent to which states may impose civil or criminal liability on federal officials for alleged violations of state law committed in the course of their federal duties." *Wyoming v. Livingston,* 443 F.3d 1211, 1213 (10th Cir. 2006).

"[S]tates may not impede or interfere with the actions of federal executive officials when they are carrying out federal laws." *Id.,* at 1217. The animating principle is long-recognized in our constitutional law: "the states have no power … to retard, impede, burden, or in any manner control, the operations of the constitutional law enacted by congress to carry into execution the power vested in

the general government." *Id.* (quoting *McCullogh v. Maryland,* 17 U.S. 316, 436 (1819)). Thus, it is the effective operation of federal law that is key, not the identity of the person executing it. Peters was attempting to faithfully comply with the federal election records preservation statute, 52 U.S.C. §20701, which must be enforced pursuant to the Supremacy Clause.

"The question is not whether federal law expressly authorizes a violation of state law, but whether the federal official's conduct was reasonably necessary for the performance of his duties." *Wyoming v. Livingston,* 443 F.3d at 1227-28. A federal officer doing what Peters did would be immune from state prosecution for those acts, evaluating the reasonableness of those acts in light of "the circumstances as they appear[ed] to [her] at the time of the act in question." *Id.*, at 1229. The fact that Peters was a county official acting to ensure the operation of federal law does not justify a different result; she is immune from state prosecution for those acts.

This dynamic of the Supremacy Clause is reflected in the Fourteenth Amendment's Privileges or Immunities Clause, which, even within its narrow scope, protects "the right of the citizen of this country…to engage in administering [the national government's] functions." *Slaughter-House Cases,* 83 U.S. 36, 79 (1872). *See also In re Quarles,* 158 U.S. 532, 535 (1895). Peters' efforts to comply with federal law surely qualify for protection as such a privilege and immunity,

especially in the context of combating the potential corruption of federal elections. *Cf. United States v. Classic,* 313 U.S. 299, 316 (1941); *The Ku-Klux Klan Cases,* 110 U.S. 651, 666-67 (1884).

The district court ignored the Supremacy Clause's protection of Peters' efforts to comply with the federal statutory mandate to preserve election records. The application of Supremacy Clause immunity is not simply a matter of Peters' constitutional rights, but of enforcing the bounds the Constitution's federal structure places on state power, including that of state courts.

Trusted Build violated the federal statutory mandate to preserve election records. Peters making the forensic images of the EMS hard drive complied with those federal requirements, was not unlawful under Colorado or federal law, and did not breach any other interests of security or privacy. The immunity established by the Supremacy Clause, and by its offshoot in the Fourteenth Amendment's Privileges and Immunities Clause, means just that: Peters is immune from the state prosecution launched in conflict with or in retaliation for her compliance with federal election law. That immunity means that the state court has no jurisdiction to entertain proceedings seeking to impose criminal liability on Peters, and it is fully appropriate – indeed, necessary -- for a federal court to say so. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015)("[I]f an individual claims federal law immunizes him from state regulation, the court may issue an injunction

15

upon finding the state regulatory actions preempted."); *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 906 n. 19 (10th Cir. 2017)(same).

None of the concerns for legitimate state prerogatives animating *Younger* abstention is involved in the immunity arising from the Supremacy Clause and the Fourteenth Amendment's Privileges and Immunities Clause. Abstention is never an option when a federal court is adjudicating a claim of an official, like Peters, to immunity from state prosecution or retaliatory proceedings for her administration of federal law. State court adjudication of state punitive proceedings initiated in response to that actor's execution of federal law *is* the injury this immunity is intended to avert.

### 2. *Younger* abstention does not apply.

"Because of the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them, the Supreme Court has repeatedly cautioned that [a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Courthouse News,* 53 F.4th at 1255 (internal quotations omitted). *Younger* abstention requires a federal court to refrain from hearing an action that would interfere with on-going state court proceedings. *Joseph A. ex rel. Corrine Wolfe v. Ingram*, 275 F.3d 1253, 1267 (10th Cir. 2002). However, *Younger* abstention does not apply when the state court proceedings are corrupted by bad faith, commonly in retaliation for the defendant's exercise of constitutional rights, *Phelps v.*

*Hamilton*, 59 F.3d 1058, 1065 (10th Cir. 1995), or when they will not afford an adequate opportunity to raise federal claims. *Joseph A.,* 275 F.3d at 1267. Both of these attributes barring *Younger* abstention are evident here.

### a. The state prosecution of Peters was brought in bad faith to punish her exercise of her constitutional rights.

It is a well-established "constitutional precept that a prosecution motivated by a desire to discourage expression protected by the First Amendment is barred and must be enjoined or dismissed, irrespective of whether the challenged action could possibly be found to be unlawful." *United States v. P.H.E., Inc.*, 965 F.2d 848, 853 (10th Cir. 1992). *See also Cullen v. Fliegner,* 18 F.3d 96, 103–04 (2d Cir.1994)("[A] refusal to abstain is also justified [even when there is a reasonable expectation of a successful prosecution] where a prosecution ... has been brought to retaliate for or to deter constitutionally protected conduct."); *Fitzgerald v. Peek,* 636 F.2d 943, 945 (5th Cir. 1981)("A [showing of retaliation] will justify an injunction regardless of whether valid convictions could conceivably be obtained.").

In *Dombrowski v. Pfister,* 380 U.S. 479, 486 (1965), the Court recognized "the sensitive nature of constitutionally protected expression" to be "of transcendent value to all society." Consequently,

> we have, in effect, avoided making vindication of freedom of
> expression await the outcome of protracted litigation. Moreover, we
> have not thought that the improbability of successful prosecution makes

17

> the case different. The chilling effect upon the exercise of First
> Amendment rights may derive from the fact of the prosecution,
> unaffected by the prospects of its success or failure.

*Id.,* at 487. As this Court put it, "the actual act of going to trial under a pretextual

prosecution has a chilling effect on protected expression." *P.H.E.,* 965 F.2d at 856.

Thus the First Amendment entails a "right not to be tried." *Id.*

The prosecution of Peters is part of an unmistakable, no-holds-barred

campaign to discredit and punish Peters for exercising her right (and duty) to

comply with federal law to preserve election records and to speak truthfully to the

public and to County decision-makers about the election integrity problems those

records exposed.

Rubinstein never prosecuted Griswold for her destruction of election records

in violation of federal and state law. Yet, at the urging of Griswold's Deputy,

Rubinstein launched an investigation of Peters in August 2021. Silencing and

discrediting Peters' expression was the target of Rubinstein's and Griswold's

maneuvers. Ex.K. In Election Order 2022-01, Griswold demanded that Peters

recant her public statements describing the destruction of election records and her

concerns about election integrity. Ex.Q, 3, 7. When Peters refused, Griswold sued

to replace Peters as Mesa County's designated election official, describing Peters'

simple compliance with federal and state election record retention laws in an over-

the-top falsehood as "the first insider threats … [that] risked the integrity of the election system in an effort to prove unfounded conspiracy theories." Ex.R, 2.

Rubinstein, Griswold, and their agents tried to maintain the falsehood that Peters broke the law in having the forensic images made. For example, Rubinstein's investigator falsely declared under oath to the judge presiding over Peters' criminal case that she "unlawfully took a digital image" of the EMS hard drive, Ex.E, ¶6, even though Deputy Secretary of State Beall admitted in other court proceedings that making the forensic images was not unlawful. Ex.L.

Peters was indicted 22 days after she announced her candidacy for Colorado Secretary of State, making her Griswold's direct competitor. Ex.E, ¶47. Peters was arrested as if she was a violent criminal, and initially held on a $500,000 bond. While she was incarcerated, her father passed away. *Id.,* ¶51. When she was finally released on a $25,000 bond after 30 hours in jail, Rubinstein insisted on bond conditions that effectively removed Peters from office, prohibiting her from contacting her employees or even entering her offices. *Id.,* ¶53. The day after the bond hearing, Rubinstein's investigator made harassing telephone calls to Peters' 93 year old mother, her daughter, and her sisters. *Id.,* ¶54.  When Peters continued to speak publicly, Rubinstein moved to revoke her bond. *Id.,* ¶55. Although Peters never failed to appear in court, Rubinstein advised the court that she was a "flight

risk" when Peters asked court permission to use her passport to obtain TSA pre-check flight status for domestic travel. Id., ¶58.

Rubinstein's war on Peters' expression and compliance with federal and state law was never clearer than in his opposition to her request to attend an out-of-state event at which a movie advocating election transparency, in which she appeared, was premiering. In his opposition, Rubinstein describes the film as "the story of Tina Peters … who made a backup of her counties (sic) [EMS] server, only to stumble across evidence of manipulation." Ex.M, ¶2. Peters, Rubinstein concludes, "is seeking permission to leave the state so that she can be celebrated as a hero for the conduct that a grand jury has indicted her for." *Id.,*¶4. Rubinstein's argument not only relies on the falsehood that Peters was indicted for making the forensic images, but drips with contempt for Peters' expressive rights and for the federal and state laws she was trying to uphold.

Rubinstein's prosecution of Peters does not warrant abstention.

### b. The state judge has foreclosed consideration of Peters' federal claims.

In her criminal case, Peters' argument for her subpoenas for the EMS hard drives of a neighboring county underscored the importance to her defense of her compliance with federal election-record-retention statutes and the unlawful deletion of records and the creation of unauthorized databases. Ex.N, 2-3, 10, 11-

12, 18. "The certification of the trusted build, the presence of non-certified software, additional election databases, and the subsequent destruction of election records will be key issues at trial." *Id.,* 14. She pointed out that the subpoenaed hard drives would provide admissible evidence to rebut Rubinstein's claims about his investigation, going "to the heart of the case."). *Id.,* 17.

The judge granted the motion to quash, tersely foreclosing any consideration of the critical matters Peters had outlined:

> [T]he issue of election equipment is collateral. The jury will not be asked to address any questions regarding the functioning of election equipment. The issues in this case are whether Defendant attempted to deceive public servants, engaged in criminal impersonation, and the like. As such, any report regarding the verity of the election equipment made by her experts, or any computer expert, is entirely irrelevant. These reports make no issue of material fact in this case more or less likely. This criminal case is not the forum for these matters.

Ex.O, 3.

The district court agreed, going so far as to wrongly contend that the adjudication of the motion to quash *was* the opportunity for Peters' constitutional claims to be heard. Ex.A, 14-15. Plainly Peters' federal constitutional claims have been ruled out-of-bounds in the state prosecution, and her "right not to be tried" will be brushed aside.

**B. Peters' Rights Would Be Irreparably Injured Without an Injunction.**

Pursuant to the Supremacy Clause and the Fourteenth Amendment's Privileges and Immunities Clause, Peters claims immunity from state proceedings

punishing her compliance with federal law. The state prosecution is the injury from which she is protected by this immunity. If her prosecution proceeds, that immunity would irretrievably be gone. Enjoining that prosecution while this Court adjudicates her claim to that immunity is necessary to avoid that irreparable injury.

Peters also contends that abstention is not appropriate in this case because the state prosecution is intended to punish her for her public statements and to deter her, and others, from doing so in the future. The irreparable chilling effect on First Amendment rights of such government action has long been recognized. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo,* 141 S.Ct. 63, 67 (2020); *Dombrowski,* 380 U.S. at 485-87. Obviously, if Peters is tried, her right not to be tried would be lost.

### C. Balancing the Equities Favors the Injunction

The factors listed in Rule 8.1(D) and (E), the absence of harm to opposing parties and the risk of harm to the public interest if the injunction is granted, merge when a government official is the opposing party. *Denver Homeless Out Loud v. Denver, Colorado*, 32 F.4th 1259, 1278 (10th Cir. 2022).

Peters' criminal trial has been postponed previously. Another postponement to properly adjudicate Peters' federal constitutional claims would not significantly burden the prosecution. Importantly, the protection of individual constitutional

rights served by the requested injunction always advances the public interest. *Free the Nipple-Fort Collins v. City of Fort Collins,* 916 F.3d 792, 807 (10th Cir. 2018). That public interest is even more acute here as Peters' speech involved election integrity, and her actions sought to comply with federal law in the face of antagonistic state actors, both matters of serious public concern. *See Bass v. Richards*, 308 F.3d 1081, 1089 (10th Cir. 2002).

## II.     Expedited Briefing and Argument Is Warranted.

While enjoining the Peters' prosecution of pending appeal is necessary to preserve her rights, promptly adjudicating the merits of this appeal is appropriate so as not to unduly delay those state proceedings. We defer to this Court's judgment and the constraints of its docket to determine what that schedule should be.

## CONCLUSION

The Court should enjoin proceedings in *People v. Peters* and expedite

briefing and appellate review.

Respectfully submitted,

/s/ *Robert J. Cynkar*

John Case                          Patrick M. McSweeney
John Case, P.C.                    Robert J. Cynkar
6901 South Pierce St. #340         Christopher I. Kachouroff
Littleton, CO 80128                Lyndsey L. Bisch
(303) 667-7407                     McSweeney, Cynkar & Kachouroff, PLLC
brief@johncaselaw.                 10506 Milkweed Drive
                                   Great Falls, VA 22066
                                   (703) 621-3300
                                   rcynkar@mck-lawyers.com

*Counsel for Plaintiff-Appellant Tina Peters*

## <u>DECLARATION OF ROBERT J. CYNKAR</u>

I, Robert J. Cynkar, attorney for Plaintiff-Appellant Tina Peters, declare as follows:

1. Attached hereto as **Exhibit A** is a true and correct copy of the Order entered by the United States District Court for the District of Colorado on January 8, 2024 [ECF No. 39] granting Defendant Daniel P. Rubinstein's Motion to Dismiss without prejudice Plaintiff Tina Peters' claim for declaratory and injunctive relief on the ground that abstention was appropriate under *Younger v. Harris,* 401 U.S. 37 (1971).

2. Attached hereto as **Exhibit B** is a true and correct copy of the Final Judgment as to Defendant Daniel P. Rubinstein entered by the United States District Court for the District of Colorado on January 8, 2024 [ECF No. 40].

3. Attached hereto as **Exhibit C** is a true and correct copy of the First Amended Complaint for Declaratory and Injunctive Relief filed in this matter on December 22, 2023 [ECF No. 33].

4. Attached hereto as **Exhibit D** is a true and correct copy of Plaintiff's Motion for a Preliminary Injunction and Supporting Memorandum, filed in this matter on November 27, 2023 [ECF No. 8].

5. Attached hereto as **Exhibit E** is a true and correct copy of the Declaration of Tina Peters, filed in this matter on November 27, 2023 [ECF No. 9].

6. Attached hereto as **Exhibit F** is a true and correct copy of the Declaration of Expert Walter C. Daugherity, filed in this matter on November 27, 2023 [ECF No. 10-6].

7. Attached hereto as **Exhibit G** is a true and correct copy of theAmended Declaration of Expert Douglas W. Gould, filed in this matter on November 27, 2023 [ECF No. 10-4].

8. Attached hereto as **Exhibit G** is a true and correct copy of the Amended Declaration of Expert Douglas W. Gould, filed in this matter on November 27, 2023 [ECF No. 10-4].

9. Attached hereto as **Exhibit H** is a true and correct copy of the Mesa County Grand Jury Indictment, filed in this matter on November 27, 2023 [ECF No. 9-12].

10. Attached hereto as **Exhibit I** is a true and correct copy of an email from Jessi Romero, filed in this matter on November 14, 2023 [ECF No. 1-3].

11. Attached hereto as **Exhibit J** is a true and correct copy of the Declaration of Ed Arnos, filed in this matter on November 27, 2023 [ECF No. 10-12].

12. Attached hereto as **Exhibit K** is a true and correct copy of an email exchange between Ed Arnos and Daniel Rubinstein On May 18, 2022 and August 30, 2023,filed in this matter on November 27, 2023 [ECF No. 10-11].

13. Attached hereto as **Exhibit L** is a true and correct copy of an excerpt of a transcript from a hearing on Nov. 2, 2022 in *Shroeder v. Griswold,* Case No. 2022 CV 033085 (Denver County District Ct.), filed in this matter on November 27, 2023 [ECF No. 10-1].

14. Attached hereto as **Exhibit M** is a true and correct copy of the Objection to Motion to Reconsider and Requested Travel, filed on August 16, 2022 in *People v. Peters,* Case No. 22CR371 (Mesa County District Ct.), filed in this matter on November 27, 2023 [ECF No. 9-15].

15. Attached hereto as **Exhibit N** is a true and correct copy of the Response to Motions to Quash Subpoenas Duces Tecum, filed on June 3, 2022 in *People v. Peters,* Case No. 22CR371 (Mesa County District Ct.).

16. Attached hereto as **Exhibit O** is a true and correct copy of the Order Re: Motions to Quash SDTS, filed on June 5, 2022 in *People v. Peters,* Case No. 22CR371 (Mesa County District Ct.), filed in this matter on November 27, 2023 [ECF No. 10-2].

17. Attached hereto as **Exhibit P** is a true and correct copy of the Declaration of Sherronna Bishop filed in this matter on November 27, 2023 [ECF No. 10-13].

18. Attached hereto as **Exhibit Q** is a true and correct copy of Election Order 2022-01, dated January 10, 2022, filed in this matter on November 27, 2023 [ECF No. 10-14].

19. Attached hereto as **Exhibit R** is a true and correct copy of a Press Release from the Colorado Secretary of State, dated January 18, 2022, filed in this matter on November 27, 2023 [ECF No. 10-15].

Executed on January 18, 2024, in Great Falls, Virginia.

_/s/ Robert J. Cynkar_
Robert J. Cynkar

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Nina Y. Wang**

Civil Action No. 23-cv-03014-NYW-SKC

TINA PETERS,

      Plaintiff,

v.

UNITED STATES OF AMERICA,
MERRICK B. GARLAND, in his official capacity as Attorney General of the United States,
JENA GRISWOLD, in her official capacity as Colorado Secretary of State, and
DANIEL P. RUBINSTEIN, in his official capacity as District Attorney for the Twenty-First
Judicial District,

      Defendants.

---

### ORDER ON MOTION TO DISMISS

---

In this action, Plaintiff Tina Peters asks this Court to intervene to prevent the State of Colorado from prosecuting her for various criminal charges brought pursuant to a grand jury indictment. *See* [Doc. 8; Doc. 33 at 39–43]. Defendant Daniel P. Rubenstein moved to dismiss Plaintiff's claims for declaratory and injunctive relief brought against him in his official capacity, arguing that this Court must abstain from interfering with the ongoing state prosecution. Based on the record before it, this Court concludes that Ms. Peters has failed to establish an exception to *the Younger* doctrine of abstention and accordingly, abstention is appropriate.

**Exhibit A**

## BACKGROUND

The court draws the following facts from the First Amended Complaint for Declaratory and Injunctive Relief (the "First Amended Complaint"),[1] [Doc. 33], and the docket for the United States District Court for the District of Colorado.[2]  Plaintiff Tina Peters ("Plaintiff" or "Ms. Peters") is the former Clerk and Recorder for Mesa County, Colorado.  [*Id.* at ¶ 5].  On March 8, 2022, a grand jury for Mesa County, Colorado, returned an Indictment against Ms. Peters (the "Indictment" or "Mesa County Indictment"), charging her with 10 criminal counts arising from the Colorado Secretary of State's trusted build election management software update (the "trusted build") that was scheduled to begin in Mesa County on May 25, 2021.  [Doc. 1-28].

The Mesa County Indictment alleges that on April 16, 2021, Jessi Romero ("Mr. Romero"), the Voting Systems Manager with the Colorado Secretary of State, informed Mesa County's election staff that only required personnel from Dominion, the Secretary of State, and Mesa County would be permitted to observe the trusted build, but that the

---

[1] Ms. Peters filed her initial Complaint for Declaratory and Injunctive Relief, [Doc. 1], on November 14, 2023.  On December 22, 2023, Ms. Peters filed the First Amended Complaint as a matter of right, within 21 days of the filing of Defendant Rubinstein's Motion to Dismiss on December 13, 2023.  [Doc. 33]; *see also* Fed. R. Civ. P. 15(a)(1)(B).

[2] Courts may take judicial notice of and consider documents on their own dockets on a motion to dismiss without converting it into a motion for summary judgment.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).  Ms. Peters has also engaged in motions practice and made certain representations about her state criminal prosecution in *Coomer v. Lindell*, Case No. 22-cv-01129-NYW-SKC (D. Colo.).  This Court takes judicial notice of that docket and to the extent it relies on certain documents from that docket, uses the convention of *Coomer*, Case No. 22-cv-1129, ECF No. ___.  In addition, this Court may take judicial notice of the state court docket in *People v. Peters*, No. 22CR371.  *See St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979) (observing that, whether requested by the parties or not, "federal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue").

trusted build would occur under camera, and members of the public could review the footage afterward.  [Doc. 1-28 at 9–10].  On April 26, 2021, the Indictment alleges, Mr. Romero informed Ms. Peters and other clerks across Colorado that if unauthorized individuals were onsite during the trusted build, the Secretary of State would "move on to the next county."  [*Id.* at 10].  According to the Indictment, by the end of the day on May 17, 2021, the security cameras in the trusted build area had been turned off and remained non-operational through the entire installation process, and on the day of the trusted build, Ms. Peters introduced a person named "Gerald Wood," who participated in the trusted build process.  [*Id.* at 11–12].  The actual Gerald Wood later denied accessing the Mesa County Clerk and Recorder's Office, either on the date of the trusted build or on other dates that a key card assigned to him was utilized.  [*Id.* at 12].  In August 2021, Secretary of State employees learned that images of the Mesa County election management systems and related passwords were available on the internet and issued Election Order 2021-01, directing Ms. Peters and the Mesa County Clerk and Recorder's Office to provide certain information, documentation, communications, and images related to the May 2021 trusted build.  [*Id.*].

Plaintiff is charged with three counts of Attempt to Influence a Public Servant, in violation of Colo. Rev. Stat. § 18-8-306; two counts of Conspiracy to Commit Criminal Impersonation, in violation of Colo. Rev. Stat. §§ 18-5-113(1)(B)(I), 18-2-201; one count of Criminal Impersonation, in violation of § 18-5-113(1)(B)(I); one count of Identity Theft, in violation of Colo. Rev. Stat. § 18-5-902(1); one count of First Degree Official Misconduct, in violation of Colo. Rev. Stat. § 18-8-404; one count of Violation of Duty, in violation of Colo. Rev. Stat. § 1-13-107(1); and one count of Failure to Comply with

Requirements of Secretary of State, in violation of Colo. Rev. Stat. § 1-13-114. [Doc. 28-1 at 1–2]. Ms. Peters's trial has been continued twice upon her request, first from March 2023 to August 2023, [*Coomer*, Case No. 22-cv-1129, ECF No. 111-1 at ¶ 3], and now to February 24, 2024. [Doc. 20 at 2]. Ms. Peters disputes these factual allegations and criminal charges. She contends that her actions related to the trusted build were efforts to protect the integrity of the election process and to comply with federal law to maintain election records. *See generally* [Doc. 33].

Believing that the state prosecution and associated state and federal investigations of her election-related activities were in retaliation for her public challenges to the validity of the 2020 presidential election and the reliability of the electronic voting system used by Mesa County as well as her criticism of the trusted build, Ms. Peters initiated this action on November 14, 2023, against the United States of America; Defendant Merrick B. Garland, in his official capacity as Attorney General of the United States ("Defendant Garland" or "Attorney General Garland");[3] Defendant Jena Griswold, in her official capacity as Colorado Secretary of State ("Defendant Griswold" or "Secretary of State Griswold"); and Defendant Daniel P. Rubinstein, in his official capacity as District Attorney for Mesa County, Colorado, ("Defendant Rubinstein" or "District Attorney Rubinstein"), invoking this Court's jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1346(a)(2). [Doc. 1].

---

[3] This Court notes that while Ms. Peters separately names as defendants the United States and Attorney General Garland in his official capacity, "[w]hen an action is one against named individual defendants, but the acts complained of consist of actions taken by defendants in their official capacity as agents of the United States, the action is in fact one against the United States." *Atkinson v. O'Neill*, 867 F.2d 589, 590 (10th Cir. 1989).

Specifically, Count I alleges that the United States and Attorney General Garland retaliated against Ms. Peters for her exercise of her First Amendment rights of free speech, free association, and petition for redress by investigating her election-related conduct.  [Doc. 33 at ¶¶ 147–53].  Count II alleges that Defendants Griswold and Rubinstein similarly have undertaken an investigation and prosecution of Ms. Peters in violation of federal law, namely, in retaliation for Ms. Peters's exercise of her above-delineated First Amendment rights and her efforts to comply with federal law with respect to the maintenance of voting records, in violation of her privileges and immunities as a citizen under the Fourteenth Amendment of the United States Constitution.  [*Id.* at ¶¶ 154–58].  Ms. Peters seeks declaratory and injunctive relief with respect to both counts.  [*Id.* at 42–43].

On November 27, 2023, Ms. Peters moved for a preliminary injunction, seeking to enjoin District Attorney Rubinstein from pursuing conducting, continuing, or participating in any way in proceedings in *People v. Peters*, or any other criminal proceedings against or investigation of Ms. Peters (the "Motion for Preliminary Injunction").[4]  [Doc. 8 at 6].  The following day, Ms. Peters filed the return of Service for Defendant Rubinstein, reflecting service that same day.  [Doc. 17].  On December 6, 2023, Ms. Peters filed the return of service for the United States,[5] reflecting service on the United States Attorney's Office for

---

[4] The filing of the Motion for Preliminary Injunction caused the case, which had originally been assigned to the Honorable S. Kato Crews, to be drawn to a District Judge.  [Doc. 12].  Ultimately, the action was assigned to the undersigned on November 28, 2023.  [Doc. 15].

[5] Because Attorney General Garland is sued in his official capacity, Ms. Peters was required to serve the United States.  Fed. R. Civ. P. 4(i)(2).

the District of Colorado.  [Doc. 18].  To date, Ms. Peters has not filed a return of service for Defendant Griswold.

On December 11, 2023, Ms. Peters moved to expedite the proceedings on her Motion for Preliminary Injunction, given that her state criminal trial was set to begin on February 24, 2024.  [Doc. 20].  That same day, counsel for District Attorney Rubinstein first entered his appearance.  [Doc. 21].  The Court then ordered Defendant Rubinstein to respond to the Motion to Expedite no later than December 13, 2023.  [Doc. 22].  On December 13, 2023, Defendant Rubinstein filed (1) the instant Motion to Dismiss Plaintiff's Complaint [ECF No. 1] Pursuant to Fed. R. Civ. P. 12 (the "Motion to Dismiss"), [Doc. 23]; (2) a Motion to Stay Briefing and Scheduling of Hearing on Motion for Preliminary Injunction (the "Motion to Stay"), [Doc. 24]; and (3) an Opposition to Motion to Expedite Proceedings ("Defendant Rubinstein's Opposition"), [Doc. 25].  Because the Motion to Dismiss raised a significant question as to whether this Court should abstain from reaching the merits of Count II as asserted against Defendant Rubinstein under *Younger v. Harris*, 401 U.S. 37 (1971)—and thus, any request for preliminary injunction— this Court denied Plaintiff's request to expedite the preliminary injunction proceedings and ordered her to file a response to the Motion to Stay on or before December 28, 2023. [Doc. 27].  The following day, Ms. Peters filed (1) a Motion for Reconsideration of the Court's Minute Order [ECF No. 27] Denying Plaintiff's Motion for Expedited Proceedings on Motion for Preliminary Injunction (the "Motion for Reconsideration"), [Doc. 28]; (2) her Response to Defendant Rubinstein's Motion to Stay Briefing and Scheduling of Hearing on Motion for Preliminary Injunction [ECF No. 24] and Opposition to Motion to Expedite Proceedings [ECF No. 25] ("Plaintiff's Response"), [Doc. 29]; and (3) her Opposition to

Defendant Rubinstein's Motion to Dismiss (the "Opposition to Motion to Dismiss"), [Doc. 30].

On December 20, 2023, the Court denied the Motion for Reconsideration; granted the Motion to Stay, staying the briefing on the Motion for Preliminary Injunction pending the Court's resolution of the Motion to Dismiss; and ordered Defendant Rubinstein to file any Reply to the Motion to Dismiss no later than December 29, 2023. [Doc. 32]. Mindful of Ms. Peters's concerns regarding her upcoming February 24 trial date, this Court also ordered Defendant Rubinstein to respond to the Motion for Preliminary Injunction within three days of any ruling on the Motion to Dismiss, if the case was not dismissed. [Doc. 36]. Defendant Rubinstein filed his Reply to Plaintiff's Opposition to Defendant Rubinstein's Motion to Dismiss ("Reply") on December 28, 2023.[6] [Doc. 38]. Neither Party sought an evidentiary hearing or identified any evidence to be presented beyond documents already on the Court's docket with respect to the instant Motion. *See* [Doc. 23; Doc. 28; Doc. 37]. The Motion to Dismiss is now ripe for review, and this Court concludes, based on its review of the record, that oral argument will not materially contribute to the resolution of the issues before it.

---

[6] On December 22, 2023, Ms. Peters filed the operative First Amended Complaint, [Doc. 33], as a matter of right pursuant to Rule 15(a)(1) of the Federal Rules of Civil Procedure; a Notice of Filing First Amended Complaint, [Doc. 34]; and an Unopposed Motion for Leave to File Amended Opposition to Defendant Rubinstein's Motion to Dismiss (the "Motion to Amend Opposition"), [Doc. 35]. While ordinarily the filing of an amended pleading moots any pending motion to dismiss directed at the prior pleading, *see Gotfredson v. Larsen LP*, 432 F. Supp. 2d 1163, 1172 (D. Colo. 2006) (explaining that an amended pleading moots any motions to dismiss aimed at an inoperative pleading), this Court construed the filing of Plaintiff's Motion to Amend Opposition as the Parties' assent that the instant Motion to Dismiss could be construed as directed at the First Amended Complaint. [Doc. 36]. Ms. Peters's Amended Opposition to Defendant Rubinstein's Motion to Dismiss (the "Amended Opposition to Motion to Dismiss" or "Amended Opposition"), [Doc. 37], was docketed that same day.

## LEGAL STANDARDS

As identified above, the central issue presented by Defendant Rubinstein's Motion to Dismiss is whether this Court should abstain from reaching the merits of Count II, and in turn, Plaintiff's Motion for Preliminary Injunction, based on the *Younger* abstention doctrine.

### I.      *Younger* Abstention Doctrine

While federal courts have a "virtually unflagging obligation" to exercise the jurisdiction given to them, *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976), the *Younger* abstention doctrine dictates that "a federal court must abstain from deciding a case otherwise within the scope of its jurisdiction in certain instances in which the prospect of undue interference with state proceedings counsels against federal relief," *Graff v. Aberdeen Enters., II, Inc.*, 65 F.4th 500, 522 (10th Cir. 2023) (cleaned up).   Generally, pursuant to the *Younger* abstention doctrine, federal courts must refrain from enjoining pending, parallel state criminal proceedings, *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013), where the state proceedings are (1) ongoing, (2) implicate important state interests, and (3) afford an adequate opportunity to present the federal constitutional challenges, *Murphy v. El Paso Co. (CO) Dist. 4 Dist. Att'y*, No. 23-1188, 2023 WL 5423509, at *2 (10th Cir. Aug. 23, 2023) (citing *Phelps v. Hamilton* (*Phelps II*), 122 F.3d 885, 889 (10th Cir. 1997)).

But exceptions to *Younger* abstention exist; federal courts are permitted to enjoin a pending state criminal prosecution provided that the prosecution was (1) commenced in bad faith or to harass; (2) based on a flagrantly and patently unconstitutional statute; or (3) related to any other such extraordinary circumstance creating a threat of irreparable

injury both great and immediate. *See Phelps v. Hamilton* (*Phelps I*), 59 F.3d 1058, 1064 (10th Cir. 1995). According to the Tenth Circuit, however, the "twin rationales of respecting prosecutorial discretion and federalism" dictate that "the exceptions to *Younger* only provide for a 'very narrow gate for federal intervention.'" *Id.* (quoting *Arkebauer v. Kiley*, 985 F.2d 1351, 1358 (7th Cir. 1993)).

## II.    Proper Framework

While noting the ambiguities, Defendant Rubinstein proceeds pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. [Doc. 23 at 2–4]. In her Amended Opposition, Ms. Peters is silent as to whether Rule 12(b)(1) is the proper vehicle for raising the issue of abstention. *See generally* [Doc. 37].

In *Graff*, the United States Court of Appeals for the Tenth Circuit (the "Tenth Circuit") observed that it was unclear whether *Younger* abstention implicates a federal court's subject matter jurisdiction—and thus, whether the framework of Rule 12(b)(1) applies—in this Circuit. *See Graff*, 65 F.4th at 523 n.32 (comparing *D.L. v. Unified School District No. 497*, 392 F.3d 1223, 1228 (10th Cir. 2004) ("*Younger* abstention is jurisdictional"), with *Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC*, 953 F.3d 660, 666 (10th Cir. 2020) ("[W]hen cases present circumstances implicating [abstention] doctrines, no question is raised as to the court's subject matter jurisdiction.")). Though the Tenth Circuit did not revolve the issue in *Graff* and has not spoken to it since, district courts within the Tenth Circuit continue to treat *Younger* abstention as jurisdictional, or akin to jurisdictional. *See, e.g.*, *Halliburton v. Eades*, No. 5:23-cv-970-F, 2023 WL 9007299, at *2 n.4 (W.D. Okla. Dec. 28, 2023) ("Younger abstention is jurisdictional." (citing *D.L*, 392 F.3d at 1232)); *Balderama v. Bulman*, No. 1:21-cv-1037-JB-JFR, 2023 WL 2728148, at

*12 (D.N.M. Mar. 31, 2023) (describing abstention as "akin to jurisdictional" (quotation omitted)); *El-Bey v. Lambdin*, No. 22-cv-00682-DDD-MDB, 2023 WL 2187478, at *4 n.4 (D. Colo. Feb. 23, 2023) (observing that "[a]lthough the *Younger* abstention doctrine is often referred to as a 'jurisdictional' issue, technically speaking, '*Younger* is a doctrine of abstention'" (quoting *D.A. Osguthorpe Family P'ship v. ASC Utah, Inc*., 705 F.3d 1223, 1230 n.8 (10th Cir. 2013)).

While mindful of the distinction between a court's subject matter jurisdiction to entertain a matter versus whether a court is required to refrain from exercising jurisdiction, *see, e.g.*, *El-Bey*, 2023 WL 2187478, at *4 n.4, definitive resolution of this issue is beyond the scope of this Court's determination here and ultimately, immaterial.  First, the Parties have not placed the issue precisely before the Court.  *Cf. Graff*, 65 F.4th at 523 n.32 (observing that "no party has addressed, let alone suggested, that the jurisdictional/non-jurisdictional nature of the *Younger* doctrine affects how this Court should address the issues on appeal").  Second, this Court is unaware of any Supreme Court or en banc decision of the Tenth Circuit that expressly overrules *D.L.*, and thus, this court is bound by it.  *See Haynes v. Williams*, 88 F.3d 898, 900 n.4 (10th Cir. 1996) ("A published decision of one panel of [the Tenth Circuit] constitutes binding circuit precedent constraining subsequent panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court."); *United States v. Spedalieri*, 910 F.2d 707, 709 n.2 (10th Cir. 1990) ("A district court must follow the precedent of this circuit . . . .").  Third, regardless of the procedural framework, a district court must resolve any question of *Younger* abstention before it proceeds to the merits, as a conclusion that *Younger* abstention applies "ends the matter."  *Goings v. Sumner Cty. Dist. Attn'y's Office*, 571 F.

App'x 634, 639 (10th Cir. 2014) (quotation and emphasis omitted).  Fourth, dismissals based on lack of subject matter jurisdiction or based on abstention principles are both without prejudice.  *See id.* at 639; *see also Graff*, 65 F.4th at 523 n.32 ("Given that dismissal without prejudice is the proper result whether or not *Younger* abstention affects a federal court's subject matter jurisdiction, this court does not further consider the doctrine's jurisdictional pedigree."  (citation omitted)).

With respect to the proper record, the Court may consider evidence outside the four corners of the operative pleading whether or not the instant Motion to Dismiss is considered a factual attack upon this Court's subject matter jurisdiction over Count II.  *See United States v. Rodriquez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001) ("In addressing a factual attack, the court does not presume the truthfulness of the complaint's factual allegations, but has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." (quotation omitted)); *Stein v. Legal Advert. Comm. of Disciplinary Bd.*, 272 F. Supp. 2d 1260, 1264 n.3 (D.N.M. 2003) (observing that "[i]t is proper to consider matters outside the pleadings for purposes of deciding a motion to dismiss that is based on abstention").  In addition, this Court may also consider documents that are attached to or incorporated in the pleading[7] and are central to the First Amended Complaint, without converting the instant Motion to Dismiss to one for summary judgment.  *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).  Finally, as previously

---

[7] Ms. Peters did not re-attach exhibits to her First Amended Complaint, but that operative pleading references the same exhibits filed with the original Complaint.  *See* [Doc. 33]. Accordingly, this Court considers [Doc. 1-3] through [Doc. 1-29] incorporated into the First Amended Complaint.

noted, this Court may take judicial notice of the court filings of its own docket and those of the state court. *See supra* n.2.

## ANALYSIS

As discussed above, before a federal court can abstain under the *Younger* doctrine, it must determine that "(1) the state proceedings are ongoing; (2) the state proceedings implicate important state interests; and (3) the state proceedings afford an adequate opportunity to present the federal constitutional challenges." *Phelps II*, 122 F.3d at 889. It is clear that *People v. Peters* is still ongoing. [Doc. 20 at 2]. There is also little doubt that *People v. Peters* implicates important state interests, as "state criminal proceedings are viewed as a traditional area of state concern." *Winn v. Cook*, 945 F.3d 1253, 1258 (10th Cir. 2019) (internal quotations omitted); *see also Bruce v. Clementi*, No. 15-cv-01653-REB, 2016 WL 660120, at *11 (D. Colo. Feb. 17, 2016) (citations omitted) (recognizing the important state interests in the administration of its judicial system and enforcement of its criminal laws). And Ms. Peters's own allegations underscore the important state interest in election integrity identified by District Attorney Rubinstein.[8] *See* [Doc. 33 at ¶ 135]; *see also* [Doc. 23 at 9–10]. Thus, this Court's analysis focuses upon Ms. Peters's contention that the Mesa County District Court will not afford her an adequate

---

[8] Although Ms. Peters argues that Colorado's interests pale in comparison to her constitutional rights, [Doc. 37 at 3], *Younger* and its progeny do not command this Court to weigh the state's interests against Ms. Peters's. Rather, *Younger* stands for the proposition that, even in the face of alleged threats to the constitutional rights of individuals, there are certain exceptional circumstances where the principles of equity, comity, and federalism require federal courts to abstain from reviewing such claims so as to "permit state courts to try state cases free from [federal] interference." *See* 401 U.S. at 43–44. Ms. Peters has not presented any authority otherwise, or that contradicts the Tenth Circuit's holding in *Winn. See* [Doc. 37 at 3].

opportunity to present her constitutional challenges arising under the First Amendment or the Privileges and Immunities Clause of the Fourteenth Amendment.  [*Id.* at 4–5].

## I.    State Proceedings Afford an Adequate Opportunity to Present Federal Constitutional Challenges

The Supreme Court has recognized that "ordinarily a pending state prosecution provides the accused a fair and sufficient opportunity for vindication of federal constitutional rights."  *Kugler v. Helfant*, 421 U.S. 117, 124 (1975).  To that end, the Tenth Circuit explained that a plaintiff has an adequate opportunity to raise federal constitutional claims in state court unless state law clearly bars their interposition.  *See Crown Point I, LLC v. Intermountain Rural Elec. Ass'n*, 319 F.3d 1211, 1215 (10th Cir. 2003).  Ms. Peters insists that the Mesa County District Court is an inadequate forum to raise her federal constitutional claims, but has presented no authority that state law prohibits her from doing so.

With respect to the purported violation of her First Amendment rights, Ms. Peters makes a single statement:  "The Mesa County District Court will not provide Peters with an adequate opportunity to litigate the federal constitutional issues essential to prevailing on her First Amendment claim."  [Doc. 37 at 4].  But neither *Younger* nor *Dombrowski v. Pfister*, 380 U.S. 479 (1965)—the only two cases that Ms. Peters cites—stands for the proposition that a Colorado state court prosecution does not afford Ms. Peters a fair and sufficient opportunity for vindication of her First Amendment rights or that Colorado law bars her from raising such an argument in Mesa County District Court.[9]

---

[9] To the extent that Ms. Peters contends she was subject to malicious prosecution and prosecutorial misconduct for exercising her rights to free speech, freedom of association and petitioning for the redress of grievance under the First Amendment, *see, e.g.*, [Doc. 33 at ¶ 118–34], this Court notes that Colorado state district courts may dismiss an indictment for prosecutorial misconduct that arises during grand jury proceedings.  *See*

Ms. Peters also argues the June 5, 2022, Order by the Honorable Matthew D. Barrett, [Doc. 1-29; Doc. 23-4][10]—in which Judge Barrett concluded that Ms. Peters had failed to show that she was entitled to a choice of evils defense—deprived her of the ability to vindicate her rights under the Fourteenth Amendment Privileges and Immunities clause. *See* [Doc. 37 at 4–6]. But again, Plaintiff cites no authority that state law clearly barred her from raising her Fourteenth Amendment Privileges and Immunities arguments within the context of her criminal prosecution. *See generally* [*id.*]. Nor does she demonstrate that she was prevented by the Mesa County District Court from framing her argument to Judge Barrett as a constitutional issue under the Fourteenth Amendment. *See* [*id.* at 5–6]; *see also Wilson v. Morrissey*, 527 F. App'x 742, 744 (10th Cir. 2013) (citing *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 15 (1987) ("[W]hen a litigant has not attempted to present his federal claims in related state-court proceedings, a federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary.")). In addition, it is undisputed that she did, in fact, raise her desire to present evidence that she engaged in the conduct at issue in order to expose issues with election equipment before Judge Barrett. [Doc. 1-29 at 3, 4]. Thus,

---

*People v. Bergen*, 883 P.2d 532, 543 (Colo. App. 1994) ("Prosecutorial misconduct during grand jury proceedings can result in dismissal if actual prejudice accrues to the defendant or the misconduct compromises the structural integrity of the grand jury proceedings to such a degree as to allow for the presumption of prejudice."). In addition, Ms. Peters sought and received a probable cause review of the grand jury proceedings and indictment from the Mesa County District Court. [Doc. 23-3].

[10] Ms. Peters cites "Ex. 16 at 3" for Judge Barrett's June 5, 2022, Order. [Doc. 37 at 4]. Ms. Peters did not attach any exhibits to her original or Amended Opposition to the Motion to Dismiss. [Doc. 30; Doc. 37]. Elsewhere in the Amended Opposition, the June 5, 2022, Order is cited as "Ex. D to the Motion." [Doc. 37 at 6]. It appears that the June 5, 2022, Order is attached as Exhibit 16 to Plaintiff's Motion for Preliminary Injunction. [Doc. 10-2]. In referring to the June 5, 2022, Order, this Court cites to [Doc. 1-29], as it has the only legible markings from the CM/ECF system.

the June 5, 2022, evidentiary ruling does not persuade this Court that Ms. Peters was deprived of an adequate *opportunity* to raise her constitutional claims. *Younger* requires only the availability of an adequate state-court forum, not a favorable result in that forum. *See Winn*, 945 F.3d at 1258.

Accordingly, this Court concludes that the three requirements of *Younger* are met here.

## II.   Bad Faith Exception to *Younger* Abstention

Even where these requirements are met, federal abstention can be overcome in cases of "proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction."[11] *Perez v. Ledesma*, 401 U.S. 82, 85 (1971). In determining whether a prosecution was commenced in bad faith or to harass, courts consider whether it was (1) "frivolous or undertaken with no reasonably objective hope of success"; (2) "motivated by the defendant's suspect class or in retaliation for the defendant's exercise of constitutional rights"; and (3) "conducted in such a way as to constitute harassment and an abuse of prosecutorial discretion, typically through the unjustified and oppressive use of multiple prosecutions." *Phelps I*, 59 F.3d at 1065.

Importantly, it is a federal plaintiff's "heavy burden" to overcome the bar of *Younger* abstention by setting forth more than mere allegations of bad faith or harassment. *See*

---

[11] *Younger* also authorizes federal courts to enjoin a state criminal prosecution where it was "based on a flagrantly and patently unconstitutional statute," or was "related to any other such extraordinary circumstance creating a threat of irreparable injury both great and immediate." *Phelps I*, 59 F.3d at 1063–64. As Ms. Peters has not alleged that her prosecution was based on an unconstitutional statute or that "this case fits into the catch-all but ill-defined category of 'extraordinary circumstances,'" this Court need only consider whether Ms. Peters's prosecution was brought in bad faith or to harass. *Id.* at 1064; *see also* [Doc. 37 at 6–11 (arguing only that Plaintiff's prosecution was undertaken in bad faith or to harass)].

*Amanatullah v. Colo. Bd. of Med. Exam'rs*, 187 F.3d 1160, 1165 (10th Cir. 1999).  To warrant federal court intervention, a plaintiff must offer sufficient evidence to demonstrate that the prosecution was substantially motivated by a bad faith motive or was brought to harass.  *Phelps I*, 59 F.3d at 1068.

Ms. Peters has not met her burden here.  First, as the *Phelps I* court recognized, a bad faith prosecution will not ordinarily be predicated upon probable cause.  59 F.3d at 1064 n.12.  Ms. Peters's criminal charges arise from a thirteen-count Indictment issued by a grand jury for Mesa County, Colorado.  [Doc. 1-28].  Ms. Peters sought a probable cause review of the grand jury proceedings and indictment, and, in a thorough and well-reasoned order, Judge Barrett concluded that each of the charges asserted against Ms. Peters was supported by probable cause.  [Doc. 23-3 at 5].  Without more evidence, in light of the probable cause finding, Ms. Peters fails to carry her heavy burden of establishing that her prosecution was frivolous or undertaken with no reasonably objective hope of success.  *See Carrillo v. Wilson*, No. 12-cv-03007-BNB, 2013 WL 1129428, at *5 (D. Colo. Mar. 18, 2013) ("Because the state district court determined that 24 of the 25 charges in the superseding indictment were supported by probable cause, the Court finds that the state criminal charges are not frivolous or undertaken with no reasonably objective hope of success."); *Wrenn v. Pruitt*, No. 5:21-cv-00059-JD, 2021 WL 1845968, at *4 (W.D. Okla. May 7, 2021) (finding that the plaintiff could not "show that the prosecution was 'undertaken with no reasonably objective hope of success' given that the state court made a finding of probable cause").

Next, the Court considers whether Ms. Peters has made a prima facie *evidentiary* showing that her prosecution was brought in retaliation for the exercise of her

constitutionally-protected rights[12] or was otherwise motivated by bad faith or for purposes of harassment. *See Phelps I*, 59 F.3d at 1066; *Phelps II*, 122 F.3d at 890. Fundamentally, Ms. Peters's reliance on allegations from her First Amended Complaint, [Doc. 37 at 6–11; *id.* at 8–11 ¶¶ 3, 5, 7–9, 12, 14–16], which are not otherwise supported by evidence, is insufficient to carry her heavy burden.[13] *Amanatullah*, 187 F.3d at 1165 (rejecting the plaintiff's claim "that Younger *abstention* [wa]s not appropriate because the district court erred in failing to consider his amended complaint," which, the plaintiff argued, "demonstrated the [defendant's] bad faith"). For example, Ms. Peters alleges that District Attorney Rubinstein "instructed a lawyer representing [Ms.] Peters and her husband not to communicate with [Ms.] Peters because she was under investigation in connection with her exercise of a power of attorney she had been given." [Doc. 37 at 8 ¶ 5 (citing [Doc. 1 at ¶ 133])]; *see also* [Doc. 33 at ¶ 131].[14] But neither as part of the First Amended Complaint, nor in support of her Amended Response to the Motion to Dismiss, does Ms. Peters proffer an affidavit by the unnamed lawyer to support the allegation.[15]

---

[12] In order to prevail on such a retaliation claim, Ms. Peters must prove that "retaliation was a major motivating factor and played a dominant role in the decision to prosecute." *Phelps I*, 59 F.3d at 1066.

[13] Some of Ms. Peters's citations to her First Amended Complaint are otherwise inapposite because the cited allegations relate only to the conduct of other Defendants, not Mr. Rubinstein, or to the investigation of other individuals. *See, e.g.*, [Doc. 37 at 8 ¶ 1 (citing allegations regarding Defendant Griswold; *id.* at 8 ¶ 2 (citing allegations related to "the Department of Justice, including the FBI"); *id.* at 10 ¶ 13 (citing allegations regarding the execution of a search warrant at the residence of Sherronna Bishop)].

[14] Although Ms. Peters appears to cite to her original Complaint, [Doc. 1], throughout her Amended Opposition to the Motion to Dismiss, the Court construes these citations as related to the corresponding factual allegations made in her operative First Amended Complaint, [Doc. 33].

[15] This Court further notes that Ms. Peters's characterization of Mr. Rubinstein's alleged contact with this attorney is materially different between the First Amended Complaint and

Plaintiff's reliance upon certain exhibits to her Motion for Preliminary Injunction to demonstrate her prosecution was undertaken in retaliation for her exercise of her First or Fourteenth Amendment rights or commenced in bad faith or for the purpose of harassment is equally unavailing. Some of the documents do not even address the factual allegations for which they are cited. For instance, Ms. Peters cites Exhibit 22 to the Motion for Preliminary Injunction for the proposition that District Attorney Rubinstein intentionally and knowingly submitted a report to the Board of County Commissioners without expert assistance in order to undermine the credibility of Ms. Peters's experts. [Doc. 37 at 8 ¶ 4]. But Exhibit 22 to the Motion for Preliminary Injunction, [Doc. 10-10], is simply an e-mail from District Attorney Rubinstein to an outside media source discussing FBI involvement in Ms. Peters's investigation, and entirely fails to address the factual issue for which it is cited.[16] In any case, Ms. Peters points to no authority for a

---

her Amended Opposition to the Motion to Dismiss. In Paragraph 131 of the First Amended Complaint, Ms. Peters alleges

> [a] lawyer representing [Ms.] Peters and her husband in November 2021 in connection with domestic matters emailed [Ms.] Peters to advise her that a member of the District Attorney's office had left a voicemail on the lawyer's telephone notifying the lawyer that [Ms.] Peters was the subject of a potential investigation into her actions as an agent under a power of attorney. The voicemail prompted the lawyer to advise [Ms.] Peters that he had a conflict of interest and could no longer represent her and her husband.

[Doc. 1 at ¶ 133; Doc. 33 at ¶ 131]. The allegation that the voicemail then prompted the lawyer to advise Ms. Peters that he could no longer represent her is materially different than the allegation that Mr. Rubinstein *instructed* the lawyer not to communicate with Ms. Peters.

[16] This Court "cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record," *Garrett v. Selby Connor Maddux & Jane*r, 425 F.3d 836, 840 (10th Cir. 2005), particularly when Ms. Peters has been represented by counsel throughout this action, *United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015) ("[I]t is not this court's duty, after all, to make arguments for a litigant that he has not made for himself."); *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10

constitutional requirement that District Attorney Rubinstein retain a computer expert before submitting a report to the Board of County Commissioners. *Cf. Jaffery v. Atl. Cty. Prosecutor's Office,* 695 F. App'x. 38, 41 (3d Cir. June 19, 2017) (rejecting the plaintiff's argument that the bad faith exception applied based, in part, on the plaintiff's failure to point to any constitutional requirement that police or prosecutors obtain a medical expert prior to prosecuting a doctor for allegedly criminal actions that occured in the course of medical treatment). Other documents do not support the factual allegation for which they are cited. For example, Ms. Peters asserts that District Attorney Rubinstein coordinated retaliatory efforts against Ms. Peters with Defendant Griswold, the Colorado Attorney General, and the Department of Justice. [Doc. 37 at 11 ¶ 17]. But the document to which Ms. Peters cites, Exhibit 2 to the Motion for Preliminary Injunction, [Doc. 9], is her own Declaration. These unsupported, conclusory allegations are insufficient to establish unlawful motivations on the part of District Attorney Rubinstein. *Carrillo*, 2013 WL 1129428, at *6.

Having found that all three factors of *Younger* abstention have been met, and no exceptions apply, abstention by this Court with respect to the claims against Defendant Daniel P. Rubinstein,[17] is mandatory. *See Joseph A. ex rel. Wolfe v. Ingram*, 275 F.3d 1253, 1267 (10th Cir. 2002) ("Once a court finds that the required conditions are present, abstention is mandatory.").

---

(10th Cir. 2001) (observing that the court has no obligation to make arguments or perform research on behalf of litigants).

[17] Defendant Rubinstein seeks dismissal of "the Complaint" or "the case and all claims without prejudice." [Doc. 23 at 15; Doc. 38 at 9]. *Younger* abstention does not apply to claims against the United States, and Defendant Griswold has not appeared. Accordingly, this Court may only properly dismiss Count II as it relates to Defendant Rubinstein.

**CONCLUSION**

For the reasons set forth herein, **IT IS ORDERED** that:

(1)     Defendant Daniel P. Rubinstein's Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R. Civ. P. 12 [Doc. 23] is **GRANTED**;

(2)     Plaintiff's claims for declaratory and injunctive relief against Defendant Daniel P. Rubinstein in his official capacity are **DISMISSED WITHOUT PREJUDICE**;

(3)     Plaintiff's Motion for a Preliminary Injunction [Doc. 8] is **DENIED as moot**; and

(4)     Defendant Daniel P. Rubinstein is entitled to his costs pursuant to Federal Rule of Civil Procedure 54(d) and D.C.COLO.LCivR 54.1.

DATED:  January 8, 2024                                    BY THE COURT:

_____
Nina Y. Wang
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-03014-NYW-SKC

TINA PETERS,

     Plaintiff,

v.

UNITED STATES OF AMERICA,
MERRICK B. GARLAND, in his official capacity as Attorney General of the United
States,
JENA GRISWOLD, in her official capacity as Colorado Secretary of State, and
DANIEL P. RUBINSTEIN, in his official capacity as District Attorney for the Twenty-First
Judicial District,

     Defendants.

**FINAL JUDGMENT AS TO DEFENDANT DANIEL P. RUBINSTEIN**

     In accordance with the orders filed during the pendency of this case, and

pursuant to Fed. R. Civ. P. 54(b) and 58, the following Final Judgment as to Defendant

Daniel P. Rubinstein is hereby entered.

     Pursuant to the Order [Docket No. 39] of United States District Judge Nina Y.

Wang, entered on January 8, 2024, it is

     ORDERED that Defendant Daniel P. Rubinstein's Motion to Dismiss [Docket No.

23] is GRANTED.  It is

     ORDERED that Plaintiff's claims for declaratory and injunctive relief against

Defendant Daniel P. Rubinstein in his official capacity are DISMISSED without

prejudice.  It is

     ORDERED that Plaintiff's Motion for a Preliminary Injunction [Doc. 8] is DENIED

as moot. It is

**Exhibit B**

ORDERED that judgment is hereby entered in favor of Defendant Daniel P. Rubinstein and against Plaintiff, in light of the Court's determination that there is no just reason for delay. *See* Fed. R. Civ. P. 54(b).   It is

ORDERED that Defendant Daniel P. Rubinstein is awarded his costs, to be taxed by the Clerk of the Court, pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

Dated at Denver, Colorado this 8th day of January, 2024.

FOR THE COURT:
JEFFREY P. COLWELL, CLERK

By: s/M. Smotts
M. Smotts, Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-3014-NYW-SKC

TINA PETERS

     Plaintiff,

v.

UNITED STATES OF AMERICA,
MERRICK B. GARLAND, Attorney General of the United States in his official
capacity,
JENA GRISWOLD, Colorado Secretary of State, in her official capacity, and
DANIEL P. RUBINSTEIN, District Attorney of the Twenty-First Judicial District,
in his official capacity,

     Defendants.

---

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

1.    This is an action for declaratory and injunctive relief seeking to

prohibit the United States and its agents and agents of the State of Colorado from

conducting criminal and other proceedings against Plaintiff, Tina Peters, for the

unlawful purpose of retaliating against her:

    (a) for exercising her freedom of speech, freedom of association, and her

right to petition the government for the redress of grievances, which are

**Exhibit C**

guaranteed by the First Amendment and the Fourteenth Amendment of the Constitution of the United States, and

(b) for her efforts, as Mesa County Clerk and by law the designated election official, to preserve election records in compliance with federal and state law in violation of her right to due process of law and her privileges and immunities as a citizen of the United States guaranteed by the Fourteenth Amendment of the Constitution of the United States.

2.      This action is grounded on the elementary proposition of law that a command of a state officer, in whatever form, which as applied would compel a county official to violate a federal or state statute has no standing as a legitimate, legally binding command, and so has no force or effect. And when that command is designed to conceal official malfeasance affecting the public interest in accurate and fair elections, which the county official discovers by her efforts to faithfully comply with those federal and state statutes, her truthful public disclosures of the facts of that malfeasance are protected by the most fundamental principles of the First Amendment. The importance of that protection is at its highest in the face of grossly untrue calumny by that state official and the use of government power to retaliate against the county official.

3.     Furthermore, under the Fourteenth Amendment it is a privilege and immunity of national citizenship to comply with federal law and engage in the administration of government functions free from retaliation by state and local officials. And the due process of law guaranteed by the Fourteenth Amendment shields a citizen of the United States from the use of the instrumentalities of state or local government, including criminal prosecution, to retaliate against that citizen for her compliance with federal law.

4.     Defendants' conduct exposes their singular goal of achieving political power and maintaining it, even at the cost of undermining the system of fair and trustworthy election that is a cornerstone of our democracy.

## PARTIES

5.     Plaintiff Tina Peters is a citizen of the United States, a resident of the State of Colorado, and the former Mesa County Clerk and Recorder.

6.     Defendant United States is the government established by the Constitution of the United States.

7.     Defendant Merrick B. Garland is sued in his official capacity as Attorney General of the United States. Defendants Garland and the United States may be collectively referred to herein as the "Federal Defendants."

8.      Defendant Jena Griswold is sued in her official capacity as Secretary
of State of Colorado.

9.      Defendant Daniel P. Rubinstein is sued in his official capacity as
District Attorney of the 21st Judicial District of Colorado. Defendants Rubinstein
and Griswold may be referred to collectively as the "State Defendants."

## JURISDICTION AND VENUE

10.      Jurisdiction is predicated on 28 U.S.C. §§ 1331, 1343(a)(3), and
1346(a)(2).

11.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a
substantial part of the events giving rise to the claims asserted in this Complaint
occurred in Denver, Colorado, in this District.

## PETERS' DUTIES AS COUNTY CLERK
## AND THE DESIGNATED ELECTION OFFICIAL

12.      On November 8, 2018, Peters was elected County Clerk and Recorder
of Mesa County, Colorado for a four-year term.

13.      As County Clerk and Recorder, Peters served as the designated
election official who exercised authority and was charged with responsibility for,
among other things, the "running" of the 2020 election of presidential electors in
Mesa County and the 2021 municipal elections in the City of Grand Junction,
Colorado. C.R.S. § 1-1-104(8).

14.   The Mesa County election management system ("EMS") server contained electronic records of the November 2020 election, and the 2021 municipal election.

15.   Under federal statutes, voting systems must "produce a record with audit capacity," 52 U.S.C. § 21081(a)(2)(A), and every officer of election must retain and preserve, for a period of twenty-two months, "all records and papers" related to any federal election. 52 U.S.C. § 20701.

16.   The criminal penalty for violating 52 U.S.C. § 20701 is a fine of up to $1,000 or imprisonment for up to one year or both.

17.   Griswold and Peters were both "officers of election" as defined in 52 U.S.C. § 20706.

18.   C.R.S. § 1-7-802 requires every designated election official to preserve "any election records" for a period of at least twenty-five months after the election.

19.   Peters had independent statutory duties to preserve election records under both federal and state law.

20.    The purposes of preserving electronic election records are, among other things, to detect and prosecute civil rights violations and election crimes, to

audit the performance of the computer voting system, and to reconstruct an election when necessary to confirm its legitimacy.

## FACTUAL ALLEGATIONS

### A. Peters' Efforts to Preserve Election Records

21.     On April 21, 2021, Peters requested the Mesa County Information Technology Department to make a copy of the Mesa County EMS hard drive, which would have preserved all election records on the physical server.  That request was denied.

22.     On April 30, 2021, Griswold issued a directive (the "Griswold directive") requiring county election officials, including Peters, to participate in installing a "Trusted Build" software upgrade to the hard drives of county computer voting systems.  A copy of the directive is Exhibit 1.

23.     Griswold and Dominion Voting Systems, Inc. ("Dominion") jointly developed the protocol and requirements for the installation of the Trusted Build upgrade.

24.     Before the installation of the Trusted Build upgrade, Peters was advised by David Stahl, a Dominion employee, during a telephone conversation in April 2021 that one effect of the Trusted Build upgrade would be to make it impossible to read the digital election records used in the 2020 election of

presidential electors in Mesa County and the 2021 municipal election in Grand Junction.

25.     Though the Griswold directive instructed local election officials to backup "election projects" before the upgrade, those "projects" did not include all the records that are essential for a post-election audit, such as audit logs, access logs, and an image of the hard drive of the County's EMS server.

26.     The federal and Colorado statutes requiring election records to be preserved had not yet expired when the Trusted Build upgrade was scheduled to occur.

27.     Peters understood from her communications with Griswold's staff that Griswold was fully aware that the Trusted Build upgrade would erase at least some of the existing election records on the Mesa County EMS server in violation of federal and Colorado laws. And Griswold's actions in 2021 and 2022 during which Griswold had repeatedly interfered with Peters' supervision of the Mesa County election function and falsely accused Peters of violating Griswold's rules convinced Peters that Griswold was determined to delete the records of the recent elections and that it would be futile to request that Trusted Build not be installed.

28.     The official website of the Colorado Secretary of State stated that the federal election records preservation statute is binding on all election officials,

which confirms that Griswold knew or was charged with knowledge that the

destruction, deletion, alteration, or overwriting of election records by any election

official within the specified period after a federal election was prohibited by

federal law.

29.     Similarly, Peters was aware when she learned of the Griswold

directive that Peters had a duty under both federal and Colorado law to assure the

preservation of all election records on the Mesa County EMS server.

30.     The Griswold directive requiring Peters and other local election

officials to assist in the Trusted Build upgrade violated Griswold's own duty under

federal and Colorado laws to preserve all election records for prescribed periods

and compelled Colorado election officials, including Peters, to violate those laws.

31.     To comply with her legal obligations to preserve election records,

Peters lawfully exercised her authority to arrange for a consultant on May 23,

2021, before the upgrade, to make a forensic image of the Mesa County EMS hard

drive. A "forensic image" is a bit-by-bit, non-modifiable (read only)  copy of all

the digital data stored on a disk drive.

32.     On May 25, 2021, agents of Griswold performed the Trusted Build

upgrade, which caused election records and data, including at least operating

system log files, on the Mesa County EMS server to be overwritten and to be no

longer recoverable in violation of federal and Colorado records-preservation statutes.

33.     On May 26, 2021, after the upgrade, Peters again lawfully exercised her authority to arrange for a consultant to make a forensic image of the Mesa County EMS server.

34.     At all times when that consultant was in a secure area, he was supervised by an employee with authorized access in compliance with Election Rule 20.5.3(b).

35.     The making of the forensic images of the Mesa County EMS server did not interfere with or obstruct in any way the installation of the Trusted Build upgrade nor did it breach security in any way.

36.     Upon receiving the forensic images, Peters provided them to cyber security expert Douglas W. Gould for analysis.

37.     Mr. Gould served as Chief Cyber Security Strategist for AT&T. He has been involved in cybersecurity issues at the highest levels of government and corporate entities for decades. He served as Chief Security Officer at the World Institute for Security Enhancement and is currently Chief Technical Officer at CyberTeamUS.

38.     The forensic images were also later provided to computer experts

Walter C. Daugherity, Ed.D. and Jeffrey O'Donnell. Dr. Daugherity received his

Masters in the Art of Teaching Mathematics from Harvard University in 1967 (at

the age of 20), and received his doctorate in Mathematical Education, also from

Harvard, in 1977. Dr. Daugherity works as a computer consultant, and in that

capacity has worked for clients in the private and public sectors, including the New

York Times, the Washington Post, IBM's Federal Systems Division, Southwestern

Bell Telephone, the Texas Department of Agriculture, and the U.S. Customs

Service.  He currently is also a Visiting Assistant Professor at Texas A & M

University in the Departments of Computer Science and Engineering. He has also

worked as a Teaching Fellow in the Division of Engineering and Applied Sciences

and as a Systems Programmer in the Computer-Aided Instruction Laboratory, both

at Harvard. He is the author of numerous refereed publications and other technical

papers and presentations.

39.     O'Donnell is a Full Stack software and database developer and analyst

with degrees in Computer Science and Mathematics from the University of

Pittsburgh. He has been a consultant to numerous American corporations and

private entities, including Rockwell International, Westinghouse Electric Nuclear,

General Defense, U.S. Steel, Mellon Bank, IOTA 360, and the Penn State Applied

Research Laboratory. He currently serves as President of Qest Development, a full service software consulting and publishing company, and Chief Information Officer of Ordros Analytics, which specializes in election analytics of all types.

40.    These experts analyzed the forensic images. They concluded that the Mesa County disk drive images revealed an unusual phenomenon that occurred during both the November 2020, General Election and the April 2021, Grand Junction municipal election.  After some of the ballots were processed and their information recorded in a set of Microsoft SQL database tables for the respective election ("Set 1"), no further data were entered in Set 1 even though ballot processing was not complete.  Rather, data from processing additional ballots were entered into a separate, newly created set of tables ("Set 2").  Further, some but not all of the data from Set 1 was copied into Set 2.  Accordingly, neither Set 1 nor Set 2 contained all the data from counting all the ballots.  Because the creation of Set 2 hid Set 1 from election workers, breaking the chain of custody and violating federal auditability requirements, election officials had no way to examine or review the ballots in Set 1 which were not copied to Set 2.  This calls into question the integrity of the vote counting process and the validity of the election results. The experts issued Mesa Report 3, which explains why the authors believe the

unusual creation of Set 2 and the partial copying of some but not all of the data from Set 1 did not result from intervention by Mesa County election personnel.

41.     The experts also concluded that Dominion's Trusted Build upgrade overwrote the entire EMS operating system, including electronic system log files containing auditable election records of the 2020 and 2021 elections.

42.     Evidence of unexplained multiple ballot databases on the Mesa County EMS server, as well as log files and other 2020 and 2021 election records, all of which were subsequently overwritten by the Trusted Build upgrade, were election records required to be preserved by federal and Colorado law and regulations.

43.     On July 28, 2021, the Department of Justice published a report announcing that those who insist on conducting election audits could be subject to federal investigation and prosecution.  That report committed the Department to "ensure full compliance with all federal laws that govern the retention and preservation of election records." https://www.justice.gov/ag/page/file/1438936/download.  The publication confirmed that state election officials "must therefore also retain and preserve records created in digital or electronic form."

**B.   Retaliation and Harassment by State and Federal Officials**

44.   Griswold's response upon learning on or about August 2, 2021, that an image of the Mesa County EMS hard drive had been made was to order several of her staff members to take control of the office of the Mesa County Clerk and Recorder and to begin an investigation.

45.   The making and dissemination of the forensic images violated no statute, administrative regulation, rule, or order in existence at any relevant time.

46.   Nevertheless, Griswold has described the forensic images made of EMS as "unauthorized" and sought prosecutions of Peters and others in Peters' office for making the forensic images.  But Griswold has not investigated the creation of additional ballot databases on the Mesa County EMS during the 2020 and 2021 elections, nor has she acknowledged the illegality of her own directive that caused election records to be deleted when the trusted build was installed.

47.   Griswold's characterization that the making of forensic images was somehow unlawful or improper is unequivocally untrue, as her own deputy admitted under oath. Appearing on behalf of the Secretary of State in *Griswold v. Schroeder,* Case No.  in the District Court of Elbert County on November 2, 2022, Deputy Secretary Christopher Beall testified that Elbert County Clerk and

Recorder Dallas Schroeder had lawfully made an image of that County's EMS server in August 2021.

48.    Beall testified further that neither Colorado law nor a rule or order of the Secretary prohibited Schroeder from making the image in August 2021.

49.    Schroeder's conduct causing an image to be made of the Elbert County EMS server was substantially the same as Peters' conduct causing Mesa County's forensic images to be made.

50.    Beall also admitted that the installation of the Trusted Build update in May 2021 overwrote the memory contained on the hard drives that are a component of the EMS server. This overwritten memory is where log files created by the EMS server are stored.

51.    Defendant Rubinstein initiated an investigation of Peters and members of her office on or about August 9, 2021, at the request of Griswold.

52.    Rubinstein requested the involvement of the Office of Colorado Attorney General Philip Jacob Weiser in the investigation of the making of the forensic images.

53.    Rubinstein then communicated with federal law enforcement officials and requested that they investigate Peters.

54.     Rubinstein and the federal and state law enforcement officials involved in the investigation knew that deletion of election records by an election official constitutes a violation of federal and Colorado law in the circumstances of this case, but they declined to pursue Griswold's potential violations of federal and Colorado election records preservation laws.

55.     Rubinstein and Weiser joined forces in August 2021 to conduct a joint investigation of the circumstances surrounding the making of the forensic images in Mesa County but have not brought a charge against Griswold for violating Colorado's election records preservation statute or investigated whether there was a violation of Colorado law in the unexplained creation of additional ballot databases in two consecutive elections on the Mesa County EMS.

56.     On August 9, 2021, Griswold issued Election Order 2021-01 (Exhibit 2), ordering Peters to permit an investigation of the voting system components and security protocol, and requiring Peters to produce records.  The order stated that the "breach in security protocol has not created an imminent direct security risk to Colorado's elections."

57.     On August 10, 2021, while Peters was participating in a Cyber Symposium in South Dakota sponsored by Michael J. Lindell, at which she made a presentation on the findings of the computer experts who had analyzed the Mesa

County EMS server images, Griswold's agents, accompanied by Rubinstein's agents, inspected Mesa County voting system components and records at the Mesa County Clerk and Recorder's Office.

58.     During the inspection on August 10, 2021, Griswold's agents found no damage to Mesa County voting system components or software.

59.     On August 12, 2021, Griswold issued Election Order 2021-02 (Exhibit 3), which prohibited Peters and Mesa County from using its computer voting system "because the Department could not establish that the voting system was not compromised."

60.     Election order 2021-02 was unnecessary.  Making the forensic images had caused no harm to the voting system hardware or software.  Election Order 2021-02 served to humiliate Peters and make her unpopular with voters by requiring Mesa County to purchase a new voting system.  It was intended to silence Peters and other critics of computer voting systems.

61.     On information and belief, Rubinstein obtained possession of the Mesa County voting system components that were listed in Election Order 2021-02, and subsequently delivered possession of the components to agents of the Federal Bureau of Investigation in Denver, Colorado. On information and belief,

the Denver FBI office still has possession of the Mesa County voting system equipment.

62.    On August 17, 2021, Griswold issued Election Order 2021-03 (Exhibit 4) assuming responsibility for the supervision of elections in Mesa County, prohibiting Peters' staff from any involvement in elections, and appointing Sheila Reiner to supervise all elections in the County.

63.    Under Colorado law, an elected official cannot be removed without a recall vote by voters in the district or county in which she was elected.

64.    Prior to August 2021, Griswold advocated to the Mesa County Board of County Commissioners (the "County Board") to replace the Dominion voting system, with a different system from the vendor Clear Ballot.

65.    On August 24, 2021, the County Board entered into an agreement with Dominion Voting Systems, Inc. for Dominion to replace the computer voting system equipment.  A copy of the Agreement is attached as Exhibit 5.

66.    On August 30, 2021, Griswold filed a petition in the District Court of Mesa County (Civil Action 2021-CV-30214) requesting the District Court to replace Peters as Mesa County's designated election official with Wayne Williams for the 2021 election.

67.     On September 1, 2021, a meeting requested by Peters' political associate Sherronna Bishop to allow her to present her concerns about computerized voting systems was held in the offices of the Mesa County government attended in person or virtually by  representatives of U.S. Attorney General Garland, Rubinstein and members of his staff, personnel from the office of Secretary of State Griswold, officers of Dominion, an FBI Special Agent, members of the Mesa County Board of County Commissioners, Ryan Macias, a critic of those who questioned the regularity of elections, Ms. Bishop, and retired U.S. Air Force Colonel Shawn Smith.

68.     At the September 1, 2021, meeting, Colonel Smith presented his position and evidence that there are multiple vulnerabilities in the Dominion voting machines, which others at the meeting declined to address.

69.     On September 3, 2021, Griswold approved the County Board's lease of new equipment from Dominion and disposal of the old equipment.  A copy of the approval is attached as Exhibit 6.

70.     On September 17, 2021, Peters presented a petition to the County Board to discontinue the use of computer voting systems in Mesa County supported by a report concerning the two forensic images made of the Mesa County EMS server in May 2021 prepared by Mr. Gould entitled *Forensic*

*Examination and Analysis Report (Mesa Report 1).* Copies of the petition and the report are attached as Exhibit 7.

71.     The report concluded that election records that were required to be preserved pursuant to federal and Colorado law had been destroyed, that any comprehensive forensic audit of the elections in 2020 and 2021 would be impossible, and that the certification by the Secretary of State of the Mesa County computerized voting system had been vitiated.

72.     On October 13, 2021, the Mesa County District Court issued its order appointing Wayne Williams as the designated election official for Mesa County for the 2021 election and confirming Sheila Reiner's appointment as Election Supervisor.  A copy of the Order is attached as Exhibit 8.

73.     On October 20, 2021, the Colorado Supreme Court declined to exercise its jurisdiction to review the District Court's October 13 Order.  A copy of the Supreme Court's Order is attached as Exhibit 9.

74.     On November 16, 2021, agents of the Federal Bureau of Investigation, under the ultimate direction of Garland, accompanied by state and local law enforcement personnel executed search-and-seizure warrants on the residences of Peters, Sherronna Bishop, Sandra Brown, and Gerald Wood.

75.     Those warrants were executed in a manner that involved excessive force and unnecessary damage to private property.

76.     The following day, on November 17, 2021, Rubinstein and Colorado Attorney General Philip J. Weiser issued a joint press release stating that the execution of search and seizure warrants was a joint operation involving agents of the FBI, Colorado Attorney General, and Rubinstein.

77.     On January 10, 2022, Griswold issued Election Order 2022-01 (Exhibit 10), which recited public statements made by Peters asserting, among other things, that Griswold's Department had "destroyed election records" and "allow[ed] influences to come into our computers changing votes…." That order required Peters to "repudiate, in writing, both the statement she made on January 5, 2022, in a FacebookLive broadcast indicating [Peters'] willingness to compromise voting equipment, that is, [Peters'] assertion that 'we've got to get those machines so… they're not able to do what they're designed to do,' and further all other statements [Peters]has made indicating a willingness to compromise voting system equipment."

78.     This "repudiation" was to be expressed within 72 hours by a "Certification and Attestation," which is attached as Exhibit 11.

79.     Peters has never stated or intimated any willingness to compromise the lawful operation of Mesa County's or any other voting system equipment.

80.     When Peters did not sign the "Certification and Attestation" within 72 hours, on January 18, 2022, Griswold filed civil action 2022CV3007 in the District Court of Mesa County, requesting that Peters be replaced as designated election official for Mesa County for the remainder of her four-year term of office.

81.     On March 1, 2022, Peters again petitioned the County Board to discontinue using computer voting systems in Mesa County.  Peters supported her petition with the second report of Mr. Gould (Mesa Report 2). A copy of Peters' petition and Mr. Gould's report are attached collectively as Exhibit 12.

82.     On April 23, 2022, citizens Cory Anderson and Sherronna Bishop submitted Mesa Report 3 to Rubinstein. A copy of the report is attached as Exhibit 13.

83.     Based on their detailed analysis, Dr. Daugherity and Mr. O'Donnell determined that the forensic image made before the trusted build showed that ballot tabulations had been interrupted, and ballot tabulation databases had been altered, during both the November 3, 2020, election and the 2021 municipal elections.

84.     Dr. Daugherity and Mr. O'Donnell further determined that the forensic image showed the unexpected and anomalous creation of a second set of ballot databases and a digital transfer of selected batches of thousands of previously tabulated ballots into those databases.

85.     As demonstrated by the report of Dr. Daugherity and Mr. O'Donnell, the unexplained and unexpected creation of a second set of ballot databases during two consecutive elections, could not have been triggered by Dominion's certified software, leading to the conclusion that uncertified software may have been clandestinely installed on the Mesa County EMS.

86.     On May 10, 2022, in civil action 2022CV3007, the Mesa County District Court granted Griswold's petition to permanently replace Peters as the designated election official for Mesa County.  A copy of the court's Order is attached as Exhibit 14.

87.     In response to Mesa Report 3, Rubinstein and Investigator Michael Struwe presented a report to the Mesa County Board on May 19, 2022.  A copy of that report is attached as Exhibit 15.

88.     Rubinstein's report was prepared and submitted in bad faith and for the purpose of intimidating and deterring Peters from continuing to speak out about

2020 election anomalies and weak election security, and from continuing to advocate for ending reliance on computerized voting systems, such as Dominion's.

89.     The findings of Rubinstein and Struwe have been challenged by Walter Daugherty in his declaration, which is attached as Exhibit 16.

90.     Rubinstein and Struwe have no expertise in cyber or database matters and did not have the benefit of independent cyber or database expertise in preparing their findings.

91.     On information and belief, the only advice or assistance that Rubinstein and Struwe received in preparing their findings was from the office of the Colorado Secretary of State and Dominion.

92.     Exhibit 16 explains that the Rubinstein report wrongly claimed that Sandra Brown caused the creation of the second ballot database by halting and re-starting the adjudication of ballots.  In fact, Rubinstein had never interviewed Sandra Brown.  When Sandra Brown was interviewed by Jeff O'Donnell, Ms. Brown stated that she never initiated a "halt and re-start" of ballot adjudication, as the Rubinstein report claimed.  The Rubinstein report failed to mention or explain the fact that in two consecutive elections, the Mesa County voting system created an extra database that masked the actual election results.

93.     The campaign launched by the State Defendants against Peters in
retaliation for her obedience to the law and her truth-telling concerning the
malfeasance she discovered was punctuated by an aggressive campaign to
personally disparage and denigrate Peters, falsely accusing her of illegal conduct.

94.     For example, in a news release published by Griswold on January 18,
2022, announcing her action to remove Peters as the Designated Election Official,
Griswold stated:

> Clerk Peters' actions constituted one of the nation's first insider
> threats where an official, elected to uphold free, fair, and secure
> selections risked the integrity of the election system in an effort
> to prove unfounded conspiracy theories.

95.     Griswold stated to a media outlet in February 2022: "Our expectations
of elected officials is to follow the law and election rules and protocols. We
unfortunately are seeing the clerk [Peters] spread misinformation about Colorado
elections."

96.     Griswold did not apply that same expectation to herself by evaluating
her own failure to follow laws mandating the preservation of election records.

97.     Griswold has taken no action in response either to the discovery of
problems on the EMS server, or to Griswold's own unlawful directive that caused
the deletion of election records.

98.     This unbridled viciousness directed at Peters reached the point where on July 11, 2022, Rubinstein's investigator, James Cannon, would falsely state in an affidavit to the judge presiding over Peters' criminal trial that making a digital image of the EMS' hard drive was unlawful.  Affidavit of James Cannon, at 9 (July 11, 2022) (attached as Exhibit 17). It was only four months later, as described above, that Griswold's deputy, Beall, admitted under oath that making such an image was not unlawful.

### i.  The Federal Investigation

99.     The administration of President Joe Biden assumed power on January 20, 2021, and shortly thereafter announced its National Strategy for Countering Domestic Terrorism. https://www.whitehouse.gov/wp-content/uploads/2021/06/National-Strategy -for-Countering-Terrorism.pdf.

100.    Several cabinet officers issued reports, press releases, or public statements announcing that they would attempt to suppress speech that questioned the legitimacy of Biden's election. These actions were part of the administration's campaign to punish citizens for, and to discourage citizens from, exercising their rights of free speech, association, the press, and the right to petition for the redress of grievances by speaking out about election fraud in the 2020 election.

101.   Director of National Intelligence Avril Haines issued a report on March 1, 2021, asserting that those who espouse "narratives of fraud in the recent election…will almost certainly spur some [domestic violent extremists] to try to engage in violence…." https://www.dni.gov/documents/assessments/Unclass-SummaryofDVEAssessment-17MAR21.pdf.

102.   Newly confirmed United States Attorney General Merrick Garland gratuitously announced in July 2021 that claims of vote fraud in the 2020 presidential election were baseless and the Department of Justice would investigate and prosecute individuals who pursued audits of elections that violated federal law. https://www.bloomberg.com/articles/2021-03-01/doj-pick-garland-disputes-trump-claims-of-widespread-voter-fraud#xj4y7vzkg.

103.   On May 14, 2021, in a National Terrorism Advisory Bulletin, the Department of Homeland Security referenced a heightened threat environment fueled by disinformation, conspiracy theories, and false narratives. https://www.dhs.gov/news/2021/05/14/dhs-issues-national-advisory-system-ntas-bulletin. *See also* https://www.dhs.gov/news/2021/01/27/dhs-issues-national-terrorism-advisory-system-ntas-bulletin."

104.   Secretary of Homeland Security Alejandro Mayorkas published a document in March 2021 in support of the National Strategy for Countering

Terrorism that associated domestic extremism with "sociopolitical developments

such as narratives of fraud in the recent general election."

https://www.dhs.gov/sites/default/files/publication/21_0301_odni_unclass-

summary-of-dve-assessment-17_march-final_508.pdf.

105.   Attorney General Garland published a report on July 28, 2021,

threatening to investigate and prosecute those citizens who pursued forensic audits

of the 2020 election. https://www.justice.gov/ag/page/file/1438936/download.

106.   Rubinstein communicated with federal law enforcement officials

about the state investigation of Peters, knowing that Biden Administration officials

had published such statements threatening federal investigation of those who

challenged the result of the 2020 general election or sought audits of that election.

A federal investigation of Peters was initiated in August 2021.

107.   In 2022, the U.S. Department of Justice convened a federal grand jury

to investigate Tina Peters and the forensic imaging of the Mesa County EMS

server.

108.   Speaking out and associating with others of like mind to advance a

message about the need for election integrity is protected by the First Amendment,

regardless of whether the statements contained in the message are accurate.

109.   The investigation of Peters by the Department of Justice was undertaken to punish and retaliate against her for having exercised her rights guaranteed by the First Amendment to question the integrity of the November 2020 election and to intimidate and discourage her from continuing to do so.

110.   The tactics used by the FBI during the investigation into the making and publishing of the Mesa County forensic images were intended to intimidate and deter citizens from associating with those, including Peters, who advocate ending the use of computerized voting systems, such as Dominion's. Such intimidation tactics burden Peters' ability to engage in protected First Amendment communications and associational activity.

111.   The Department of Justice exercised bad faith in launching the investigation of Peters because it knew or should have known it had no reasonable prospect of obtaining convictions on the basis of charges under the three statutes it has invoked: 18 U.S.C. §§ 371, 1028(a)(7), and 1030(a)(2)(A).

112.   The charge of a violation of 18 U.S.C. § 1028(a)(7) is legally insufficient because there was no intent to violate another statute, the access card involved was not "issued by or under the authority of the United States or a sponsoring entity of an event designated as a special event of national significance," and there was no federal nexus giving the court jurisdiction.

113.   The charge of a violation of 18 U.S.C. § 1030(a)(2)(A) fails because there was no damage to the EMS server caused by the making of the forensic images.

114.   The charge of a violation of 18 U.S.C. § 371 fails because there was no violation of either of the other two statutes.

115.   On information and belief, the Federal Defendants have not pursued any investigation to determine how additional databases were created on the Mesa County EMS during ballot tabulations in two consecutive elections.

116.   At the conclusion of the state investigation conducted jointly by District Attorney Rubinstein and the Colorado Attorney General, Rubinstein issued a press release on August 30, 2022, announcing that he and Attorney General Weiser had asked the United States Attorney to continue his federal investigation of Peters. The press release is attached as Exhibit 18.

117.   The Department of Justice, including the FBI, has continued its investigation to determine if any federal crime had been committed by Peters but ignored Griswold's violation of the federal election records preservation statutes.

**ii.  The State Prosecution**

118.   After launching his investigation of Peters and the making of the images of the Mesa County EMS hard drive, Rubinstein convened a grand jury in

Mesa County to investigate Tina Peters and the forensic imaging of the Mesa County EMS

119.   In bad faith, Rubinstein submitted applications to magistrates for search warrants and arrest warrants and asked the Mesa County grand jury to indict Peters without advising the grand jury that the deletion of election records of the 2020 presidential election ordered by Griswold as a result of the installation of the Trusted Build upgrade violated federal and Colorado law, or that Peters and the other individuals charged had a legal obligation to preserve the election record that Griswold had directed them to delete.

120.   The grand jury returned the indictment against Peters on March 8, 2022.  A copy of the indictment is attached as Exhibit 19.

121.   Rubinstein acted in bad faith to present the indictment of Peters to the grand jury because none of the counts has a reasonable prospect of justifying a conviction.

122.   The bad faith of Rubinstein is underscored by the fatally flawed charges he has brought against Peters, in particular the failure of the indictment to address Peters' understanding of her duty under federal and Colorado laws to preserve election records on the Mesa County EMS server, negating the criminal intent required to establish the offenses charged.

123.   An equally fundamental legal insufficiency of the indictment is the absence of clear allegations giving at least the bare bones detail needed to put Peters on notice of the charges against her and to define exactly what the prosecution must prove.

124.   The charges set out against Peters fail to pass muster as a minimally sufficient indictment under basic norms of due process because they fail to allege facts supporting critical elements of the offenses charged. For example,

a) Counts 1, 2, and 5 allege attempts to influence public servants by "deceit," which Colorado law understands as a *fraudulent* misrepresentation or conduct designed to *defraud* another, but these counts contain no factual allegations of fraud by Peters.

b) Counts 4, 6, and 7 charge criminal impersonation, which under Colorado law must be undertaken for *unlawful* purposes with the intent to *unlawfully* gain a benefit or to *injure* or *defraud* another. No factual allegations can be found in the indictment supporting such characterizations of Peters' conduct.

c) Count 8 charges identity theft which must be done to obtain money or, other thing of value, but includes no factual allegations to this effect. Even more fundamentally troubling, the indictment fails to include the undisputed fact that

the individual whose information was purportedly stolen gave his permission for Peters to use it.

d) Count 9 charges first degree official misconduct, which requires conduct done to obtain a benefit or maliciously cause harm to another. Again, no factual allegations are included in the indictment supporting such a characterization of Peters' conduct.

e) Count 10 charges a violation of duty and Count 11 charges a failure to comply with requirements of the Secretary of State. While it is not clear what specific conduct is being alleged in these counts, Peters violated no lawful "requirement" of the Secretary of State but rather fulfilled her duty to preserve election records as required by federal and state laws.

125.   Rubinstein's investigator falsely represented in his affidavit in support of the application for an arrest warrant for Sandra Brown, who was Peters' elections manager, that Belinda Knisley had stated in her proffer interview with Rubinstein and the investigator that Peters had instructed Knisley to lie to the Mesa County Human Resources Department about Gerald Wood when the transcript of the interview showed that Knisley made no such statement.

126.   Rubinstein played a role in the exorbitant $500,000 bond requirement imposed on Peters after she was indicted and arrested.

127.   In July 2022, Rubinstein requested revocation of Peters' bond to punish and retaliate against her for making public statements on matters of grave public concern when she left Colorado to speak about illegal activity by Griswold and Dominion.

128.   In August 2022, Rubinstein again maliciously opposed Peters' request to travel outside Colorado to engage in protected First Amendment activity, saying: "Ms. Peters is seeking permission to leave the state so that she can be celebrated as a hero for the conduct that a grand jury has indicted her for…."  His opposition was plainly prompted by his expressly articulated disapproval of Peters' repeated assertions that Griswold had violated federal and Colorado law by ordering the deletion of election records.

129.   After the death of Peters' father, Struwe contacted Peters' 93-year-old mother, her sister, her daughter, and other members of Peters' family pressing them for information about Peters as a method of harassing Peters and her family members as retaliation against Peters for her role in the making and publishing of the forensic images, her outspoken criticism of Griswold, and her statements about the need to end the use of computerized voting systems, such as Dominion's.

130.  Personnel from Rubinstein's office contacted Peters' husband, who was suffering from Parkinson's Disease and dementia at an adult care facility in Mesa County and pressured him to execute certain documents.

131.  A lawyer representing Peters and her husband in November 2021 in connection with domestic matters emailed Peters to advise her that a member of the District Attorney's office had left a voicemail on the lawyer's telephone notifying the lawyer that Peters was the subject of a potential investigation into her actions as an agent under a power of attorney. The voicemail prompted the lawyer to advise Peters that he had a conflict of interest and could no longer represent her and her husband.

132.  Despite the insistence by Peters' counsel that her experts only be contacted through him, Rubinstein's investigator Struwe repeatedly contacted Peters' expert Mr. O'Donnell directly in violation of the Colorado Rules of Professional Conduct.

133.  On June 5, 2022, the state court judge presiding over Peters' criminal prosecution ruled that she may not present evidence at trial to support her First and Fourteenth Amendment defenses to the charges against her (Exhibit 20).  The effect of the ruling is to deny Peters the opportunity (a) to introduce evidence of Griswold's violation of federal and Colorado election-record preservation statutes

and Griswold's directive that local election officials must participate in those violations, (b) to assert as a defense Peters' constitutional immunity from retaliation, including spurious criminal prosecution, for making forensic images to preserve election records, and (c) to invoke the protections of the United States Constitution's First, Fifth, and Fourteenth Amendments.

134.   Strikingly, even though Peters has not violated any state statute, the Department of Justice itself has nonetheless conceded in related litigation that violating a state statute cannot be criminally sanctioned where the individual "would be forced to choose between 'intentionally flouting state law' and 'forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in (another) criminal proceeding.'" *Lindell v. United States,* No. 22-3510 (8th Cir.) (Appellees' Response Brief at 15).

## PETERS' CONSTITUTIONALLY PROTECTED ACTIVITIES

135.   Government misconduct and the legitimacy of elections are matters of public concern.

136.   Speech concerning election integrity and government misconduct is protected by the First Amendment.

137.   Investigation of government misconduct and election irregularities is activity protected by the First Amendment.

138.   Pursuant to the Privileges and Immunities Clause in the Fourteenth Amendment and the Supremacy Clause in Article VI of the United States Constitution, a citizen of the United States, including a state or local official like Peters, is immune from prosecution for alleged violations of state law when that law is applied to prevent that citizen from complying with the requirements of a federal statute.

139.   Under the unambiguous language of the federal and Colorado election records preservation laws, Peters had an overriding obligation to preserve all election records on the Mesa County EMS server for the prescribed periods and she cannot be held criminally liable – or be prosecuted -- for failing to comply with any directive from Griswold requiring Peters to violate, or cooperate in the violation of, those laws.

140.   All directives from Griswold that were intended to cause, and had the effect of causing, the deletion of election records which must be preserved under federal and Colorado law were unlawful, beyond Griswold's authority, void, and not binding on Peters.

141.   The callous malfeasance of the State Defendants in their unrestrained, vicious attacks on Peters and her family is highlighted by the fact that they were well-aware of the requirements of the federal election records preservation statute.

The official website of the Colorado Secretary of State stated at all relevant times that that statute is binding on all election officials.

142.   The use of the instrumentalities of state or local government, including criminal prosecution, to retaliate against a citizen of the United States for compliance with federal law is a violation of that citizen's right to due process of law guaranteed by the Fourteenth Amendment.

143.   If a forensic image of the EMS hard drive had not been made before the Trusted Build upgrade was installed, all election records showing the creation of the second set of ballot databases and the digital transfer of selected batches of thousands of previously tabulated Mesa County ballots would have been overwritten, deleted, and made no longer recoverable.

144.   Peters exercised her rights to free speech, free association, and to petition for the redress of grievances when she informed others about the existence and contents of the forensic images and about the conclusions of the cyber experts for the ultimate purpose of publicizing to authorities and the general public the unlawful deletion of election records at the direction of Griswold in violation of federal and Colorado election records preservation laws, and problems with the Mesa County computer voting system.  Peters violated no laws when she publicized either the forensic images or the cyber and database experts' findings.

145.    Peters has spoken at numerous rallies and other gatherings on the subjects of election security, Griswold's unlawful directive to delete election records, and the software installed on the Mesa County EMS server. Peters violated no laws by her actions participating at these events.

146.    Peters' actions to secure a forensic image of the EMS server before the trusted build was an exercise of her privilege to comply with federal law with immunity from retaliatory action from state or local officials.

## COUNT 1

**Violations by the Federal Defendants of Plaintiff's First Amendment Rights of Freedom of Speech, Freedom of Association, and the Right to Petition for the Redress of Grievances**

147.   The allegations in the foregoing paragraphs of this Complaint are incorporated here by reference.

148.   Any form of official retaliation for exercising Plaintiff's freedoms guaranteed by the First Amendment, including prosecution, threatened prosecution, bad faith investigation, and legal harassment constitutes a violation of the First Amendment.

149.   The Federal Defendants' past and ongoing retaliatory and punitive conduct toward Peters was and is substantially motivated by Peters' constitutionally protected activity. Federal Defendants' conduct has caused and continues to threaten injuries to Peters that would chill a person of ordinary firmness from continuing to engage in Peters' constitutionally protected conduct.

150.   Based upon the foregoing allegations and assertions, Defendant the United States has investigated Plaintiff to punish her for exercising her First Amendment free speech right for the purpose of informing her fellow citizens of illegal actions of Griswold and problems with the computer voting system in Mesa County, to petition for the redress of grievances, to associate for the purpose of

expressive advocacy, and to discourage her and those who would associate with her from exercising their right to associate, to petition for redress of grievances, and to speak freely and publicly about the need for reform of the election system.

151.   Peters' First Amendment rights will be violated by any further action of Defendants to investigate and prosecute her because of Defendants' bad faith and retaliatory actions and because Colorado courts have barred Peters from asserting in her criminal case the right not to be punished for exercising federal constitutional rights to engage in free speech, free association, and petitioning the government for redress of grievances.

152.   Plaintiff is entitled to prospective injunctive relief from federal constitutional violations by federal officials.

153.   Plaintiff is entitled to declaratory relief under 28 U.S.C. § 2201.

## COUNT 2

**Violations by the State Defendants of Plaintiff's Rights, Privileges, and Immunities Secured by the United States Constitution**

154.   The allegations in the foregoing paragraphs of this Complaint are incorporated here by reference.

155.   State Defendants Rubinstein and Griswold, acting under color of Colorado law, have undertaken an investigation and prosecution of Plaintiff to punish Peters, in violation of federal law,

(a) for the exercise of her First Amendment rights to inform her fellow citizens of illegal actions of Griswold and problems with the computer voting system in Mesa County, to associate for the purpose of expressive advocacy, and to discourage Plaintiff and other citizens who have associated with Plaintiff or might associate in the future from exercising their right to associate, to petition for the redress of grievances, and to speak publicly for reform of the election system; and

(b) for her efforts to comply with federal law governing the maintenance of election records in violation of her right to the due process of the laws and her privileges and immunities as a citizen of the United States guaranteed by the Fourteenth Amendment.

This conduct is ongoing and threatens continuing and future injury to Peters.

156.   State Defendants' past and ongoing retaliatory and punitive conduct toward Peters was and is substantially motivated by Peters' constitutionally protected activity. State Defendants' conduct has caused and continues to threaten injuries to Peters that would chill a person of ordinary firmness from continuing to engage in Peters' constitutionally protected conduct.

157.   Plaintiff is entitled to prospective injunctive relief from federal constitutional violations by state officials under 42 U.S.C. § 1983 and *Ex parte Young,* 209 U.S. 123 (1908).

158.   Plaintiff is entitled to declaratory relief under 42 U.S.C. § 1983, *Ex parte Young,* 209 U.S. 123 (1908), and 28 U.S.C. § 2201.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests the entry of an Order or Orders:

(a) Granting preliminary and permanent injunctive relief prohibiting Defendants from conducting and proceeding with criminal proceedings, including investigations and prosecutions, against the Plaintiff pending the resolution of Plaintiff's claims brought in this action;

(b) Declaring that Defendants' actions alleged herein have violated Plaintiff's First Amendment rights of freedom of speech, freedom of association, freedom of the press, right to petition for the redress of grievances, and the Supremacy Clause, as well as Plaintiff's rights to due process and to enjoy her privileges and immunities as a citizen of the United States under the Fourteenth Amendment.

(c) Declaring that all warrants issued were in violation of the First and Fourteenth Amendments and, therefore, invalid;

(d) Declaring that subpoenas issued by the 21st Judicial District grand jury were in violation of the First and Fourteenth Amendments;

(e) Declaring that the indictment of Plaintiff by the 21st Judicial District grand jury was in violation of the First and Fourteenth Amendments;

(f) Granting reasonable attorneys' fees to Plaintiff pursuant to 28 U.S.C. § 2412 and 42 U.S.C. § 1988 and any other applicable laws; and

(g) Granting such other and further relief as the Court deems just and proper.

Respectfully submitted December 22, 2023

_s/ Robert J. Cynkar_
Robert J. Cynkar
Patrick M. McSweeney
Christopher I. Kachouroff
Lyndsey L. Bisch
_McSweeney, Cynkar & Kachouroff, PLLC_
10506 Milkweed Drive
Great Falls, VA 22066
(703) 621-3300
rcynkar@mck-lawyers.com


s/_John Case_
John Case
John Case, P.C.
6901 South Pierce St. #340
Littleton CO 80128
Phone|303-667-7407
brief@johncaselaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2023, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the following email address:

<u>For Defendants United States of America and Merrick Garland</u>:

Jennifer Lake
Assistant United States Attorney
United States Attorney's Office, District of Colorado
Jennifer.Lake@usdoj.gov

<u>For Defendant Daniel Rubinstein</u>:

Todd Starr
Mesa County Attorney
Todd.starr@mesacounty.us

I hereby certify that on December 22, 2023, I sent the foregoing to the

following individuals at the email addresses set out below:

<u>For Defendant Jena Griswold</u>:

Michael Kotlarczyk
Senior Assistant Attorney General
Mike.Kotlarczk@coag.gov

LeeAnn Morrill
First Assistant Attorney General, Public Officials Unit
LeeAnn.Morrill@coag.gov

_/s/ Robert J. Cynkar_____

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-03014 -SKC

TINA PETERS

      Plaintiff,

v.

UNITED STATES OF AMERICA,
MERRICK B. GARLAND, Attorney General of the United States in his official capacity,
JENA GRISWOLD, Colorado Secretary of State, in her official capacity, and
DANIEL P. RUBINSTEIN, District Attorney of the Twenty-First Judicial District, in his official capacity,

      Defendants.

## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION
## AND SUPPORTING MEMORANDUM

**Exhibit D**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES                                                      (ii)

INTRODUCTION                                                             (1)

BACKGROUND                                                              (2)

(ARGUMENT

I.  PRELIMINARY RELIEF IS WARRANTED                                      (9)

   A. Peters Is Likely to Prevail on the Merits                           (9)

     1. Peters Has Presented Valid *Prima Facie* Claims of Retaliation under
       the First and Fourteenth Amendments                               (12)

       a.  Constitutionally protected activities                          (13)
       b.  Irreparable injury                                             (18)
       c.  Retaliatory motivation                                         (20)
       d.  Bad faith                                                      (23)
       e.  Peters is unlikely to receive a fair trial in state court       (35)

   B.  Peters Will Suffer Irreparable Injury Without Preliminary Relief    (37)

   C.   The Balance of Equities Favors Peters                             (38)

CONCLUSION                                                              (38)

CERTIFICATE OF LENGTH                                                   (40)

CERTIFICATE OF SERVICE                                                  (40)

TABLE OF AUTHORITIES

**Cases**

*ACLU of Illinois v. Alvarez,*
*Amalgamated Fed. Emp. Union Local 590 v. Logan Valley Plaza, Inc.,*
     391 U.S. 308 (1968)
*Awad v. Ziriax,*
*AT&T Co. v. Winbachand Conserve Program, Inc.,* 421 F.3d 1421 (3d Cir. 1994)
*Bass v. Richards,* 308 F.3d 1081 (10th Cir. 2002)
*Benisek v. Lamone,* 138 S.Ct. 1942 (200
*Brown v. Mississippi,*
*Chaplaincy of the Full Gospel Churches v. England,* 454 F.3d291 (D.C.Cir. 2006)
*Cunningham v. Neagle,* 135 U.S. 1 (1890)
*Douglas v. City of Jeannette,*
*Duncan v. Louisiana,* 391 U.S. 145 (1965)
*Durham v. Jones,*
*Elam Constr., Inc. v. Reg. Transp. Dist.,* 129 F.3d 1343 (10th Cir.
*Fitzgerald v. Peek,* 6636 F.2d
*Free the Nipple-Fort Collins v. City of Fort Collins,*
*Garcia v. City of Trenton,* 348 F.3d 726 (8th Cir. 2003)
*Gessler v. Colo. Common Cause,* 327 P.3d 232 (Colo. 2014)
*Hamling v. United States,* 418 U.S. 87 (1974)
*Hanlen v. Gessler,* 333 P.3d 41 (Colo. 2014)
*Harmaon v. City of Norman,* 981 F3d 1148 (10th Cir. 2000)
*Harris v. People,*
*Heideman v. s. Salt*
*Irizarry v. Yehia,*
*Kikumura v. Hurley,*
*Ku-Kluz Klan Cases,*
*Kugler v. Helfant,*
*McCullogh v. Maryland,* 17 U.S> 316 (1819)
*McDonnell v. United States,*
*McIntyre v. Ohio Elec. Board,*

*Moore v. Sims,* 442 U.S. 415 (19  )

*Nken v. Holder*

*O Centro Espirita*

*People v. Brown,* 562 P.2d 754 (Colo. 1997)

*People v. Buckellew,*

*People v. Dilger,*

*People v. Gonzales,* 534 P.2d 626 (Colo. 1975)

*People v. Janousek,* 871 P.2d 1189 (Colo. 1994)

*People v. Johnson,*

*People v. Peters,* Case No.

*Phelps v. Hamilton,*

*Pickering v. Bd. Of Educ.,*

*Planned Parenthood Ass'n of Utak v. Herbert,* 828 F.3d 1245 (10th Cir. 2016)

*In ree Quarles,*

*Rankin v. McPherson,*

*Roberts v. U.S. Jaycees,* 468 U.S.

*RoDa Drilling Co. v. Siegal,*

*Roman Cath. Diocese of Brooklyn v. Cuomo,*

*Slaughter-House Cases,*

*Trant v. Oklahoma,* 754 F.3d 1158 (10th Cir. 2014)

*Utah Licensed Beverage Ass'n v. Leavitt,* 656 F.3d 1061 (10th Cir. 2001)

*United States v. Alvarez,*

*United States v. Classic,*

*United States v. Hathaway,*

*United States v. Kalu,*

*United States v. P.H.E., Inc.,* 965 F.2d 848 (10th Cir.

Verlo v. Martinez, 820 F.3d 1113 (10th Cir. 2016)

*Winter v. NRDC,* 555 U.S.

*Worrell v. Henry,* 219 F.3d

*Wyoming v. Livingston,* 443 F.3d 1211 (10th Cir. 2006)

*Younger v. Harris,* 401 U.S. 37 (1971)

**Statutes**

42 U.S.C. § 1983
52 U.S.C. § 20701
52 U.S.C. § 21801
C.R.S. §


**Secondary Sources**

WRIGHT, MILLER & KANE, FED. PRAC, & PROCEDURE
B. Covington, *State Official Misconduct Statutes and Anticorruption Statutes
    after Kelly v. United States,* 121 COLUM. L. REV. 273 (2021)
J. Harrison, *Reconstructing the Privileges and Immunities Clause,* 101 YALE L.J.
    1385 (1993)

## INTRODUCTION

Pursuant to Fed.R.Civ.P. 65(a), Plaintiff Tina Peters moves this Court for an order enjoining, pending the resolution of Peters' claims in this action, Defendant District Attorney Daniel P. Rubinstein ("Rubinstein") from conducting, continuing, or participating in any way in proceedings in *People v. Tina Peters,* Case No. 22CR371 (Dist. Ct. Mesa Co.), or any other criminal proceedings against or harassment of Peters.

The grounds for this Motion, set out in more detail below, are that these criminal proceedings and investigations have been and will continue to be taken by Rubinstein in bad faith to punish Peters, because in 2021 she made a legal forensic image of the Mesa County Election Management System ("EMS") server. The forensic image includes digital election records of the November 2020 election and the Grand Junction municipal election in 2021. If Peters had not made the forensic image, those digital election records would have been irretrievably lost. Federal and state law required Peters to preserve digital election records for specified periods: 52 U.S.C. § 20701 (22 months); CRS 1-7-802 (25 months). The federal statute carries a criminal penalty.

By using a criminal prosecution to retaliate against Peters, Rubinstein has violated, and threatens to continue violating Peters' First Amendment rights to

1

speak out, to investigate and report official misconduct, to petition the government

for the redress of grievances, and to associate with others. Rubinstein's conduct

has also violated, and threatens to continue violating Peters' privileges and

immunities under the Fourteenth Amendment to comply with federal law and

engage in the administration of government functions free from retaliation by state

officials, and her Fourteenth Amendment right to due process of law, which shields

a U.S. citizen from the weaponizing of state government instrumentalities,

including criminal prosecution, to retaliate against that citizen for her exercise of

First Amendment rights and for her compliance with federal law.

## BACKGROUND

On April 30, 2021, Colorado Secretary of State Jena Griswold (Griswold)

sent an email directing Peters to participate in installing a "Trusted Build" upgrade

to Mesa County's EMS server.  The email is Exhibit 1.

Peters, then Mesa County Clerk and Recorder and its designated election

official, had received reports from voters who claimed irregularities in recent

elections.  In an April 2021 telephone call, David Stahl, an employee of Dominion

Voting Systems, Inc. ("Dominion"), advised Peters that the Trusted Build would

delete software that allowed the system to read certain ballots.  Peters understood

that erasure of this information during the Trusted Build installation would make

2

results of the 2020 and 2021 elections impossible to verify. [Peters Declaration, Ex 2, ¶ 7].

Peters knew that if records of the elections were erased, they would be irretrievably lost, and it would be impossible for her as county clerk to conduct an audit or accurate recount of the most recent elections. As Peters explains in her Declaration, she was forced to choose between (1) violating election records preservation laws or (2) following the law by making a forensic image of the server before the Trusted Build installation took place. Peters chose to follow the law. [*Id* ¶¶ 6-24].

Peters engaged a qualified consultant named Hayes to make a forensic image of the EMS hard drive. A forensic image is a bit-for-bit unalterable (read only) copy of a hard drive. It does not modify any data. It causes no harm to the voting system. [*Id* ¶¶ 17-22].

Griswold's email specified that she would limit access to the Trusted Build installation to employees of Griswold, the county clerk, and Dominion. At the time, no state law or regulation prohibited Peters from having a qualified consultant present to observe the Trusted Build installation [*Id* ¶ 16]. To circumvent Griswold's email, Peters arranged for Hayes to use the access badge of Gerald Wood, another consultant. Wood gave permission for his access badge to

be used by Hayes. Whenever Hayes was in a secure area, he was supervised by an employee with authorized access in compliance with Election Rule 20.5.3(b). [*Id* ¶¶ 25-28].

Peters and Hayes made the first forensic image on May 23, 2021, two days before the Trusted Build installation. The forensic image preserved election records and software from the 2020 and 2021 elections. On May 25, Griswold's agent erased the entire EMS server during the Trusted Build installation. Peters and Hayes made a second forensic image on May 26, immediately after the Trusted Build. The second forensic image captured only the new software installed by Griswold. All prior election records had been erased from the server during the Trusted Build installation. [Declaration of Douglas Gould, Ex. 18 at 11]. If Peters had not made the forensic image on May 23, records of the most recent elections would have been irretrievably lost. [Ex. 2 ¶ 26 and 31].

Qualified cyber and database experts analyzed the forensic images. Cybersecurity expert Douglas Gould concluded that the Trusted Build erased election records of the November 2020 election and the 2021 municipal election (as Peters had rightly anticipated) [Ex. 18 at 11]. Gould also found that normal operation of the voting system during an election overwrote records that were required to be preserved for future audits. [*Id* at 9-10]. Two other experts, Walter

C. Daugherity Ph.D. and Jeffrey O'Donnell, concluded that the Mesa County disk drive images revealed an unusual phenomenon that occurred during both the November 2020 General Election and the April 2021 Grand Junction municipal election: After some of the ballots were processed and their information recorded in a set of Microsoft SQL database tables for the respective election ("Set 1"), no further data were entered in Set 1 even though ballot processing was not complete. Rather, data from processing additional ballots were entered into a separate, newly created set of tables ("Set 2"). Further, some but not all the data from Set 1 was copied into Set 2. Accordingly, neither Set 1 nor Set 2 contained all the data from counting all the ballots. Because the creation of Set 2 hid Set 1 from election workers, breaking the chain of custody and violating federal auditability requirements, election officials had no way to examine or review the ballots in Set 1 which were not copied to Set 2. This unexpected behavior by the software calls into question the integrity of the vote-counting process and the validity of the election results. [Declaration of computer science expert Walter C. Daugherity, Ph.D. Ex 19 ¶ 15].

On August 10-12, 2021, Peters attended a televised symposium in Sioux Falls, South Dakota sponsored by Michael Lindell [Ex 2 ¶33]. Peters made a speech in which she advocated for election transparency and criticized Griswold.

5

On or about August 2, 2021, Griswold learned of the making of the first forensic image. Even though no statute, rule, or order was violated by creation of the forensic images, Griswold ordered her staff to initiate an investigation of Peters, based on the justification that there had been a "security breach" [Exhibit 20, p. 2]. According to Rubinstein, he received a call on August 9 from Griswold's Deputy, Christopher Beall. Without showing probable cause that a crime had been committed, Beall urged Rubinstein to start a criminal investigation of Peters. [Rubinstein report, Ex. 21 at 2]. Rubinstein immediately began investigating Peters (*Id.*). Rubinstein contacted the FBI and urged the agency, without any proper cause, to participate in investigating Peters. [Rubinstein email, Ex 22].

Rubinstein acted in bad faith because he did not acknowledge or investigate Griswold's unlawful erasure of election records during the Trusted Build installation. Rubinstein was motivated, at least in substantial part, by an unlawful intent to punish Peters for the protected First Amendment acts of making and publishing the forensic image and to deter Peters from publicly asserting that Griswold had violated election records preservation laws.

Rubinstein's investigator signed an affidavit [before the judge presiding over Peters' criminal case], which stated falsely that Peters acted "unlawfully" when she made the forensic image [Ex 14 p. 9]. Griswold's Deputy Secretary of State

Christopher Beall admitted in testimony in another case that making forensic images was not prohibited by law.  [Exhibit 15 at 2, L. 14-17].  Rubinstein's investigator misrepresented to the Court that Peters' deputy, Belinda Knisley, had stated during her proffer interview that Peters had told her to lie. [Ex. 14 at 13].

Rubinstein and Griswold have claimed that the directive in the April 30, 2021, email from Griswold's office requiring Peters to "[b]ackup any election projects on your voting system" [Ex. 1] assured the preservation of all records subject to the election records preservation statutes. [Ex. 23 at 3, Rubinstein email to Ed Arnos]. That is not accurate; by design, the Trusted Build upgrade overwrote the entirety of the voting system software and data on the Mesa Country EMS server.  Records essential to conducting a post-election audit or recount, which were overwritten by the Trusted Build installation, are not included among election project records. [*Id* at 1-2; Arnos Declaration, Ex. 24 ¶ 8; Ex. 2 ¶ 13].  To conceal her own wrongdoing, Griswold continues to claim that Peters acted unlawfully by making the forensic image [Griswold tweet 11/25/23 Ex. 17].

Every voting system used in an election of a federal officer must meet federal requirements. 52 U.S.C. § 21081(a). Such requirements provide that the voting system must "produce a record with an audit capacity for such system." 52 U.S.C. § 21081(a)(2)(A), which includes "a permanent paper record with a manual

audit capacity." 52 U.S.C. §21081(a)(2)(B)(i). That record must be "available as an official record for any recount…." 52 U.S.C. § 21081(a)(20)(B)(iii). The deletion of the records on the EMS server made an audit of the 2020 and 2021 elections impossible. The purpose of the election records retention statutes is to assure that audits can be conducted. 52 U.S.C. § 21801(b)(1)(D). Election records are also generally subject to public inspection under the Colorado Open Records Act.

A Colorado statute provides that Voting System Standards adopted by the Federal Election Commission (now the Election Assistance Commission) apply to elections in the State. CRS 1-5-601.5. Those standards define "voting system" to include "the software required to program, control, and support the equipment that is used to define ballots, to cast and count votes, to report and/or display election results, and to maintain and produce all audit trail information." VSS 1.5.1. "All audit trail information spelled out in subsection 4.5 of the Standards shall be retained in its original format, whether that be real-time logs generated by the system, or manual logs maintained by election personnel." VSS 2.2.11. The Department of Justice has stated: "Jurisdictions must therefore retain and preserve records created in digital or electronic form." https://www.justice.gov/opa/press-release//file/1417796/download.

## III.
## PRELIMINARY RELIEF IS WARRANTED.

A request for preliminary injunctive relief must be evaluated under the four-factor test of *Winter v. NRDC,* 555 U.S. 7, 20 (2008). *Planned Parenthood Ass'n of Utah v. Herbert.* 828 F.3d 1245, 1252 (10th Cir. 2016). For Peters to obtain a preliminary injunction, she must establish: (a) that she is likely to succeed on the merits; (b) that she is likely to suffer irreparable injury unless the preliminary injunction is granted; (c) that the balance of equities tips in her favor; and (d) that the grant of an injunction is in the public interest. 828 F.3d at 1252. When defendants are government actors, the last two factors are considered together, *Nken v. Holder,* 556 U.S. 416, 435 (2009).

### A. Peters Is Likely to Prevail on the Merits.

It is sufficient to obtain a preliminary injunction for a movant to present a *prima facie* case on the merits. *Planned Parenthood Ass'n of Utah v. Herbert,* 828 F.3d 1245, 1252 (10th Cir. 2016). 11A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2948.3 (2014) ("All courts agree that plaintiff must present a prima facie case but need not show a certainty of winning."). In the First Amendment context, this factor is often determinative because of the seminal importance to society of the interests at stake. *Verlo v. Martinez,* 820 F.3d 1113, 1126 (10th Cir. 2016); *see Dombrowski v. Pfister,* 380 U.S. 479, 486 (1965).

9

In order to obtain a preliminary injunction, plaintiffs must show that they are "substantially likely" to prevail. *Harmon v. City of Norman,* 981 F.3d 1141, 1146 (10th Cir. 2020). The preliminary relief sought by Peters requires that she satisfy a "heavier burden" regarding the likelihood-of-success and balance-of-harms factors because a preliminary injunction would grant her substantially the relief she could obtain after a trial on the merits. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,* 389 F.3d 973, 979 (10th Cir. 2004) (*en banc*) (*per curiam*), *aff'd sub nom. Gonzales v. O Centro Espirita Beneficiente Uniao Do Vegetal,* 546 U.S. 418 (2006). Peters must assert "questions going to the merits so serious, substantial, difficult and doubtful, as to make the issue ripe for litigation and deserving of more deliberate investigation." *RoDa Drilling Co. v. Siegal,* 552 F.3d 1203, 1208 n. 3 (10th Cir. 2009). A grant of Peters' motion, therefore, requires "a strong showing" on each of those two factors. *Westar Energy, Inc. v. Lake,* 352 F.3d 1215, 1224 (10th Cir. 2009). Peters satisfies that heavy burden by her showing of a clear violation of her First Amendment rights and by the overriding importance of protecting free speech. *Dombrowski,* 380 U.S. at 489.

The Complaint asserts two claims. Count 1 applies to the Federal Defendants only and is not at issue in this Motion.  Count 2 asserts that agents of the State of Colorado violated 42 U.S.C. § 1983 by acting under Colorado law to

violate Peters' First Amendment and Fourteen Amendment rights. The claim relies on the well-settled rule that "[a]ny form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom." *Worrell v. Henry,* 219 F.2d 1197, 1212 (10th Cir. 2000); *see McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 357 (1995) ("[T]he purpose behind the Bill of Rights, and the First Amendment in particular [is] to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society."); *Smith v. Paul,* 258 F.3d 1167, 1176 (10th Cir. 2001); *Phelps v. Hamilton,* 59 F.3d 1058, 1066 (10th Cir.1995); *United States v. P.H.E., Inc.,* 965 F.2d 848, 853 (10th Cir. 1992).

*Ex parte Young,* 209 U.S. 123 (1908) is "the fountainhead of federal injunctions against state prosecutions." *Dombrowski,* 380 U.S. at 483. The Court in that 1908 decision concluded that federal intervention is justified to protect persons against state criminal proceedings that violate the Constitution. 209 U.S. at 156. In later decisions, the Court limited that holding in the interest of comity to cases in which irreparable injury can be shown. *E.g., Douglas v. City of Jeannette,* 319 U.S. 157 (1943). But in *Dombrowski*, the Court held that *Douglas* does not govern when a First Amendment violation would cause irreparable injury and that any

substantial impairment of the freedom of expression clearly shows irreparable injury. 380 U.S. at 489-90. The party suffering such injury need not await "the state court disposition and ultimate review by this Court of any adverse determination." *Id.,* at 486;  *see* WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 4251 (4/23 Update).

### 1.  Peters Has Presented Valid *Prima Facie* Claims of Retaliation under the First and Fourteenth Amendments.

To establish a *prima facie* claim of unconstitutional retaliation for the exercise of a First Amendment right, Peters must offer evidence that (1) she was engaged in constitutionally protected activity, (2) Rubinstein's actions caused her injury that would chill a person of ordinary firmness from continuing that activity, and (3) Rubinstein's actions were substantially motivated as a response to Peters' protected activity. *Worrell,* 821 F2d at 1212. The requested injunctive relief would prohibit Rubinstein from continuing the criminal prosecution that is scheduled for trial in Mesa County District Court on February 24, 2024.   Peters meets her burden by showing a "strong likelihood" of prevailing on her retaliation claim. *Id.* at 980. The balance of harms is decidedly in her favor because the protection of First Amendment rights is a societal priority. *Dombrowski,* 380 U.S. at 486 ("For free expression—of transcendent value to all society, and not merely to those exercising their rights—might be the loser.").

### a. Constitutionally protected activities

Peters engaged in four constitutionally protected activities: (1) she exercised her right to free expression by speaking publicly about Griswold's violation of the election records preservation statutes and problems with computerized voting systems [Ex 2 ¶¶ 32, 33, 34, 55, 56]; (2) she exercised her right to freedom of association by enlisting and engaging other citizens who shared her views [*Id* ¶¶ 33, 34,]; (3) she exercised her right to make forensic images of public election records and to use the images to investigate government misconduct [*Id* ¶¶ 15-24]; and (4) she petitioned the government for redress of grievances by presenting reports of findings based on the images to the Mesa County Board of County Commissioners ("County Board") [*Id* ¶¶ 38, 48; Peters' petitions to the County Board are Exhibits 4 and 7]. Peters' public statements are protected by the Free Speech Clause of the First Amendment. *See Pickering v. Bd. of Educ.,* 391 U.S. 563, 573 (1988). Making forensic images of the EMS server is entitled to First Amendment protection. *See Irizarry v. Yehia,* 38 F.4th 1282, 1290-96 (10th Cir. 2022) (filming police to preserve evidence of misconduct is protected). Associating with others who share her concerns to advance a message that computerized voting systems are a threat to election integrity is an exercise of the freedom of association. *See Planned Parenthood Ass'n,* 828 F.3d at 1259.  Peters' submissions

of expert reports to the County Board with a request to stop using insecure computer voting systems is an exercise of the right to petition for redress of grievances. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).

The subject matter of Peters' public statements and other protected activities constitutes an issue of profound public concern. *See Trant v. State of Oklahoma,* 754 F.3d 1158, 1165 (10th Cir. 2014). Misconduct by government officials and the integrity of the election process are also matters of profound public concern. *Durham v. Jones,* 737 F.3d 293, 296 (4th Cir. 2013) (misconduct); *Bass v. Richards,* 308 F.3d 1081, 1089 (10th Cir. 2002) (elections).

"The controversial character of the statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin v. McPherson,* 483 U.S. 378, 387 (1987). Peters' speech is constitutionally protected, even if Rubinstein disagrees with her point of view. *See United States v. Alvarez,* 5667 U.S. 709, 729 (2012) (plurality opinion); *id.,* at 739 (Breyer, J., concurring); *id.,* at 751-52 (Alito, J., dissenting). "[F]alsity alone may not suffice to bring the speech outside the First Amendment." *Id.,* at 719. Moreover, even within its narrow scope, the Privileges and Immunities Clause of the Fourteenth Amendment protects "the right of the citizen of this country…to engage in administering [the national government's] functions." *Slaughter-House Cases,* 83 U.S. 36, 79 (1872). *See also In re Quarles,*

158 U.S. 532, 535 (1895) ("Among the rights and privileges which have been recognized by this court to be secured to citizens of the United States by the constitution are … the right of every judicial or executive officer, or other person engaged in the service … of the United States, in the course of the administration of justice, to be protected from lawless violence."). Peters' efforts to comply with federal law surely qualify for protection as a privilege and immunity within the meaning of the Fourteenth Amendment, especially in the context of combating the potential corruption of elections, including a federal election. *Cf. United States v. Classic,* 313 U.S. 299, 316 (1941) ("That the free choice by the people of representatives in Congress … was one of the great purposes of our Constitutional scheme of government cannot be doubted. We cannot regard it as any the less the constitutional purpose or its words as any the less guaranteeing the integrity of that choice…."); *The Ku-Klux Klan Cases,* 110 U.S. 651, 666-67 (1884) ("In a republican government, like ours, … the temptations to control … elections by violence and by corruption is a constant source of danger…. [N]o lover of his country can shut his eyes to the fear of future danger from both sources.").

The privilege of a county official to faithfully comply with a federal law that is part of a federal regime advancing secure federal elections, and her concomitant immunity from state prosecution punishing that effort, is no novelty. Rather, it is a

proposition fitting comfortably within the long body of precedent of Supremacy Clause immunity that recognizes the immunity of federal officials from prosecution for state law violations caused by their execution of federal law. In *Cunningham v. Neagle,* 135 U.S. 1 (1890), the Supreme Court established that federal officers were immune from state prosecution for acts committed within the reasonable scope of their duties. The Tenth Circuit has likewise recognized that "Supremacy Clause immunity governs the extent to which states may impose civil or criminal liability on federal officials for alleged violations of state law committed in the course of their federal duties." *Wyoming v. Livingston,* 443 F.3d 1211, 1213 (10th Cir. 2006).

These principles apply with equal force to protect conduct by non-federal officials. The rule is that "states may not impede or interfere with the actions of federal executive officials when they are carrying out federal laws." *Id.,* at 1217. The animating principle is fundamental and long recognized in our constitutional law that "the states have no power … to retard, impede, burden, or in any manner control, the operations of the constitutional law enacted by congress to carry into execution the power vested in the general government." *Id.* (quoting *McCullogh v. Maryland,* 17 U.S. 316, 436 (1819)). Thus, it is the effective operation of federal law that is key, not the identity of the person executing it. Here, Peters was

attempting to faithfully assure the operation of the federal election records preservation statute, 52 U.S.C. § 20701, a legitimate enactment of Congress exercising the power vested in it by the Constitution.

"The question is not whether federal law expressly authorizes a violation of state law, but whether the federal official's conduct was reasonably necessary for the performance of his duties." *Wyoming v. Livingston,* 443 F.3d at 1227-28.  It is beyond doubt that a federal officer doing what Peters did would be immune from state prosecution for those acts, evaluating the reasonableness of those acts in light of "the circumstances as they appear[ed] to federal officers at the time of the act in question." *Id.*, at 1229. The fact that Peters was a county election official acting to assure compliance with a federal statute that expressly required that "every officer of election" preserve  "all records" of the 2020 election compels that result; she is immune from state prosecution for her acts done to comply with federal law.

Finally, it would seem undeniable that a baseless state prosecution as retaliation for Peters' efforts to comply with federal law is an utterly lawless undertaking, offending not only the Supremacy Clause, but also the most basic notions of due process protected by the Fourteenth Amendment. *Cf. Duncan v. Louisiana,* 391 U.S. 145, 149 (1968); *Brown v. Mississippi,* 297 U.S. 278, 285-87 (1936). After all, "The Due Process Clause prevents state activity that is, literally,

lawless." John Harrison, *Reconstructing the Privileges or Immunities Clause*, 101 Yale L.J. 1385, 1454 (1992).

### b. Irreparable injury

The second *Winter* factor requires Peters to show she is likely to suffer irreparable harm if preliminary injunctive relief is not granted. *Benisek v. Lamone.* 138 S. Ct. 1942, 1944 (2018). The violation of a First Amendment right constitutes irreparable injury. *Elrod v. Burns,* 427 U.S. 347, 373 (1976) ("[T]he temporary violation of a constitutional right itself is enough to establish irreparable harm."); *Heideman v. S. Salt Lake City,* 723 F.3d 1114, 1145 (10th Cir. 2013); *Kikumura v. Hurley,* 242 F.3d 950, 963 (10th Cir. 2001) ("When an alleged constitutional right is involved, most courts hold that no further of irreparable injury is necessary.").

To warrant a preliminary injunction, Peters' irreparable injury must be great and immediate. *Moore v. Sims,* 442 U.S. 415, 433 (1979); *Phelps,* 59 F.3d at 1064. The injuries caused and threatened by Rubinstein's ongoing actions to punish Peters for constitutionally protected activity are plainly immediate. *Dombrowski,* 380 U.S. at 489. Because of the societal importance of protecting an individual's free speech rights, the injuries are great. *Id.* at 486.

Whether Defendant's actions would chill a person of ordinary firmness from continuing her First Amendment activities is subject to an objective test. *Irizarry v.*

*Yehia,* 38 F.4th 1282, 1292 (10th Cir. 2022). It is a test "designed to weed out trivial matters…." *Garcia v. City of Trenton,* 348 F.3d 726, 728 (8th Cir. 2003). The lengths to which Rubinstein has gone constitute an extraordinary and coordinated attempt to deter Peters and her associates from persisting in political speech and the investigation of government misconduct. By any standard, Defendant's actions had a chilling effect on Peters. It is beyond reasonable dispute that being criminally prosecuted would objectively dissuade a person of ordinary firmness from continuing to engage in the activity that provoked the retaliatory prosecution.  Rubinstein's prosecution of Peters and involvement of FBI agents deterred Elbert County Clerk Dallas Schroeder and other county clerks from associating with Peters [Ex 6].  Before the FBI raids on the homes of Peters' and her political associate Sherronna Bishop, citizens were eager to associate with them.  After the raids, citizens were reluctant to do so [Ex 24 ¶¶ 41-42].

The injury that Peters must show to obtain preliminary injunctive relief need only be "likely." *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 297 (D.C. Cir. 2006). Peters has shown in her Complaint and her Declaration [Ex2] that there is more than a "subjective chill" of First Amendment rights. Peters will suffer irreparable injury if a preliminary injunction is not granted. *Roman Catholic*

*Diocese of Brooklyn v. Cuomo,* 141 S. Ct. 63, 67 (2020); *Dombrowski,* 380 U.S. at 485-86**.**

### c.  **Retaliatory Motivation**

"The First Amendment bars a criminal prosecution where the proceeding is motivated by the improper purpose of interfering with the defendant's constitutionally protected speech." *P.H.E., Inc.,* 965 F.2d at 849. A prosecutor has a "responsibility to refrain from improper methods calculated to produce a wrong conviction as well as to use every legitimate means to bring about a just one." *Harris v. People,* 888 P.2d 259, 263 (Colo. Sup. Ct. 1985) (*en banc*)

Rubinstein began investigating Peters on August 9, 2021, after Griswold's Deputy, Christopher Beall, called and asked him to do so [Ex. 9 at 2].  Since then, Rubinstein has retaliated against Peters in close coordination with Griswold.

Griswold's zeal to punish Peters for exercising First Amendment rights is demonstrated by Election Order 2022-01, in which Griswold demanded that Peters recant public statements about voting system equipment [Ex 26 ¶ 24]. When Peters refused to recant her statements, Griswold carried out her threat to remove Peters from office.  Griswold published a press release on January 18, 2022, announcing the filing of a lawsuit to replace Peters as the Mesa County designated election official, stating: "Clerk Peters' actions constituted one of the nation's first insider

threats where an official, elected to uphold free, fair, and secure selections risked the integrity of the election system **in an effort to prove unfounded conspiracy theories.**" [Ex. 27 at 2] (Emphasis added). That statement shows that Griswold's intended purpose was to punish Peters for exercising her First Amendment right to make a copy of the EMS server to document government misconduct. *See Irizarry,* 38 F.4th at 1290-96.

On February 14, 2022, Peters announced her candidacy for Colorado Secretary of State, making her a direct competitor for Griswold's office. [Ex. 2 ¶ 47]. On March 1, 2022, Peters presented her second petition to the County Board, asking them to stop using computer voting systems [Ex. 7]. Seven days later, Rubinstein announced the indictment of Peters [Ex. 8].

Rubinstein never investigated Griswold's destruction of election records during the Trusted Build installation, which shows his bias for Griswold and animus against Peters. While investigating Peters at Griswold's request, Rubinstein advised a lawyer representing Peters and her husband not to communicate with Peters because she was being investigated. [Ex. 2 ¶ 41; attorney email Ex. 5]. Rubinstein then indicted Peters 22 days after she announced her candidacy for Secretary of State, and one week after she presented her second

petition to the County Board.  After he indicted Peters, Rubinstein requested an outrageous $500,000 bond [Ex 2 ¶ 52].

When the court set bond at $25,000, Rubinstein insisted on bond conditions that effectively removed Peters from office.  She was prohibited from contacting any of her employees.  She could not enter her offices.  [*Id* ¶ 53; Bond Ex. 9 at 2]. The day after the bond hearing, Rubinstein's investigator made harassing telephone calls to Peters' 93 year old mother, her daughter, and her sisters.  [*Id* ¶ 54].  When Peters continued to speak publicly, Rubinstein filed a motion to revoke her bond [*Id* ¶¶ 55-56; Motion Ex. 10].  Peters appeared in a movie advocating election transparency.  Rubinstein opposed Peters' request to appear at the premiere, arguing that Peters "is seeking permission to leave the state so that she can be celebrated as a hero for the conduct that a grand jury has indicted her for." [Ex. 2 , ¶ 57; Motion Ex. 11].  Although Peters never failed to appear in court, Rubinstein advised the court that she was a "flight risk" when Peters asked court permission to use her passport to obtain TSA pre-check flight status for domestic travel [Ex. 2 ¶ 58; DA Response Ex. 12].  When Peters sent an email notice to 64 county clerks of her request for a recount of an election, Rubinstein claimed the email violated bond conditions, and persuaded the court to deny her travel requests.  [Ex. 2 ¶ 59; Order Ex. 13].

Like Griswold, Rubinstein sought to publicly discredit Peters and computer science experts who agreed with her.  Although Rubinstein had no expertise in computer science, he claimed implausibly that Peters' assistant, Sandra Brown, had interrupted ballot tabulation in two consecutive elections and caused the creation of new sets of ballots [See Rubinstein report Ex. 22, attempting to publicly discredit Peters' experts, refuted by Daugherity Declaration Ex. 19].

### d.  Bad faith

Peters must show an "unusual circumstance" to justify a preliminary injunction prohibiting Rubinstein from continuing to prosecute Peters. *Younger v. Harris,* 401 U.S. at 53. It is well established that one such circumstance is bad faith on the part of a governmental official in pursuing an investigation or prosecution. *Dombrowski,* 380 U.S. at 490; *Phelps,* 59 F.3d at 1066.  Prosecutorial bad faith is plainly present here.

In addition to the misrepresentations that Rubinstein's investigators made to the court (see p. 7 above), Rubinstein misinformed the grand jury that Peters' image of the server was "unlawfully downloaded" [Ex. 8 at 6].  As Griswold's Deputy testified, making a forensic image of an EMS server did not violate the law [Ex. 15 at 2 L. 14-17].

Rubinstein acted in bad faith by indicting Peters because he had no reasonable basis for believing he could obtain a valid conviction for the charges. *Kugler v. Helfant,* 421 U.S. 117, 126 n.6 (1975); *Fitzgerald,* 636 F.2d at 945. As a matter of law and fact, the indictment does not set out a *prima facie* case against Peters for the charges specified. Each count falls short of the pleading threshold required for a minimally sufficient indictment. "An indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense." *United States v. Hathaway*, 318 F.3d 1001, 1009 (10th Cir. 2003). As the U.S. Supreme Court has explained, "Undoubtedly the language of the statute may be used in the general description of an offence, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." *Hamling v. United States*, 418 U.S. 87, 117–18 (1974).

The Colorado Supreme Court has underscored this principle:

> A criminal indictment by a grand jury serves two essential purposes. First, the indictment must give the defendant sufficient notice of the crime that has allegedly been committed so that a defense may be prepared. Second, the indictment must define the acts which constitute the crime with sufficient definiteness so that the defendant may plead the resolution of the indictment as a bar to subsequent proceedings. To accomplish these purposes the indictment must clearly state the essential facts which constitute the offense. Fundamental fairness

24

requires no less. These requirements have been codified in Crim.P. 7(a)(2) which states: "Every indictment of the grand jury shall state the crime charged and essential facts which constitute the offense."

*People v. Buckallew*, 848 P.2d 904, 909 (Colo. 1993). Allegations of essential facts are absent from each count.

• Counts 1, 2 and 5 of the indictment charge violations of CRS § 18-8-306 (making an attempt to influence any public official by "deceit … with the intent thereby to alter or affect the public servant's decision, vote, opinion, or action" a Class 4 felony) with respect to Jess Romero, a voting systems manager from the Secretary of State's Office ("SOS"), David Underwood, a Mesa County IT employee, and Danny Casias, an SOS employee. For each of the three, the indictment recites the text of the statute. [Ex. 8 at 3-4]. For Romero, the indictment simply adds that he established procedures for the Trusted Build upgrade. [*Id* at 3]. For Underwood, the indictment alleges that he was the technician who put together the temporary security identification for Wood. [*Id*] For Casias, it alleges only that he met the consultant Peters identified as Wood. [*Id at 4*]. For none of the individuals does the indictment even try to allege some specific "decision, vote, opinion or action" within the meaning of the statute – i.e., some "formal exercise of government power," *McDonnell v. United States*, 579 U.S. 550, 578 (2016) – that Peters was supposedly trying to influence [*Id* at 3-4, 12].

25

So, too, the indictment fails to allege facts showing Peters acted with

"deceit," which the law does not understand as being satisfied by just any

misrepresentation. As the Colorado Supreme Court has explained, the statute does

not define "deceit," so the Court derived its meaning from common usage:

> *Black's Law Dictionary* defines deceit as "[a] ***fraudulent*** and deceptive
> misrepresentation ... used by one or more persons to deceive and trick
> another, who is ignorant of the true facts, to the prejudice and damage
> of the party imposed upon." *Id.* at 405. Similarly, in *Webster's Third
> New International Dictionary* 584 (1986), deceit is defined as "any
> trick, collusion, contrivance, false representation, or underhand practice
> used ***to defraud*** another."

*People v. Janousek*, 871 P.2d 1189, 1196 (Colo. 1994) (emphases added).

The deceit condemned by this statute must have the purpose of ***defrauding***

someone, that is, "obtain[ing] money or property by false or fraudulent pretenses,

representations or promises." *United States v. Kalu*, 791 F.3d 1194, 1204 (10th Cir.

2015)(quoting Tenth Circuit Pattern Jury Instruction 2.56). Peters' actions were not

intended to deceive, but instead had the practical purpose of avoiding obstacles

improperly created by officials who were trying to erase election records while

preventing any copy from being preserved. The indictment fails to allege any facts

that call into question Peters' good-faith and lawful motive.  The indictment does

not state that Peters made representations about Wood and Hayes to any "public

servant" in order to obtain money or property from them. The necessary element of

§ 18-8-306 that Peters acted with "deceit" directed at accomplishing fraud is completely absent from the allegations against her.

• Counts 4, 6, and 7 charge Peters with criminal impersonation and a conspiracy to commit criminal impersonation in violation of CRS §§ 18-5-113(1)(B)(1) and 18-2-201. These counts also appear to arise from Hayes' use of Wood's access badge, but once again the indictment fails to give the minimally sufficient detail to describe what the charge really is. For example, the indictment claims the defendants used Woods' identification "to further their criminal scheme," [*Id* at 7], but never describes what that scheme was. Count 6 appears to allege that Peters impersonated Wood, [*Id* at 4] but no factual detail is supplied as to how this impersonation occurred. Count 6 claims that Wood is somehow subject to "various forms of liability and criminal exposure" because of Peters' conduct, but never explains what that exposure could be. [*Id*]. As to conspiracy, Count 7 identifies as conspirators ***possibly*** Sandra Brown and ***possibly*** persons ***unknown*** to the Grand Jury and the District Attorney. [*Id* at 4]

The Colorado Supreme Court has been careful to circumscribe the criminal impersonation statute to avoid any constitutional vulnerability for overbreadth. As the Court noted:

Certainly, there are lawful uses of assumed fictitious identities, as was recognized by the legislature when it drafted the statute and limited the

27

> proscription to those false impersonations undertaken to accomplish **_unlawful_** purposes. In view of this limitation, the statute cannot be said to sweep unreasonably broadly and proscribe protected conduct, as contended by appellant.

*People v. Gonzales*, 534 P.2d 626, 628 (Colo. 1975)(emphasis in original).

Thus, this "statute … defines criminal impersonation as assuming a false or fictitious identity or capacity, and in that identity or capacity, doing any act with intent to unlawfully gain a benefit or injure or defraud another." *People v. Brown*, 562 P.2d 754, 756 (Colo. 1977). Impersonation as occurred in this case -- not designed to secure an unlawful benefit or to injure or defraud – does not qualify as a criminal impersonation used to secure some benefit. As one appellate court explained:

> Although some cases addressing criminal impersonation have found that the intent to defraud could be inferred from the surrounding circumstances … those cases cannot be read as standing for the proposition that criminal intent is invariably to be inferred whenever false identifying information is given to police. Indeed, in *People v. Shaw, …* a conviction for criminal impersonation based on the defendant's having given a false name to an arresting officer was reversed because the prosecution had failed to present evidence that the use of the false name would result in a benefit to the defendant.

*People v. Johnson*, 30 P.3d 718, 723 (Colo. App. 2000).

Finally, Wood agreed to supply his identification to Hayes. [Ex. 2 ¶ 25].  It is not true that "impersonation" of Wood was undertaken without his permission.

• Count 8 also arises from the use of Wood's access badge, charging Peters with "identity theft" in violation of C.R.S. § 18-5-902(1)(A), which makes it a crime to use the "personal identifying information, financial identifying information or financial device of another without permission or lawful authority with the intent to obtain cash, credit, property, services, or any other thing of value or to make a financial payment." *See also* C.R.S. § 18-1-901 ("'Thing of value' includes real property, tangible and intangible personal property, contract rights, choses in action, services, confidential information, medical records information, and any rights of use or enjoyment connected therewith."). It is beyond dispute that Peters did not act with the intent to acquire cash or anything else of value within the meaning of the statute. This charge is so utterly unfounded it demonstrates Rubinstein's bad faith.

The indictment mentions the use of only two items associated with Wood --: a key card access badge and a "Yubikey" -- but it does not explain how either item qualifies as "personal identifying information, financial identifying information or [a] financial device" within the meaning of the statute. *See* C.R.S. § 18-5-901(13) (defining "personal identifying information"); C.R.S. § 18-5-901(7) (defining "financial identifying information"); C.R.S. § 18-5-901(6) (defining "financial device").

The Yubikey is something like a thumb drive, was not used by anyone, and so cannot be the basis for this count. While the access badge did have Wood's name on it, this only identified who the badge was assigned to;  it did not make the access card a form of personal identification. Access cards were often issued simply labelled "Temp 1," "Temp 2," and so on, for vendors and others who were not county employees [Ex 2 ¶ 27], so the badge did not represent and was not linked to somebody of detailed identifying information filed somewhere. In truth, the badge functioned more like a modern electronic hotel room key. It is a temporary pass giving the bearer access to certain facilities. It is not the kind of "personal identifying information" that can be stolen within the understanding of § 18-5-902. Even if the access badge does qualify as "personal qualifying information" under § 18-5-902, Wood gave his permission for it to be used by Hayes [Ex. 2 ¶ 25], so no impersonation or "theft" of Wood's identity took place.

• Count 9 charges Peters with first degree official misconduct in violation of C.R.S. § 18-8-404(1). An official violates this statute:

> if, with intent to obtain a benefit for the public servant or another or maliciously to cause harm to another, he or she knowingly:
>
> (a) Commits an act relating to his office but constituting an unauthorized exercise of his official function; or
>
> (b) Refrains from performing a duty imposed upon him by law; or

(c) Violates any statute or lawfully adopted rule or regulation relating to his office.

The indictment relies exclusively on the text of the statute to make this charge, which is fatally insufficient without more substantiating allegations. Most importantly, this offense must be undertaken to "obtain a benefit" or to "maliciously cause harm to another." The importance of this required specific intent is illustrated by the Colorado Supreme Court's reversal of a county tax collector's conviction for this offense in *People v. Dilger,* 585 P.2d 918 (Colo. 1978). The tax collector had been approaching various commercial taxpayers seeking to collect a penalty for the nonpayment of taxes, when, as it turned out, those taxpayers were actually not delinquent in their tax payments. And these field visits were contrary to the procedures of the tax assessor's office. As the Court explained in reversing the conviction:

> We find that in the present case the requisite element of "intent to obtain a benefit for himself or maliciously to cause harm to another" was not proved beyond a reasonable doubt. Both of the principal witnesses for the prosecution … admitted that the defendant never asked or even implied that they pay him any money. There is therefore no direct evidence that the defendant sought to obtain a monetary or other benefit for himself….
>
> While specific intent may be inferred circumstantially, mere conjecture of intent is not acceptable in lieu of proof beyond a reasonable doubt…. Evidence showing that a tax collector approached nondelinquent taxpayers and requested an unusual means of payment

does not establish beyond a reasonable doubt intent to obtain personal benefit.

*Id.,* at 919-20. *See also* B. Covington, *State Official Misconduct Statutes and Anticorruption Federalism After Kelly v. United States*, 121 Colum. L. Rev. 273, 283 & n. 63 (2021) (citing *Dilger*) (element of specific intent "provide[s] defendants with a valid defense if they acted in good faith for the public benefit but did so mistakenly.").

Missing here are any factual allegations to support this element of the offense. Peters complied with federal (and state) law when she made a backup copy of election records before they were destroyed by the Trusted Build installation, which erased those records. There is no evidence that Peters acted from any of the corrupt motives required by C.R.S. § 18-8-404(1).

Beyond the issue of specific intent, a fatal lack of specificity permeates this count. The indictment states that Peters acted to benefit someone or to cause harm to someone, but there are no factual allegations to support such a claim. Who was benefited? Who was harmed? Similarly, the indictment alleges she took an act that was an "unauthorized exercise of her official function," but never says what that act was. The indictment sets out various general characterizations of Peters' conduct using "and/or" phrasing, which means Peters cannot know what specifically she is accused of doing. The indictment does not even specify the

statute or regulation Peters supposedly violated – if, of course, the indictment is actually charging that aspect of the offense, which one cannot know from the text of the indictment.  The absence of rudimentary factual detail renders Count 9 a nullity as a matter of law.

• Count 10 charges a violation of CRS § 1-13-107(1), alleging that "Tina Peters was a public officer, election official, or other person upon whom any duty is imposed by this code who then violated, neglected, or failed to perform such duty or is guilty of corrupt conduct in the discharge of the same." Yet this Count fails to put Peters on notice of the alleged illegal conduct that forms the basis for her indictment for a "violation of duty." Strikingly, the indictment does not even specify the duty at issue in this charge. And again, the indictment is punctuated by "or," and so the precise wrongdoing at issue is not identified. According to the indictment, Peters *either* violated an unnamed duty, *or* she in some way neglected it, *or* she failed to perform it altogether, *or* she engaged in unspecified "corrupt conduct in the discharge" of that mystery duty.

Earlier on, the indictment cites two rules concerning access to secure areas, Rules 20.5.3(a) and 20.5.5, (Indictment, at 9), but does not expressly link them to this Count or otherwise allege facts establishing a violation of those rules. Importantly, the indictment fails to mention Rule 20.5.3(b), which provides that

"no other individuals may be present in these locations ***unless supervised by one or more employees with authorized access***." (emphasis added). Since there is no allegation that Hayes was unaccompanied by Peters, who had authorized access, no violation of this Rule could have occurred.

• Finally, Count 11 charges a violation of C.R.S. § 1-13-114, alleging that "Tina Peters willfully interfered or willfully refused to comply with the rules of the Secretary of State or the Secretary of State's designated agent in carrying out of the powers and duties proscribed [sic] in section 1-1-107, C.R.S." Absent is a "statement of the facts and circumstances as will inform the accused of the specific offense … with which he is charged." *Hamling,* 418 U.S. at 118. There is no identification of the rules that are at issue here, much less a specific description of facts indicating that Peters interfered or refused to comply with them.  Though the indictment claims Peters did not comply with "all" of the requests or directives in an Election Order of the Secretary of State, that simply means that Peters did in fact comply with some, but those she allegedly did not comply with are not disclosed.

However, we do know – and the indictment does not suggest otherwise -- that all of Peters' acts were directed at ensuring election records were preserved as required by federal and Colorado law. 52 U.S.C. § 20701; CRS § 1-7-802. If there

were any rules or administrative directives with which Peters did not comply, those rules and directives were subordinate to Peters' statutory obligations. Peters' compliance with them under the circumstances would have improperly advanced a criminal scheme to destroy election records in violation of the governing statutes. It is an elementary proposition of law that "the Secretary of State does not have authority to promulgate rules that conflict with other provisions of law." *Gessler v. Colorado Common Cause*, 327 P.3d 232, 235 (Colo. 2014). *See also Hanlen v. Gessler*, 333 P.3d 41, 49 (Colo. 2014) ("[T]he Secretary's power to promulgate rules regarding elections is not without limits. Specifically, the Secretary lacks authority to promulgate rules that conflict with statutory provisions."); CRS § 24-4-104(4)(b)(IV) ("No rule shall be adopted unless … [t]he regulation does not conflict with other provisions of law."); C.R.S. § 24-2-103(8)(a) ("Any rule … which conflicts with a statute shall be void."); C.R.S. § 24-4-106(7) (requiring courts to set aside agency actions that are "contrary to law"). Thus, any rules or administrative directives violated by Peters in the context of this case were utterly void and cannot provide a basis for the alleged violation of C.R.S. § 1-13-114.

### e. Peters is unlikely to receive a fair trial in state court

Another basis for enjoining a state prosecution is that there will likely be no adequate opportunity for the plaintiff to be heard on her federal constitutional

claims or defenses. *Kugler v. Helfant,* 421 U.S. 117, 124 (1975) ("Only if extraordinary circumstances render the state court incapable of fairly and fully adjudicating the federal issues before it, can there be any relaxation of the deference to be accorded to the state criminal process."); *Younger,* 401 U.S. at 45; *Amalgamated Fed. Emp. Union Local 590 v. Logan Valley Plaza, Inc.,* 391 U.S. 308, 328-29 n. 3 (1068) (Black, J., dissenting); *Dombrowski,* 390 U.S. at 486. In this case, the June 5, 2022, ruling by Judge Matthew D. Barrett on a motion to quash subpoenas *duces tecum* in *People v. Peters,* Case No. 22CR371 effectively precludes reliance by Peters on federal constitutional defenses that she is entitled to assert. Judge Barrett ruled that the records sought by Peters' subpoena were not material to the issues pending in Peters' criminal case and further:

> The jury will not be asked to address any questions regarding the functioning of election equipment.
>
> [A]ny report regarding the verity of the election equipment made by her experts, or any counter expert, is entirely irrelevant. These reports make no issue of material fact in this case more or less likely. This criminal case is not the forum for these matters.
>
> Choice of evil is a statutory defense and is only applicable when the alleged crimes were necessary as an emergency measure to avoid an imminent public or private injury that was about to occur by reason of a situation occasioned or developed through the conduct of the actor and which is of sufficient gravity to outweigh the criminal conduct.

[Ex 16 at 3].  These rulings will preclude Peters from asserting defenses based on the First and Fourteenth Amendments, as well as the Supremacy Clause.

### B. Peters Will Suffer Irreparable Injury Without Preliminary Relief

The first two *Winter* factors are the most critical. *Nken,* 556 U.S. at 434. The second factor is that Peters must show that she is likely to suffer irreparable harm if preliminary injunctive relief is not granted. *Benisek v. Lamone.* 138 S. Ct. 1942, Peters has previously described on pages 14-15 the irreparable injury that she will continue to suffer unless her motion for preliminary injunctive relief is granted.

### C. The Balance of Equities Favors Peters.

The third *Winter* factor, whether the balance of the equities favors the moving party, is considered together with the fourth factor, whether an award of a motion for preliminary injunction would serve the public interest, when Government is the opposing party. *Nken,* 556 U.S. at 435.

The protection of individual constitutional rights always serves the public interest. *Free the Nipple-Fort Collins v. City of Fort Collins,* 916 F.3d 792, 807 (10th Cir. 2018); *Awad v. Ziriax,* 670 F.3d 1111, 1132 (10th Cir. 2012)*.* Peters' interest in vindicating her rights to free speech, to free association, and to petition the government for the redress of grievances guaranteed by the First Amendment outweighs Defendants' interest in pursuing criminal proceedings against her,

particularly given the absence of justification for investigating and charging Peters based on the statutes they cite. *See Bass,* 365 F.3d at 1089; *Utah Licensed Beverage Ass'n v. Leavitt,* 256 F.3d 1061, 1076 (10th Cir. 2001). The Seventh Circuit has noted: "In First Amendment cases, 'the likelihood of success on the merits will often be the determinative factor.' " *ACLU of Illinois v. Alvarez,* 679 F.3d 588, 589 (7th Cir. 2018).

The public interest would be served by granting preliminary relief in this case. "[T]he public interest…favors plaintiffs' assertion of their First Amendment rights." *Elam Constr., Inc. v. Regional Transp. Dist.,* 129 F.3d 1343, 1347 (10th Cir. 1997)); *see AT&T Co. v. Winbach and Conserve Program, Inc.,* 42 F.3d 1421, 1427 n. 8 (3d Cir. 1994): "As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff."

## CONCLUSION

The Court should enter an Order granting a preliminary injunction prohibiting Defendant Rubinstein from further prosecution, investigation, or harassment of Peters.

Respectfully submitted November 27, 2023

s/*John Case*_____
John Case

38

John Case, P.C.
6901 South Pierce St. #340
Littleton CO 80128
Phone|303-667-7407
brief@johncaselaw.com
Co-Counsel for Plaintiff

Patrick M. McSweeney
Robert J. Cynkar
Christopher I. Kachouroff
Lyndsey L. Bisch
*McSweeney, Cynkar & Kachouroff, PLLC*
3358 John Tree Hill Road
Powhatan, VA 23139
(804) 937-0895
FAX (877) 598-4668
Co-Counsel for Plaintiff

## CERTIFICATE OF LENGTH

Undersigned counsel certifies that the foregoing Motion and Memorandum

consists of 8825 words, exclusive of caption, signature block, and tables.

s/*John Case*
John Case

## CERTIFICATE OF SERVICE

Undersigned counsel certifies that the foregoing Motion and Memorandum will be

personally served upon the Defendant Daniel P. Rubinstein with a copy of the

Summons and Complaint and all exhibits on November 27, 2023.

s/*John Case*
John Case

Plaintiff's Motion for Preliminary Injunction

EXHIBIT 2, Page 1

## DECLARATION OF TINA PETERS

I, Tina M. Peters, make this declaration pursuant to 28 U.S.C. § 1746.

1.      I am a citizen of the United States and a resident of Mesa County, Colorado.

2.      I am over the age of 21 years and competent to make this declaration.

3.      I was elected Mesa County Clerk and Recorder in November 2018 for a term of four years.

4.      I served in 2021 as the designated election official of Mesa County. As such, I was responsible for preserving election records. Federal law requires all officers of election to preserve election records for 22 months in case of audits, recounts, or litigation. Colorado statute requires county clerks to preserve election records for 25 months.

5.      Many constituents requested an audit of the November 2020 election. Others were suspicious of the outcome of the March 2021 municipal election.

6.      On April 30, 2021, my office received an email from the office of Secretary Griswold. The email is Exhibit 1. It directed me to participate in the installation on the Mesa County election management system ("EMS") server of an upgrade that was referred to as the "Trusted Build."

7.      In an April 2021 telephone conversation with David Stahl, a Dominion employee, I learned that the Trusted Build upgrade would delete the QR code program that allows the system to read certain ballots. I understood that erasure of this information during the Trusted Build would make results of the 2020 and 2021 elections impossible to verify.

8.      I then confirmed in a telephone conversation with a member of Griswold's staff that the Trusted Build would erase the electronic records that Mr. Stahl had identified.

9.      It was my responsibility as County Clerk and Recorder and the designated election official of Mesa County to know the laws that apply to my job. I had studied 52 U.S.C. § 20701 and Colorado Revised Statute 1-7-802. These laws require preservation of election records for 22 months and 25 months,

**Exhibit E**

respectively, following an election. The federal statute carries a criminal penalty. My office took the law seriously.  During elections, we were instructed to save any paper found on the floor of a voting service polling center, and to place the paper in a box marked "Trash" and save it for 25 months.

10.     I was concerned that the Trusted Build would delete from the EMS server digital information that I was required by law to preserve.

11.     The email from Secretary Griswold's office had the unavoidable effect of forcing me to participate in the deletion of election records from county voting system computers, in violation of the election records preservation statutes.

12.     The Secretary required all local election officials to back up "election project" records before the Trusted Build installation, which I did.

13.     The Mesa County "election project" records retained the results of the election, but not how the results were obtained.  "Election project" records did not include all electronic information that experts said was essential  for a post-election audit.

14.     I did not trust the Secretary of State because she applied partisan views in a non-partisan office.  The Secretary appointed a Democrat to oversee my office.  Employees of the Secretary collaborated with a recall election effort, which failed.  I concluded that it would be futile to resist the Trusted Build upgrade.

15.     I had to choose between violating election preservation laws, or going against the Secretary's email.  I chose to go against the email.

16.     At the time, as County Clerk and Recorder, it was legal for me to engage a consultant to make a forensic image of the EMS server.

17.     I engaged a consultant to make a forensic image of the server.  The consultant's name was Hayes.

18.     My understanding is that a forensic image is a bit-by-bit, unalterable (read only) copy of all election records stored on the election management system. I understood that a forensic image is admissible in court as evidence.

19.     I authorized the consultant to enter the secured area and make the forensic images under the supervision of myself and elections manager Sandra Brown, as provided in Election Rule 20.5.3(b) [Exhibit 3].

20.     Making the forensic images did not violate any statute, rule, or order in effect at the time.

21.     Making the forensic images caused no harm or damage to the computer voting system of Mesa County.

22.     Making the forensic images of the Mesa County EMS server did not interfere with or obstruct in any way the installation of the Trusted Build upgrade nor did it breach security in any way.

23.     Secretary Griswold's email protocol had the effect of concealing unlawful deletion of election records, by preventing expert oversight of the Trusted Build.

24.     I concluded that, to preserve election records as required by law, I had no reasonable alternative except to ignore Secretary Griswold's unlawful email.

25.     My staff provided the consultant with the electronic access badge of Gerald Wood, so that the consultant could enter the secured area.  Mr. Wood voluntarily consented to his badge being used by the consultant.

26.     On May 23, 2021, two days before the Trusted Build, Hayes made a forensic image of the EMS server hard drive.  Sandra Brown and I were present. On May 26, 2021, after the Trusted Build was completed, Hayes made a second forensic image of the EMS server hard drive.

27.     During an election, when ballots are being processed, access to secured areas is strictly controlled.  The Trusted Build was presented as a benign computer upgrade that did not take place during an election.  Access badges were often issued labeled "Temp 1," "Temp 2," and so on, for vendors and others who were not county employees but needed access to secure areas to perform functions authorized by the clerk.

28.     When the consultant was in the secure area during the Trusted Build, he was supervised by an employee with authorized access in compliance with Election Rule 20.5.3(b).

29.     Secretary Griswold and District Attorney Daniel Rubinstein contend that my noncompliance with Griswold's email violated CRS 1-13107(1), 1-13-114, 18-2-201, 18-5-113(1)(B)(I), 18-5-902(1), and 18-8-306. I have been indicted for violating those statutory provisions.

30.     I believe that I did not violate any criminal statute, because my actions preserved election records that I was required by law to preserve.

31.     If I had not made the forensic images, election records of the November 2020 election, and the March 2021 municipal election, would have been irretrievably lost.

32.     Before August of 2021, I advocated to County Commissioner Janet Rowland that Mesa County use the Clear Ballot voting system instead of Dominion.  I also spoke publicly questioning the security of Dominion voting systems.

33.     I attended the Sioux Falls, South Dakota symposium.  I made a presentation that was broadcast on television.

34.     I communicated before and after the installation of the Trusted Build with many citizens who shared my concerns about the need for election integrity and ending the use of computerized vote tabulation.  I believed then, and I continue to believe, that hand counting ballots is the only secure way to tabulate votes.  I understand that any computer can be hacked.  As a result, all computer voting systems are insecure.  I also understand that after votes are counted by computers, it is impossible to reconstruct exactly how the scanners and computers counted the votes.  We are told by the Secretary to simply trust the computers and accept the results.  The system cannot be audited as required by federal law.

35.     On August 10, 2021, I learned that agents from the offices of the Secretary and the District Attorney were in my office.  I learned later that Mr. Rubinstein's agents had on a date unknown to me, obtained possession of the entire Mesa County computer voting system, including all computer equipment and software.  I do not know if he obtained possession of the voting system by

executing a search and seizure warrant, or if possession was voluntarily transferred to him by the Board of County Commissioners.

36.    I received credible reports that the Federal Bureau of Investigation was monitoring my travel to Sioux Falls.

37.    After the Lindell conference, I was advised that there were credible threats against my life.  I flew to Texas.  After my hotel room was broken into, I was protected by 24/7 armed security.

38.    On September 17, 2021, I submitted a written petition to the Mesa County Board of County Commissioners ("County Board"), asking them to discontinue use of Dominion computer voting systems in Mesa County [Exhibit 4].

39.    In early October 2021, I went to the assisted living facility in Grand Junction to see my husband, Thomas Peters, who had been diagnosed with Parkinson's Disease and early onset dementia.  The facility told me that another person had Power of Attorney, and they refused to allow me to see Tom in person.

40.    In a later phone call, Tom said some people came to him at the facility and had him sign a paper.  He said he didn't know what he signed.  He asked me to contact our attorneys for help.

41.    I requested an opportunity to meet with our attorney Zachary Reams.  Mr. Reams advised me by email on November 2, 2021, that he had received a voicemail from the District Attorney's office that mentioned an investigation into my actions as agent under the power of attorney.  Mr. Reams said that with the DA and Adult Protection involved, he had a conflict of interest, and he could not represent either Tom or me.  He recommended that I hire a criminal lawyer to deal with these new accusations.  Mr. Reams email is Exhibit 5.

42.    The District Attorney never brought any charges against me for my actions as Tom's agent under the power of attorney.  However, I have not been allowed to see my husband in person since October of 2021.

43.     On November 16, 2021, the FBI executed several search warrants on me and my political associates.  This resulted in the seizure of numerous computers, cell phones, removable storage devices, and iPads belonging to me and others.

44.     The FBI has held those electronic devices for more than two years. They have had access to private communications among many of my associates, some of whom wished to remain anonymous.

45.     The tactics used by the FBI in executing those warrants were abusive and had the chilling effect of intimidating individuals who would associate with my effort to question the integrity and transparency of elections, and to advocate for reform of election laws.

46.     The investigations launched by the Secretary, the District Attorney, and the U.S. Department of Justice in August 2021, which led to the execution of search warrants, continue to affect my ability to communicate and associate with others.   Mr. Rubinstein and the FBI intimidated other county clerks from associating with me and speaking out for election transparency.  See Declaration of Dallas Schroeder, Exhibit 6.

47.     On February 14, 2022, I announced my candidacy for the Republican nomination for the office of Colorado Secretary of State.  My mission was to reform the election system and return the state of Colorado to counting ballots by hand.  This made me a direct competitor of Jena Griswold.

48.     On March 1, 2022, I presented a second written petition to the County Board, asking them to stop using insecure voting systems [Exhibit 7].

49.     On March 8, 2022, District Attorney Rubinstein announced the indictment of me and my Deputy Clerk, Belinda Knisley [Exhibit 8].

50.     The indictment occurred 22 days after I announced my candidacy for Secretary of State, and only seven days after I delivered my second petition to the Board of County Commissioners.   The indictment was followed by actions against me and my family members, some of which are set forth below.

Case No. 1:23-cv-03014-SKC   Document 9   filed 11/27/23   USDC Colorado   pg 7 of 10
Appellate Case: 24-1013   Document: 010110986287   Date Filed: 01/18/2024   Page: 146
Plaintiff's Motion for Preliminary Injunction
EXHIBIT 2

51.     When I learned about the indictment, I turned myself in.  My father was near death.  I was not allowed to go to my father, and he died while I was in jail.

52.     The District Attorney advocated for an excessive cash bond of $500,000.

53.     The Court set bond at $25,000.  However, the Judge granted the District Attorney's request to prohibit me from having any contact with any of my employees in all five divisions of the Clerk and Recorder office (elections, motor vehicle, recording, accounting, and clerk to the Board of County Commissioners).  The District Attorney also asked the Court prohibit me from entering any of the three office locations of the clerk and recorder.  The bond restrictions made it impossible to do my job, so it had the effect of removing me from office.  A copy of the bond is Exhibit 9.

54.     The day after the bond hearing, an investigator in the District Attorney's office made harassing telephone calls to my 93 year old mother, my daughter, and my sisters.

55.     After the indictment, I continued to speak publicly about the insecurity of computer voting systems, and to advocate for election transparency.  I proposed hand counting ballots, as many countries do.  To silence me, the District Attorney opposed my travel requests and tried to revoke my bond for trivial reasons.  Some specific examples are below.

56.     In July 2022, the District Attorney requested that the court revoke my bond because I left Colorado to speak at the Constitutional Sheriffs and Peace Officers Conference [Exhibit 10].  My lawyer at the time told me he had obtained Court approval before I left.

57.     In August 2022, the District Attorney opposed my request to travel to Springfield Missouri to attend the premiere of "Selection Code," a movie in which I participated.  He stated: "Ms. Peters is seeking permission to leave the state so that she can be celebrated as a hero for the conduct that a grand jury has indicted her for. . . .The undersigned, on behalf of the county I represent, object to this request, do not believe it is necessary, and represent to the Court that this may be the most offensive travel request the undersigned has ever seen."  See Exhibit 11.  Based on Mr. Rubinstein's recommendation, the judge ordered me not to travel.

58.    Although I have never failed to appear in court, Mr. Rubinstein claimed that I was a "flight risk" when I asked court permission to use my passport to obtain TSA pre-check flight status for domestic travel [Exhibit 12].

59.    When I requested and paid for a recount of the 2022 Republican primary race for Secretary of State, I sent notice by email to county clerks in all 64 counties.  Fruita police applied for an arrest warrant, claiming that by emailing notice to the clerk of Mesa County, I violated the protection order in my bond that prohibited me from contacting any employee of the clerk. [Exhibit 13, Part1].  The District Attorney used the trivial alleged violation of the protection order to convince the court to deny my request for travel. [Exhibit 13, Part 2].

60.    Recently I was in conversation with a friend in the Dollar store.  My friend had just lost her husband.  A former employee from the clerk's office walked by.  The police called and demanded to know who I had been in conversation with.  Police told my attorney that they were investigating whether I had violated my bond by speaking to someone in the Dollar Store.

61.    On July 11, 2022, an investigator for District Attorney Rubinstein declared under oath to the district judge presiding over my criminal case that I "unlawfully took a digital image of the entire Dominion hard drive"  [Exhibit 14 at page 9]. The allegation was false.  Deputy Secretary of State Christopher Beall admitted under oath in a different case involving the Clerk and Recorder of Elbert County that making a forensic image of an EMS server was legal at the time it was done [Exhibit 15].

62.    District Attorney Rubinstein obtained a search warrant for my iPad, based on his false assertion to the judge that my iPad contained a prohibited video recording of a judicial proceeding.  The judge issued a contempt citation based on Rubinstein's false representation.  Another judge found me guilty of contempt for denying that I had recorded a judicial proceeding on the iPad.  Rubinstein personally tried the contempt hearing.  At the time, the police still had possession of the iPad.  Rubinstein's assertion was later shown to be baseless, after examination of my iPad by a forensic expert, who found that no such recording had ever occurred.

63.    I am scheduled to stand trial in February 2024 on the indictment issued on March 8, 2022.

64.     The actions of the District Attorney and his office have punished me for, and attempted to deter me from, exercising my right to speak freely, to associate freely with those who share my beliefs, and to petition the government for the redress of grievances.

65.     Those actions have had a significant adverse effect on my ability to associate and communicate with citizens who previously associated and communicated with me, as well as others who might have been enlisted to investigate election irregularities.

66.     By indicting me, Mr. Rubinstein intimidated county clerks and other elected officials from associating and communicating with me.  His actions have restricted my freedom to urge elected officials to discontinue reliance on computerized voting systems, and to reform election laws.

67.     At the urging of Mr. Rubinstein, the Judge presiding over my criminal trial will not allow me to present evidence that exposes problems in the voting system, and Griswold's erasure of election records during the Trusted Build installation.  Such evidence would show the jury why, under the law, I was required to make the forensic images.  The Judge's order is Exhibit 16.

68.      On November 24, 2023, the Secretary posted the following message on X (formerly Twitter):

> Tina Peters compromised her own voting equipment in an attempt to prove the Big Lie and risked her constituents constitutional right to vote," Griswold said.  [Peter's] attempts to evade accountability with this frivolous lawsuit will not work."

Exhibit 17.

69.     The post is intended to convince the public, including potential jurors in Mesa County, that I committed a crime when I made a legal backup copy of the voting system hard drive.

70.     I do not see how the criminal trial can be fair under these circumstances.

I declare under penalty of perjury that the information contained in the foregoing paragraphs is true and correct based upon my knowledge and belief.

Dated: November 25, 2023

Tina M. Peters

## <u>DECLARATION OF EXPERT WALTER C. DAUGHERITY</u>

WALTER C. DAUGHERITY declares, under penalty of perjury that the following is true and correct.

### <u>Qualifications</u>

1.     My full name is Walter Chisholm Daugherity.  I am a Senior Lecturer Emeritus in the Department of Computer Science and Engineering at Texas A&M University and also a computer consultant to major national and international firms, as well as to government agencies, including classified work.

2.     Prior to my retirement in 2019, I taught computer science and engineering at both the undergraduate and graduate levels for 37 years, the last 32 years being at Texas A&M University. Courses I developed and taught include courses in artificial intelligence, expert systems, programming and software design, quantum computing, and cyberethics.

3.     I have published 26 research articles related to expert systems, fuzzy logic, noise-based logic, and quantum computing from over $2.8 million in funded research projects, plus conference papers and other publications.

**Exhibit F**

Case No. 1:23-cv-03014-SKC   Document 10-6   filed 11/27/23   USDC Colorado   pg 2 of 7
Appellate Case: 24-1013   Document: 010110986287   Date Filed: 01/18/2024   Page: 151
Plaintiff's Motion for Preliminary Injunction
EXHIBIT 9

4.      As a computer expert I have consulted for major national and international firms, including IBM Federal Systems Division, *New York Times*, *Washington Post*, *Los Angeles Times*, Southwestern Bell Telephone, Fulbright & Jaworski (Houston), and Phonogram B.V. (Amsterdam), and also for government agencies such as Cheyenne and Arapaho Tribes of Oklahoma, Texas Department of Agriculture, U. S. Customs Service, and classified work.

Further details about my qualifications are included in my Curriculum Vitae attached as Exhibit A.

5.      I have qualified as an expert witness in other court cases related to elections, electronic voting machines, and election data.

### Outline and Summary

6.      Jeffrey O'Donnell and I co-authored Mesa County [Colorado] Voting Systems Report #3, Election Database and Database Processing Analysis ("Mesa Report 3"), issued March 19, 2022.  On April 23, 2022, citizens Cory Anderson and Sherronna Bishop submitted Mesa Report 3 to District Attorney Daniel P. Rubinstein.  In response, on May 19, 2022, Mr. Rubinstein wrote a letter to the Mesa County Commissioners and the Grand Junction City Counsel [sic] ("Rubinstein Letter").

7.      This declaration rebuts erroneous claims made in the Rubinstein Letter.

### Mesa Report 3

8.      Mesa Report 3 was the result of analyzing two disk images of the Election Management Server ("EMS") computer in Mesa County, Colorado.  The two images are of the contents of the same 953 gigabyte hard disk drive on two different dates in May,

2021, before and after the so-called "Trusted Build" on May 25, 2021.  The "before" image contained election records from both the November 2020 General Election and the April 2021 Grand Junction City Council Election; these election records were improperly deleted by the so-called "Trusted Build" and therefore do not appear in the "after" image.

9.    Each image reflects the entire contents of a hard disk drive containing a set of software running on a computer using the Microsoft Windows Server 2016 operating system.  This combination of hardware and software is commonly termed a "server."  Note that Microsoft ended mainstream support of the Windows Server 2016 operating system on January 11, 2022, and retired the Windows Server 2016 operating system on August 9, 2022, rendering it obsolete prior to the November 8, 2022, general election.

10.    The elements of the Mesa County EMS system are typical of many other computer server systems I have designed or studied.  The Mesa County images indicate that the computer server system included vote counting software provided by Dominion Voting Systems ("DVS"), Microsoft SQL Server database management software, other software packages, and the Windows Server 2016 operating system itself that manages the entire computer server system.

11.    The Microsoft SQL Server database management software is the software that maintains data from the counting of votes by the DVS software.  In other words, the DVS software processes and reads ballots; then it records the ballots' contents in the Microsoft SQL database as electronic data tables.

12.    Mesa Report 3 explains that during the processing of ballots for an election the Microsoft SQL database software should create one set of tables containing the data

read by the Dominion software from the ballots' contents.  A set of tables for this purpose

includes a table to keep track of ballots that require "adjudication" (clarification after

human review), ballots that do not require adjudication, and the total count after all

ballots have been fully adjudicated and processed.  These tables are the electronic

equivalent of hand-written tallies of votes.

13.    Election results are determined from the contents of the Microsoft SQL

database tables.

14.    After the processing of ballots for a particular election is complete, the

Microsoft SQL server database tables for that election should be preserved as required by

federal statute and the federal Voting System Standards ("VSS").  When the next election

occurs, the Dominion software should cause a new set of Microsoft SQL database tables

to be created for that new election, without deleting previous election records.

15.    Mesa Report 3 explains that the Mesa County disk drive images revealed an

unusual phenomenon that occurred during both the November, 2020, General Election

and the April, 2021, Grand Junction municipal election.  After some of the ballots were

processed and their information recorded in a set of Microsoft SQL database tables for

the respective election ("Set 1"), no further data were entered in Set 1 even though ballot

processing was not complete.  Rather, data from processing additional ballots were

entered into a separate, newly created set of tables ("Set 2").  Further, some but not all of

the data from Set 1 was copied into Set 2.  Accordingly, neither Set 1 nor Set 2 contained

all the data from counting all the ballots.

16.    Because the creation of Set 2 hid Set 1 from election workers, breaking the

chain of custody and violating federal auditability requirements, election officials had no way to examine or review the ballots in Set 1 which were not copied to Set 2. This calls into question the integrity of the vote counting process and the validity of the election results.

17.     Mesa Report 3 explains why the authors believe the unusual creation of Set 2 and the partial copying of some but not all of the data from Set 1 did not result from intervention by Mesa County election personnel.

### Rebuttal to Rubinstein Claims

18.     The Rubinstein Letter erroneously claims that elections manager Sandra Brown halted and re-started the adjudication of ballots, and this "halt and re-start" resulted in the creation of Set 2 during the November 2020 election. However, when co-author Jefferey O'Donnell interviewed Ms. Brown, she stated that she never initiated a "halt and re-start" of ballot adjudication.

19.     The Rubinstein Letter claims that Ms. Brown was not interviewed by the authors of Mesa Report 3. There appears to be no basis for Mr. Rubinstein to make that claim, since he never interviewed Ms. Brown before issuing the Rubinstein Letter (Rubinstein Letter, page 4). Jeffrey O'Donnell, a co-author of Mesa Report 3, did interview Sandra Brown, and she denied that she initiated a "halt and re-start."

21.     Regardless of the reason for the creation of Set 2 and the partial preservation of information from Set 1, the fact remains the system was capable of, and indeed did, create an extra database that masked the actual election results. This point is omitted from the Rubinstein Letter.

22.     If an election employee had initiated a "halt and re-start" of the Dominion ballot adjudication process, the commands to "halt and re-start" should have been logged by the software.  However, the EMS logs within the Dominion software application do not show any commands to halt and re-start ballot adjudication.

22.     Turning now to the April, 2021, municipal election, on pages 12 *et seq.* the Rubinstein Letter discusses problems encountered.  It does *not* claim that such problems or their attempted solutions caused the creation of Set 2 for that election.  The Rubinstein Letter disputes the explanation of Mesa Report 3 for the creation of Set 2 in April, 2021, yet posits no alternative cause.  Despite this lack of analytic rigor, in its overall conclusion (Rubinstein Letter page 1), the Rubinstein Letter asserts that Sandra Brown also caused the creation of Set 2 in April, 2021.  This is a bald assertion without factual support.

23.     The Rubinstein Letter includes alleged phone records showing that Sandra Brown contacted Dominion for help during processing of the April, 2021, municipal election.  The Rubinstein Letter was not able to confirm with Dominion (a) whether Dominion did provide assistance to Brown, or (b) what that assistance was if it was provided.  The Rubinstein Letter says Dominion guessed about what they *would have* told Brown if she had called them.

24.     On page 10 of the Rubinstein Letter, an image is shown of Sandra Brown replacing a computer, and above that the report details the action, including the statement "After approximately 15 minutes of processing, the

system loads the new adjudication session and tabulation and adjudication operations resume, apparently without issue, for the remainder of the day." While Ms. Brown is seen replacing a computer, she is not replacing the Election Management System server.  This is obvious both from the size of the system she is holding and the fact that such a switch would have left indelible evidence within the server's files and databases.  All manipulation events proven in Report #3 occur within the server.  Highlighting this unrelated and irrelevant action demonstrates serious lack of understanding of the findings of Report #3.

24.    Regardless of how Set 2 was created in each election, the Rubinstein Letter does not explain how or why part (but not all) of the data from Set 1 was copied to Set 2 in two consecutive elections.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 8, 2023.


/s/ *Walter C. Daugherity*

Walter C. Daugherity

Case No. 1:23-cv-03014-SKC   Document 10-7   filed 11/27/23   USDC Colorado   pg 1 of 15
Plaintiff's Motion for Preliminary Injunction
EXHIBIT A
Appellate Case: 24-1013   Document: 010110986287   Date Filed: 01/16/2024   Page: 157

**EXHIBIT A**

Curriculum Vitae of Walter C. Daugherity

## Walter C. Daugherity
## 10895 Lakefront Drive
## College Station, TX 77845
## (979) 845-1308 (Office)
## Walter.Daugherity@post.Harvard.edu

# EDUCATION

Ed.D., Mathematical Education, Harvard University, Cambridge, Massachusetts, 1977.
   Dissertation: "On the Ordering of Topics in the Teaching of Mathematics."
   Advisor: Marc Lieberman.

M.A.T., Mathematics, Harvard University, Cambridge, Massachusetts, 1967 (age 20).

B.S., Mathematics, Oklahoma Christian College, Oklahoma City, Oklahoma, 1966 (3
   years).  Minors: Physics and chemistry, German.

# EXPERIENCE

| | |
|---|---|
| 1973 to present | Daugherity Brothers, Inc., (Computer consultants), Bethany, Oklahoma.  Co-founder, chairman, and president. Clients include IBM Federal Systems Division, New York Times, Washington Post, Los Angeles Times, Cheyenne and Arapaho Tribes of Oklahoma, Southwestern Bell Telephone, Fulbright & Jaworski (Houston), Texas Department of Agriculture, Phonogram B.V. (Amsterdam), and U. S. Customs Service. |
| 1987 to present | Texas A & M University, College Station, Texas.  Visiting Assistant Professor/Senior Lecturer/Senior Lecturer Emeritus, Departments of Computer Science and Engineering and Electrical and Computer Engineering, College of Engineering. |
| 1989-91 | Texas A & M University System, College Station, Texas. Director, Knowledge Systems Research Center, Computer Science Division of the Texas Engineering Experiment Station. |

Case No. 1:23-cv-03014-SKC   Document 10-7   filed 11/27/23   USDC Colorado   pg 2 of 15
Appellate Case: 24-1013   Document: 010110986287   Date Filed: 01/31/2024   Page: 158
Plaintiff's Motion for Preliminary Injunction
EXHIBIT 24

| 1984-87 | Blinn College, Brenham, Texas.  Computer science instructor. Part-time 1984-86, full-time 1986-87. |
| 1978-80 | Rose State College, Midwest City, Oklahoma.  Data processing instructor (part-time). |
| 1971-73 | ECRM, Bedford, Massachusetts.  Systems programmer. |
| 1970-71 | Harvard Computing Center, Cambridge, Massachusetts. Telecommunications specialist. |
| 1969-70 | Computer-Aided Instruction Laboratory, Harvard University, Cambridge, Massachusetts.  Systems programmer. |
| 1968-70 | Harvard University, Division of Engineering and Applied Physics, Cambridge, Massachusetts. Teaching fellow (for George Mealy and Thomas Bartee). |
| 1967 | Driscoll Junior High School, Brookline, Massachusetts. Mathematics teacher. |
| 1967 | University of Oklahoma Medical Center Computing Facility, Oklahoma City, Oklahoma.  Programmer. |
| 1966 | University of Central Oklahoma Data Processing Center, Edmond, Oklahoma.  Programmer. |
| 1965 | Oklahoma Christian University of Science and Arts, Oklahoma City, Oklahoma.  Statistical programmer. |
| 1963 | University of Oklahoma Computer Center, Norman, Oklahoma. Lab instructor. |

## RESEARCH AND DESIGN

1. Refereed Publications

Daugherity, W. C., and Kish, L. B., "More on the Reference-Grounding-Based Search in Noise-Based Logic," *Fluctuation and Noise Letters*, Vol. 21, No. 3, 2250023, 2022.

Kish, L. B., and Daugherity, W. C., "Entanglement, and Unsorted Database Search in Noise-Based Logic," *Applied Sciences*, Vol. 9, No. 15, 3029, 2019.

Case No. 1:23-cv-03014-SKC   Document 10-7   filed 11/27/23   USDC Colorado   pg 3 of 15
Appellate Case: 24-1013   Document: 010110986287   Date Filed: 05/07/2024   Page: 159
Plaintiff's Motion for Preliminary Injunction
Exhibit 7

Kish, L. B., and Daugherity, W. C., "Noise-Based Logic Gates by Operations on the Reference System," *Fluctuation and Noise Letters*, Vol. 17, No. 4, 1850033, 2018.

Daugherity, W. C., and Coulson, R. N., "Knowledge Engineering for Sustainable Agriculture Management," *Proceedings of ICAST 2001 Conference* (Beijing, China, November 2001), 2:266, 2001.

Coulson, R. N., Saarenmaa, H., Daugherity, W. C., Rykiel, E. J., Saunders, M. C., and Fitzgerald, J. W., "A Knowledge System Environment for Ecosystem Management," book chapter in Klopatek, J. and Gardner, R. (eds.), *Landscape Ecological Analysis: Issues and Applications*, Springer-Verlag, 57-79, 1999.

Coulson, R. N., Daugherity, W. C., Rykiel, E. J., Saarenmaa, H., and Saunders, M. C., "The Pragmatism of Ecosystem Management: Planning, Problem Solving and Decision Making with Knowledge-Based Systems," *Proceedings of Eco-Informa '96 Global Networks for Environmental Information Conference* (Lake Buena Vista, Florida, November 1996), 10:342-50, 1996.

Coulson, R. N., Fitzgerald, J. W.[*], Daugherity, W. C., Oliveria, F. L., and Wunneburger, D. F., "Using Spatial Data for Integrated Pest Management in Forest Landscapes," *Proceedings of the 11th Conference on Geographic Information Systems: Integrating Spatial Information Technologies for Tomorrow* (Vancouver, British Columbia, Canada, 1997).

Daugherity, W. C.; Harris, C. E., Jr.; and Rabins, M. J., "Introducing Ethics and Professionalism in REU Programs," *Proceedings of the 1995 World Conference on Engineering Education* (Minneapolis, Minnesota, October 1995).

Coulson, R. N., Daugherity, W. C., Vidlak, M. D.[*], Fitzgerald, J. W.[*], Teh, S. H.[*], Oliveria, F. L., Drummond, D. B., and Nettleton, W. A., "Computer-based Planning, Problem Solving, and Decision Making in Forest Health Management: An Implementation of the Knowledge System Environment for the Southern Pine Beetle, ISPBEX-II," *Proceedings of the IUFRO Symposium on Current Topics in Forest Entomology* (Maui, Hawaii), 1995.

Yen, J., Daugherity, W. C., Wang, H.[*], and Rathakrishnan, B.[*], "Self-Tuning and Self-Learning Fuzzy Systems," book chapter in Yen, J., Langari, R., and Zadeh, L. (eds.), *Industrial Applications of Fuzzy Logic and Intelligent Systems*, IEEE Press, 1995.

* Graduate Research Assistant I funded

3

Daugherity, W. C., Video review of *Introduction to Biological and Artificial Neural Networks for Pattern Recognition,* by Steven K. Rogers, in *IEEE Transactions on Neural Networks*, Vol. 5, No. 5, 1994.

Teh, S. H.[*], Daugherity, W. C., and Coulson, R. N., "A User-Centric Methodology for Building Usable Expert Systems," *Proceedings of the 7th International Conference on Industrial and Engineering Applications of Artificial Intelligence and Expert Systems* (Austin, Texas, May-June 1994), 45-48, 1994.

Daugherity, W. C., "A Neural-Fuzzy System for the Protein Folding Problem," *Proceedings of the Third International Workshop on Industrial Fuzzy Control & Intelligent Systems (IFIS `93)* (Houston, Texas, December 1993), 47-49, 1993.

Daugherity, W. C., "A Partially Self-Training System for the Protein Folding Problem," *Proceedings of the World Congress on Neural Networks (WCNN `93)*, (Portland, Oregon, July 1993).  Invited paper.

Yen, J., Wang, H.[*], and Daugherity, W. C., "Design Issues of Reinforcement-Based Self-Learning Fuzzy Control," *Proceedings of the World Congress on Neural Networks (WCNN `93)*, (Portland, Oregon, July 1993).

Daugherity, W. C., "Characterizations of Fuzzy Operations," *Proceedings of the Second International Workshop on Industrial Fuzzy Control & Intelligent Systems* (College Station, Texas, December 1992), 234, 1992.

Yen, J., Wang, H.[*], and Daugherity, W. C., "Design Issues of a Reinforcement-Based Self-Learning Fuzzy Controller for Petrochemical Process Control," *Proceedings of North American Fuzzy Information Processing Society* (Puerto Vallarta, December 1992), 1992.

Yen, J., Wang, H.[*], and Daugherity, W. C., "An Adaptive Fuzzy Controller with Application to Petroleum Processing," *Proceedings of IFAC Workshop on Intelligent Manufacturing Systems* (Dearborn, October 1992), 1992.

Yen, J., Daugherity, W. C., and Rathakrishnan, B.[*], "Fuzzy Logic and Its Application to Process Control," *Proceedings of CAPA Technology Conference* (Houston, May 1992), 78-86, 1992.

* Graduate Research Assistant I funded

Daugherity, W. C., Rathakrishnan, B.[*], and Yen, J., "Performance Evaluation of a Self-Tuning Fuzzy Controller," *Proceedings of the IEEE International Conference on Fuzzy Systems (FUZZ-IEEE)* (San Diego, March 1992), 1992.

Daugherity, W. C., "An Application of Geometrical Reasoning to a Combinatorial Problem," *Proceedings of the Seventh Annual Conference on Applied Mathematics* (Edmond, Oklahoma, April 1991), pp. 226-232, 1991.

Daugherity, W. C., Review of *Data Communications Dictionary*, by Charles J. Sippl, in *Computing Reviews*, Vol. 17, No. 9, pp. 335-336, 1976.

Daugherity, W. C., "Circuits for Dial-up and Local Use of a Stand-alone PDP-8," *Proceedings of the Digital Equipment Computer Users Society*, Vol. 2, No. 2 (Los Angeles, December 1975), pp. 413-414, 1976.

Daugherity, W. C., Review of *Effective Use of ANS COBOL Computer Programming Language*, by Laurence S. Cohn, in *Computing Reviews*, Vol. 16, No. 10, p. 441, 1975.

Manwell, T., Daugherity, W., Desch, S., and Stolurow, L., "Tom Swift and His Electric Bilingual Grandmother," *ACM SIGCUE Bulletin*, Vol. 7, No. 1, pp. 5-17, 1973.

Daugherity, W. C., "A Telephone Amplifier," *Transactions of the Oklahoma Junior Academy of Science*, Vol. IV, pp. 130-132, 1961.

\* Graduate Research Assistant I funded

2. Other Publications

Daugherity, W. C., "Honors Section," in Rabins, M. J., and Harris, C. E. Jr. (eds.), *Engineering Ethics Teaching Manual*, 1997.

Daugherity, W. C., "Honors Section," in Rabins, M. J., and Harris, C. E. Jr. (eds.), *Engineering Ethics Teaching Manual*, 1996.

Allen, G. D., Nelson, P., Jarvis, R. D., and Daugherity, W. C., "System Impact of Hit Assessment Capability for NPB Discrimination:  Analysis of the Case of No-Hit Assessment," *Weapons Lab/TALN Technical Report*, Kirtland Air Force Base, May, 1990.

3. Other Conference Papers and Presentations

Coulson, R. N., and Daugherity, W. C., "A Knowledge Engineering Approach for Ecosystem Management," 11th Annual Landscape Ecology Symposium, International Association for Landscape Ecology - Integration of Cultural and Natural Ecosystems Across Landscapes: Applications of the Science, Galveston, Texas, 1996.

Coulson, R. N., and Daugherity, W. C., "Decision Support Systems for Forest Pests: Where Do All the Knowledge-Based Systems Go?", North American Forest Insect Work Conference, San Antonio, Texas, 1996.

Daugherity, W. C. and Coulson, R. N., SPBEBE (Economic and Environmental Impact Assessment for Southern Pine Beetle Suppression Projects), computer code, developed for the USDA Forest Service, Forest Health Protection, 1996-1997.

Coulson, R. N., and Daugherity, W. C., "Knowledge System Environment for Ecosystem Management," Global Studies Seminar, Battelle Pacific Northwest Laboratories, Richland, Washington, 1995.

Daugherity, W. C. and Coulson, R. N., ISPBEX-II (Integrated Southern Pine Beetle Expert System), computer code, developed for the USDA Forest Service, Forest Health Protection, 1994.

Daugherity, W. C., and Yen, J., "Tutorial on Neuro-Fuzzy Systems," Third International Workshop on Industrial Fuzzy Control & Intelligent Systems Houston, Texas, December 1993.

Daugherity, W. C., "Introduction to LISP with an On-line Demonstration," Houston Geotech '91, Houston, Texas, 1991.

Daugherity, W. C., "The Universal Classification Problem," South Central Regional Conference of the Association for Computing Machinery, Austin, Texas, 1984.

4. Research Projects

"Remote Laboratory Data Entry and Retrieval System," Texas Department of Agriculture, Walter C. Daugherity, 1986, $3,000 (Daugherity 100%).

"Electrochemical Modeling of a Sinter Plate, Sealed Design Nickel-Cadmium (Ni-Cd) Battery Cell," National Aeronautics and Space Administration, Ralph E. White, Walter C. Daugherity, 1 graduate student, 1989, 25% of my salary 1989-90 (Daugherity 100%).

"Application of Reasoning under Uncertainty to Process Control," Texaco, Walter C. Daugherity and John Yen, 1 graduate student; competitive and peer-reviewed, September 1990, $18,000.

"Design of a Computational Classroom," Texas A & M University, Walter C. Daugherity, September 1990-May 1991, $60,000 (Daugherity 100%).

"Design of a Second Computational Classroom," Texas A & M University, Walter C. Daugherity, January 1991-December 1992, $153,000 (Daugherity 100%).

"Development of Honors Courses in Artificial Intelligence and Analysis of Algorithms," Texas A & M University, Walter C. Daugherity, James Abello and Arkady Kanevsky, 2 graduate  students, competitive, September 1991-May 1991, $11,000 (Daugherity 50%).

"Integrated Southern Pine Beetle Expert System"; USDA Forest Service; Robert N. Coulson, Walter C. Daugherity, and Jeffrey W. Fitzgerald; 5 graduate students; competitive and peer-reviewed; 1985-1992, $974,120.

"Distributed Data-Base Support for the ISPBEX Expert System"; USDA Forest Service; Robert N. Coulson, Walter C. Daugherity, and Jeffrey W. Fitzgerald;   1 graduate student; competitive and peer-reviewed; 1992-93; $35,000.

"Integrated Southern Pine Beetle Expert System II"; USDA Forest Service; Robert N. Coulson, Walter C. Daugherity, and Jeffrey W. Fitzgerald; competitive and peer-reviewed; March 1993-February 1994; competitive and peer-reviewed; $170,000.

"Ecological Modelling of Regional Responses to Global Changes: A Knowledge System Environment for Planning, Problem-Solving and Decision Making"; Battelle Pacific Northwest Laboratory; Robert N. Coulson and Walter C. Daugherity; competitive and peer-reviewed; June-December 1995; $39,996.

"Fitness of a Genetically Modified *Gliocladium virens* in Soil and Rhizosphere"; USDA Cooperative State Research Service; Charles M. Kenerley and Walter C. Daugherity; 1 senior associate, 2 graduate students, and 1 undergraduate student; competitive and peer-reviewed; September 1996-August 2001; $254,450 (Daugherity 50%).

"Southern Pine Beetle Biological Evaluation and Economic Evaluation Program Conversion"; USDA Forest Service, Forest Health Protection; Robert N. Coulson (PI) and Walter C. Daugherity (Co-PI); competitive and peer-reviewed; 1996-1997; $16,421.

"The Texas Imported Fire Ant Survey: The Fire Ant Spatial Information Management System (FASIMS)"; Texas Agricultural Experiment Station; Robert N. Coulson (PI) and S. Bradleigh Vinson, Maria D. Guzman, Douglas F. Wunneburger, and Walter C. Daugherity (Co-PI's); competitive and peer-reviewed; January 1998-December 1998; $50,000.

"Special Topics in Computer Science Concepts and Programming"; Academy for Advanced Telecommunications and Learning Technologies; Walter C. Daugherity; competitive and peer-reviewed; June 1998-May 1999; $5,000 (Daugherity 100%).

"Object Modeling Techniques Support for National Simulation Center Tactical Directorate"; U. S. Army through prime contractor Cubic Applications, Inc.; Walter C. Daugherity, James A. Wall, and José Salinas; competitive; September 1998-April 1999; $74,498 (Daugherity 20%).

"The Fire Ant Spatial Information Management System (FASIMS)"; Texas Department of Agriculture, Texas Imported Fire Ant Research and Management Plan; Robert N. Coulson (PI) and Douglas F. Wunneburger, S. Bradleigh Vinson, and Walter C. Daugherity (Co-PI's); competitive and peer-reviewed; 1999-2001; $220,000.

"Evaluating the Impact of Southern Pine Beetle on Ecologically Sustainable Forest Management"; USDA Forest Service; Robert N. Coulson and Walter C. Daugherity; 1 graduate student and 1 undergraduate student; competitive and peer-reviewed; 2000-2003, $90,000.

"Honey Bee Initiative"; State of Texas; Robert N. Coulson (PI), Walter C. Daugherity (Consultant); 2 graduate students; competitive; September 2001-August 2002; $40,000.

"Increasing Computer Science Retention by Developing and Deploying Self-Paced Learning Modules"; State of Texas; Jennifer Welch and Frank Shipman (Co-PI's), Lawrence Petersen, Walter C. Daugherity, and Lauren Cifuentes (Key Personnel); 10 undergraduate students; competitive; June 2002-August 2004; $422,692.

"Facilitating the Transition to Java in High School Computer Programming Classes"; Texas A&M University System Academy for Educator Development; Walter C. Daugherity; 1 graduate student; competitive and peer-reviewed; December 2003-September 2004; $2,966 (Daugherity 100%).

"Instructional Technology Enhancements for Computer Teaching Labs," Texas A&M University, Walter C. Daugherity, competitive, January 2004-August 2004, $20,000 (Daugherity 100%).

"Increasing Computer Science Retention with Peer Teachers and Learning Modules"; State of Texas; Valerie Taylor and Jennifer Welch (Co-PI's), Lawrence Petersen, Walter C. Daugherity, and Joseph Hurley (Key Personnel); undergraduate students; competitive; September 2004-August 2005; $173,158.

*Cumulative total: $2,845,801*

5. Research Proposals
*Note:* Funded proposals are listed in section 4 above.

"Automated Support for VLSI Standard Cell Optimization," Texas Advanced Technology Program, Walter C. Daugherity, competitive and peer-reviewed, July 1989, not funded, $233,887.

"Integration of Computer Software Models for NiCd Battery Design," National Aeronautics and Space Administration, Ralph E. White and Walter C. Daugherity, competitive and peer-reviewed, 1990, not funded, $125,000.

"Innovative Use of Supercomputers and Parallel Computers in Grades K-8," Department of Energy, Paul Nelson, Walter C. Daugherity and Bahram Nassersharif, competitive and peer-reviewed, December 1990, preproposal submitted, $885,000.

"Integration of Texas Junior Colleges into State and National Computer Networks," Texas Advanced Technology Program, Walter C. Daugherity and Charles H. Beard, competitive and peer-reviewed, July 1991, not funded, $174,219.

"Adaptive Fuzzy Control for Industrial Processes," Texas Advanced Research Program, John Yen and Walter C. Daugherity, competitive and peer-reviewed, July 1991, not funded, $177,064.

"Development of a Fuzzy Logic Tuner for a PID Controller," Texaco, John Yen and Walter C. Daugherity, 1992-93, not funded, $200,000.

"National Center For Ecological Analysis and Synthesis," National Science Foundation; Robert N. Coulson, Walter C. Daugherity *et al.*, competitive and peer-reviewed, July 1994, not funded, $10,000,000.

"Development of a Fungal Growth Model for Risk Assessment," Texas Advanced Research Program, Charles M. Kenerley and Walter C. Daugherity, competitive and peer-reviewed, July 1995, not funded, $203,792.

"Intelligent Vehicle Navigation System," Texas Advanced Technology Program, Walter C. Daugherity and Jeffrey W. Fitzgerald, competitive and peer-reviewed, July 1995, not funded, $195,058.

"Innovative Programs to Increase the Enrollment in Computer Science," Texas Technology Workforce Development Grant Program, Valerie Taylor and Frank Shipman (co-PI's), Lawrence Petersen, Walter C. Daugherity, and Joseph Hurley (Key Personnel), competitive and peer-reviewed, March 2005, pending, $69,760.

6. New Design Methods, Techniques, or Concepts Developed

Null Modem
    I independently invented the null modem in 1969 and constructed one for Harvard University (which is still operational!).
Computer Keyboard National Standard
    As a member of the Harvard-MIT Terminal Committee, I participated in the development of the national standard for computer keyboards (*e.g.*, putting braces above brackets for the benefit of programming languages). Nearly every computer terminal and keyboard since then (*e.g.*, VT100, PC) uses this layout.
Integrated User Training
    I invented the method of training users about additional features of an application program by integrating the information with the operation of the program (see Manwell, Daugherity, *et al.* under Publications, above). This is now widely adopted, *e.g.*, by Microsoft for its Windows operating systems in the "Getting Started" panel.
Object-Oriented Database
    I independently invented and implemented an object-oriented database to support arbitrary combinations of data types.
Self-Organizing Fuzzy Controller
    In collaboration with Balaji Rathakrishnan (a Graduate Research Assistant I funded) and John Yen, I developed a new systematic methodology for constructing and tuning fuzzy logic controllers. The research project was funded by Texaco (see the preceding section for details) for use in its refineries.

Plaintiff's Motion for Preliminary Injunction
EXHIBIT 7

# TEACHING

1. New Courses Developed

> CPSC 111/211/311 Java and C-based sequence - Member of curriculum
>   subcommittee, taught 111 and 211
> CPSC 210 (Honors) - Data Structures
> CPSC 320 (Honors) - Artificial Intelligence
> CPSC 489 - Object-Oriented Programming, Systems, and Languages
> CPSC 635 - Natural Language Processing (taught by Dr. P. Mayer)
> CPSC 689 - Symbolic and Algebraic Computation (not taught)
> CSCE 489/PHIL 382 (with Glen Miller [PHIL]) - Ethics and
>   Cybertechnology
> ENGR/PHIL 482 (Honors) - Ethics and Engineering
> PHIL 282 (with Glen Miller [PHIL]) – Ethics in a Digital Age
> PHYS/ELEN 674 (with David Church [PHYS]) - Special Topics in
>   Quantum Computing (the first course at Texas A&M in quantum
>   computing, and, to the best of my knowledge, the first course in quantum
>   computing anywhere in Texas), taught Spring, 2005, for the fifth time.
> A Distance Learning section of CPSC 601 - Programming in C and Java,
>   taught Spring, 2003.
> Two sections of CPSC 111 - Computer Science Concepts and Programming
>   taught with student peer teachers as assistants, Fall, 2002.
> Honors section of CPSC 111 - Computer Science Concepts and
>   Programming taught with student peer teachers as assistants, Fall, 2004.
> Developed (with Lawrence Petersen) an intensive summer training program
>   in Java and Software Engineering for high-school computer science
>   teachers, taught Summer, 2003.
> Developing an intensive summer training program in Data Structures for
>   high-school computer science teachers, taught Summer, 2004; I was also
>   completely responsible for recruiting teachers, getting them admitted,
>   arranging for housing, and so on.

2. Courses Taught

   A. Graduate

   | | |
   |---|---|
   | CPSC 601 | Programming in C and Java |
   | CPSC 602 | Object-Oriented Programming, Development, and Software Engineering |
   | CPSC 614 | Computer Architecture |
   | CPSC 625 | Artificial Intelligence |
   | CPSC 632 | Expert Systems |
   | CPSC 681 | Graduate Seminar |
   | CPSC 685 | Problems |

CPSC 691          Research
PHYS/ELEN 674 Quantum Computing (co-teacher)

B. Undergraduate

CPSC 111          Computer Science Concepts and Programming
CPSC 111H        Computer Science Concepts and Programming (Honors)
CPSC 120          Programming II
CPSC 120H        Programming II (Honors)
CPSC 203          Introduction to Computing
CPSC 206          Structured Programming in C
CPSC 210          Data Structures
CPSC 210H        Data Structures (Honors)
CPSC 211          Data Structures and Implementations
CPSC 211H        Data Structures and Implementations (Honors)
CPSC 285          Special Topics - Data Structures for Teachers
CPSC 289          Special Topics - Java and Software Engineering for Teachers
CPSC 311          Analysis of Algorithms
CPSC 320/420    Artificial Intelligence
CPSC 320H/420H  Artificial Intelligence (Honors)
CPSC 321          Computer Architecture
CPSC 464          Integrated Systems Design Automation
CPSC 485          Problems
CPSC/ELEN 485H  Problems (Honors theses)
CPSC 489          Object-Oriented Programming, Systems, and Languages
CSCE 113          Intermediate Programming and Design
CSCE 121          Introduction to Program Design and Concepts
CSCE 121H        Introduction to Program Design and Concepts (Honors)
CSCE 315          Programming Studio
CSCE 410          Operating Systems
CSCE 489          Cyberethics (co-teacher)
ENGR 112          Foundations of Engineering II
ENGR 112H        Foundations of Engineering II (Honors)
ENGR/PHIL 482H  Ethics and Engineering (Honors)

# PROFESSIONAL OUTREACH

1. Director, Knowledge Systems Research Center

2. Invited Significant Seminars or Lectures

   Daugherity, W. C., "Computers and Privacy," Phi Theta Kappa Honor Society
   State Convention, Blinn College, Brenham, Texas, 1985.

Case No. 1:23-cv-03014-SKC   Document 10-7   filed 11/27/23   USDC Colorado   pg 13 of 15
Appellate Case: 24-1013   Document: 010110986287   Date Filed: 07/12/2024   Page: 169

Plaintiff's Motion for Preliminary Injunction
EXHIBIT 20

Daugherity, W. C., and DeSoi, J. F., "Objected-Oriented Programming," Second Annual Texaco Artificial Intelligence Symposium, Houston, Texas, 1989.

Daugherity, W. C., "A Self-Tuning Fuzzy Controller," ARRI Conference on Fuzzy Logic, Arlington, Texas, March 1992.

Daugherity, W. C., Yen, J., and Langari, R., "Tutorial on Fuzzy Logic," Second International Workshop on Industrial Fuzzy Control & Intelligent Systems, College Station, Texas, December 1992.

Daugherity, W.C., "A Partially Self-Training System for the Protein Folding Problem," World Congress on Neural Networks, Portland, Oregon, July 1993.

Daugherity, W.C., "Neuro-fuzzy Systems," Third International Workshop on Industrial Fuzzy Control & Intelligent Systems, Houston, Texas, December 1993.

Daugherity, W.C. and Harris, C.E., "Ethics and Engineering," NSF Research Experience for Undergraduates, College Station, Texas, Summer 1994.

Daugherity, W.C. and Harris, C.E., "Ethics and Engineering," NSF Research Experience for Undergraduates, Austin, Texas, Summer 1994.

Daugherity, W.C. and Harris, C.E., "Ethics and Engineering," NSF Research Experience for Undergraduates, College Station, Texas, Summer 1995.

Daugherity, W.C. and Harris, C.E., "Ethics and Engineering," NSF Research Experience for Undergraduates, Austin, Texas, Summer 1995.

Daugherity, W.C., "Public-Key Cryptography Meets Quantum Computing: Why Secret Agencies are Quaking in their Boots." Quantum Computing Seminar, Texas A&M University, April 9, 2001.

Daugherity, W.C., "Quantum Computing 101: How to Crack RSA." DefCon X, Las Vegas, NV, August 4, 2002.

Daugherity, W.C., "Computer Ethics." ENGR 482 Ethics and Engineering, Texas A&M University, April 14-16, 2003.

Daugherity, W.C., "Incorporating Computer Ethics into an Engineering Ethics Course." University of Texas Ethics Conference, Austin, Texas, April 16, 2004.

Case No. 1:23-cv-03014-SKC   Document 10-7   filed 11/27/23   USDC Colorado   pg 14 of 15
Appellate Case: 24-1013   Document: 010110986287   Date Filed: 07/03/2024   Page: 170
Plaintiff's Motion for Preliminary Injunction
EXHIBIT 4

Daugherity, W.C., "Computer Ethics." ENGR 482 Ethics and Engineering, Texas A&M University, November 8-10, 2004.

Daugherity, W.C., "[My] 53 Years of Computing History," CSCE 681 Open Graduate Seminar, Texas A&M University, November 18, 2015.

3. Consulting

> St. Joseph's Hospital, Bryan, Fall 1990, at no charge.
> Other clients include IBM Federal Systems Division, New York Times, Washington Post, Los Angeles Times, Cheyenne and Arapaho Tribes of Oklahoma, Southwestern Bell Telephone, Fulbright & Jaworski (Houston), Texas Department of Agriculture, Phonogram B.V. (Amsterdam), and U. S. Department of the Treasury.

# HONORS AND AWARDS

> Oklahoma Junior Academy of Science, elected to membership, 1961, Oklahoma State University
> National Science Foundation, Institute for High Ability Secondary School Students, 1962, University of Oklahoma
> Westinghouse, Science Talent Search national finalist, 1963
> National Merit Scholarship test, highest score in Oklahoma, 1963 Frontiers of Science, scholarship, 1963, Oklahoma City, Oklahoma
> Engineering Club of Oklahoma City, award, 1963, Oklahoma City, Oklahoma Oklahoma Christian College, full scholarship (top entering freshman), 1963, Oklahoma City, Oklahoma
> National Science Foundation, Undergraduate Research Participation Program, 1965, University of Oklahoma, Norman, Oklahoma
> Alpha Delta Tau, National Honor Society, 1966
> Who's Who in American Colleges and Universities, 1966 Graduate Record Exam in Mathematics, scored 800, 1966 Harvard University, Prize Fellowship, 1966
> National Science Foundation, Academic Year Institute, 1967 Phi Delta Kappa, National Honor Society, 1967
> Harvard University, Class Marshal for the Graduate School of Education, 1967 Harvard University, Bowdoin Prize, bronze medal and cash award for outstanding writing, 1973

Case No. 1:23-cv-03014-SKC   Document 10-7   filed 11/27/23   USDC Colorado   pg 15 of 15
Appellate Case: 24-1013   Document: 010110986287   Date Filed: 05/07/2024   Page: 171
Plaintiff's Motion for Preliminary Injunction
EXHIBIT 6

Association for Computing Machinery, selected as a reviewer for
    *Computing Reviews*, 1975
Association for Computing Machinery, Outstanding Regional
    Intercollegiate Programming Contest Director Award, 1993,
    Indianapolis, Indiana
World Congress on Neural Networks, Neural Systems Session Co-chair,
    1993, Portland, Oregon
Graduate Student Council, 1997 Outstanding Graduate Faculty Award
    citation: "For your time and dedication to graduate students at
    Texas A&M."
Named by the TAMU System to The Academy for Educator Development, a
    major component of The Texas A&M University System's Regents'
    Initiative for Excellence in Education, 2003 (one of only two faculty
    members selected from the entire College of Engineering).
Winner, $500 cash prize, Texas A&M University Academic Integrity
    Week Essay Competition (Faculty Category), 2004.
Texas A&M University, Department of Computer Science &
    Engineering, 2009 Undergraduate Faculty Award citation: "In
    grateful appreciation of dedicated service, exemplary attitude, and
    significant contribution."
Qualified for American MENSA, 2015.
Oklahoma Christian University, Department of Mathematics and Computer Science,
2015
    Distinguished Alumnus Award citation: "For outstanding vision, dedication, and
    commitment to excellence."

## AMENDED DECLARATION

I, Douglas W. Gould, declare under penalty of perjury that the following is true and correct:

## I      QUALIFICATIONS

My qualifications and experience with regard to computer-based systems and in particular the security aspects of computer-based systems are stated in Exhibit 1.1 attached.

## II      ACTIVITIES PERFORMED

Computer forensics is the application of investigation and analysis techniques to gather and preserve evidence from a particular computing device about how it has been operated and by whom.

The Dominion DVS 5.11 and 5.13-CO systems are software suites that operate on Windows-based computers. From a computer forensic analysis point of view the fact that the system is used to tabulate votes in elections does not distinguish it significantly from other Windows-based computer systems.

I performed a forensic analysis of an image of the Dominion Voting Systems (DVS) Election Management System (EMS) Server (data storage media "hard disc") with DVS version 5.11-CO election application software as used in Mesa County in the 2020 general election and the 2021 Grand Junction municipal election. The image replicated the entire EMS server before the May 25, 2021 DVS "trusted build" update.

I also performed a forensic analysis of an image of the Dominion Voting Systems (DVS) Election Management System (EMS) Server with version 5.13-CO election application software taken after the May 25, 2021 "trusted build" update.

The forensic images were acquired using Access Data® FTK® Imager (Forensic Tool Kit) software.  FTK Imager produces a report for each image it captures.  The report identifies the person who acquired the image, the date and time of imaging, and the make, model and serial number of the hard drive that was imaged.  FTK Imager produced a report for the pre-trusted build image that is shown in figure 1.  FTK Imager produced a report for the post-trusted build image that is shown in figure 2.

Although the matter before the court addresses DVS version 5.13-CO software following the "trusted build" upgrade process, the forensic image report of DVS version 5.11-CO (Figure 1) is relevant because the Colorado Secretary of State issued a press release on August 17, 2021 that includes the following statement:

- Two hard drive images from Mesa County election servers were released on the internet during the week of August 9, 2021. Analysis confirms that these images belong to Mesa County hard drives and were created before and after the May 25, 2021 trusted build. The only method to make such copies is to physically access the machines.

- One of the hard drive images is believed to have been taken on Sunday, May 23, 2021.

**Exhibit G**

Amended Declaration of Douglas W. Gould December 20, 2022
Page **2** of **13**

The FTK report on the pre-trusted build image that I examined indicates that the image was acquired on Sunday, May 23, 2021 from the Mesa County EMS server (Figure 1). This is the same date that the Secretary of State identifies for the pre-trusted build image. The Secretary of State admits that the trusted build took place Tuesday May 25, 2021. The FTK report on the post-trusted build image that I examined indicates that the image was acquired on May 26, 2021.

Figure 1 describes the image as "EMSSERVER", which appears to mean the Mesa County EMS server.  The case number assigned was 052321, which corresponds to the date the pre-trusted build image was acquired from the Mesa County EMS server, Sunday May 23, 2021.

The report in Figure 2 describes the image as "EMSSERVER_v2", which indicates that a new image of the same Mesa County EMS server hard drive.  The case number assigned was 052621, which corresponds to the date the post-trusted build image was acquired from the Mesa County EMS server, Wednesday May 26, 2021.

The drive serial number in Figure 1 (pre-trusted build image report) and Figure 2 (post trusted build image report) is identical.  The drive geometry also is identical.  This means that both the pre-trusted build image and the post-trusted build image were acquired from the same hard drive, namely Dell drive model PERC H370 Adp SCSI, serial number 00222e64128c016e1d004fc54220844a.

Both images contain the application suite Dominion DVS 5.11 or 5.13-CO, indicating they are images of a system supplied to the Colorado counties that use Dominion Voting Systems products.

Thus, it is indisputable that both images that I examined were acquired from the same hard drive on the Mesa County EMS server.  The pre-trusted build image was acquired May 23, 2021.  The post-trusted build image was acquired May 26, 2021.

Case No. 1:23-cv-03014-SKC   Document 10-4   filed 11/27/23   USDC Colorado   pg 3 of 13

Plaintiff's Motion for Preliminary Injunction
EXHIBIT 18

Appellate Case: 24-1013   Document: 010110986287   Date Filed: 01/02/2024   Page: 374

Amended Declaration of Douglas W. Gould December 20, 2022
Page **3** of **13**

Figure 1



```
Created By AccessData® FTK® Imager 4.2.0.13

Case Information:
Acquired using: ADI4.2.0.13
Case Number: 052321
Evidence Number: 00003
Unique description: EMSSERVER
Examiner: cjh
Notes:


------------------------------------------------------------

Information for F:\EMSSERVER\EMSSERVER:

Physical Evidentiary Item (Source) Information:
[Device Info]
 Source Type: Physical
[Drive Geometry]
 Cylinders: 121,534
 Tracks per Cylinder: 255
 Sectors per Track: 63
 Bytes per Sector: 512
 Sector Count: 1,952,448,512
[Physical Drive Information]
 Drive Model: DELL PERC H730 Adp SCSI Disk Device
 Drive Serial Number: 00222e64128c016e1d004fc54220844a
 Drive Interface Type: SCSI
 Removable drive: False
 Source data size: 953344 MB
 Sector count:    1952448512
[Computed Hashes]
 MD5 checksum:    3d7cf05ca6e42db765bf5c15220c097d
 SHA1 checksum:   eab06a7ea23586de2746b9142461717e075f5c9f

Image Information:
 Acquisition started:   Sun May 23 16:30:36 2021
 Acquisition finished:  Sun May 23 19:08:08 2021
 Segment list:
  F:\EMSSERVER\EMSSERVER.E01
```

*Figure 1 - Forensic Image Report of Mesa County EMS Server Hard Disk Image with Dominion v. 5.11-CO*

Amended Declaration of Douglas W. Gould December 20, 2022
Page **4** of **13**

Figure 2



```
Created By AccessData® FTK® Imager 4.2.0.13

Case Information:
Acquired using: ADI4.2.0.13
Case Number: 052621
Evidence Number: 00002
Unique description: EMSSERVER_v2
Examiner: cjh
Notes:

----------------------------------------------------------------

Information for E:\Mesa\EMSSERVER_v2:

Physical Evidentiary Item (Source) Information:
[Device Info]
 Source Type: Physical
[Drive Geometry]
 Cylinders: 121,534
 Tracks per Cylinder: 255
 Sectors per Track: 63
 Bytes per Sector: 512
 Sector Count: 1,952,448,512
[Physical Drive Information]
 Drive Model: DELL PERC H730 Adp SCSI Disk Device
 Drive Serial Number: 00222e64128c016e1d004fc54220844a
 Drive Interface Type: SCSI
 Removable drive: False
 Source data size: 953344 MB
 Sector count:   1952448512
[Computed Hashes]
 MD5 checksum:    52861d5a7750ab535a9d5f7277469c10
 SHA1 checksum:   1bf8f22edb37f72bb29428a591046a1f64279a3f

Image Information:
 Acquisition started:  Wed May 26 17:43:17 2021
 Acquisition finished: Wed May 26 20:19:14 2021
 Segment list:
  E:\Mesa\EMSSERVER_v2.E01
```

*Figure 2 - Forensic Image Report of Mesa County EMS Server Hard Disk Image with Dominion v. 5.13-CO*

From these forensic images I

(i)     determined information about the voting system used in the 2020 general election and 2021 Grand Junction municipal election;

(ii)    assessed the impact of the software update (called "trusted build") on the computer and voting system; and

Case No. 1:23-cv-03014-SKC   Document 10-4   filed 11/27/23   USDC Colorado   pg 5 of 13

Plaintiff's Motion for Preliminary Injunction
EXHIBIT 18 Page 5

Appellate Case: 24-1013   Document: 010110986287   Date Filed: 01/10/2018   Page: 176

Amended Declaration of Douglas W. Gould December 20, 2022
Page **5** of **13**

(iii)   analyzed the DVS 5.13-CO election software installation (the current voting system software in Mesa County and Colorado).

## III   CONFIGURATION OF COMPUTER SYSTEM

The DVS EMS Server (hereafter EMS Server) is a computer-based system that, among other functions, reads ballots, interprets markings on ballots, and totals the vote counts in each race in an election.  The data from these operations are stored in a Microsoft SQL Server database (a software application) maintained on the EMS Server.  The EMS server operates in concert with the Microsoft Windows 2016 Server operating system. The Windows operating system manages all the resources[1] of the computer system. No software runs on the system without the permission of and restrictions/limitations provided by the operating system.  The same operating system was and is used in conjunction with both DVS versions 5.11-CO and 5.13-CO.  An evaluation of how the DVS functions also requires consideration of how the operating system functions, as the DVS cannot operate independently of the operating system.

Accordingly, my evaluation relates to the EMS Server and the Windows operating system as "configured" when the images were taken.  "Configuration" simply means that variable settings in the computer system affect how the system performs.  For example, settings can be established for what constitutes a valid password, for who can access the system, for whether and how the system preserves data, and for many other elements of the system's operation.

## IV   PERFORMANCE STANDARDS APPLIED TO THE DVS VOTING SYSTEM

I was asked to evaluate whether the data retention characteristics of the DVS Voting System, including its EMS server, running with the Windows Server 2016 operating system, substantially complies with the requirements of the <u>Voting Systems Standards</u> (VSS) that were promulgated in 2002 by the Federal Election Commission (FEC).[2]

The VSS contains specific requirements for retaining records of the election process. These are unrelated to legal requirements for retention of "election records."  My analysis was whether the system complied with the FEC's 2002 VSS, not whether the system complied with requirements relating to election records.   The two are distinct and unrelated.  How the system retains records or not is a consequence of configuration settings.

---

[1] Among other resources, Memory, processor time, which programs run and at what priority, which programs can preempt others, Input/Output (including reading and writing to the disks, database, logfiles, etc)., sizes and limitations/restrictions of the system, security and access control.
[2] I also found deficiencies in the security aspects of the systems that violate the VSS.  Those are not discussed in this declaration, as they are beyond its scope.

Plaintiff's Motion for Preliminary Injunction

EXHIBIT 18

## V.    VSS REQUIREMENTS

VSS §2.2.11 specifies in pertinent part:

> Regardless of system type, all audit trail information … shall be retained in its original format, whether that be real-time logs generated by the system, or manual logs maintained by election personnel.  The election audit trail includes not only in-process logs of election night (and subsequent processing of absentee or provisional ballots), but also time logs of baseline ballot definition formats, and system readiness and testing results.

VSS §2.2.5.1, titled "System Audit Purpose and Context", states on page 2/23:

> Election audit trails provide the supporting documentation for verifying the correctness of reported election results. They present a concrete, indestructible archival record of all system activity related to the vote tally, and are essential for public confidence in the accuracy of the tally, for recounts, and for evidence in the event of criminal or civil litigation.

VSS §2.2.5.2.1 (e), page 2-25 states:

> The generation of audit record entries shall not be terminated or altered by program control or by the intervention of any person. The physical security and integrity of the record shall be maintained at all times.

VSS §2.2.4.1 (h), page 2-23 states "To ensure system integrity, all systems shall" :

> Maintain a permanent record of all original audit data that cannot be modified or overridden but may be augmented by designated authorized officials in order to adjust for errors or omissions (e.g., during the canvassing process.)

The VSS states its purposes to include ensuring that sufficient records *shall be* retained to detect and prosecute civil rights violations and election crimes, or to audit the performance of the voting system, and *to reconstruct* an election.  The VSS repeatedly refers to "audit trail," "audit records" and similar concepts.  A computer based system can create and retain records of various types of system activity that enable audits of what happened in the system in the event these are needed for investigations such as those mentioned in the above VSS statement.  Such records also are necessary to determine whether any system malfunctions or interventions occurred, what they were, how they happened and who was involved.  In fact, such determinations cannot be made without such audit records and audit trails.  Audit records in a computer system are given various names by the software providers.  For example, Microsoft refers to such records in the Windows operating system as "logs" or "log files."  In the Microsoft SQL Server software, such records are referred to as a "journal."  Whatever the particular name used, they all constitute "audit files" as used in the VSS.

Case No. 1:23-cv-03014-SKC   Document 10-4   filed 11/27/23   USDC Colorado   pg 7 of 13

Appellate Case: 24-1013   Document: 010110986287   Date Filed: 01/02/2024   Page: 178

Plaintiff's Motion for Preliminary Injunction
EXHIBIT 18

Amended Declaration of Douglas W. Gould December 20, 2022
Page **7** of **13**

## VI   DOMINION DOCUMENTATION WARNS AGAINS DELETING LOG FILES, BUT AT THE SAME TIME INSTRUCTS USERS TO CONFIGURE SHORT LOG FILE SIZES

Dominion's manuals for DVS version 5.13-CO acknowledge that log files should be maintained, that the Windows operating system performs the logging, that such files could grow to a large size, that accordingly log file sizes should be configured to at least 2 GB each, and that care should be taken to archive log files to prevent data destruction.  At the same time, such manuals also instruct users to configure log files to only 20 MB (one percent the size of two gigabytes) and to configure log files to overwrite older information with newer information instead of archiving the older information.

Whatever the manuals say, the Windows Server 2016 operating system that accompanies DVS versions 5.11-CO and 5.13-CO is configured with the smaller log files (20 MB) and does not archive older log files.

See 2.03 Democracy Suite EMS Functionality Description, Version: V.13-CO::4, April 16, 2021 and 2.09 Democracy Suite EMS System Maintenance Manual, Version: 5.13-CO::2, April 5, 2021.

## VII   THE OPERATING SYSTEM DELETES CRITICAL RECORDS UNDER BOTH DVS VERSIONS

As stated, both DVS version 5.11-CO and 5.13-CO operate under the Microsoft Windows Server 2016 operating system.  I found that configurations for both DVS 5.11-CO before the "trusted build" and for DVS 5.13-CO after the "trusted build" limited log file size to 20 MB.  Accordingly, record retention behavior of the system running DVS version 5.13-CO will be identical to the record retention behavior of the system running DVS version 5.11-CO.  I observed that 5.11-CO software configurations resulted in destruction of electronic files that VSS requires to be retained, i.e, log file records and other audit trail records that could be necessary to investigate crimes or civil rights violations.[3]

My examination of the operating system configuration in the images of the Mesa County EMS Server found that the system was configured for very small logfile sizes.  Logfiles are the records of what occurs within the system, when it occurs, who caused it to occur, and what were the consequences of the occurrence.  Logfiles are records of the activity of the system running on the server, in this case the DVS voting system including its operating system and other software used in tallying votes.  They are essential for any audit of how the system performed its functions during an election or at any other time.

If properly configured and compliant with the VSS, the operating system logfiles will contain the time-stamped IP addresses and identity of all users connecting to the system; they will indicate which user or programmed authority caused the execution of each program, the time of execution and all error conditions including whether a storage device ran out of space or other errors not generated by human input. A single logfile entry (i.e.,

---

[3] Complete details of the forensic examinations and the findings for DVS version 5.11-CO, supporting this declaration are contained in the two forensic reports entitled "Mesa County Colorado Voting System Report #1" (hereafter referred to as "Report #1") and "Mesa County Colorado Voting System Report #2" (hereafter referred to as "Report #2") which are incorporated fully herein.

Case No. 1:23-cv-03014-SKC   Document 10-4   filed 11/27/23   USDC Colorado   pg 8 of 13

Plaintiff's Motion for Preliminary Injunction
EXHIBIT 18 Page: 8

Appellate Case: 24-1013   Document: 010110986287   Date Filed: 04/10/2024   Page: 179

Amended Declaration of Douglas W. Gould December 20, 2022
Page **8** of **13**

including one election-related record) requires approximately 68 kilobytes of space in the logfile. Performing the division (20 megabytes divided by 68 kilobytes) yields 294 records as the maximum number of records that a 20 megabyte logfile can retain. When the logfile size exceeds 20 megabytes, the computer operating system will discard the oldest record (to make space for the next record) and replace it with the newest record, overwriting the data, violating the requirement in law for the records to be preserved.

It is not possible to reconstruct how the system processed election data without complete logfiles. When logfiles are configured to a very small size, only the newest information about the system's operation can be preserved; previous information automatically is deleted to make room for more recent information. Accordingly, short logfile sizes prevent the preservation of data relating to the system's past operations, including its processing of elections.

The DVS system copies selective data from system records into a database using a program that is part of the election software called the "EMS Logger." The EMS Logger contains a set of logfile data that is insufficient to audit the integrity of or reconstruct an election and does not comply with the VSS requirement to retain data "in its original format." (Section V, VSS Requirements, §2.2.1.1). The DVS system's EMS Logger is not sufficient to constitute the "audit trail" and "audit records" as used in the 2002 VSS.

## VIII   DATA RETENTION PERIODS

I was asked to evaluate whether the DVS Voting System, including the EMS server, retains data for periods required by the VSS.

The VSS requires data retention after elections for specific periods and specific reasons. The VSS states "Because the purpose of this law is to assist the Federal government in discharging its law enforcement responsibilities in connection with civil rights and elections crimes, its scope must be interpreted in keeping with that objective" and specifies that "The appropriate state or local authority **must preserve all records that may be relevant** to the detection and prosecution of federal civil rights or election crimes for the 22-month federal retention period, if the records were generated in connection with an election that was held in whole or in part to select federal candidates."[4]  (emphasis added)

The VSS continues to state (in the same reference) "Regardless of system type, all audit trail information . . . shall be retained **in its original format**, whether that be real-time logs generated by the system, or manual logs maintained by election personnel. The election audit trail includes not only in-process logs of election night (and subsequent processing of absentee or provisional ballots), but also time logs of baseline ballot definition formats, and system readiness and testing results."[5] (emphasis added)

VSS Vol. 1, §2.2.5.1, titled "System Audit Purpose and Context", states on page 2/23, "Election audit trails provide the supporting documentation for verifying the correctness of reported election results. They present a concrete, indestructible archival record of all system activity related to the vote tally, and are essential for public confidence in the

---

[4] 2002 Voting System Standards, Volume 1, page 2-34, §2.2.11
[5] *Id.*

Case No. 1:23-cv-03014-SKC   Document 10-4   filed 11/27/23   USDC Colorado   pg 9 of 13

Appellate Case: 24-1013   Document: 010110986287   Date Filed: 02/01/2018   Page: 180

Plaintiff's Motion for Preliminary Injunction
EXHIBIT 18

Amended Declaration of Douglas W. Gould December 20, 2022
Page **9** of **13**

accuracy of the tally, for recounts, and for evidence in the event of criminal or civil litigation."

## A. ROUTINE OPERATION OF THE SYSTEM DESTROYS DATA THAT ARE NECESSARY FOR ANY RECONSTRUCTION OR AUDIT OF AN ELECTION

The DVS 5.11 and 5.13-CO systems employ "commercial off the shelf" software (COTS) as that term is used in the VSS. That is because the entire system runs under a Windows Server 2016 operating system that is in wide use and well understood by actors who might wish to interfere with the operation of the system. Moreover, other software applications on the system are in wide use in applications unrelated to elections. While the DVS software itself is used only in connection with elections and therefore might not be that well known by computer software experts, the operating system and other applications are well known. This exposes the system potentially to greater risk than a completely proprietary system. Accordingly, the VSS contains special requirements for COTS systems such as the system used in Colorado.

VSS Vol. 1, §2.2.5.3 addresses specific record retention requirements for "COTS" (Commercial Off-The-Shelf) software.[6] The configuration of the system I examined falls far short of complying with these requirements.

VSS §2.2.5.3, page 2-26, states:

> Further requirements must be applied to COTS operating systems to ensure completeness and integrity of audit data for election software. These operating systems are capable of executing multiple application programs simultaneously. These systems include both servers and workstations (or "PCs"), including many varieties of UNIX and Linux, and those offered by Microsoft and Apple. Election software running on these COTS systems is vulnerable to unintended effects from other user sessions, applications, and utilities, executing on the same platform at the same time as the election software.

> "Simultaneous processes" of concern include unauthorized network connections, unplanned user logins, and unintended execution or termination of login processes. An unauthorized network connection or unplanned user login can host unintended processes and user actions, such as the termination of operating system audit, the termination of election software processes, or the deletion of election software audit and logging data. The execution of an operating system process could be a full system scan at a time when that process would adversely affect the election software processes. Operating system processes improperly terminated could be system audit or malicious code detection.

---

[6] The voting system used by Mesa County employs commercial off the shelf (COTS) software. COTS elements include the Microsoft Windows operating system, Microsoft SQL Server Database Management System, and Microsoft SQL Server Management Studio. Therefore, VSS standards relating to COTS elements apply in this case.

Case No. 1:23-cv-03014-SKC   Document 10-4   filed 11/27/23   USDC Colorado   pg 10 of 13

Plaintiff's Motion for Preliminary Injunction
EXHIBIT 2 Page 10

Appellate Case: 24-1013   Document: 010110986287   Date Filed: 01/31/2024   Page: 181

Amended Declaration of Douglas W. Gould December 20, 2022
Page **10** of **13**

To counter these vulnerabilities, three operating system protections are required on all such systems on which election software is hosted.  First, authentication shall be configured on the local terminal (display screen and keyboard) and on all external connection devices ("network cards" and "ports").  This ensures that only authorized and identified users affect the system while election software is running.

Second, **operating system audit shall be enabled for all session openings and closings, for all connection openings and closings, for all process executions and terminations, and for the alteration or deletion of any memory or file object**.  This ensures the accuracy and completeness of election data stored on the system. It also ensures the existence of an audit record of any person or process altering or deleting system data or election data.

Third, the system shall be configured to execute only intended and necessary processes during the execution of election software.  The system shall also be configured to halt election software processes upon the termination of any critical system process (such as system audit) during the execution of election software. [Emphasis added.]

The term "operating system audit" above refers to operating system log files.  It is by means of log files that it is possible to audit "session openings and closings," "connection openings and closings," "process executions and terminations," and "the alteration or deletion of any memory or file object."   These required records are obtained from operating system logs, Windows "event" logs, application logs (including database logs, logs of custom election software, and other programs that are executed).

Forensic analysis revealed that (a) DVS does not retain all these records in their original format, and (b) DVS retains only excerpts from some of these logs (the "EMS Logger") rather than complete records on the EMS Server. Forensic analysis further revealed that the DVS EMS Server overwrites operating system logs (original format records, i.e., logfiles) and fails to retain these data as required by VSS §2.2.4.1 (h).  The DVS EMS overwrites operating system logfiles because, with the maximum logfile size configured at 20 megabytes, when the logfile exceeds 20 megabytes, record preservation is overridden and the disk file space is re-used, erasing earlier records.  This setting ensures that much logfile data automatically will be deleted in the normal operation of the system.  This setting is identical in the current version (5.13-CO) voting system and will cause the same overwriting / deletion behavior (the same operating system with the same settings will behave the same way).

Because the extremely limited copies of logs that do exist in the EMS Logger database do not contain specifically required content from the 2020 and 2021 elections (version 5.11-CO), because operating system logfile size is limited to 20 megabytes ensuring the overwriting of operating system logfile data, the VSS requirement for retention of logs and records and for retention of such records in their "originally generated format" have been violated.

Case No. 1:23-cv-03014-SKC   Document 10-4   filed 11/27/23   USDC Colorado   pg 11 of 13

Plaintiff's Motion for Preliminary Injunction

Appellate Case: 24-1013   Document: 010110986287   Date Filed: 11/11/2024   Page: 182

EXHIBIT 3

Amended Declaration of Douglas W. Gould December 20, 2022

Page **11** of **13**

## B. THE TRUSTED BUILD DELETED MASSIVE AMOUNTS OF DATA FROM PREVIOUS ELECTIONS LESS THAN 22 MONTHS AFTER SUCH ELECTIONS

The contents of the Mesa County EMS server, including the hard drive of the computer on which it runs, were radically changed in May, 2021.  I am told this was done by representatives of the software vendor and the Colorado Secretary of State. Some of the effects of this process were:

1. The hard drive was reformatted.  As a result, most of the data previously stored on the hard drive became impossible to retrieve and should be considered deleted.

2. The data deleted included operating system logfiles[7] and Microsoft Windows event logfiles.  A total of 695 of these files were deleted: 505 operating system logfiles and 190 windows event files.

3. The data deleted included DVS version 5.11-CO software.

4. New copies of the operating system and the applications running on the system were placed on the hard drive.  The DVS applications version 5.13-CO was one of those applications.

5. Ballot images were preserved on a separate disk drive on the EMS Server, but original operating system records were deleted.

The data deleted during the May, 2021 "trusted build" included data required to be retained by the VSS.

## VIII   DEFICIENCIES CANNOT BE MITIGATED BY ADJUSTING SYSTEM CONFIGURATION

In other settings, such as a computer system operated by a commercial company, some of the foregoing deficiencies could be mitigated or corrected by changing configuration settings.  That appears to be impractical if not impossible in the setting of the DVS voting system.

VSS §1.6.1, page 1-14, in relevant part, states:

> Qualification tests validate that a voting system meets the requirements of the Standards and performs according to the vendor's specifications for the system.

> After a system has completed qualification testing further examination of a system is required if modifications are made to hardware, software, or telecommunications, including the installation of software on different hardware.

---

[7] There are numerous logfiles with different naming conventions for different purposes.  Windows operating system, application, security and setup events are recorded in "event" files with the suffix ".evtx", while many of the functions of the operating system are recorded in logfiles with the filename suffix ".log".  There are many other logfiles that include, for example, an inventory of files included in a software update that do not contain information relevant to the reconstruction or audit of an election and are not included in these numbers.

Case No. 1:23-cv-03014-SKC Document 10-4 filed 11/27/23 USDC Colorado pg 12 of 13

Appellate Case: 24-1013 Document: 010110986287 Date Filed: 07/01/2024 Page: 183

Plaintiff's Motion for Preliminary Injunction

EXHIBIT 2

Amended Declaration of Douglas W. Gould December 20, 2022

Page **12** of **13**

Generally, a voting system remains qualified under the standards against which it was tested, as long as no modifications not approved by an ITA are made to the system.

In the 2002 VSS, an ITA is an "Independent Testing Authority." The current designation is a "Voting System Testing Laboratory" (VSTL) which is accredited by the U.S. Election Assistance Commission.

VSS §1.6.2, page 1-15, in relevant part, states:

Certification tests are performed by individual states with or without the assistance of outside consultants …

Certification tests performed by individual states typically rely on information contained in documentation provided by the vendor for system design, installation, operations, required facilities and supplies, personnel support and other aspects of the voting system.

Some reasons why it is impractical to mitigate the system's deficiencies are the following:

First, it is possible that neither the county personnel nor the secretary of state's personnel are competent to adjust system settings or to identify the need for such changes. Indeed, making such changes might violate Colorado law. It also might violate contracts with the vendor of the voting system.

Second, the entire system as configured for elections must be tested by a federally accredited voting system testing laboratory. Adjustments to the system might require testing of the entire system under state and or federal law.

Third, my understanding is that Colorado law and election rules require voting systems to be decertified if there is a suspicion that their operations have been altered. To adjust the system's configuration could require decertification of the system and prevent its use in an election.

Fourth, if the system must be adjusted or reconfigured, this is accomplished by copying a new certified image provided by the vendor onto the hard drive, destroying the data thereon. Accordingly, the act of updating the contents of a county's system to comply with the VSS itself would violat the VSS by destroying records relating to the 2022 primary election, violating record retention statutes.


FINDINGS AND CONCLUSIONS

1. As delivered to the State of Colorado by Dominion Voting Systems, the DVS EMS Server (version 5.13-CO and version 5.11-CO) is configured to erase (overwrite) critical election records, audit trails, and operational logfile records. Destruction of these data makes it impossible to detect election crimes or civil rights violations. Destruction of data makes it impossible to audit or reconstruct an election.

2. As delivered, the DVS Voting System operating system is configured for a maximum log file size of 20 megabytes. Both the DVS versions 5.11-CO and

Case No. 1:23-cv-03014-SKC   Document 10-4   filed 11/27/23   USDC Colorado   pg 13 of 13
Plaintiff's Motion for Preliminary Injunction
Appellate Case: 24-1013   Document: 010110986287   Date Filed: 11/27/2023   Page: 184
EXHIBIT 12   Page: 184
Amended Declaration of Douglas W. Gould December 20, 2022
Page **13** of **13**

5.13-CO contain this same configuration maximum size limit.  This logfile size is inadequate to ensure the preservation of election data.

3. DVS software contains an "EMS Logger" program that does not "preserve all records that may be relevant to the detection and prosecution of federal civil rights or election crimes," specifically omitting detailed software executions, alterations and deletions of files and external connections to the EMS Server.  The EMS Logger does not satisfy the VSS requirement for audit record retention.

4. No audit of the electronic voting and tabulation of ballots is possible because the data necessary to audit, reconstruct the election or detect election crimes have been destroyed, both by configuring the maximum logfile size to be too small, and by deletion of records not otherwise preserved using the "trusted build" process.

5. It is impractical to attempt to correct or even mitigate the effects of the system deficiencies and non-compliance with the VSS.

6. The DVS system does not substantially comply with VSS requirements.


I declare under penalty of the perjury laws of the state of Colorado and the United States that the foregoing is true and correct, and that this declaration was executed this 19th day of December 2022 in Morehead City, North Carolina.


December 20, 2022                    /*s/Douglas W. Gould*_____
                                     Douglas W. Gould

Plaintiff's Motion for Preliminary Injunction
EXHIBIT 28

# Doug Gould, CISSP, CAS

Doug Gould is a results-oriented security leader with 35YRs+ experience in Business and Government Solutions security services. He has successfully partnered with management and technical leads of global corporations and government organizations to design solutions, demonstrate and implement technical capabilities of security products and services, and advise C Level clients as a Chief Security Strategist while at AT&T. Doug is currently the Chief Technical Officer at Cyber Team US.

**CORE COMPETENCIES**

- Business Management

- Security Architecture & Design

- High Level and Detailed Security Policy
- Security Infrastructure: FW, IDS, IPS, and more

- Systems Security –Unix/Linux & Windows

- Regulatory Compliance - SOX, HIPAA, more

- Penetration Testing and Assessment (IT Security, also Physical Security)

- Rationalization of GRC and Risk Management
- Physical Security - Threat Assessment/Risk Analysis; TSCM; Protection Strategy; Design
- Public Key Infrastructure; AAA solutions
- Enterprise Systems Administration; Infrastructure-wide Config Management
- Bus. Continuity Planning, Disaster Recovery
- SCADA, Process Control, Pharmaceutical compliance (21 CFR & cGxP's)
- Security Investigation, Computer Forensic Expert

## PROFESSIONAL EXPERIENCE

- Chief Technical Officer, Cyber Team US
- Chief Security Strategist, AT&T Security Center of Excellence
- Technical Security Consultant, AT&T Security Center of Excellence
- Principal Security Architect, City and County of San Francisco (Health Information Exchange, leading national standards initiatives)
- Principal Security Architect, State of Florida enterprise network (OC core MPLS network, 4000+ CPE routers, advanced security); planning, design and implementation.
- Advanced Convergence Secure VPN Infrastructure development and deployment
- Commercialization Implementation team, AT&T's global-scope Aurora SIEM platform
- Appointed Chief Information Security Officer, World Institute for Security Enhancement.
- Forensic Analyst, Expert Witness*
- Senior Faculty Member, World Institute for Security Enhancement – Computer Forensic Analysis, Advanced Computer Forensic Analysis, Technical Surveillance Countermeasures.
- Instructor, Checkpoint Firewall-1 NG with AI
- Advanced SIEM Architecture Design & Implementation (Cisco MARS, Q-Radar, Intellitactics, others)
- Firewall and Network Security in HA Extreme Criticality National Security Government / DoD environments

Plaintiff's Motion for Preliminary Injunction
EXHIBIT 128

## Resume of Doug Gould, CISSP, CAS

- Multi Vendor VPN Interoperability Specialist
- Author, *Information Security Framework Methodology*$^{TM}$
- Principal Security Consultant, Able Information Security – Checkpoint, Symantec, Cisco and Forensic expert
- Course Author & Instructor, *Beyond CISSP, Advanced Computer Forensic Analysis*
- Senior Computer Forensic Analyst, *Expert Witness*
- **Keynote Speaker, Able 2004 Security Conference –** *Norfolk Virginia, "The Future of Computer Security".*
- Physical and Electronic Security Assessment for Federal Critical Infrastructure Data Centers
- President, Eastern Carolina InfraGard, 2002-2003
- Performed Security Audits, Security Assessments and Penetration Testing
- Installed and Configured ASA, PIX, FWSM and Checkpoint firewalls and, Checkpoint Interspect, Symantec Manhunt, Cisco IDS, Enterprise Security Manager (ESM), Silent Runner, more …
- Installed and Configured High Availability and Load Balancing Firewall Solutions supporting VPN access for >16,000 simultaneous global (worldwide) users in DoD environments
- Performed Firewall Installation, configuration, rule base and policy development for Federal, State and Local Governments, and for National Critical Infrastructure organizations (US Ports), as well as numerous commercial clients
- Established Multi-Vendor Interoperability VPN Solutions, including leading edge secure Converged Services
- Consulted with clients on, developed and authored corporate security policies.
- Architected 900-node international business network and operational security infrastructure
- Performed Regulatory Compliance assessments for computer security, authentication and electronic signatures in regulated environments
- Performed assessment against Sarbanes-Oxley, HIPAA, PCI, ISO-17799, NIST Standards, FISMA, FIPS, DOE Criteria, DoD STIG's, FERC and NERC guidelines.
- Expert in security of SCADA (Supervisory Control And Data Acquisition) systems and networks
- Performed Application Security Assessments for Database Systems, Manufacturing Systems and Control Systems in regulated environments

Current Position – *Chief Technical Officer, Cyber Team US*
Partner, co-owner.  Responsible for operations management including service delivery, sales force management, consulting services, training, operational infrastructure design, implementation and business management, business strategy, marketing and growth strategies.

Previous Experience – *Senior Technical Security Consultant, AT&T Security Center of Excellence*
Upon AT&T acquisition of Alienvault, AT&T Cybersecurity was formed.  I have been a key person in the development of security messaging in the new AT&T Cybersecurity business unit.  Key spokesperson for AT&T Security offers – presenting and demonstrating AT&T offers to customer cabinet-level officers.  Core ability to simplify technology and present key advantages in a business leadership context.  Uniquely able to translate technological advantage into business imperative.  Retired from AT&T in 2020.

Previous Experience – *AT&T Chief Security Strategist*
Responsible for leading security strategy for all of AT&T's Enterprise and Global Transnational customers.  As one of the most senior Subject Matter Experts (SME) in information security, worked with chief executives and cabinet officers of the Fortune-500 and Global Transnational companies to define approaches to address comprehensive security concerns from strategic alignment of risk and compliance with business goals to specific integration of solutions into existing infrastructures defining a path of continuous improvement toward the ultimate goal of achieving desired risk tolerance.  Led a team of SMEs and Application Security Executives to achieve sales objectives.  Facilitated Product management and operations collaboration to strengthen the portfolio and improve market position.  Managed large complex projects including difficult client retention and account recovery strategies with a well-reasoned and disciplined approach, a can-do attitude and drive to get things done.

Plaintiff's Motion for Preliminary Injunction
EXHIBIT 4

# Resume of Doug Gould, CISSP, CAS

<u>Previous Experience</u> – *Principal Architect, Security, AT&T*
In this role defined security implementations for large corporations, US States and the US Federal Government, from high level strategy to detailed design. Defined Governance, Risk and Compliance for multiple clients in conjunction with security architecture and operational process design, including the first healthcare network fully compliant with Healthcare Information Exchange standards. Developed operational processes including assessment and mitigation strategies to optimize customer's Security Operations Centers. Defined security strategies to protect assets of a company responsible for more than a Trillion dollars. Defined the entire security architecture, operational plan, lights-out data center and SOC for one of the 5 largest US States. Defined and implemented security operations for US Government Agencies.

<u>Previous Experience</u> – *Senior Security Consultant, AT&T Security Consulting*
Beginning in 2006, led security consulting within AT&T and developed offers, trained consultants and let client engagements to achieve landmark and reference work, grow the practice and position new capabilities. Became the go-to person to resolve challenging issues and complex problems.

<u>Previous Experience</u> – *President and Principal Consultant, Gould Professional Services*
Incorporated in July 2001, served as President and Principal Consultant of the corporation. Performed security work for a broad spectrum of clients and security related tasks – clients included:

| | | |
|---|---|---|
| Blue Cross and Blue Shield | Quintiles Transnational | Novo Nordisk |
| Roxanne Laboratories | Able Information Security | SAIC / DIA |
| Gardner Law Firm | Progress Energy | Port of Virginia |
| City of Chesapeake | City of Virginia Beach | National Business Aviation Association |
| Cisco Systems | US Army | Boston Scientific |

Tasks for these clients included Security Architecture Design, Perimeter Security Design, Security Policy Assessment, Security Policy Development, Firewall Installation & Rulebase Design, Teaching Firewall Engineering & Admin, Data Center Security Design, Intrusion Detection & Prevention Systems, Installation & Rule Base Development, Interior Enclave Security, Forensic Examination of Computers; Expert Witness Testimony (Computer Security Expert), Penetration Testing, Critical Infrastructure Security Assessment (physical, electronic and computer security), Regulatory Compliance Assessment (security) and Technical Compliance Remediation, Technical Surveillance Countermeasures, Database Security, Systems Security, Infrastructure and Architecture Security Evaluation and Remediation.

<u>Previous Experience</u> – *Product Manager, Optical and Broadband Services, Lucent Technologies*
2001-2003 Responsible for professional services management for 16 product lines from basic route and switch through complex multi-terabyte intercity trunking technologies. Defined operational strategy, policy, process and oversaw service delivery. Certified Product Manager.

<u>Previous Experience</u> – *Regional Security Resource Manager – International Network Services*
International Network Services, Inc. / Lucent Technologies: Responsible for the development, leadership and management of Mid-Atlantic regional Network Security consulting practice, including forensic and emergency response services. Defined and implemented services, training and staff development, sales and delivery processes. Developed Managed Security Services business. Consulted on startup strategy for Lucent's new ventures; responsible for B2B strategic relationship negotiations. Provided senior consultative leadership to client teams and executives.

<u>Previous Experience</u> – *Lead Security Manager, US EPA – Lockheed Martin Professional Services.*
Lead responsibility for Information Security at the US EPA's National Data Processing Center, including perimeter security, data integrity, systems and applications monitoring and management.

<u>Previous Experience</u> – *Vice President, Partner, Imagine Systems.|*
Information Security business targeting small to medium size IS customers. Marketing, technical sales, P&L responsibility. Developed one of the first real-estate search capabilities on the Internet in 1994, including all access, database, imaging and presentation technologies.

Resume of Doug Gould, CISSP, CAS

<u>Previous Experience</u> – *Producer and Recording Engineer, Bongiovi-Walters Productions, New York City.*
Responsible for audio recording and production of special projects.  Line producer for live TV broadcast, recording for syndication and live audience performance of <u>The Early Days of Radio</u>, a big-band entertainment season run with cast and crew of 60.

<u>Previous Experience</u> – *Senior Technical Associate, Bell Laboratories*
AT&T Bell Laboratories, Murray Hill, NJ.  Laser Development, Computing Services (Murray Hill Computer Center), Computer Security (Bell Labs Computer Security Group), Lightwave Product Manufacturing, Visual Solutions (video teleconferencing); project manager, technical lead, responsible for engineering team; managed $M+ budget, Infosec Responsibility across 3 major data centers, 350+ systems from minis to Mainframes and Cray. Responsibilities also included semiconductor device physics, fiber and optical development engineering, test and measurement physics, VLSI Design and Test.  Product Realization specialist including transfer to Manufacture.  Quality Systems expertise.  Solved major infrastructure problems with KDD/Japan's fiber backbone by identifying polarization dependence issues; Development team & test engineer, AT&T Advanced Video Processor (AVP) chipset (H.323 implementation,  AVP4120, AVP4125), Advantest certified.  Pioneer in Computer Forensics (first case 1986).

# Key Areas of Expertise

## Technology Skills

### Data Networking

- Principal Security Architect for European Retailer w/900 outlets in 56 countries
- Special Security Implementations for classified networks/systems
- Principal Security Architect, State of Florida network
- Principal Security Architect, City and County of San Francisco
- Principal Security Consultant to $300M business that manages ~$1 Trillion in assets
- Network Forensics

### Products

- Checkpoint Product Line
- Symantec Product Line
- Radware Product Line
- Cisco PIX, ASA, VPN concentrators; routers, switches, IDS
- Silent Runner
- Intellitactics SIEM, Q Radar SIEM, Fortigate Firewall, AT&T Aurora SIEM (Internal only, global scale)
- Encase, Access Data, Net Forensics Computer Forensics

### Certifications and Training

- Certified Anti-Terrorism Specialist (CAS)
- Technical Surveillance Countermeasures certified Instructor  (TSCM)
- Certified Information Systems Security Professional (CISSP)
- Checkpoint Certified Security Administrator / Engineer (CCSA/CCSE)
- Symantec Certified Product Engineer – Manhunt IDS (SCPE)
- Linux / Unix Systems Programmer / Developer (includes contributions to AT&T UNIX)
- FEMA Certified Emergency Manager
- NJ Certified Public Information Officer
- FCC General Radiotelephone License

## Resume of Doug Gould, CISSP, CAS

**Major Forensic Cases**

• 1986 – Disclosure of National Security Information Discovered a leak of highly classified information and was able to identify the perpetrator within a group of 15 people. The FBI and US Naval Investigative Service brought this to resolution.

• Early 1990's – US Secret Service investigation, "Mothers of Doom" hacker case At USSS Evidence Lab, in response to a request for assistance from USS SA Jack Lewis, performed evidence recovery and identified 800 pages of evidence, invalidating immunity of a suspect's testimony in a proffer session.

• Late 1990's – Interpath, a North Carolina Internet Service Provider (ISP) This ISP was a tier-1 (top level) provider infected with Stacheldraht malware. Investigated the live (running) server and identified that all evidence on disc had been deleted. The only remaining evidence was a running program in memory, which was recovered. This case changed the Best Practice in Forensics – no longer is the first step necessarily removing the power. Had that been done no evidence would remain in this case.

• Late 1990's – As senior security administrator for the US EPA, investigated a complaint from the White House of computer intrusions and discovered an international attack involving 4 countries. Wrote monitoring and tracking software to capture the perpetrator online, brought together the FBI, Royal Canadian Mounted Police (RCMP), Scotland Yard and Deutche Bundespost in a live investigation tracking the intruder resulting in an arrest in Germany.

• South Carolina – A Public Works supervisor accused of violation of county policy was fired and brought countersuit. Forensic investigation recovered 4 3" thick binders of evidence showing sexual misconduct. Countersuit dismissed.

• Discovered Al Qaida attack plans targeting US Soil. Working with the FBI, the perpetrator, who was a foreign citizen in the US. Arrest made within 48 hours and the attack was thwarted.

• Mid-2000's – Florida vs. Rabinowicz, Palm Beach, FL – in a case where possession of contraband was the only element of proof, stipulated that the contraband was authentic and present. I proved forensically that the defendant was not technically in possession of the evidence and that evidence was planted. Qualified as an expert witness and provided expert testimony in this case.

• Mid-2000's – Identified a leak of national security from Oak Ridge National Laboratory involving chemical weapon information using forensic analysis and was able to identify the perpetrator. DSS responded and resolved the case.

• Mid-2000's – Investigated sabotage of a health industry contractor. The systems administrator had been fired and sabotaged the system. Solved the case and the administrator went to prison.

## Instructor of Forensics

• Taught Forensics and Advance Forensic Techniques to State Law Enforcement, Military and major corporate customers at the World Institute for Security Enhancement.

• Taught Technical Surveillance Countermeasures (TSCM) course for government and industry at the World Institute for Security Enhancement.

• Wrote the entire course and taught the entire CISSP curriculum at Able Information Systems.

Case No. 1:23-cv-03014-SKC   Document 9-12   filed 11/27/23   USDC Colorado   pg 1 of 18
Plaintiff's Motion for Preliminary Injunction
Appellate Case: 24-1013   Document: 010110986287   Date Filed: 03/05/2024   Page: 190
EXHIBIT 28

DISTRICT COURT, MESA COUNTY, COLORADO
125 N. Spruce Street
Grand Junction, CO 81505

**IN RE: THE MESA COUNTY GRAND JURY**

**PEOPLE OF THE STATE OF COLORADO**

v.

**TINA PETERS,**

**and**

**BELINDA KNISLEY,**

**Defendants.**

FILED IN COMBINED COURT

MAR 0 8 2022

MESA COUNTY COMBINED COURT
MESA COUNTY, COLORADO

▲  **COURT USE ONLY**  ▲

| | |
|---|---|
| DANIEL P. RUBINSTEIN, District Attorney*<br>JANET STANSBERRY DRAKE,<br>Special Deputy District Attorney*<br>ROBERT S. SHAPIRO,<br>Special Deputy District Attorney*<br>P.O. Box 20,000<br>Grand Junction, CO 81502-5031<br>Registration Numbers:<br>27473 (DPR);  27697 (JSD);  26869 (RSS)<br>*Counsel of Record | Grand Jury Case:  21CR100<br><br>District Court Case Numbers: |

**MESA COUNTY GRAND JURY INDICTMENT**

**COUNT 1:**   ATTEMPT TO INFLUENCE A PUBLIC SERVANT, C.R.S. 18-8-306 (F4)
**24051**

**Tina Peters and Belinda Knisley**

**COUNT 2:**   ATTEMPT TO INFLUENCE A PUBLIC SERVANT, C.R.S. 18-8-306 (F4)
**24051**

**Tina Peters and Belinda Knisley**

**COUNT 3:**   ATTEMPT TO INFLUENCE A PUBLIC SERVANT, C.R.S. 18-8-306 (F4)
**24051**

**Belinda Knisley**

**Exhibit H**

**COUNT 4**   CONSPIRACY TO COMMIT CRIMINAL IMPERSONATION, C.R.S. 18-5-113(1)(B)(I) AND 18-2-201 (F6) **1011EC**

Tina Peters and Belinda Knisley

**COUNT 5:**   ATTEMPT TO INFLUENCE A PUBLIC SERVANT, C.R.S. 18-8-306 (F4) **24051**

Tina Peters

**COUNT 6**   CRIMINAL IMPERSONATION - CAUSE LIABILITY, C.R.S. 18-5-113(1)(B)(I) (F6) **1011E**

Tina Peters

**COUNT 7**   CONSPIRACY TO COMMIT CRIMINAL IMPERSONATION – CAUSE LIABILITY, C.R.S. 18-5-113(1)(B)(I) AND 18-2-201 (F6) **1011EC**

Tina Peters

**COUNT 8**   IDENTITY THEFT - USES INFORMATION TO OBTAIN THING OF VALUE, C.R.S. 18-5-902(1) (F4) **1307G**

Tina Peters

**COUNT 9:**   FIRST DEGREE OFFICIAL MISCONDUCT, C.R.S. 18-8-404 (M2) **24101**

Tina Peters

**COUNT 10:**   VIOLATION OF DUTY, C.R.S. 1-13-107(1) (M) **38022**

Tina Peters

**COUNT 11:**   FAILURE TO COMPLY WITH REQUIREMENTS OF SECRETARY OF STATE, C.R.S. 1-13-114 (M) **3802E**

Tina Peters

**COUNT 12:**   VIOLATION OF DUTY, C.R.S. 1-13-107(1) (M) **38022**

Belinda Knisley

**COUNT 13:**   FAILURE TO COMPLY WITH REQUIREMENTS OF SECRETARY OF STATE, C.R.S. 1-13-114 (M) **3802E**

Belinda Knisley

STATE OF COLORADO            )
                            ) ss.
MESA COUNTY                 )

Of the 2021-2022 term of the Mesa County District Court (21st Judicial District) in the year of 2022, the Mesa County Grand Jurors, chosen, selected, and sworn in the name and by the authority of the People of the State of Colorado, upon their oaths, present the following:

## COUNT 1

ATTEMPT TO INFLUENCE A PUBLIC SERVANT, C.R.S. 18-8-306 (F4)

On or about April 23 – May 18, 2021, in Mesa County, State of Colorado, **Tina Peters and Belinda Knisley**, unlawfully and feloniously attempted to influence **Jessi Romero** of the Colorado Department of State/Secretary of State's Office, a public servant, by means of deceit, with the intent thereby to alter or affect the public servant's decision, vote, opinion, or action concerning a matter which was to be considered or performed by the public servant or the agency or body of which the public servant was a member; in violation of section 18-8-306, C.R.S.

## COUNT 2

ATTEMPT TO INFLUENCE A PUBLIC SERVANT, C.R.S. 18-8-306 (F4)

On or about May 10 – May 19, 2021, in Mesa County, State of Colorado, **Tina Peters and Belinda Knisley**, unlawfully and feloniously attempted to influence **David Underwood** of Mesa County, a public servant, by means of deceit, with the intent thereby to alter or affect the public servant's decision, vote, opinion, or action concerning a matter which was to be considered or performed by the public servant or the agency or body of which the public servant was a member; in violation of section 18-8-306, C.R.S.

## COUNT 3

ATTEMPT TO INFLUENCE A PUBLIC SERVANT, C.R.S. 18-8-306 (F4)

On or about May 17, 2021, in Mesa County, State of Colorado, **Belinda Knisley**, unlawfully and feloniously attempted to influence **Stephanie Wenholtz** of the Mesa County Clerk and Recorder's Office, a public servant, by means of deceit, with the intent thereby to alter or affect the public servant's decision, vote, opinion, or action concerning a matter which was to be considered or performed by the public servant or the agency or body of which the public servant was a member; in violation of section 18-8-306, C.R.S.

## COUNT 4

CONSPIRACY TO COMMIT CRIMINAL IMPERSONATION - CAUSE LIABILITY, C.R.S. 18-5-113(1)(B)(I) AND 18-2-201 (F6)

On or about April 23 – May 19, 2021, in Mesa County, State of Colorado, **Tina Peters and Belinda Knisley,** with the intent to promote or facilitate the commission of the crime of Criminal Impersonation, unlawfully and feloniously agreed with the other co-defendant named above, Sandra Brown and/or a person or persons to the Grand Jury and District Attorney unknown that one or more of them would engage in conduct which constituted that crime or an attempt to commit that crime, or agreed to aid the other person or persons in the planning or commission or attempted commission of that crime, and an overt act in pursuance of the conspiracy was committed by one or more of the conspirators; in violation of sections 18-5-113(1)(b)(I) and 18-2-201, C.R.S.

## COUNT 5

ATTEMPT TO INFLUENCE A PUBLIC SERVANT, C.R.S. 18-8-306 (F4)

On or about May 25, 2021, in Mesa County, State of Colorado, **Tina Peters,** unlawfully and feloniously attempted to influence **Danny Casias** of the Colorado Department of State/Secretary of State's Office, a public servant, by means of deceit, with the intent thereby to alter or affect the public servant's decision, vote, opinion, or action concerning a matter which was to be considered or performed by the public servant or the agency or body of which the public servant was a member; in violation of section 18-8-306, C.R.S.

## COUNT 6

CRIMINAL IMPERSONATION - CAUSE LIABILITY, C.R.S. 18-5-113(1)(B)(I) (F6)

On or about May 23 – May 27, 2021, in Mesa County, State of Colorado, **Tina Peters,** unlawfully, feloniously, and knowingly assumed a false or fictitious identity or capacity, legal or other, namely: **Gerald "Jerry" Wood,** and in such identity or capacity performed an act that, if done by the person falsely impersonated, might have subjected such person to an action or special proceeding, civil or criminal, or to liability, charge, forfeiture, or penalty; in violation of section 18-5-113(1)(b)(I), C.R.S.

## COUNT 7

CONSPIRACY TO COMMIT CRIMINAL IMPERSONATION – CAUSE LIABILITY, C.R.S. 18-5-113(1)(B)(I) AND 18-2-201 (F6)

On or about May 18 – May 27, 2021, in Mesa County, State of Colorado, **Tina Peters** with the intent to promote or facilitate the commission of the crime of Criminal Impersonation, unlawfully and feloniously agreed with Sandra Brown and/or a person or persons to the Grand Jury and District Attorney unknown that one or more of them would engage in conduct which constituted that crime or an attempt to commit that crime, or agreed to aid the other person or

persons in the planning or commission or attempted commission of that crime, and an overt act in pursuance of the conspiracy was committed by one or more of the conspirators; in violation of sections 18-5-113(1)(b)(I) and 18-2-201, C.R.S.

## COUNT 8

IDENTITY THEFT - USES INFORMATION TO OBTAIN THING OF VALUE, C.R.S. 18-5-902(1)(A) (F4)

On or about May 23 – May 25, 2021, in Mesa County, State of Colorado, **Tina Peters**, unlawfully, feloniously, and knowingly used the personal identifying information, financial identifying information, or financial device of **Gerald "Jerry" Wood** without permission or lawful authority with the intent to obtain cash, credit, property, services, or any other thing of value or to make a financial payment; in violation of section 18-5-902(1)(a), C.R.S.

## COUNT 9

FIRST DEGREE OFFICIAL MISCONDUCT, C.R.S. 18-8-404 (M2)

On or about April 23, 2021-August 15, 2021, in Mesa County, State of Colorado, **Tina Peters**, a public servant, with intent to obtain a benefit for any person or maliciously cause harm to another, unlawfully and knowingly committed an act relating to her office but constituting an unauthorized exercise of her official function and/or refrained from performing a duty imposed upon her by law and/or violated a statute or lawfully adopted rule or regulation relating to her office; in violation of section 18-8-404, C.R.S.

## COUNT 10

VIOLATION OF DUTY, C.R.S. 1-13-107(1) (M)

On or about April 23 – August 15, 2021, in Mesa County, State of Colorado, **Tina Peters**, was a public officer, election official, or other person upon whom any duty is imposed by this code who then violated, neglected, or failed to perform such duty or is guilty of corrupt conduct in the discharge of the same; in violation of section 1-13-107(1), C.R.S.

## COUNT 11

FAILURE TO COMPLY WITH REQUIREMENTS OF SECRETARY OF STATE, C.R.S. 1-13-114 (M)

On or about April 23 - August 15, 2021, in Mesa County, State of Colorado, **Tina Peters**, willfully interfered or willfully refused to comply with the rules of the Secretary of State or the Secretary of State's designated agent in carrying out of the powers and duties proscribed in section 1-1-107, C.R.S., in violation of section 1-13-114, C.R.S.

## COUNT 12

VIOLATION OF DUTY, C.R.S. 1-13-107(1) (M)

On or about August 9 – August 15, 2021, in Mesa County, State of Colorado, **Belinda Knisley**, was a public officer, election official, or other person upon whom any duty is imposed by this code who then violated, neglected, or failed to perform such duty or is guilty of corrupt conduct in the discharge of the same; in violation of section 1-13-107(1), C.R.S.

## COUNT 13

FAILURE TO COMPLY WITH REQUIREMENTS OF SECRETARY OF STATE, C.R.S. 1-13-114 (M)

On or about August 9 - August 15, 2021, in Mesa County, State of Colorado, **Belinda Knisley**, willfully interfered or willfully refused to comply with the rules of the Secretary of State or the Secretary of State's designated agent in carrying out of the powers and duties proscribed in section 1-1-107, C.R.S., in violation of section 1-13-114, C.R.S.

The essential, but non-exclusive, facts presented by the Mesa County Grand Jury in support of Counts 1-13 are as follows:

## SUMMARY OF RELEVANT FACTS

During the relevant timeframe, April-August 2021, Tina Peters was the Clerk and Recorder in Mesa County, Grand Junction, Colorado. Belinda Knisley was the Deputy Clerk and Recorder. Sandra Brown, then a key employee, was the back office Elections Manager who had access to the voting system computers and equipment.

As part of the State of Colorado's initial criminal investigation it was learned that in early August 2021, public servants with the Colorado Secretary of State's Office (SOS) became aware that a series of confidential digital images of Mesa County Dominion Voting Systems (DVS) equipment and related passwords had been published on the internet. The public dissemination of this sensitive information constituted an unauthorized data breach. The compromised sensitive data included images depicting a proprietary hard drive with unlawfully downloaded/imaged software from Mesa County's election management server's hard drive. Additionally, unique Basic Input/Basic Output (BIOS) confidential passwords necessary to conduct a "trusted build" systems upgrade were also distributed in violation of SOS rules. A "trusted build" is an in-person upgrade of election management software that supports a county's voting system. Voting system equipment operate on a "closed network." This means that voting system equipment is not connected to the internet.

The Mesa County trusted build occurred on May 25-26, 2021. Personnel associated with any trusted build in Colorado include representatives from the SOS, experts from DVS, and a few designated county elections staff personnel who are designated and undergo a background check in advance of the trusted build.

Case No. 1:23-cv-03014-SKC   Document 9-12   filed 11/27/23   USDC Colorado   pg 7 of 18
Plaintiff's Motion for Preliminary Injunction
EXHIBIT 8, Page 196
Appellate Case: 24-1013   Document: 010110986287   Date Filed: 01/18/2024   Page: 7

Beginning in April 2021 and in advance of the May 25-26, 2021, trusted build, Tina Peters and Belinda Knisley, either as principal actors and/or acting as complicators, devised and executed a deceptive scheme which was designed to influence public servants, breach security protocols, exceed permissible access to voting equipment, and set in motion the eventual distribution of confidential information to unauthorized people. Furthermore, these defendants, without permission or lawful authorization, also used the name and personal identifying information of Gerald "Jerry" Wood to further their criminal scheme. This unlawful use of Mr. Wood's identity by Tina Peters and Belinda Knisley also subjected Mr. Wood to various forms of liability and criminal exposure.

## APPLICABLE COLORADO ELECTION LAW AND RULES

### DEFINITIONS

Rule 1.1.43 from 8 CCR 1505-1 of the Code of Colorado Regulations defines a **"trusted build"** to mean the write-once installation disk or disks for software and firmware for which the Secretary of State has established the chain-of-custody to the building of the disks, which is then used to establish or re-establish the chain-of-custody of any component of a **voting system** that contains firmware or software. The trusted build is the origin of the chain-of-custody for any software and firmware component of the voting system.

Rule 1.1.46 from 8 CCR 1505-1 of the Code of Colorado Regulations defines a **"voting system"** as defined by section 1-1-104(50.8), C.R.S. to mean:

    (a) The total combination of mechanical, electromechanical, or electronic equipment (including the software, firmware, and documentation required to program, control, and support the equipment) that is used to:

        (1) Define ballots;
        (2) Cast and count ballots;
        (3) Report or display election results; and
        (4) Maintain and produce any audit trail information.

    (b) The practices and associated documentation used to:

        (1) Identify system components and versions of such components;
        (2) Test the system during its development and maintenance;
        (3) Maintain records of system errors and defects;
        (4) Determine specific system changes to be made to a system after the initial qualification of the system; and
        (5) Make available any materials to the voter (such as notices, instructions, forms or paper ballots).

    (c) "Voting system" **does not** include any other component of election administration, such as voter registration applications or system, electronic pollbooks, ballot delivery and retrieval systems, signature verification and envelope sorting devices, ballot on demand printers, election night reporting and other election reporting systems, and

other components used throughout the election process that do not capture and tabulate votes.

Rule 1.1.22 from 8 CCR 1505-1 of the Code of Colorado Regulations defines, in relevant part, **"election management system"** to mean the hardware and software applications used to configure, program, and report election results from one or more voting system components, including the ballot definition and the election reporting subsystem.

Rule 1.1.25 from 8 CCR 1505-1 of the Code of Colorado Regulations defines, in relevant part, **"election management software"** to mean the software for election equipment or computers that controls election setup vote recording, vote tabulation, and reporting.

## STATUTES

In Colorado, pursuant to state statute, the Colorado Secretary of State and the secretary's office has the duty "[t]o supervise the conduct of …. Statewide ballot issue elections in this state[.]" Section 1-1-107(1)(a), C.R.S.  Pursuant to section 1-1-107(2)(a), C.R.S., the Secretary of State has the power to promulgate, publish and distribute … such rules as the secretary of state finds necessary for the proper administration and enforcement of the election laws.

Additionally, it is important to note that in Colorado a County Clerk and Recorder, in rendering decisions and interpretations under Colorado's Election Code, **shall** consult with the Secretary of State and follow rules and orders promulgated by the Secretary of State pursuant to the Election Code.  Section 1-1-110(1), C.R.S.   Next, pursuant to section 1-5-616(1)(g), C.R.S., the Secretary of State shall adopt rules … that establish minimum standards for electronic and electromagnetic voting systems regarding … security requirements."

Furthermore, "[t]he secretary of state shall by written order" address a voting system that "does not comply with applicable standards or deviates from a certified system[.]" Section 1-5-621(4), C.R.S.

## RULES

Building on the above applicable state statutes, in the State of Colorado the SOS has promulgated and adopted rules in the Colorado Code of Regulations which are relevant to this matter.  These rules apply to all election officials who have assumed the responsibility and duty of administering elections throughout the state.  The applicable rules from 8 CCR 1505.1 which were in effect at the time of the charged criminal offenses are as follows:

1.  Rule 11.1 - Voting Systems Access, with associated Rules 11.1.1, 11.1.2 and 11.1.3.  These rules focus on the county's designated election official being responsible to securely store election setup records.  Only persons with the clerk's written authorization may access the records.  Furthermore, in accordance with section 24-72-305.6, C.R.S. all permanent and temporary county staff who have access to the

   voting system or any voting or counting equipment must pass a criminal background check.

2. **Rule 20.3.2 - County Security Procedures.** This rule states, "The county must maintain and document uninterrupted chain-of-custody for each voting device from the installation of the trusted build to the present."

3. **Rule 20.5.3(a) - Access to Secure Areas.** This rule states, "Access to ...the lock... to ballot storage areas, counting room, location of adjudication, or tabulation workstations, is restricted to **employees** who have passed a criminal background check."

4. **Rule 20.5.5 – Access to Secure Areas.** This rule states, "Access to where election management software is used is limited to authorized election officials and watchers only."

5. **Rule 20.6.1(d), (e) and (g) – Internal Controls for the Voting System.** These rules state that the county may not connect or allow a connection of any voting system component to the Internet and that if any component of the voting system is equipped with Wi-Fi capability or a wireless device, the county must ensure that the wireless capability or device is disabled before use in an election. The county must also include in its security plan the name, title and date of background checks for each employee with access to any of the areas or equipment set forth in Rule 20.6.1.

6. **Rule 20.19.2(a)(2) – Access Logs.** The relevant aspect of this rule states that in addition to the audit logs generated by the election management system, the county must maintain access logs that record the following:

     (1) Modifications to the system's hardware, including insertion or removal of removable storage media, or changes to hardware drivers.

## CRIMINAL CONDUCT

Beginning in April 2021, the SOS commenced preparations for conducting trusted build election management software upgrades that would occur across Colorado. Mesa County's trusted build was set to begin on May 25, 2021. On April 16, 2021, Jessi Romero, the Voting Systems Manager with the SOS, responded to a request from Mesa County's election staff which sought to have members of the public onsite at the Elections Office in Mesa County during the trusted build. Mr. Romero, as a public servant and employee for the SOS, informed Mesa County's election staff that only required personnel from Dominion Voting Systems, the SOS, and the county will be permitted in the trusted build. Mr. Romero also reminded the Mesa County elections staff that, "The trusted build will be installed under camera, so for those members of the public that are interested in the process, my suggestion is to bring them in (after your install date) and allow them to watch the video." Mr. Romero informed the Grand Jury that it was the SOS' awareness that Mesa County's election staff had historically always kept their various security surveillance cameras on and operating.

Case No. 1:23-cv-03014-SKC   Document 9-12   filed 11/27/23   USDC Colorado   pg 10 of 18

Plaintiff's Motion for Preliminary Injunction
EXHIBIT 9
Appellate Case: 24-1013   Document: 010110986287   Date Filed: 07/12/2024   Page: 199

On April 19, 2021, Tina Peters reached out to Mesa County's IT staff and started a dialogue that also included Belinda Knisley, amongst others. Tina Peters stated that her office had requested that members of the public be present to watch the trusted build. Ms. Peters then revealed to the county IT staff that the SOS declined this request and that only Mesa County employees could be present. Ms. Peters told a Mesa County IT employee that security cameras would not capture what was exactly being done on the computer monitors, therefore Ms. Peters wanted Mesa County IT staff present to watch the trusted build.

On April 23, 2021, Tina Peters, Belinda Knisley, and others had a discussion regarding supposed vulnerabilities to election management systems. During that meeting, Tina Peters was told it was against the law to open the machines, and there was conversation about bringing in a team who could help her.

On April 26, 2021, Jessi Romero of the SOS emailed Tina Peters and the other clerks across the state explaining that DVS' Democracy Suite 5.13 voting system update had been certified by a federally accredited Voting System Test Laboratory (VSTL) for use in Colorado. As a result of this certification, the state was preparing a trusted build. On April 30, 2021, Jessi Romero notified the state's county clerks, including Ms. Peters, what procedures needed to occur in advance of the trusted builds occurring across the state. The detailed email from the SOS notified Tina Peters and her office that no later than one week prior to Mesa County's scheduled trusted build the county must confirm who would participate on behalf of the clerk's office. The SOS further advised the county clerks, including Tina Peters, that "Only authorized state staff, county election staff and Dominion staff may be present during trusted build." Additionally, the SOS advised the clerks throughout the state that, "The onsite installation of the Trusted Build is not the time for members of the public, representatives from the local parties, or county officials other than the Clerk & Recorder to observe or ask questions about the process or any of the disinformation being pushed about the election." The SOS email dated April 30, 2021, advised, "If when we arrive onsite, or during the process there are others present (beyond Dominion and county election staff that have been authorized, and the Clerk & Recorder) in the area where the Trusted Build will take place, we will move on to the next county."

Finally, the SOS provided preparation instructions to the clerks that they should, "Backup any election projects on your voting system to removeable media before our arrival." Detailed step-by-step instructions on how a county would backup its election projects were made available to the clerks. The backup of election projects and election records does not include anyone imaging the hard drive of the county's DVS election management software. Any county's backed up "election records" and its paper record of those election records are kept separately by the county for a designated period.

On May 13, 2021, notwithstanding the SOS' admonition to the clerks across Colorado, including Ms. Peters and her key staff, which limited county representatives at the Trusted Build to "county election staff," Belinda Knisley initiated communication with Mesa County Human Resources (HR) requesting access permissions and a county email account for an "I.T. person" to support the clerk's upcoming work involving its election equipment. In a follow-up communication on the same day Ms. Knisley emailed HR about a "Temp Employee" needing security badge access and a county email address. Clerk Tina Peters was included on this e-mail. Then, on May 14, 2021, a county IT employee contacted Ms. Knisley regarding the above

referenced request.  Initially Ms. Knisley responded by saying that the person needing the email was "not a new hire" and that the person was a "temp person for the Elections Department." Around the same timeframe, Tina Peters told the IT employee (David Underwood) that the person needing the county email was someone from the state and would need an email address like the last time someone from the state came in.  Relying on the misrepresentations of Tina Peters and Belinda Knisley, Mr. Underwood, believing he was initiating temporary access for a state employee, began the process of creating a Mesa County computer network login and county email address for Mr. Wood.

On May 17, 2021, Ms. Knisley started the process of getting the security surveillance cameras within the election offices turned off.  This included shutting off one or more cameras in the secured rooms where the upcoming trusted build would be conducted.   A county IT employee who was assigned to handle the cameras testified that he had no memory of any prior request from the Mesa County Clerk's office to shut off any security surveillance cameras.  By the end of the day on May 17, 2021, the security surveillance cameras protecting the secured elections areas were turned off and not operational from that point forward through the entire trusted build install process.

Also on May 17, 2021, Belinda Knisley told the office's front-office elections manager, Stephanie Wenholtz, that Gerald Wood was the new "Admin. Assistant" in the Clerk and Recorder's Office.  Stephanie Wenholtz was then excluded from the trusted build and told that Gerald Wood would participate in her place.  Relying on the misrepresentations of Belinda Knisley, Stephanie Wenholtz conducted a background check on Gerald Wood.

On May 18, 2021, Sandra Brown, the back-office elections manager, sent an email to SOS employee Jessi Romero stating that Mesa County would adhere to the procedures outlined in the SOS' April 30, 2021, email regarding the trusted build procedures and that Gerald Wood in the capacity of "Administrative Assistant" was going to be the third member of Mesa County staff to be present at the trusted build.   Deputy Clerk Belinda Knisley was cc'd on this email to Mr. Romero.

Gerald "Jerry" Wood was served with a subpoena and compelled to testify before the Mesa County Grand Jury. Mr. Wood testified that Tina Peters contacted him by telephone and told him that she may need him to do some contract work that Mesa County IT either could not do or would not do. He was told that the work involved backing up Dominion voting machines. He advised that he had no familiarity with those machines and would discuss the jobs she needed him to do as they came up.  Tina Peters later put Mr. Wood in touch with Belinda Knisley who obtained his name and social security number to run a background check. Ms. Knisley then directed Mr. Wood to go to Mesa County HR to obtain his access badge. Mr. Wood obtained his county access badge on Wednesday, May 19, 2021, the same day Ms. Knisley directed Mr. Underwood to help Mr. Wood login to the Mesa County computer network with the use of an assigned Yubikey. A Yubikey is a device that provides authorized users a two-factor authentication security feature for computer and network access. Mr. Wood testified that he never received a Yubikey and the Yubikey Mr. Underwood assigned to Mr. Wood has not been located. After a meeting with Ms. Peters and Ms. Knisley on May 19, 2021, Mr. Wood was required to return the access badge to Ms. Knisley before he left the elections building. Mr.

Case No. 1:23-cv-03014-SKC   Document 9-12   filed 11/27/23   USDC Colorado   pg 12 of 18
Plaintiff's Motion for Preliminary Injunction
EXHIBIT 24
Appellate Case: 24-1013   Document: 010110986287   Date Filed: 07/10/2024   Page: 201

Wood was never hired by Mesa County in any capacity, he has never done any work for Mesa County, and he has never been employed by the state.

Mesa County records show that on Sunday, May 23, 2021, key card access badges assigned to Tina Peters, Sandra Brown, and Gerald Wood were used to access secured election offices. Security cameras were still disabled due to Belinda Knisley's prior request.

On Tuesday, May 25, 2021, the Mesa County trusted build was set to begin in the morning. DVS employee David Stahl was present and testified that Tina Peters introduced him to a man she referred to as Gerald Wood, who she said was an administrative assistant who was in training and would be involved in the elections process.

Danny Casias, an SOS employee and public servant, who was the only SOS employee to participate in the Mesa County trusted build on May 25-26, 2021, also testified that Tina Peters introduced him to a person she called Gerald Wood. Tina Peters described Gerald Wood as being an employee of the Motor Vehicle Division who was transferring over to Elections.

Mr. Wood testified that he did not go to the Mesa County Clerk and Recorder's Office in Grand Junction on Sunday, May 23, 2021, or Tuesday, May 25, 2021, and did not use the access badge that he had previously turned over to Ms. Knisley on May 19, 2021. The Grand Jury was presented with evidence which corroborated Mr. Wood's sworn testimony regarding his whereabouts on both Sunday, May 23, 2021, and Tuesday, May 25, 2021.

In early August 2021, SOS employees learned that images of the Mesa County election management systems and related passwords were on the internet. On or about August 9, 2021, the SOS issued Election Order 2021-01 which ordered Tina Peters and the Mesa County Clerk and Recorder's Office to provide access to the SOS for an inspection. The SOS also ordered the Mesa Clerk and Recorder to immediately produce to the SOS staff any documentation of written and verbal communications, including but not limited to, emails, texts, messaging programs, social media, direct messaging, voice mails, emails, and call logs by and with the Mesa County Clerk and Recorder or staff or designee regarding DVS machines or the trusted build process. Furthermore, the SOS directed the Mesa Clerk to provide communications that contain or reflect or reference any images, videos, actions, or recordings arising from or related to the trusted build installation conducted on May 25, 2021. The SOS also directed the Clerk to produce documents showing the dates of employment and job descriptions for all representatives of the Mesa County Clerk and Recorder's office who participated in the trusted build on May 25, 2021. Ms. Peters and Ms. Knisley did not comply with all of the requests or directives contained in Election Order 2021-01.

On August 10, 2021, Belinda Knisley stated in an interview that Tina Peters directed her to turn off the cameras in May 2021. Belinda Knisley also said that the Clerk's Office considered hiring Gerald Wood but had decided against hiring him.

On August 12, 2021, the SOS ordered that Mesa County was prohibited from using their elections equipment in future elections. The Order was based in part because the SOS could not confirm that the BIOS settings were not accessed after the trusted build process and could not establish confidence in the integrity or security of the Mesa elections equipment.

Case No. 1:23-cv-03014-SKC   Document 9-12   filed 11/27/23   USDC Colorado   pg 13 of 18
Plaintiff's Motion for Preliminary Injunction
EXHIBIT 84
Appellate Case: 24-1013   Document: 010110986287   Date Filed: 11/27/2024   Page: 202

DANIEL P. RUBINSTEIN*
District Attorney

JANET STANSBERRY DRAKE, 27697*
Special Deputy District Attorney
ROBERT S. SHAPIRO, 26869*
Special Deputy District Attorney
Attorneys for the People
*Counsel of Record

Subscribed and sworn to before me in the Mesa County, State of Colorado, this **8th** day of March 2022.

Notary Public

My commission expires:

April 20, 2022

HALEY GONZALEZ
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID #20184017407
My Commission Expires April 20, 2022

The Mesa County Grand Jury presents the within Indictment, and the same is hereby ORDERED FILED this ___ day of March, 2022.

Arrest Warrants to issue:

BOND SET AT _no bond pending advisement_ FOR TINA PETERS

BOND SET AT _no bond pending advisement_ FOR BELINDA KNISLEY

District Court Judge,
21st Judicial District and Presiding
Judge for the Mesa County Grand
Jury

Plaintiff's Motion for Preliminary Injunction
EXHIBIT 84

**THE MESA COUNTY GRAND JURY**

**Case No. 2021 CR 100**

In Re: Tina Peters and Belinda Knisley

AS TO COUNT 1

A TRUE BILL

A NO TRUE BILL

_____
FOREPERSON

_____

AS TO COUNT 2

A TRUE BILL

A NO TRUE BILL

_____
FOREPERSON

_____

AS TO COUNT 3

A TRUE BILL

A NO TRUE BILL

_____
FOREPERSON

_____

AS TO COUNT 4

A TRUE BILL

A NO TRUE BILL

_____
FOREPERSON

_____

Case No. 1:23-cv-03014-SKC   Document 9-12   filed 11/27/23   USDC Colorado   pg 16 of 18
Plaintiff's Motion for Preliminary Injunction
Appellate Case: 24-1013   Document: 010110986287   Date Filed EXHIBIT 84   Page: 16 205

AS TO COUNT 5

A TRUE BILL                                    A NO TRUE BILL

FOREPERSON

AS TO COUNT 6

A TRUE BILL                                    A NO TRUE BILL

FOREPERSON

AS TO COUNT 7

A TRUE BILL                                    A NO TRUE BILL

FOREPERSON

AS TO COUNT 8

A TRUE BILL                                    A NO TRUE BILL

FOREPERSON

AS TO COUNT 9

A TRUE BILL                                    A NO TRUE BILL

_____                        _____
FOREPERSON

AS TO COUNT 10

A TRUE BILL                                    A NO TRUE BILL

_____                        _____
FOREPERSON

AS TO COUNT 11

A TRUE BILL                                    A NO TRUE BILL

_____                        _____
FOREPERSON

AS TO COUNT 12

A TRUE BILL                                    A NO TRUE BILL

_____                        _____
FOREPERSON

AS TO COUNT 13

A TRUE BILL                                    A NO TRUE BILL

_____                        _____
FOREPERSON

I, ███████████████████████, the Foreperson of the Mesa County Grand Jury, do hereby swear and affirm that each and every True Bill returned in this indictment by the Mesa County Grand Jury was arrived after deliberation and with the assent and agreement to the existence of probable cause by at least nine members of the Mesa County Grand Jury. Furthermore, the Mesa County Grand Jury consents and instructs the District Attorney that this Indictment may be returned on the record in open court before the Presiding Judge with or without the foreperson being present.

█████████████████████

Foreperson

Subscribed and sworn to before me in Mesa County, State of Colorado, this ___8th___ day of March 2022.

_____
Notary Public

My commission expires:

_April 20, 2022_

HALEY GONZALEZ
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID #20184017407
My Commission Expires April 20, 2022

18

---------- Forwarded message ---------

From: **Jessi Romero** <Jessi.Romero@sos.state.co.us>

Date: Fri, Apr 30, 2021 at 1:03 PM

Subject: Trusted Build information

To:

Cc: Judd Choate <Judd.Choate@sos.state.co.us>, Hilary Rudy <Hilary.Rudy@sos.state.co.us>, Danny Casias <Danny.Casias@sos.state.co.us>, Edward Morgan <Edward.Morgan@sos.state.co.us>, Will Graham <Will.Graham@sos.state.co.us>

Good afternoon,

In advance of the upgrade to your voting system, I'm reaching out to provide guidance on how to prepare for our visit, and what procedures we all will be required to follow when we are onsite for your Trusted Build.

**COVID-19**

- CDOS staff has been fully vaccinated.
- Please find the attached document titled "COVID-19 Trusted Build Procedures_4.30.21" for a list of requirements that we all must follow.
- I would like to bring a few requirements from this document to your immediate attention:

  - "The number of Dominion and county staff will be limited based on the size of the room and the minimal amount of people required to complete the process in a safe and efficient manner."

  - "The Voting Systems Manager will advise the county and vendor of the maximum number of staff from each that may be present during the process."

    - Adams, Arapahoe, Boulder, Denver, El Paso, Jefferson, Larimer, Weld:
      - Staff will be limited to 4 CDOS, 8 Dominion & 8 county staffers.
    - All other counties:
      - Staff will be limited to 1 CDOS, 2 Dominion & 2 county staffers.

  - "No later than **one week** before the scheduled appointment, the county and Dominion must each confirm in writing (by email) the staff who will be present, and that they will adhere to these procedures during the trusted build installation. The Voting Systems Manager will not finalize a visit until confirmation is received."

**Exhibit I**

1. Please send me an email at any time up to one week before your scheduled Trusted Build stating that you will comply with the requirements listed in the document, and identifying the county staff members (by name and position) who will be involved in the Trusted Build.
2. I will confirm by email that I have received your list of staff and that you will comply with the requirements.
3. CDOS staff assigned to your Trusted Build will send you an email before your visit to confirm who will be onsite and other details.

○ "Only authorized state staff, county election staff and Dominion staff may be present during trusted build."

- The onsite installation of the Trusted Build is not the time for members of the public, representatives from the local parties, or county officials other than the Clerk & Recorder to observe or ask questions about the process or any of the disinformation being pushed about the election.
- If, when we arrive onsite, or during the process there are others present (beyond Dominion and county election staff that have been authorized, and the Clerk & Recorder) in the area where the Trusted Build will take place, we will move on to the next county. It will then be the responsibility of the Clerk and Recorder to ship equipment to Denver so it may be upgraded at a time that works for Dominion and CDOS. Once the equipment is upgraded, it will then also be your responsibility to ship the equipment back to your county.
- We are happy to communicate with anyone who has questions or concerns about the process at any time before or after your Trusted Build date.

**Preparation & notes**

- Backup any election projects on your voting system to removable media before our arrival.
- Please have all equipment set up per the COVID-19 guidance before our arrival. For those who do not have the space to set up your entire inventory at one time, please have a plan to seal (if necessary) and swap equipment out.
- Remove the bezels from your Samsung ICXs, should you have them. You do not need to open the base of the ICX.
- QuickHash, Libre Office, and the Aegis drive software will be installed on your EMS client or express server.

**Background checks**

- Background checks for DVS and CDOS staff are attached to this email.

We look forward to seeing everyone again! It has been far too long. Please let me know if you have any questions.

## DECLARATION OF ED ARNOS

I,        Ed Arnos, declare under penalty of perjury that the following is true and correct:

1.        I have been working with computers since 1963. In my 54-year civilian business career, I have evaluated, designed, specified, manufactured, managed, diagnosed, and repaired hardware and software for computer systems and trained others to use and support them. I have served as a computer consultant to major corporations. A copy of my resume is attached to this Declaration.

2.        A general purpose computer is an electronic device that interprets and executes instructions. It can perform many tasks as a consequence of the instructions (software) it is executing. If you lack a copy of the instructions it executed to perform a given task you have no record of how it performed that task and consequently cannot make an authoritative statement about how it performed the task.

3.        The Mesa County Election Management System (EMS) is a collection of computers and peripheral devices that can process mail-in ballot envelopes and scan, decipher, select for adjudication, record, and tally ballots and is utilized to perform those functions for Mesa County in an election. The EMS server is the computer that receives data from peripheral devices, such as scanners.

4.        A disk Image of an EMS server is a record of all the computer instructions on the server, all the data processed and created by the server while processing an election, and all the audit records created by the server when it was processing an election. It is also a requisite resource to restore an EMS server to a particular state.

5.        The image of the EMS server taken by Tina Peters includes part (but not all) of the digital election records that must be preserved to reprocess an election. To reprocess an election, digital records must be preserved from not only the server, but also from all of the peripheral devices including scanners.

6.        To document what a computer system did during an election, one can make an image of the system drive(s) to document the state of the system every day of the election. Those records enable an investigator to reprocess the election and determine what was changed if the tallies are not identical to those first produced.

7.        I understand that the Secretary of State erases election records when performing a Trusted Build. This is an unacceptable practice, because without preserving images of the hard drives, there is no way to reconstruct how the EMS behaved during a prior election. Any evidence of hacking or misbehavior during the election is erased.

**Exhibit J**

8.      As I have tried to explain to District Attorney Daniel Rubinstein, saving "Election Project Backup" (EPB) preserves only a small subset of information on the EMS. The EPB process does not preserve software or log files necessary to reconstruct how the EMS tabulated votes during an election. Therefore, performing EPB after an election is not an acceptable method of preserving all digital election records.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of November, 2023 at Grand Junction, Colorado.


_Ed Arnos_ (signature)
_____
Ed Arnos

# Ed Arnos

## Summary of Experience with Computer Systems
design, creation, installation, maintenance and management

1963 Introduced to computer systems by Bernard Galler at the University of Michigan. Part time job as systems operator - console operations, loading cards, mounting and dismounting tapes, folding and wrapping printouts.

1965 - BA degree from the University of Michigan in Mathematics - Probability and Statistics

1966 - Qualified as US Air Force Communications Officer.

1967-1969 Qualified as instructor and taught USAF Command and Control Computer Systems (called Management Information Systems in the private sector) utilized at the Pentagon and HQ of each major Air Command.

1969-1974 Manager of Large Computer (PDP-10) Software Support for Digital Equipment Corporation in Maynard, MA. Created Critical System Task strategy for software support and Minimum Standards for supportable software. Served as last resort problem solver for the most difficult PDP-10 customer computer system problems.

1975-1979 Project Manager for Datatrol, Inc. in Hudson, MA. Designed, sold, wrote specifications, implemented, and installed credit authorization systems for major department stores (e.g. Saks Fifth Ave., Dayton Hudson); totalizator (wagering) systems (West Palm Beach Jai Alai); computer systems to operate and manage government run lotteries (e.g. Massachusetts state lottery, lotto systems for 5 Canadian provinces). Wagering systems are high availability systems with significant penalties (> million $) for late deliveries or downtime.

1979-2007 Owner & CEO of Transaction Systems Inc. in Winter Park, FL. Designed and manufactured hardware and software for entertainment ticketing; designed and implemented communications protocol for supporting custom terminals on multi-dropped leased lines; manufactured, installed, operated, and maintained online systems for entertainment ticketing (Select-a-Seat, Ticketmaster); consulted on project management techniques to companies with computer projects just forming or in trouble (e.g. Utah Jazz, Southland (7-Eleven)).

2008-present Owner & CEO of High Availability Management, LLC; Designed and implemented software and management techniques that make small business systems high availability (max downtime 15 minutes and avoid total system failure).

(970) 245-4914
(970) 260-4895
transys@bresnan.net

Case No. 1:23-cv-03014-SKC   Document 10-11   filed 11/27/23   USDC Colorado   pg 1 of 6
10/10/23, 11:25 AM          McSweeney, Cynkar & Kachouroff, PLLC Mail - FW: Questions concerning actions by the Colorado Sec. of State
Plaintiff's Motion for Preliminary Injunction
Exhibit 28, Page 213
Appellate Case: 24-1013   Document: 010110988287   Date Filed: 01/31/2024   Page: 1213

Patrick McSweeney <patrick@mck-lawyers.com>

## FW: Questions concerning actions by the Colorado Sec. of State
1 message

**Ed Arnos** <transys@bresnan.net>
To: Patrick S <patrick@mck-lawyers.com>
Cc: Tina Peters <tinapeters.us@pm.me>

Wed, Sep 13, 2023 at 10:06 AM

**From:** Ed Arnos [mailto:transys@bresnan.net]
**Sent:** Wednesday, August 30, 2023 11:17 AM
**To:** 'Dan Rubinstein'
**Subject:** RE: Questions concerning actions by the Colorado Sec. of State

Mr. Rubinstein:

Your email below asserts the "trusted build" process did not destroy any "election records" because the SoS "directed the Clerk to backup the election records" using the Election Project Backup (EPB) process. The EPB backs up the data that was presented to the Dominion software for processing an election and the data that was created by the Dominion software after it processed the election data.

An EPB is sufficient to reprocess the an election on a system that has and operating system and Dominion software installed. It is not sufficient to reprocess an election in exactly the same way in which it was processed during the election because the software running on the EMS at that time and the audit logs it created is not backed up. This difference can be significant in countering a legal challenge to how an election was processed. For example:

The 3rd Mesa County forensic report about which you presented an argument to challenge its assertion to the County Commissioners. In your argument, you and or your investigator correlated specific times from the video surveillance cameras to specific times in the audit logs taken from the disk image that Tina Peters created to clarify what activities were occurring in the video. More significantly, with complete disk images from the Mesa County Election Management System (EMS) you could have restored those images to the EMS recreating the exact state of the EMS when it processed the 2020 and 2021 elections. By rerunning the election on the EMS you could irrefutably demonstrate that the EMS either created 2 databases of ballots or not and thereby confirm or refute the assertion of the 3rd forensic report.

An EPB is a subset of all the information on an EMS. An EPB is sufficient data for another Dominion system to reprocess an election. It is insufficient to refute an assertion that a particular EMS did not process the election correctly. That requires a disk image of all the system disks on the EMS being challenged.

**Exhibit K**

Case No. 1:23-cv-03014-SKC   Document 10-11   filed 11/27/23   USDC Colorado   pg 2 of 6

10/10/23, 11:25 AM         McSweeney, Cynkar & Kachouroff, PLLC Mail - FW: Questions concerning actions by the Colorado Sec. of State

Appellate Case: 24-1013   Document: 010110986287   Date Filed: 08/20/2024   Page: 214

Additionally, an EPB is not sufficient to detect that software on the EMS has been modified from the certified version (hacked). An EPB does not store copies of the software on the system or the audit logs of how the system processed the election. A disk image includes everything on the disk. By comparing a disk image running on the EMS to a disk image of the certified software you can easily detect modifications to the certified software image and detect that your system has been hacked.

Of significance to Mesa County, a disk image of all system disks taken when the system is certified (immediately after a trusted build) is requisite to restore an EMS to the certified state. It is never valid to demand a computer system cannot be utilized for a specific purpose without demonstrating what it cannot do. Hardware diagnostics can certify the hardware and restoring a certified image of the software certifies the software. See attached file "Disk image is a required election record"

I will make myself available to you if you have a credible computer system manager who asserts disk images are not a requisite tool for managing computer systems in general. You clearly agree a disk image is an election record because you used one to defend against an assertion challenging an anomaly in how an election was processed.

To my original issue in prior emails to you, in the past, the SoS prohibited by election rule the taking of any disk image of any EMS in Colorado. That denies every County Clerk the ability to preserve the information necessary to carry out their legal responsibility to preserve election records. When the SoS authorized and scheduled a "trusted build" she should have:

1.   Demanded the "trusted build" installation team take a disk image of every EMS system disk prior to installing the new.

2.   Given each Clerk a copy of those images to enable them to discharge their obligation to preserve election records.

3.   Given each Clerk a list of software bugs and vulnerabilities that are fixed and new features available in the new software required to justify updating the software.

Instead the "trusted build" team started by wiping the disks clean and then installing the new software. Wiping the disks clean destroyed any evidence of corrupt software and/or hacking on every Dominion system in Colorado and created a liability for each Clerk by destroying an election they are required to preserve. As further evidence the purpose of the "trusted build" was to deny access to EMS software, the SoS sued Elbert County to recover disk images of the Elbert County EMS. These images were taken without violating any election rule and they were not useful in planning an attack against the current election software because they were images of software prior to the trusted build, not of the current software. The SoS sued to recover images of the software that processed 2 prior elections so they would not be available to anyone else.

There are no longer election rules against taking a disk image. You must by law have permission from the SoS to take an image. The SoS recently denied our Clerk permission to take a disk image making Clerk Bobbie Gross liable for failing to preserve an election record.

I will make myself available to you if you are beginning to understand the significance of disk images and would like to pursue in greater detail how this situation might be improved.

Case No. 1:23-cv-03014-SKC   Document 10-11   filed 11/27/23   USDC Colorado   pg 3 of 6

10/10/23, 11:25 AM          McSweeney, Cynkar & Kachouroff, PLLC Mail - FW: Questions concerning actions by the Colorado Sec. of State

Plaintiff's Motion for Preliminary Injunction

Appellate Case: 24-1018   Document: 010110988287   Date Filed: 11/21/2023   Page: 215

Exhibit D

Ed Arnos

Gold Standard Project

(970) 245-4914


**From:** Dan Rubinstein [mailto:dan.rubinstein@mesacounty.us]
**Sent:** Wednesday, May 18, 2022 11:13 AM
**To:** Ed Arnos
**Subject:** Re: Questions concerning actions by the Colorado Sec. of State


Mr. Arnos,


The subject of tomorrow's briefing to the commissioners is not on this topic, but rather report 3. However, to answer your question, No. The Secretary of State cannot be charged for "willfully" destroying records by completing a process which, by its very nature, has to delete an outdated system to load the new system, **because she directed the Clerk to back up the election records (called "election projects" by their terms) in an email just prior to the Trusted Build**. This email was sent to every Clerk in the State that used Dominion software and was about to undergo a Trusted Build.


It would be ludicrous to claim that she willfully destroyed something that she specifically directed the Clerk to back up for the purpose of assuring it is NOT destroyed. By directing the Clerk (or her designee) to do so, it further invokes C.R.S. 1-7-802 which states that it is the designated elections officials (DEO) responsibility to maintain those records. At the time Clerk Peters was the DEO. That email assures that the SOS has told the Clerk to do this and that the Clerk, not only knows that it is their responsibility to back up the system to maintain those records, but that the Clerk also knows to act prior to the Trusted Build in order to assure they are NOT destroyed.


I am attaching a copy of the guide book (199 pages) which tells the Clerk how to back everything up. The part which shows them how to back it up starts on page 13. I am also sending the email the SOS Office sent, directing the Clerk to back everything up prior to the trusted build (see page 2 under the heading Preparation and Notes). Both of these documents are open records as emails and attachments to public officials email, so I am not disclosing anything that is secretive.


Respectfully,


Dan Rubinstein


On Wed, May 18, 2022 at 10:05 AM Ed Arnos <transys@bresnan.net> wrote:

> Dear Mr. Rubinstein:
>
>
> I am a citizen of Mesa County concerned about the actions taken by the Colorado Secretary of State during the 2020 election. I have attached my letter asking you some questions derived from those concerns.
>
>
> I plan to attend your meeting with the County Commissioners tomorrow.

Plaintiff's Motion for Preliminary Injunction

EXHIBIT 25

10/10/23, 11:25 AM                McSweeney, Cynkar & Kachouroff, PLLC Mail - FW: Questions concerning actions by the Colorado Sec. of State

Thank you in advance for your time addressing these concerns.


Ed Amos

245-4914

2102 S Broadway

Grand Junction, CO  *1507



--

Daniel P. Rubinstein

District Attorney

21st Judicial District Attorney's Office

**Disk image is a required election record Rev A.docx**
18K

# Is a disk image of an EMS an "Election Record" required to be preserved by law?

August 5, 2022

**Definitions:**

<u>A Computer System</u> – is a general purpose device that can perform many tasks as a consequence of the instructions (software) it is executing. If you entrust a computer to scan ballots and produce tallies of how voters voted, you must have a <u>record</u> of the instructions it executed or could have executed and the anomalies it encountered while processing the election to be able to document how it calculated the tallies it produced.

<u>The State of a Computer System</u> – is documented by a list of the hardware to which it is connected, images of all the firmware in itself and those devices (this can be automated so it can be done quickly and reliably), images of all the devices from which it can access and execute instructions (this can be automated so it can be done quickly and reliably), and the state of all option settings in the hardware and software (this can be automated so it can be done quickly and reliably).

<u>Election Management System (EMS)</u> – A computer system(s) which can scan, decipher, select for adjudication, record, and tally ballots and is utilized to perform those functions in an election. It is also refers to any computerized system which can perform any subset of those functions in an election.

<u>"Trusted Build" State of an EMS</u> – is the documented state of an EMS immediately after it has been certified for use in an election. Restoring an EMS to this state implies it is certified for use in an election.

<u>Disk Image of an EMS</u> is a record of all the computer instructions available to an EMS, all the data processed and created by the EMS while processing an election, and all the audit records created by the EMS when it was processing an election. It is also a requisite resource to restore an EMS to a particular state.

**Legal argument for considering a disk image of an EMS an "election record".**

*C.R.S. 1-1-104 (11) "Election records" includes accounting forms, certificates of registration, pollbooks, certificates of election, signature cards, all affidavits, voter applications, other voter lists and records, mail ballot return envelopes, voted ballots, unused ballots, spoiled ballots, and replacement ballots.*

C.R.S 1-1-104(11) lists a number of items that are "election records". It does not <u>exclude</u> anything. It uses the word "includes" to avoid excluding items that are clearly "election

records". Therefore any item which is "needed in any contest proceedings" resulting from a dispute in how the election was conducted (e.g. a written instruction manual that is given to each election judge describing what an election judge can and cannot do) is an "election record".

*C.R.S. 1-7-802. Preservation of election records.*

*The designated election official shall be responsible for the preservation of any election records for a period of at least twenty-five months after the election or until time has expired for which the record would be needed in any contest proceedings, whichever is later. Unused ballots may be destroyed after the time for a challenge to the election has passed. If a federal candidate was on the ballot, the voted ballots and any other required election materials shall be kept for at least twenty-five months after the election.*

C.R.S. 1-7-802 specifies the designated election official must preserve an election record that is "needed in any contest proceedings" until the time for those contest proceedings has expired. Any challenge as to how the EMS processed an election, requires an accurate record of the state of the EMS and the ability to rerun the election. A series of disk images of the EMS taken at the start and end of each day of the election is a near perfect record of the state of the EMS and enables the ability to rerun the election.

Failure to take and preserve these images eliminates any accurate record of the state of the EMS during the election. If a rerun of the election on the existing EMS produces a tally identical to the certified tally from the election and a rerun of the election after restoring the "trusted build image" produces the same identical tally then the EMS can be certified as consistent in its tally results. If these reruns produce tallies that differ from the certified tally, lacking disk images taken during and immediately after the election there is no record of the state of the EMS necessary to track down why the tallies differ.

Ed Arnos
transys@bresnan.net
(970) 245-4914

1

```
 1   DENVER COUNTY DISTRICT COURT        )
     COLORADO                            )
 2   520 West Colfax Avenue              )
     Denver, Co 80204                    )   * COURT USE ONLY *
 3   _____)_____
                                        )
 4   DALLAS SCHROEDER,                  )
                                        )
 5   Plaintiff,                         )
                                        )
 6   v.                                 )
                                        )CASE NO: 2022 CV 033085
 7   JENA GRISWOLD,                     )DIVISION: 209
                                        )
 8   Defendant.                         )
     _____)_____
 9   For the Plaintiff:                 )
     John Case, Esq.                    )
10                                      )
     For the Defendant:                 )
11   Emily Buckley, ATD                 )
     Michael Kotlarcyzk, ATD            )
12   _____

13

14   The matter came on for Hearing on November 2, 2022, before

15   the HONORABLE ALEX C. MYERS, and the following proceedings

16   were had.

17   _____

18

19                  (RECORDED AND TRANSCRIBED)

20

21

22

23

24                                    Exhibit L

25
```

1    ten-minute break, and we'll be back here at 13 after, all

2    right?  You can step down.

3                    (Recess was taken from 4:03 p.m. until 4:16

4    p.m.)

5                    THE COURT:  All right.  Mr. Case, you may

6    proceed with cross-examination when you're ready.

7                    MR. CASE:  Thank you, Your Honor.

8                    CROSS-EXAMINATION

9    BY MR. CASE:

10        Q.   Good afternoon, Mr. Beall.

11        A.   Good afternoon.

12        Q.   So are you an expert in computer science?

13        A.   No.

14        Q.   And you testified on direct that when Mr.

15   Schroeder imaged the hard drives of the Elbert County voting

16   system, it was legal for him to do so, true?

17        A.   It was legal under the -- excuse me.  Legal under

18   the rules -- Secretary of State rules at the time, yes.

19        Q.   Yes.  So he didn't do anything wrong when we

20   copied those hard drives, true?

21        A.   Actually, that's not true.

22        Q.   Well, he didn't violate any existing election

23   rules, did he?

24        A.   We are unable to confirm whether he complied with

25   the requirement to delete and wipe to zero the storage

| District Court | |
|---|---|
| Mesa County, State of Colorado<br>Court Address: 125 N. Spruce St., Grand Jct., CO 81505 | |
| **Plaintiff(s): People of the State of Colorado,** | ↑ COURT USE ONLY ↑ |
| **Defendant(s): TINA MARIE PETERS** | Case No: 22CR371 |
| Daniel P. Rubinstein, District Attorney<br>Twenty-First Judicial District of Colorado<br>P.O. Box 20,000<br>Grand Junction, CO 81502-5031<br>Phone Number: (970) 244-1730<br>Fax Number: (970) 244-1729<br>Atty. Reg. #: 27473 | DIV: 9<br><br>CTRM: Matthew Barrett |

### OBJECTION TO MOTION TO RECONSIDER AND REQUESTED TRAVEL

COME NOW the People of the State of Colorado, by and through their undersigned District Attorney, and object to the defendant's motion in the above case. AS GROUNDS THEREFORE, the People state as follows:

1. The defendant seeks permission to travel to Springfield, Missouri to attend a summit called the *Moment of Truth Summit*. According to the defendant's motion, the summit will include the premiere of a documentary film in which Ms. Peters participated.

2. A review of the website for the Moment of Truth Summit reveals that the film *Selection Code* will be shown at that summit. Selection Code (see attached exhibit 1) has website wherein it describes the film, and has a trailer. Ms. Peters is celebrated as a hero of sorts for doing what the film describes as following "the story of Tina Peters the County Clerk in Mesa County, Colorado, who made a backup of her counties (sic) Dominion Voting System server, only to stumble across evidence of manipulation in a recent local city council election… and also the 2020 general election. Tina's discovery ignites a chain reaction upending her life. And upending the world."

3. Ms. Peters, still the Clerk and Recorder of Mesa County, and drawing a salary of approximately $93,000 a year, is seeking permission to attend this premier because she is "speak[ing] at the event as well and will receive compensation for her services. Ms.

# Exhibit M

Peters advers (sic) that this trip is necessary to further her business interests… ."

4. In summary, Ms. Peters is seeking permission to leave the state so that she can be celebrated as a hero for the conduct that a grand jury has indicted her for, and claims this is necessary to further her business interests, at a time where she continues to draw a substantial salary as the elected Clerk and Recorder, while doing no work for the county who is paying her.

5. The undersigned, on behalf of the county I represent, object to this request, do not believe it is necessary, and represent to the court that this may be the most offensive travel request the undersigned has seen.

6. The undersigned further notifies the court that he has consulted with the victim in the case, and he takes no position.

BASED ON THE FOREGOING, the People would respectfully request this Honorable Court to deny the requested travel.

Respectfully submitted this 16 day of August, 2022.

DANIEL P. RUBINSTEIN
District Attorney
Twenty-First Judicial District

By /s/ Daniel P. Rubinstein
Daniel P. Rubinstein, Reg. No. 27473
District Attorney

COUNTY COURT, MESA COUNTY, COLORADO
125 N. Spruce Street,
Grand Junction, CO 81505

DATE FILED: June 3, 2022 10:39 PM
FILING ID: B20E259133A78
CASE NUMBER: 2022CR371

THE PEOPLE OF THE STATE OF COLORADO,
Plaintiff,

v.

TINA PETERS,
Defendant.

▲ COURT USE ONLY ▲

**ATTORNEYS FOR DEFENDANT:**
Law Offices of Randy B. Corporon, P.C.
Randy B. Corporon, #29861
Beth Chambers
2821 S. Parker Road, Suite 555
Aurora, CO 80014
Phone Number: 303-749-0062
rbc@corporonlaw.com
bethc@corporonlaw.com

Case No.: 22CR371

Division: 9

## RESPONSE TO MOTIONS TO QUASH SUBPOENAS DUCES TECUM

Defendant, Tina Peters, through undersigned counsel, respectfully submits her response to the Motions to Quash Subpoenas Duces Tecum as follows:

<u>Introduction</u>

1. On May 4, 2022, Defendant issued a subpoena duces tecum to Colorado Attorney General Phil Weiser and Secretary of State Jena Griswold ("Secretary") to produce the following, on or before May 24, 2022:

> All external hard drives that contain images of the Elbert County election management server, two scanning computers, and/or the adjudication computer, including but not limited to both copies of the hard drive as produced pursuant to the Order in Elbert County Case Number 2021CV30016, as issued by District Court Judge, Judge Gary M.

**Exhibit N**

Kramer, on April 29, 2022, and received by the Secretary of State, or designated custodian of records for the Office of the Secretary of State's Office.[1]

2. The People filed a Motion to Quash Subpoenas Duces Tecum ("Motion") on May 5, 2022. The office of the Colorado Attorney General joined in the Motion on May 9, 2022 ("Joinder").

3. The Mesa County Grand Jury Indictment charged Defendant with 10 Counts relating to her alleged actions which occurred in Mesa County, CO on or between the dates of April 23, 2021 and August 15, 2021, and that resulted in her obtaining a forensic image of the Dominion voting machine hard drives utilized in elections in 2020 and 2021.

4. The Subpoenaed Hard Drives are extremely relevant to the defense in this case. District Attorney Rubinstein stated in connection with a public presentation held on May 19, 2022, that there is no evidence that the manipulation of election records and the subsequent destruction of that evidence uncovered by Defendants' cyber experts exists in any Colorado county other than Mesa County. DA Rubinstein has also argued that human error—not internal machine manipulation—caused the sequence of events within the voting system uncovered by Defendant's experts. DA Rubinstein admits that: (1) unauthorized election databases were created in both the November 2020 General election and the Grand Junction April 2021 Municipal election; and (2) computer log files do not explain how this occurred. The creation of unauthorized databases without an audit trail violates 2002 Voting Systems Standards which are mandatory under Colorado law. This means the Mesa County voting system is illegal under both federal and state law. Examination of the Subpoenaed Hard Drives is relevant to establish the

---

[1] Hereinafter the "Subpoenaed Hard Drives".

2

statewide voting system violates the 2002 Voting Systems Standards, and Defendant's actions were necessary to protect all Coloradans from public harm.

5.      To date no examination of the Subpoenaed Hard Drives has taken place.

Legal Standard

In *United States v. Andolschek*, 142 F.2d 503, 506 (2d. Cir. 1944) Judge Learned Hand said:

> While we must accept it as lawful for a department of the government to suppress documents, even when they will help determine controversies between third persons, we cannot agree that this should include their suppression in a criminal prosecution, founded upon those very dealings to which the documents relate, and whose criminality they will, or may, tend to exculpate. So far as they directly touch the criminal dealings, the prosecution necessarily ends any confidential character the documents may possess; it must be conducted in the open, and will lay bare their subject matter.
> The government must choose; either it must leave the transactions in the obscurity from which a trial will draw them, or it must expose them fully. Nor does it seem to us possible to draw any line between documents whose contents bears directly upon the criminal transactions, and those which may be only indirectly relevant. Not only would such a distinction be extremely difficult to apply in practice, but the same reasons which forbid suppression in one case forbid it in the other, though not, perhaps, quite so imperatively.

*Jencks v. United States*, 353 U.S. 657, 671 (1957).

In every criminal case the defendant has the right to compel the attendance of witnesses and the production of tangible evidence by service of a subpoena. *See* Crim. P. 17. Crim. P. 17(c) is the means by which Defendant may compel third parties to produce evidence for use at trial. Crim. P. 17(c) requires a court, on motion, to block the enforcement of an unreasonable or oppressive subpoena by modifying or quashing the subpoena. *People v. Spykstra*, 234 P.3d 662, 668 (Colo. 2010).

The leading case interpreting the unreasonable or oppressive standard is *Bowman Dairy Co. v. United States*, which recognized certain fundamental characteristics of the subpoena duces tecum in criminal cases. A subpoena duces tecum (1) is not intended to provide a means of

3

discovery for criminal cases; and (2) its chief innovation was to expedite the trial by providing a time and place before trial for the inspection of subpoenaed materials. *United States v. Nixon*, 418 U.S. 683, 698–99 (1974) (citing *Bowman Dairy Co*, 341 U.S. 214, 220 (1951)).

In *Nixon*, the Supreme Court of the United States set forth the standards by which district courts are to evaluate the enforceability of a subpoena duces tecum. *Id.* at 699. Citing the established test devised in *United States v. Iozia,* 13 F.R.D. 335, 338 (S.D.N.Y.1952), the Supreme Court held that pretrial production of evidence by third parties pursuant to Rule 17(c) is appropriate only where the moving party shows: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition." *Id.* (footnote omitted); *See Bowman Dairy Co.,* 341 U.S. at 221 ("In short, any document or other materials, admissible as evidence, obtained by the Government by solicitation or voluntarily from third persons is subject to subpoena.").

"The Supreme Court then conflated the generally accepted four facet formulation from *Iozia* into what has become the now talismanic paradigm: (1) relevancy; (2) admissibility; and (3) specificity." *U.S. v. King,* 194 F.R.D. 569, 573 (2000) (citing *Nixon,* 418 U.S. at 700).

In *Spykstra,* the Colorado Supreme Court adopted the *Nixon* test and added an initial element to "make explicit what is otherwise inherent." *Spykstra*, 234 P. 3d at 669. Accordingly, when a criminal pretrial third-party subpoena is challenged, a defendant must demonstrate:

(1) A reasonable likelihood that the subpoenaed materials exist, by setting forth a specific factual basis;

4

(2) That the materials are evidentiary and relevant;
(3) That the materials are not otherwise procurable reasonably in advance of trial by the exercise of due diligence;
(4) That the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and
(5) That the application is made in good faith and is not intended as a general fishing expedition.

*Spykstra,* 234 P.3d at 669; *See Nixon,* 418 U.S. at 699–700 (citation omitted).

Pretrial production and inspection expedite criminal proceedings by allowing "the parties in advance of trial to obtain and evaluate certain documentary evidence with a view toward determining its possible utility at trial." *Spykstra,* 234 P.3d at 669-70; 2 Barbara E. Bergman & Nancy Hollander, *Wharton's Criminal Evidence* § 10:9 (15th ed.1998); *Nixon,* 418 U.S. at 698–99; Colo. Bar Assoc. Ethics Opinion 102: Use of Subpoenas in Criminal Proceedings, Mar. 21, 1999. However, "[f]orcing any defendant to confront the choice between issuing a pre-trial subpoena duces tecum and disclosing his defense to the government places an unconstitutional limitation on the defendant's right to compulsory process." *United States v. Daniels,* 95 F.Supp.2d 1160, 1164 (D. Kan. 2000) (citations omitted).

<u>Legal Analysis</u>

i. The Subpoenaed Hard Drives Exist.

Secretary of State, Jena Griswold ("Secretary") filed a Petition for Enforcement of Election Orders Pursuant to C.R.S §§ 1-1-107(2)(d) and 1-1.5-104(10)(d) ("Enforcement Petition") on February 17, 2022, against Elbert County Clerk and Recorder, Dallas Schroeder ("Clerk Schroeder"). In a subsequent litigation, *Hanks, et. al. v. Griswold,* 2021CV033691, the Secretary learned that, on August 26, 2021, Clerk Schroeder copied images of the hard drives in the Election Management Server ("EMS"), two Image Cast Central ("ICC") computers, and the

5

adjudication computer to an external hard drive.  *See* Plaintiff Dallas Schroeder's Resp. to Defendant's Election Order 2022-02, pg. 1, attached hereto as Exhibit A.

Clerk Schroeder used a logic cube forensic falcon neo device, which is a federally approved software device for imaging election systems hard drives.  *Id.* at pg. 2.  Clerk Schroeder has a statutory duty, as an election official pursuant to both federal and state law, to preserve election records for 22 and 25 months, respectively, after an election.  *See* 52 U.S.C. § 20701; C.R.S. § 1-7-802.  52 U.S.C. 20701 requires every officer of a federal election "to retain and preserve…all records and papers" relating to an election.  Additionally, the "voting system shall produce a record with an audit capacity for such system." *See* 52 U.S.C. § 21081 (a)(2)(A).

On April 29, 2022, Clerk Schroeder was ordered to turn over both copies of the August 26, 2021 imaged hard drives to the Secretary.  The court held that, as the state's chief election officer, it is the Secretary's "duty to preserve and protect election-related information, including copies of the hard drives." *See* Order Granting Motion for Judgment on the Pleadings, pg. 19, attached hereto as Exhibit B.  Currently, the Subpoenaed Hard Drives, which form the basis for Defendant's subpoena duces tecum, exist and are in the custody of the Secretary.  Upon information and belief, the Subpoenaed Hard Drives remain sealed and the chain of custody is intact.  As part of the Enforcement Petition against Clerk Schroeder, the Secretary admitted that:

(1) The Dominion software in Mesa County is identical to the software in Elbert County (¶ 107);

(2) The trusted build performed in Mesa County on May 25-26, 2021 was identical to the trusted build which occurred in Elbert County on August 27, 2021 (¶ 100);

(3) The trusted build erased certain files on the Elbert County voting system equipment to prepare the equipment for future elections, and that all election records required to be preserved should have been preserved as directed on a required back up (¶ 120);

(4) She will not authorize the forensic imaging of Democracy Suite 5.13 hard drives to determine if election records were erased from Democracy Suite 5.11 (¶ 119);

(5) Democracy Suite 5.13 is configured to automatically overwrite certain log files[2] that exceed 20 MB (¶ 25);

(6) During a 2019 trusted build, the Secretary authorized employees of the Secretary of State's office to install identical "golden image"[3] versions of Democracy Suite 5.11 on the voting systems in both Mesa County and Elbert County (¶ 58);

(7) Pursuant to 52 USC § 20701, both the Secretary and County Clerks have duties to preserve "all records, papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election" for a period of 22 months (¶ 63);

(8) Pursuant to C.R.S. § 1-7-802, both the Secretary and County Clerks have a duty to preserve election records for a period of 25 months (¶ 67);

(9) The contents of the Subpoenaed Hard Drives are different than the required back up directed by the Secretary to preserve election records (¶¶ 91, 120); and

(10) The trusted build erases the software and certain other contents from the hard drives of voting system components (¶ 93).

*See* Petitioner's Reply to Counterclaims; Amended Response to Petition for Enforcement and Counterclaims, attached hereto as Exhibit C.

Notably, the Secretary and Clerk Schroeder's duty to preserve all election records,

includes the Subpoenaed Hard Drives and, pursuant to federal and state law, this duty expires on

September 3, 2022, and December 3, 2022, respectively.

---

[2] Logfiles are records of events that happen in your computer, either by a person or by running a process. Logfiles are required on voting systems to reconstruct the function of and events taking place on the voting systems. Voting systems are required to generate and preserve, as critical to the ability to determine and reproduce the conditions and details of election conduct when using electronic voting systems, logfiles of all system functions including normal activity, connectivity, file and data access, operator and automated processes, and errors. Logfiles are critical to the ability to detect improper operation including the ability to detect malicious intrusions as well as other improper activities and conditions, and configuration changes that could enable alteration of the actual vote count. Colorado law requires logfiles be maintained pursuant to C.R.S. § 1-5-601.5 and subsequent compliance with the FEC's 2002 Voting Systems Standards.

[3] A golden image is the basis from which all copies of a particular software originate from.

ii.  The Subpoenaed Hard Drives are Evidentiary and Relevant to Defendant's Criminal Defense.

Defining the "government" is important in criminal discovery matters because the prosecution does not have to scour the files of every governmental agency on the chance that some pertinent information, or information that the defendant deems pertinent, may be disclosed. *United States v. Bryan,* 868 F.2d 1032, 1036 (9th Cir.1989).  However, the prosecutor will be deemed to have knowledge of and access to anything in the possession, custody or control of any federal agency participating in the same investigation of the defendant. *Id.*

Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.  C.R.E. 401.  Generally, facts which logically tend to prove or disprove a fact in issue, or which afford reasonable inferences or shed light upon matters contested are relevant. *People v. Carlson,* 677 P.2d 390, 392 (Colo. App. 1983), *aff'd,* 712 P.2d 1018 (Colo. 1986); C.R.E. 401 & 402 (citation omitted).

a.  The Subpoenaed Hard Drives are Relevant to a Choice of Evils Defense.

Some of the evidence which Defendant anticipates will be presented in this case includes: (1) Mesa County Reports 1-3; (2) District Attorney Rubinstein's investigation and report to the Mesa County Commissioners; (3) Actions taken by the Secretary; and (4) Admissions from the Secretary.  It is likewise anticipated that, as a result, the affirmative defense of choice of evils will be one of the defenses available to the alleged actions of Defendant.

Defendant's conduct was legally authorized if: (1) it was necessary as an emergency measure to avoid an imminent public or private injury which was about to occur because of a situation occasioned or developed through no conduct of the defendant, and (2) the injury was of

sufficient gravity that, according to ordinary standards of intelligence and morality, the desirability and urgency of avoiding the injury clearly outweighed the desirability of avoiding the injury sought to be prevented by the statutes defining the 10 counts Defendant is charged with violating. *See* Colo. Jury Instr., Criminal H:09.

Prior to trial, Defendant is required to serve notice of her intent to employ the choice of evils defense set forth in C.R.S. § 18-1-702. *Andrews v. People,* 800 P.2d 607, 610 (Colo. 1990). The choice of evils defense is a creature of statute and may only be invoked when an offer of proof is made that establishes the requisite statutory foundation. *Id.* Before a defendant can present a choice of evils defense to the jury, C.R.S. § 18-1-702 requires that the trial court make an initial determination of whether the allegations of facts by the defendant, if proved, would constitute legal justification for the prohibited conduct. *Id.*; *See People v. Dover,* 790 P.2d 834, 836 (Colo.1990); *see also People v. Strock,* 623 P.2d 42, 46 (Colo. 1981).

A sufficient offer of proof must establish: (1) all other potentially viable and reasonable alternative actions were pursued, or shown to be futile, (2) the action taken had a direct causal connection with the harm sought to be prevented, and that the action taken would bring about the abatement of the harm and, (3) the action taken was an emergency measure pursued to avoid a specific, definite, and imminent injury about to occur. *Andrews,* 800 P.2d at 610.

Defendant is charged with 10 criminal counts relating to alleged actions she took in her official capacity as Mesa County Clerk and Recorder to obtain forensic images of the Mesa County Election Management Server ("Mesa Server") both before and after the mandatory

software update which was ordered by the Secretary. The software update, or trusted build,[4] required all of the 62 Colorado counties which use various components of voting systems equipment and software provided by Dominion Voting Systems, Inc. ("Dominion") to update Dominion Democracy Suite software version 5.11 ("Democracy Suite 5.11") to version 5.13 ("Democracy Suite 5.13"). The trusted build occurred in Mesa County on May 25-26, 2021.

The forensic images of the Mesa Server were subsequently analyzed by cybersecurity experts in three reports. Through detailed forensic examination of how the trusted build affected the Mesa Server, the first Report ("Report #1") found "…election records, including data described in the Federal Election Commission's 2002 Voting System Standards ("2002 VSS") mandated by Colorado law as certification requirements for Colorado voting systems, have been destroyed on Mesa County's voting system, by the system vendor and the Colorado Secretary of State's Office." *See* Mesa County Colorado Voting Systems, Report #1 with Forensic Examination and Analysis, attached hereto as Exhibit D.

Pursuant to C.R.S. § 1-5-601.5 and Election Rules 21.4.1. and 21.4.2, all county voting systems must, at a minimum, meet the objective performance and functional criteria contained in the 2002 VSS. A voting system that is not in compliance with the 2002 VSS requirements is unable to be lawfully certified for use in the state of Colorado. C.R.S. § 1-5-601.5.

"[T]he right to vote is a fundamental right of the first order." *Erickson v. Blair,* 670 P.2d 749, 754 (Colo.1983). It is guaranteed by the federal constitution, and by article II, section 5 of

---

[4] The trusted build is "the write once installation disk or disks for software and firmware for which the Secretary of State has established the chain of custody to the building of disks, which is then used to establish or re-establish the chain of custody of any component of a voting system that contains firmware or software. The trusted build is the origin of the chain of custody for any software and firmware component of the voting system." *See* CO Election Rule 1.1.42 from 8 CCR 1505-1 of the Colorado Code of Regulations.

the Colorado Constitution. Like most states, Colorado went considerably farther than the federal government in creating an explicit constitutional right to vote. Art. II, § 5 of the Colorado Constitution provides that "[a]ll elections shall be free and open; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." *See Colorado Common Cause v. Davidson*, No. 04CV7709, 2004 WL 2360485, at *3 (Colo. Dist. Ct. Oct. 18, 2004). Concomitant with the right to cast a vote is the right to have that vote counted without undue interference with the exercise of that right. *Meyer v. Lamm*, 846 P.2d 862, 872 (Colo. 1993) (citing *Erickson,* 670 P.2d at 754).

The Motion and Joinder claim the Subpoenaed Hard Drives are not relevant because Defendant could only speculate about what was occurring in other counties at the time she took alleged actions in Mesa County. *See* Mot., pg. 2; Joinder, pg. 3. A sufficient offer of proof for the choice of evils defense looks to a defendant's motives when the alleged actions occurred. However, it also requires a defendant to specify the harm that was abated from the alleged actions taken. On January 13, 2021, Dominion submitted its application to the Secretary for certification regarding "modification of a voting system" to install Democracy Suite 5.13 on Colorado county voting systems. The application for certification occurred a mere 2 months after the November 3, 2020 presidential election. *See* Dominion Voting Systems' Application for Modification of a Voting System, attached hereto as Exhibit E. Defendant became suspicious of the results of the 2021 Grand Junction Municipal election. Shortly after the Municipal election, the Secretary's office sent notice of the upcoming trusted build, which would occur in 62 counties across Colorado. As part of this notice, the Secretary included requirements for the trusted build process, which denied the public access to watch the trusted build. Defendant

became even more suspicious regarding the secrecy of the trusted build. To prepare for the trusted build, Defendant spoke with an employee of Dominion. The Dominion employee stated that the Democracy Suite 5.13 software update would delete certain files on the voting system election management server hard drive. The Secretary has also confirmed that the erasure of election records was an inherent part of the trusted build. *See* Ex. C, ¶ 93. When Defendant inquired further as to why the trusted build had to occur if it would delete certain election files, the Dominion employee responded that this particular build was in response to demands from someone in Aspen. Defendant realized that deletion of certain files from the November 2020 General election was a statewide harm, as the records of Mesa County's election results directly impact any audit of Colorado's statewide election results. The Subpoenaed Hard Drives are relevant to the destruction of election records, which has a direct causal connection with Defendant's obligations to follow numerous federal and state laws including the preservation election records for purposes of an audit.

Pursuant to 52 U.S.C. § 20701, Defendant has a duty to preserve "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election" for a period of 22 months. Defendant is further obligated to adhere to 52 U.S.C. §10308(b), which states "[w]hoever, within a year following an election in a political subdivision in which an observer has been assigned (1) destroys, defaces, mutilates, or otherwise alters the marking of a paper ballot which has been cast in such election, or (2) alters any official record of voting in such election tabulated from a voting machine or otherwise, shall be fined not more than $5,000, or imprisoned not more than five years, or both."

Colorado's preservation of records statute states in part, "The designated election official

shall be responsible for the preservation of any election records for a period of at least 25 months after an election…" See C.R.S. § 1-7-802. In addition to the audit logs generated by the election management system, Defendant is required to maintain access logs that record the following: (1) the date, time, and user's name for each instance that a user enters or exits the system or the system's report printing functions; and (2) modifications to the system's hardware, including insertion or removal of removable storage media, or changes to hardware drivers. 8 CCR § 1505-1, Rule 20.19.1 & 2. Defendant knew her obligations as Mesa County's Chief Election Officer pursuant to both state and federal law. Defendant's state of mind at the time of her alleged actions is material to the choice of evils defense, where Defendant must establish that alleged actions taken to create forensic images of the Mesa Server were an emergency measure which Defendant pursued to avoid a specific, definite, and imminent injury regarding the destruction of election records. There is a sufficient likelihood that the contents of the Subpoenaed Hard Drives are relevant to a choice of evils defense, because the destruction of election records from a general election is an injury which harms not only Mesa County voters but all Coloradans. *Nixon*, 418 U.S. at 700.

 b. The Subpoenaed Hard Drives are Relevant to Establish the Secretary's Bias.

 Colorado law requires a modification of a voting system to be "de minimis." *See* 8 CCR 1505-1, Rule 21.1.1. After receiving a written application for approval of the "modification." the secretary "…shall determine if the proposed modification may cause adverse effects on the security or accuracy of elections." C.R.S. § 1-5-618. The second Mesa County report (Report #2) details the failure of security mechanisms to protect election records. For example, there was unauthorized and uncertified software (Microsoft SQL Server Management Studio (SSMS) &

LibreOffice) installed on the Mesa County Democracy Suite 5.11 Election Management Server. *See* Mesa County Colorado Voting Systems, Report #2, Forensic Examination and Analysis Report, attached hereto as Exhibit F.

The existence of uncertified software violates the certification of the voting system and makes the use of the voting system in an election illegal. C.R.S. § 1-5-601.5. The Subpoenaed Hard Drives have the same Democracy Suite 5.11 software installed as the Mesa County Election Management Server. *See* Ex. C, ¶ 58. Analysis of the Subpoenaed Hard Drives will support Defendant's choice of evils defense regarding the public injury, beyond Mesa County, of use of a voting system that did not meet 2002 VSS standards for security, and thus violated Colorado law.

The investigation into Defendant's alleged actions was initiated by the Secretary through Election Order 2021-01. However, Mesa County Reports 1-3 detail numerous election crimes relating solely to the 2019 and 2021 trusted builds which were certified and supervised by the Secretary. The Secretary is likely to be a key witness for the Government and she provides a crucial link in the proof of Defendant's alleged actions. *Davis v. Alaska*, 415 U.S. 308, 317 (1974) (citation omitted).

The certification of the trusted build, the presence of non-certified software, additional election databases, and the subsequent destruction of election records will be key issues at trial. The Secretary's admissions *supra*, confirm that inherent within a trusted build is the "erasure [of] software and certain other contents from the hard drives of voting systems components." *See* Ex. C, ¶ 93. The Secretary admits that the trusted builds which occurred in 2019 pertaining to Democracy Suite 5.11 and in 2021 pertaining to Democracy Suite 5.13, were identical in both

14

Mesa and Elbert counties. *Id.* at ¶¶ 58, 100. The Secretary has further admitted that there is a difference between the back up of election records as directed by her office, and the preservation of election records through a forensic image. *Id.* at ¶¶ 91 & 120; *See* Mesa County Grand Jury Indictment.

The Subpoenaed Hard Drives are relevant and admissible to cross-examine the Secretary on any bias regarding actions the Secretary took in Mesa County. *Davis,* 415 US at 308, 316-17 (citing *Greene v. McElroy*, 360 U.S. 474, 496 (1959)) (A trial court cannot bar defense counsel from exploring the subject of a crucial witness' potential bias on cross-examination, including the reason for that potential bias, even if this information is protected by a statutory privilege intended to protect the witness; such information is valuable in the jury's evaluation of the truthfulness of the witness' testimony. Exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.). . Did the Secretary issue the order that Defendant is charged with violating in an attempt to avoid discovery of her own violations of the law?

To provide a similar cybersecurity analysis to the Mesa Server, Defendant will issue a subpoena duces tecum for forensic images of the current Democracy Suite 5.13 election server, two ICC computers and the adjudication computer hard drives in Elbert County. Democracy Suite 5.13 erases Democracy Suite 5.11; and Mesa and Elbert counties are the **only** counties in Colorado where evidence exists which establishes Defendant's alleged actions had a direct causal connection to the preservation of election records, which Defendant had and still has a duty to preserve under state and federal law.

c. The Subpoenaed Hard Drives are Relevant to Rebut DA Rubinstein's Investigation Claims.

On May 19, 2022, District Attorney Rubinstein submitted his findings to the Mesa County Commissioners regarding his investigation into Report #3, Elections Database and Data Process Analysis ("Investigation"), which provided additional analysis regarding the Mesa Server. *See* Conclusion of Investigation of Report 3 re: Elections, May 19, 2022, attached hereto as Exhibit G. The third report ("Report #3") explicitly states, "The findings of this report were prepared by the authors as consultants to the legal team representing Tina Peters, the Mesa County Clerk and Recorder, pursuant to her statutory duties as Mesa County's Chief Election Official." *See* Mesa County Report # 3, Election Database and Data Process Analysis, attached hereto as Exhibit H.

While DA Rubinstein claims his Investigation had no connection with the criminal case against Defendant, he admits that his Investigation occurred simultaneous to the criminal investigation into Defendant's alleged criminal conduct. *See* Ex. G, pg. 2. DA Rubinstein summarizes his Investigation by stating, "This investigation is being closed with no finding of probable cause that a crime was committed by any person." *Id.*, pg. 22.

However, DA Rubinstein also concluded that, "This investigation has revealed that the second adjudication database in both the November, 2020 General Election, and the April, 2021 Grand Junction Municipal Election was caused by direct action of the former Back Office Elections Manager, Sandra Brown. There is no evidence of any other person, program or outside influence leading to the anomaly referenced in Report 3. Further investigation would be required to determine if Sandra Brown's actions resulted in the failure of the Designated Elections Official to be able to preserve the election records as required by statute." *Id.*, pg. 1.

Notably, DA Rubinstein was unable to interview Sandra Brown regarding her alleged actions. *Id.*, pg. 4. DA Rubinstein did not cite to any incident report(s) on file with the Secretary of State which detailed Sandra Brown's alleged actions and the egregious software malfunction that resulted in new election databases created in **both** the 2020 General election and the 2021 Grand Junction Municipal election. *See* Ex. G *gen; see also* Ex. H, pg. 3. This is important considering that failure to submit a report is grounds for decertification of the entire Mesa County voting systems. *See* Ex. G *gen*; 8 CCR § 1505-1, Rule 11.7.3(d). Had a report been submitted, the Secretary would have been obligated to distribute a copy to all counties using the voting system in question. *Id.*, Rule 11.7.3(g). DA Rubinstein has referred to Sandra Brown's alleged actions as a "nuclear option."[5]

DA Rubinstein's official statements regarding his Investigation to the Mesa County Commissioners' public meeting taints the jury pool in Mesa County. The Subpoenaed Hard Drives are relevant and admissible for rebuttal evidence regarding DA Rubinstein's public conclusions regarding his Investigation. Rebuttal evidence is that evidence which tends to contradict the adverse party's case, whether it be challenging the testimony of a specific witness or refuting the adverse party's entire theory or claim. *People v. Welsh*, 80 P.3d 296, 304 (Colo. 2003) (citing *People v. Trujillo,* 49 P.3d 316, 320 (Colo.2002)). Unlike impeachment evidence, which is more focused on the credibility of an individual declarant, "[r]ebuttal evidence goes to the heart of the case, reflecting upon the truth of facts upon which the other side relies." *Id.* (citing *People v. Cobb,* 962 P.2d 944, 953 (Colo.1998) (Kourlis, J., dissenting)). Thus, rebuttal evidence is essentially substantive in nature.

---

[5] https://coloradonewsline.com/2022/05/19/mesa-county-da-finds-no-criminal-evidence-following-investigation-into-tina-peters-fraud-claims/

On one hand DA Rubinstein states that the Subpoenaed Hard Drives "...appear to be a fishing expedition or other discovery tool, possibly for actions which the defendant may be involved in, or other matters relating to interests Ms. Peters and her supporters are looking into relating to election integrity." *See* Mot., pg. 2. Yet, on the other, he admits Report #3 establishes the need for further investigation regarding Defendant's duty to preserve election records as required by statute. *See* Ex. G, pg. 1.

In his Investigation, DA Rubinstein completely ignores the fact that the trusted build deleted **numerous**[6] election records on the Mesa Server prior to the required records retention period expiring. *See* 52 U.S.C. § 10308; *see* Ex. G, *gen.*; *see also* Exs. D, F, & H. Defendant disagrees with the entirety of DA Rubinstein's conclusions regarding his Investigation. The Subpoenaed Hard Drives are evidentiary and relevant to DA Rubinstein's Investigation conclusion that "...Report #3 incorrectly attributes the anomaly of a second adjudication database to something other than human action." *See* Ex. G, pg. 1.

Sandra Brown, who is likely to be a key witness for the Prosecution is said to have allegedly used a "reject and delete" command which is not listed in the Dominion manual on the Secretary of State's webpage thereby causing a second adjudication database to be created. *Id.*, pg. 7. The Subpoenaed Hard Drives will almost certainly establish that a second adjudication database in Elbert County could not have been the fault of Sandra Brown. Defendant does not have to fully describe the content on the Subpoenaed Hard Drives to establish their relevancy.

---

[6] Exhibit D states, "By comparing file names in the two images (before and after the Dominion Update on May 25-26, 2021) examination and analysis identified 28,989 files that were deleted. During a software update, some replacement of program files and their related content is normally expected. However, the examination found that 695 log and event files necessary for the determination of election integrity were deleted." *Id.*, pgs. 1-2.

*Nixon,* 418 U.S. at 700 (citing *United States v. Gross,* 24 F.R.D. 138 (SDNY 1959)). Instead, Defendant must establish a sufficient likelihood that the Subpoenaed Hard Drives are relevant to the offenses charged in the indictment. *Id.*

iii. Pretrial Production of the Subpoenaed Hard Drives are Relevant and Necessary to a Rule 702 Inquiry.

Due to the complexity of cybersecurity analysis, Defendant will request a Rule 702 inquiry regarding whether the scientific evidence proffered is both reliable and relevant. *People v. Shreck,* 22 P.3d 68, 77 (Colo. 2001), *as modified* (May 14, 2001)(citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993); *see Brooks v. People,* 975 P.2d 1105, 1114 (Colo. 1999) (holding that under CRE 702, evidence that is reasonably reliable and that will assist the trier of fact should be admitted).

The cybersecurity analysis of the Subpoenaed Hard Drives is material and relevant to a C.R.E. 702 inquiry. Mesa County Reports 1-3 were based upon forensic images of <u>only</u> the election management server, which were taken both before and after the May 25-26, 2021 trusted build. The Subpoenaed Hard Drives, include "…images of the hard drives in the election server, two ICC (image cast central) computers and the adjudication computer…" *See* Ex. A. The Subpoenaed Hard Drives encompass a much more complete system topology of the voting infrastructure as opposed to the Mesa Server, which encompasses a centralized end point but it is not the entirety of dependent components of an election system. Software configuration is the instruction that the application (i.e. Democracy Suites 5.11 and 5.13) communicates to the operating system and hardware to establish the election infrastructure.

On June 17, 2021, the Secretary issued emergency rules prohibiting third-parties from forensically auditing county election voting systems equipment. The Secretary further filed a

lawsuit to take custody of the Subpoenaed Hard Drives, and Defendant is unable to procure them from anyone other than the Secretary. Pretrial production and inspection of the Subpoenaed Hard Drives is further necessary as the content is too voluminous and complex to decipher during trial without causing significant delay.[78]

iv. Cybersecurity Analysis of the Subpoenaed Hard Drives Is Lawful and Security Concerns are Unfounded.

The Attorney General ("AG") and the Secretary argue that Subpoenaed Hard Drives are protected from disclosure pursuant to the Uniform Election Code ("UEC") and rules promulgated by the Secretary under the UEC. *See* Joinder, pg. 3. According to the AG, because the Subpoenaed Hard Drives contain mirror images of the Elbert County voting system components, which are defined to include both a "voting system" and "voting equipment," production of the Subpoenaed Hard Drives would constitute a security concern. *Id.* at pgs. 3-4.

A security concern could potentially lead to decertification of voting system components. *Id.* Nowhere in either the UEC or the election rules is there a provision which forbids production of the Subpoenaed Hard Drives when shown to be relevant and admissible to a defendant's legal defense in a criminal matter. Moreover, the 2016 Master Voting Systems Agreement between Dominion and Colorado explicitly allows for disclosures of Dominion's confidential information when mandated by federal or state law including, without limitation, CORA, administrative order of a federal, state, or local agency, or judicial order of a court of competent jurisdiction.

---

[7] Author of Mesa County Reports 1 & 2 took 6 months to analyze the hard drives and report his findings.
[8] Generally, the need for evidence to impeach witnesses is insufficient to require production of evidence in advance of trial. *Nixon*, 418 U.S. at 701. However, when there are other valid potential evidentiary uses for the same material, and there is real potential for an unreasonable delay of trial due to the analysis and subsequent report of findings, it is relevant to Defendant's burden pursuant to *Spykstra* and *Nixon*. *Id.*

*See* Master Voting Systems Agreement Between Colorado Department of State and Dominion

Voting Systems, Inc., attached hereto as Exhibit I.

A voting system as defined in C.R.S. § 1-1-104(50.8) means:

(a) The total combination of mechanical, electromechanical, or electronic equipment
(including the software, firmware, and documentation required to program, control, and
support the equipment) that is used to:
    (1) Define ballots;
    (2) Cast and count votes;
    (3) Report or display election results; and
    (4) Maintain and produce any audit trail information.
(b) The practices and associated documentation used to:
    (1) Identify system components and versions of such components;
    (2) Test the system during its development and maintenance;
    (3) Maintain records of system errors and defects;
    (4) Determine specific system changes to be made to a system after the initial
    qualification of the system; and
    (5) Make available any materials to the voter (such as notices, instructions, forms,
    or paper ballots).

8 CCR § 1505-1, Rule 1.1.45

Notably a voting system <u>does not</u> include any other component of election administration

such as voter registration applications or systems, electronic pollbooks, ballot delivery and

retrieval systems, signature verification and envelope sorting devices, ballot on demand printers,

election night reporting and other election reporting systems, and other components used

throughout the election process that do not capture and tabulate votes. *See* 8 Colo. Code Regs. §

1505-1, Rule 1.1.45.

In their Joinder, the Secretary and AG argue that disclosure of the Subpoenaed Hard

Drives would enable software savvy individuals with access to the voting system components to

create a virtual rendition of the entire voting system. *Id.* at 5. The user would have unlimited

opportunities to discover vulnerabilities in the system and potentially learn how to gain illegal

access in future elections. *Id.* This argument is misplaced.

Numerous software applications and operating systems are deployed to public servers,

daily, in the United States. The Subpoenaed Hard Drives are considered compiled applications,

which represent and encompass code that has been built. This can be distinguished from source

code, which is the step-by-step detailed process to build an application. The entire world of

commercial software exists of compiled applications which are distributed to public servers,

daily.

For example, Microsoft, Apple, Oracle, Google all distribute compiled applications to the

public without fear of reverse engineering. Recently, on May 19, 2022, the Department of

Justice announced a new policy[9] for charging cases under the Computer Fraud and Abuse Act.

The policy for the first time directs that good-faith security research should not be charged.

"Good faith security research means accessing a computer solely for purposes of good-faith

testing, investigation, and/or correction of a security flaw or vulnerability, where such activity is

carried out in a manner designed to avoid any harm to individuals or the public...."

Similarly, the federal Cybersecurity and Infrastructure Security Agency, or CISA, which

has a federal mandate to oversee election security infrastructure, supports ethical hacking to

discover vulnerabilities in election infrastructure. Ethical hacking is the process of evaluating

software systems for vulnerabilities. CISA has also launched a platform[10] of a vulnerability

disclosure program allowing ethical hackers to report security flaws to federal agencies, which

---

[9] https://www.justice.gov/opa/pr/department-justice-announces-new-policy-charging-cases-under-computer-fraud-and-abuse-act
[10] https://techcrunch.com/2021/06/08/cisa-launches-platform-to-let-hackers-report-security-bugs-to-us-federal-agencies/

includes election infrastructure. The Def Con Voting Village[11] is an annual cybersecurity conference, where the U.S. government supports ethical hacking on voting systems to discover vulnerabilities. Hackers are given free rein to break into a wide variety of decommissioned election equipment, some of which is still in use today. The fact that Dominion may have multiple vulnerabilities does not preclude Defendant from using the Subpoenaed Hard Drives for her criminal defense. There are numerous ways to protect the security of the Subpoenaed Hard Drives and Defendant will cooperate with protective orders regarding same.

The Joinder claims that the Subpoenaed Hard Drives "may contain scanned ballots, which likely include markings that could be used to identify specific voters, thus compromising voter's constitutional right to secrecy in voting." *Id.* at pg. 5. The constitutional right to secrecy in voting extends to protect the identity of a voter and not the content of his or her ballot. *Marks v. Koch*, 284 P.3d 118, 121 (Colo. App. 2011). The phrase "secrecy in voting" protects from public disclosure the identity of an individual voter and any content of the voter's ballot that could identify the voter. *Id.*

Moreover, concerns that a cybersecurity expert analyzing the Subpoenaed Hard Drives will violate the constitutional right to secrecy of Colorado citizens is misplaced. Article VII, section 8 of the Colorado Constitution states, "[n]othing in this section, however, shall be construed to prevent the use of any machine or mechanical contrivance for the purpose of receiving and registering the votes cast at any election, provided that secrecy in voting is preserved." The Colorado Constitution requires voting systems equipment to inherently provide

---

[11] https://www.cnn.com/2019/08/12/politics/defcon-voting-village-darpa-dominion/index.html

for "secrecy in voting." *See* Colo. Const. art VII, § 8. The information contained in the hard drives does not contain specific voter identification information as explained below.

The Joinder incorrectly states that the Subpoenaed Hard Drives include the "ballot marking device." *Id.* at 4-5. Clerk Schroeder did not image the ICX ballot marking devices. When a paper ballot is processed, Election Judges examine the paper ballot as they disassemble the mail ballot. One Judge removes the ballot with the secrecy sleeve and hands the ballot to another Judge. This Judge removes the ballot from the secrecy sleeve, flattens the ballot and examines it for any stray marks. A stray mark includes identifying information or markings that would cause an issue with scanning. If stray marks are found the Judges duplicate the ballot. This process is logged, the original ballot is saved, and the duplicate ballot is scanned.

The likelihood that personal identifying information would be found on any ballot on the Subpoenaed Hard Drives is low. Ballot images are also subject to production via the Colorado Open Records Act. El Paso and Pueblo counties post ballot images to their websites for the public to initiate any desired recount. All images have to be reviewed and any identifying marks are redacted before releasing them to public. Election Judges and Watchers sign documents which forbid them from discussing any identifying marks on ballots. Cybersecurity experts can also sign these documents to alleviate any concerns of the AG and the Secretary.

Access and disclosure rights in criminal cases "do not endanger the government's paramount interest in national security. The government's interest can be protected by dismissal of the prosecution or less drastic concessions by the government in a criminal case." *Dhiab v. Trump*, 852 F.3d 1087, 1092 (D.C. Cir. 2017) (quoting Bruce E. Fein, *Access to Classified Information: Constitutional and Statutory Dimensions*, 26 WM. & MARY L. REV. 805, 828

(1985)).  The rationale of the criminal cases is that, since the Government which prosecutes an

accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake

prosecution and then invoke its governmental privileges to deprive the accused of anything

which might be material to his defense.  *Jencks*, 353 U.S. at 671(citing *Reynolds*, 345 U.S. at

12).  The Government can invoke its evidentiary privileges only at the price of letting Defendant

go free.  *Id.*

WHEREFORE, Defendant respectfully requests this Court deny the Motions to quash.

Respectfully submitted this 3rd day of June, 2022.

**Law Offices of Randy B. Corporon, P.C.**

*/s/ Randy B. Corporon*
Randy B. Corporon
**ATTORNEY FOR DEFENDANT**

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on this <u>3rd</u> day of June, 2022, a true and correct copy of the foregoing
**RESPONSE TO MOTIONS TO QUASH SUBPOENAS DUCES TECUM** was served upon
the following:

Daniel P Rubinstein, District Attorney
P.O. Box 20,000 .
Grand Junction, CO 81502
via CCEF

The Colorado Attorney General
Phillip Weiser
1300 Broadway, 10th Floor
Denver, CO 80203
via CCEF or email

*/s/ Beth Chambers*

25

Case No. 1:23-cv-03014-SKC   Document 10-2   filed 11/27/23   USDC Colorado   pg 1 of 4
Appellate Case: 24-1013   Document: 010110986287   Date Filed: 01/16/2024   Page: 248
Plaintiff's Motion for Preliminary Injunction
EXHIBIT 2016, Page 1

| ☒ District Court  ☐ Juvenile Court<br>Mesa County, Colorado<br>Court Address: 125 N. Spruce Street<br>Grand Junction, CO  81506<br><br>_____<br><br>PEOPLE OF THE STATE OF COLORADO,<br><br>v.<br><br>TINA PETERS, Defendant | DATE FILED: June 5, 2022<br>CASE NUMBER: 2022CR371<br><br><br><br>▲                              ▲<br>**COURT USE ONLY** |
|---|---|
| | Case Number:  22 CR 371<br><br>Division  9  Courtroom  Barrett |
| **ORDER RE: MOTIONS TO QUASH SDTS** ||

Before me are motions to quash various *subpoenas duces tecum* ("SDT").  The motions were filed by the People, the Colorado Attorney General, and the Secretary of State (collectively the "People").  The SDTs were issued by Defendant.  I have reviewed the motions, the response, the SDTs, and the file.  After considering the foregoing, as well as the exhibits provided, I issue the following Order:

*Background*

Defendant is charged with several crimes involving Attempting to Influence Public Servants, Identity Theft, Criminal Impersonation, Conspiracy to Commit Criminal Impersonation, Official Misconduct, Failure to Comply with Requirements of the Secretary of State, and Violation of a Duty.

The allegations in this case span a period beginning in or about April 2021 and into August 2021.  Defendant is the Clerk and Recorder for Mesa County and oversees elections for Mesa County.  Defendant is alleged to have secreted an unknown person into a trusted build, which is a process in which elections equipment is updated. In order to accomplish this, Defendant used the identifying information for someone else so the other person could attend the trusted build without being identified.  Defendant and others misrepresented the identity of the other person to several public servants.

Defendant knew when the trusted build was going to be conducted and had several weeks' notice for the same. She also knew she could stop the trusted build from occurring altogether.

It was later discovered that sensitive information from the trusted build was published to the internet. It was also discovered that data from Mesa County election equipment had been copied and published to the internet.

**Exhibit O**

On or about May 5, 2022, Defendant issued several SDTs. The entities served are: the Colorado Attorney General and the Colorado Secretary of State. The SDTs request generally identical documents/records, to wit: external hard drives, two scanning computers, and/or the adjudication computer, as produced to the District Court, Elbert County. The records relate to Elbert County election equipment.

The People move to quash the SDTs arguing the information sought in the SDTs is not relevant to this case, is protected by law, and could not be used to assist Defendant in her potential assertion of a Choice of Evils defense.

***Applicable Law***

"There is no general constitutional right to discovery in a criminal case[.]" Weatherford v. Bursey, 429 U.S. 545, 559, 97 S. Ct. 837, 846, 51 L. Ed. 2d 30 (1977). "Both [the Colorado Supreme Court] and the United States Supreme Court have emphasized that their respective rules permit subpoenas only for the production of 'evidence'-not as an investigative tool." People v. Baltazar, 241 P.3d 941, 944 (Colo. 2010).

Criminal *subpoenas* are governed by Crim. P. 17. Documents requested pursuant to a *subpoena* issued under Crim. P. 17 should only be disclosed when:

(1) A reasonable likelihood that the subpoenaed materials exist, by setting forth a specific factual basis;

(2) That the materials are evidentiary and relevant;

(3) That the materials are not otherwise procurable reasonably in advance of trial by the exercise of due diligence;

(4) That the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and

(5) That the application is made in good faith and is not intended as a general fishing expedition.

People v. Spykstra, 234 P.3d 662, 669 (Colo. 2010)

A court "may quash or modify the subpoena if compliance would be unreasonable or oppressive." Crim. P. 17(c). "[W]here a subpoena is issued for materials potentially protected by a privilege or a right of confidentiality, the defendant must make a greater showing of need and, in fact, might not gain access to otherwise material information

Case No. 1:23-cv-03014-SKC   Document 10-2   filed 11/27/23   USDC Colorado   pg 3 of 4
Plaintiff's Motion for Preliminary Injunction
EXHIBIT 16
Appellate Case: 24-1013   Document: 010110986287   Date Filed: 01/17/2024   Page: 250

depending on the nature of the interest against disclosure." People v. Battigalli-Ansell, 492 P.3d 376, 389–90 (Colo. App. 2021) (citations and quotations omitted).  Crim. P. 17 does not create a broad right to discovery as is the case in civil cases, and it is not a tool for discovery. Spykstra, 234 P.3d at 669.

*Findings and Order*

I first find the requested materials exist.  The requested materials are likely in the possession of the Secretary of State. The records are also not reasonably procurable from any other source.

I do not find, however, the requested materials are evidentiary or relevant.  The allegations in this case span the course of a handful of months in 2021.  All the acts occurred in Mesa County.  The events here have nothing to do with Elbert County election equipment.  What happened in Elbert County, on a different date, with different actors, is not relevant to this action.  There is no indication Defendant was thinking about Elbert County election equipment when the alleged conduct in this case took place.

Moreover, the issue of election equipment is collateral.  The jury will not be asked to address any questions regarding the functioning of election equipment.  The issues in this case are whether Defendant attempted to deceive public servants, engaged in criminal impersonation, and the like.  As such, any report regarding the verity of the election equipment made by her experts, or any counter expert, is entirely irrelevant.  These reports make no issue of material fact in this case more or less likely.  This criminal case is not the forum for these matters.

Defendant also does not know what is in the Elbert County election records. As such, her want to inspect the same constitutes a fishing expedition.  The information in those records is just as likely to help her arguments as it is to hurt her arguments.

To the extent Defendant claims she needs this information to bolster a "choice of evils" defense I am not persuaded.

"Choice of evils is a statutory defense and is only applicable when the alleged crimes were necessary as an emergency measure to avoid an imminent public or private injury that was about to occur by reason of a situation occasioned or developed through no conduct of the actor and which is of sufficient gravity to outweigh the criminal conduct." People v. Al-Yousif, 206 P.3d 824, 831 (Colo. App. 2006), as modified on denial of reh'g (Dec. 28, 2006).  In order to be entitled to this defense, a "defendant must show that his or her conduct was necessitated by a specific and imminent threat of injury to his or her person under circumstances that left the defendant no reasonable and viable alternative other than to violate the law of which the defendant stands charged."  Id.

"[I]f a reasonable legal alternative was available to defendant[] as a means to avoid the threatened injury, [she] properly may be foreclosed from asserting a choice of evils defense." <u>People v. Brandyberry</u>, 812 P.2d 674, 679 (Colo. App. 1990)

Defendant claims she engaged in her conduct so that she could expose issues with the election equipment. Other than a conversation on an unknown date with an unidentified employee of Dominion, she fails to note, however, *any* alternative action she took to avoid violating the law.

With weeks of notice, Defendant does not allege she attempted to discuss her concerns with the Secretary of State. She does not allege she went to local law enforcement with her concerns. She does not allege she went to state law enforcement with her concerns. She does not allege she went to federal law enforcement with her concerns. She does not allege she filed a civil lawsuit seeking to stop the trusted build. She also does not allege she attempted to stop the trusted build from taking place altogether by refusing to allow it to occur.

An imminent threat of injury that necessitates a defendant to violate the law is not one that is seen coming weeks in advance.

The record before me reflects that Defendant did not engage in any alternative action to avoid committing the alleged criminal conduct. Defendant has failed to show she would be entitled to a choice of evils defense. As such, the records she seeks are irrelevant.

The argument of needing these records to support a claim of bias against the Secretary of State is also misplaced. The records sought would not be admissible as impeachment evidence, in any event. C.R.E. 608.

Finally, many of the records, as noted in the joinder to the motion to quash, would likely be protected from disclosure, and therefore confidential. No showing of need has been made under the heightened standard.

Accordingly, the motions to quash are **GRANTED**.

**IT IS SO ORDERED** this 5th day of June, 2022.

_____
MATTHEW D. BARRETT
DISTRICT COURT JUDGE

## DECLARATION OF SHERRONNA BISHOP

I, Sherronna Bishop, make this declaration pursuant to 28 U.S.C. § 1746:

1.    I am a United States citizen over the age of 21 years and competent to make this declaration.

2.    I concluded during during the 2020 election cycle that there were legitimate concerns about the regularity of elections in the State of Colorado.

3.    I discovered that there were many fellow citizens who shared my concern about election integrity and were willing to participate in investigating elections and advocating for reform of election laws and procedures.

4.    In the spring of 2021, I learned that the Colorado Secretary of State had developed, with the participation of its vendor, Dominion Voting Systems, Inc., what it called the Trusted Build upgrade to be installed on the Mesa County, Colorado election management system server.

5.    I consulted with knowledgeable individuals about the technical and other issues associated with a Trusted Build installation on a computerized voting system.

6.    Based on the information that I received from those knowledgeable individuals, I concluded that the Trusted Build installation would overwrite all records on the County's computerized voting system.

7.    I was aware that a copy of the County's election management system server had been made before the Trusted Build upgrade was installed and another copy made after the installation.

8.    My research showed that under both federal and Colorado statutes election officials were required to preserve all election records for certain periods of time after an election and that those periods had not expired when the Trusted Build upgrade was installed.

9.    I had been introduced to cyber expert Doug Gould who had been asked to review and report on the images made of the County's election server.

10.    Mr. Gould advised that the Trusted Build installation had overwritten election records that were required to be preserved and that unauthorized software had been found on the voting system before the Trusted Build installation that enabled the manipulation of cast votes.

11.    In August 2021, I requested a meeting with representatives of the Mesa County Board of County Commissioners to advise the County about vulnerabilities in the Dominion voting equipment and software.

1

**Exhibit P**

12.    It was my intention to urge the Board of County Commissioners not to continue contracting with Dominion especially because of the vulnerabilities in its equipment.

13.    The Board scheduled a September 1, 2021, meeting with me as indicated in the one-page document headed "Election Briefing" attached to this declaration as Exhibit A.

14.    I informed the individual described as the organizer of the meeting, Brenda Wiseman, that I would be accompanied by retired U.S. Air Force Colonel Shawn Smith (virtually) and Cory Anderson (in person) at the meeting.

15.    When I arrived for the meeting at the Mesa County government facility, I was surprised because I had been advised by the County that the meeting would be limited to six attendees to find the Board had arranged for the meeting to be a Zoom meeting as well as an in-person meeting.

16.    Among the individuals on the Zoom call were personnel in the office of the United States Attorney General.

17.    District Attorney Dan Rubinstein and personnel from his office attended in person.

18.    Personnel from the office of the Secretary of State attended.

19.    Officers of Dominion attended.

20.    An FBI Special Agent attended.

21.    Ryan Macias, an out-of-state individual had been a critic of those who questioned the reliability of computerized voting systems, participated.

22.    During the September 1, 2021, meeting Colonel Smith described what he had identified as vulnerabilities in the Dominion voting machines.

23.    The members of the Board of County Commissioners were hostile to our position that the Dominion contract relationship should be terminated and declined to address the vulnerabilities described by Colonel Smith..

24.    On November 16, 2021, I was with my family at our home in Garfield County, Colorado when I heard loud pounding at the front door and shouting that I could not make out.

25.    I took my two youngest children to their bedrooms.

26.    My husband heard the noise from his basement office and came upstairs to investigate.

27.    As my husband approached the unlocked front door, it was forced open with a battering ram, throwing pieces of it several yards into the house. Photographs of the damage to the front door that I made are attached as Exhibits B, C, D, and E.

28.     The period of time between the first pounding on the door and the forceful break-in was no more than 45 seconds to the best of my recollection.

29.     I counted at least ten individuals in what I perceived as SWAT gear with weapons drawn and other individuals in front of the house or just entering the house, including personnel that I identified as Federal Bureau of Investigation agents, local police officers, and personnel from the office of the District Attorney.

30.     I requested to see the credentials of the law enforcement officers who came into the house, but none provided that information.

31.     I heard my husband repeatedly request to see the search warrant in a voice that those law enforcement officers who entered the house could hear, to which Michael Struwe, an investigator with the District Attorney's office, responded: "You will get it in our own time."

32.     One of the individuals in SWAT gear eventually handed me a search and seizure warrant, a screenshot of which we took. It is attached as Exhibit F.

33.     The individuals who arrived at our house came in several vehicles that caused our neighbors to notice what was occurring, causing my family and me great embarrassment.

34.     The local police chief handcuffed my husband and said that he did not know what was happening and was there just to assist.

35.     Another law enforcement officer then handcuffed me.

36.     An FBI agent grabbed our 18-year-old daughter forcibly as she came downstairs, grabbed her cell phone from her, and began examining it although it was not listed on the warrant.

37.     My two youngest children had come down form their bedrooms in tears and obviously shocked by what was happening.

38.     At one point, the female FBI agent attempted to threaten me with questions about the safety of weapons in our home.

39.     The law enforcement contingent spent approximately three hours searching every room in our home.

40.     I asked Investigator Struwe, who participated in the search, what I had done to justify the search and he responded: "You connect people."

41.     As a result of the actions of law enforcement and the District Attorney's office personnel at our home on November 16, 2021, a number of individuals who had been eager to participate with me and others who advocate for an end of the use of computerized voting systems are reluctant to do so any longer out of fear of retaliation by federal, state, and local officials.

42.     I have found since November 17, 2021, that attracting and retaining individuals who are willing to participate in the advocacy that I have been supporting has been markedly more difficult to achieve because of their fear of official retaliation.

I certify under penalty of perjury that the information contained in the foregoing paragraphs is true and correct based upon my knowledge and belief.

Dated 11/19   , 2023

Sherronna Bishop

Plaintiff's Motion for Preliminary Injunction
EXHIBIT D

# Exhibit A

2/6/23, 3:32 PM                                Mesa County - Calendar - Event details

✕  **Elections Briefing**                              Save        More actions ⌄

Sep 1, 2021    8:30am  to  10:00am    Sep 1, 2021    (GMT-07:00) Mountain Time - Denver    Time zone

☐ All day    Does not repeat

Going? ⌄    Add note

**Event Details**   Find a Time

Guests    Rooms

📍  https://us06web.zoom.us/j/82829044841?pwd=cCtqUlg4d0Y4eVV0Q2hGT0k2Mm5    📖

19 guests
11 yes
1 no, 7 awaiting

🔔  Notification ⌄   10        minutes ⌄   ✕                                💬  ✉

Add notification                                                            ✓ Brenda Wiseman
                                                                               Organizer

📅  Brenda Wiseman            ⌄                                              ✓ Cody Davis 📞

                                                                            ✓ Dan Rubinstein
🗂  Busy ⌄   Default visibility ⌄   ⓘ
                                                                            ✓ deo@mesacounty.us *
Availability might be shown in other Google apps ⓘ
                                                                            ✓ James Cannon

≣   B  I  U  S  ≣  ≣  🔗  ✗                                                 ✓ Janet Drake *

                                                                            ✓ Rowland, Janet
*Sherronna, Please contact Brenda Wiseman (brenda_wiseman@mesacounty.us or 970-*
*244-1757) with a list of those attending in person. A maximum of 6 individuals may be*       ✓ Peter Baier 📞
*present in the meeting room. We ask that all others join via zoom.*
                                                                            ✓ Rob Shapiro *

Mesa County is inviting you to a scheduled Zoom meeting.                     ✓ scott.mcinnis@mesacounty.us *

Join Zoom Meeting                                                           ✓ waynewilliamslaw@comcast.net *
https://us06web.zoom.us/j/82829044841?
pwd=cCtqUlg4d0Y4eVV0Q2hGT0k2Mm5HZz09                                         ✗ Jacobson, Jonathan (CRM) *

Meeting ID: 828 2904 4841                                                   ✓ alex.zappe@ic.fbi.gov *
Passcode: 124888
One tap mobile                                                                Nina Atencio
+17207072699,,82829044841#,,,,*124888# US (Denver)
+13462487799,,82829044841#,,,,*124888# US (Houston)                          Rene Romero *

Dial by your location                                                        sherronna7@gmail.com *
  +1 720 707 2699 US (Denver)
  +1 346 248 7799 US (Houston)                                               Stephanie Reecy
  +1 253 215 8782 US (Tacoma)
  +1 312 626 6799 US (Chicago)                                               Todd Starr
  +1 646 558 8656 US (New York)
  +1 301 715 8592 US (Washington DC)                                         Linda Frasier
Meeting ID: 828 2904 4841                                                     Optional
Passcode: 124888
Find your local number: https://us06web.zoom.us/u/ketYuaybEg                ✓ 544Rood-Commissioners Board Room

                                                                           🏢 ✓ G2R - BOCC *

                                                                            * Calendar cannot be shown ⓘ

Plaintiff's Motion for Preliminary Injunction
EXHIBIT 7

# Exhibit B

Plaintiff's Motion for Preliminary Injunction
EXHIBIT O25, Page: 8

11/19/23, 12:08 PM



Plaintiff's Motion for Preliminary Injunction
EXHIBIT C

# Exhibit C

11/19/23, 12:09 PM    Screenshot_20231023_075047_Gallery.jpg

Plaintiff's Motion for Preliminary Injunction

EXHIBIT 25

# Exhibit D

Plaintiff's Motion for Preliminary Injunction
EXHIBIT 254 Page 12

11/19/23, 12:09 PM

# Exhibit E

Plaintiff's Motion for Preliminary Injunction

EXHIBIT 254 Page 1 265



Plaintiff's Motion for Preliminary Injunction

EXHIBIT 25

# Exhibit F

Case No. 1:23-cv-03014-SKC   Document 10-13   filed 11/27/23   USDC Colorado   pg 16 of 23
Plaintiff's Motion for Preliminary Injunction
EXHIBIT 254
Appellate Case: 24-1013   Document: 010110986287   Date Filed: 07/22/24   Page: 267

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the
District of Colorado

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

)
)
)  Case No.
)
161 S Golden Dr., Silt, CO 81652 and the )
person of Sherronna Bishop if located )
therein, more fully described in Attachment )
A-4, attached hereto. )

## SEARCH AND SEIZURE WARRANT

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the __State and__ District of __Colorado__:

**SEE "ATTACHMENT A-4"** attached hereto and incorporated by reference

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal the *):*

**SEE "ATTACHMENT B-4"** attached hereto and incorporated by reference

I find that the affidavit(s), or any recorded testimony, establishes probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before __11/27/21_____ *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to __Gordon P. Gallagher, USMJ_____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30).*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: __11/13/21 at 11:25 am__

_____
*Judge's signature*

City and state: __Grand Junction, CO__

Gordon P. Gallagher, USMJ
*Printed name and title*

Page ___/___ of ___/___

FD-597 (Rev 8-11-94)

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
Receipt for Property Received/Returned/Released/Seized

File # _____

On (date) 11/16/2021                    item(s) listed below were:
                                        ☒ Received From
                                        ☐ Returned To
                                        ☐ Released To
                                        ☐ Seized

Jason
muszkiewicz

(Name) Sherann Bishop            Chris
(Street Address) 161 S Golden Dr      Mattfalley
(City) SJT, CO 81657

Description of Item(s):

#1 Samsung Galaxy S10e Model SM-G970U
   S/N: R58M233SMPW

#2 HP Pavilion Laptop w/ Cord
   S/N 5CD037JM57

#3 Lenovo FDBF w/ Cord
   S/N MP10WENV

Received By: _____ (Signature)    Received From: _____ (Signature)



AO 93 (Rev. 11/13) Search and Seizure Warrant

### ATTACHMENT A-4
### LOCATION TO BE SEARCHED:

**A RESIDENCE LOCATED AT:**
**161 S Golden Drive, Silt, Colorado 81652**
**and the person of SHERRONNA BISHOP, if located therein**

The location to be searched is the residence at **161 S Golden Drive, Silt, Colorado 81652**, as well as the person of Sherronna Bishop, if located therein at the time of the execution of the warrant. The residence is described as a single-story "Rancher-style" home a with basement, located in the Eagles View subdivision, in Silt, Colorado. The exterior of the residence is light, brown-colored stucco and white window encasements. The numbers "161" are visible and affixed to the north side of the house. I have viewed photos of this residence and fellow FBI agents have personally observed the physical residence location. The following are two photographs that fairly and accurately depict the target location:

 

Additionally, Sherronna Bishop **(DOB:** 8/18/80) is described as a white female, age 41. The following is a photograph of Sherronna Bishop:



## ATTACHMENT B-4

1.   All records or information in or on SUBJECT PREMISES 4 described in Attachment A-4 (including the person of Sherronna Bishop, if located therein at the time of the execution of the warrant) that relate to violations of 18 U.S.C. §§ 1030(a)(5)(A) (intentional damage to a protected computer), 1343 (wire fraud), 371 (conspiracy to cause intentional damage to a protected computer and/or commit wire fraud), or 1349 (conspiracy to commit wire fraud) (the "SUBJECT OFFENSES"), and involve Tina Peters, Gerald Wood, Belinda Knisley, Sandra Brown, or Sherronna Bishop (the "SUBJECTS"), since November 1, 2020, including:

   a.   All records and information relating to damage to any Dominion computerized voting system, including any impairment to, or attempt to impair, the integrity or availability of data, a program, a system, or information;

   b.   All records and information relating to BIOS on any Dominion computerized voting system, including any modification to, or attempt to modify, a BIOS setting;

   c.   All records and information relating to the attachment of any peripheral to any Dominion computerized voting system, including any USB flash storage drive or other external storage media;

   d.   All records and information relating to the operation of any Optical Disc Drive on any Dominion computerized voting system, including the use or attempted use of CDs or DVDs to run software;

   e.   All records and information relating to any software, program, application, or code used to obtain information about the configuration, security features, contents, or vulnerabilities of any Dominion computerized voting system;

1

Plaintiff's Motion for Preliminary Injunction
EXHIBIT 254   Page 271

f. All records and information relating to any attempted or successful misappropriation, theft, conversion, transfer, or exfiltration of any proprietary hardware, software, or other data;

g. All records, information, and evidence indicating the geographical location of any Subject and/or the owner or user of SUBJECT PREMISES 4;

h. All records or information indicating the state of mind of any Subject, as it relates to the SUBJECT OFFENSES discussed in the Affidavit;

i. All records and information indicating attempts by any Subject to conceal an individual's involvement in the SUBJECT OFFENSES; and

j. All records and information indicating the identity of any person(s) – including records that help reveal the whereabouts of the person(s) – who communicated with any Subject about any matters related to the commission of the SUBJECT OFFENSES.

2.    For any computer (defined below) or electronic storage medium (also defined below) whose seizure is otherwise authorized by this warrant, and any computer or electronic storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (collectively hereinafter, "DEVICE"):

a. evidence of who used, owned, or controlled the DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chats," instant messaging logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the DEVICE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the SUBJECT OFFENSES under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the SUBJECT OFFENSES under investigation;

f.  evidence of the attachment to the DEVICE of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the DEVICE;

h.  evidence of the times the DEVICE was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the DEVICE;

j.  volatile data and volatile memory stored on the DEVICE;

k.  documentation and manuals that may be necessary to access the DEVICE or to conduct a forensic examination of the DEVICE;

l.  records of or information about Internet Protocol addresses used by the DEVICE;

m.  records of or information about the DEVICE's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages,

4

Plaintiff's Motion for Preliminary Injunction
EXHIBIT 254

search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

n.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" means data on any form of computer or electronic storage medium.

The term "computer" includes desktop computers, notebook computers, mobile/cellular phones, and tablets.

The term "electronic storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

Executing law enforcement personnel are authorized to depress the fingerprints and/or thumbprints of persons within or in close proximity to SUBJECT PREMISES 4 onto the Touch ID or fingerprint sensor of any Apple iPhone, iPad, or other Apple brand device, or other device that has a fingerprint sensor, in order to gain access to the contents of any such device. Law

enforcement personnel may also hold the device(s) found at SUBJECT PREMISES 4 in front of the face of persons within or on SUBJECT PREMISES 4 to activate the facial recognition feature; and/or hold the device(s) found at SUBJECT PREMISES 4 in front of the face of persons within or on SUBJECT PREMISES 4 to activate the iris recognition feature, for the purpose of unlocking the device(s) in order to search the contents as authorized by this warrant.

Plaintiff's Motion for Preliminary Injunction
EXHIBIT 26, Page 1



# Jena M Griswold

**Colorado Secretary of State**

## Election Order 2022-01

| | |
|---|---|
| Re: | **2022 Election Activity in Mesa County – Supervision to Ensure Compliance with Legal Requirements** |
| Date: | **January 10, 2022** |

### Operative Facts

On August 9, 2021, the Secretary of State issued Election Order 2021-01 to the Mesa County Clerk and Recorder, ordering that Mesa County Clerk and Recorder Tina M. Peters ("Clerk Peters") must, among other requirements, permit civil servants from the Colorado Department of State ("the Department") to inspect the voting system components and security protocol records currently in Mesa County's possession. On August 10, 2021, Department staff accessed these components and their software, in addition to reviewing certain records of the Mesa County Clerk and Recorder's office. The 2021-01 Order required the production of documents related to a potential security breach involving voting system equipment in the Mesa County Clerk and Recorder's office. Clerk Peters' office did not produce documents required by the Order. Nevertheless, Mesa County's county administration provided some of the requested documents, to the extent the county administration had access to them.

On August 12, 2021, the Secretary of State issued Election Order 2021-02 to Clerk Peters. That order prohibited Clerk Peters and the Mesa County Clerk and Recorder's office from using specific voting systems components in any future election because the Department could not establish that the voting system was not compromised.

On August 17, 2021, the Secretary of State issued Election Order 2021-03 to Clerk Peters. In that order the Secretary formally exercised her authority to supervise Mesa County elections, including all activities related to the then-upcoming November 2, 2021, coordinated election. Among its provisions, the order appointed Sheila Reiner to supervise all conduct related to elections in Mesa County and prohibited Deputy Clerk Belinda Knisley and elections employee Sandra Brown from participating or supervising any aspect of Mesa County elections until otherwise instructed.

On August 30, 2021, the Secretary of State filed a petition for relief under §§ 1-1-107 & -113, C.R.S., seeking an order from the Mesa County District Court removing Clerk Peters as the Designated Election Official ("DEO") for the then-upcoming November 2021 coordinated election and appointing an alternate DEO to serve for that election. That petition set out numerous violations by Clerk Peters and certain of her subordinates of various election rules and orders. Among these violations were the following: security breaches by Clerk Peters, Deputy Clerk Knisley, and elections employee Brown in which they allowed an unauthorized non-employee to be present during the Mesa County "trusted build" and the subsequent leak of the component BIOS passwords to social media sites demonstrating a compromise to the security of Mesa County's voting system equipment; and, breach of duty and wrongful acts by both Clerk Peters

**Exhibit Q**

and Deputy Clerk Knisley for failing to maintain adequate voting systems chain of custody, failing to ensure a secure process for Mesa County's "trusted build," allowing an unauthorized non-employee to be present during the trusted build, facilitating the unauthorized disclosure of voting system equipment software, and failing to cooperate with efforts by the Secretary of State's Office to remediate the security breaches.

On October 13, 2021, the Mesa County District Court entered an order granting the Secretary's petition. The Court's order found, *inter alia,* that Clerk Peters' actions had enabled a "security vulnerability" to be created with Mesa County's voting system equipment; Clerk Peters had been "untruthful with the Secretary and her staff;" that Clerk Peters "failed to follow the rules and orders of the Secretary;" that Clerk Peters had "failed to take adequate precautions to ensure that confidential information would be protected;" and that in light of the uncontroverted factual record submitted to the Court, Clerk Peters had breached her duties, neglected her duties, and committed other wrongful acts sufficient to justify her removal as DEO for the November 2021 Coordinated Election in Mesa County. The Court enjoined Clerk Peters from serving as the DEO for that election and confirmed the Secretary's request that Wayne Williams serve as the DEO for that election and Sheila Reiner serve as the Election Supervisor. Under the Court's order, unless otherwise modified by the Court, Clerk Peters will be authorized to resume the duties of Mesa County DEO upon the completion of all tabulation activities related to the November 20201 Coordinated Election in Mesa County. A copy of the Court's order is attached to this Election Order 2022-01 as **Exhibit A**.

The Colorado Supreme Court subsequently denied Clerk Peters' petition for appellate review of the District Court's order thereby finalizing that Order pursuant to section 1-1-113, C.R.S.  A copy of the Supreme Court's order to that effect is attached to this Election Order 2022-01 as **Exhibit B**.

Since the Secretary launched the Department's initial inquiry in August 2021, the findings of which are summarized in Election Orders 2021-01, -02, and -03, the Department's investigation of the Mesa County security breach has been ongoing. Numerous subsequent statements by Clerk Peters demonstrate that she continues to present a danger to the security of elections in Mesa County, and include but are not limited to the following:

- In a September 26, 2021 podcast, Clerk Peters admitted to "commissioning someone" to enter Mesa County offices and to make images of the server without the Department's knowledge. *See* https://truthandliberty.net/episode/tina-peters-and-sherronna-bishop-searching-for-the-truth/ (at 12:44).

- In an October 11, 2021 news conference, Clerk Peters again admitted that she arranged to breach the security of Mesa County's voting system server and had images of the server's hard drive created before and after the "trusted build" process, in contravention of the Department's direction and rules. *See* https://www.nbc11news.com/2021/10/12/mesa-county-clerk-recorder-tina-peters-hosts-news-conference/.

- After being enjoined from serving as Mesa DEO for the November 2021 Coordinated Election, Clerk Peters gave a speech at the Western Conservative Network Action Conference in Salt Lake City on October 22-23, 2021, in which she continued to extoll her illegal actions during the "trusted build" process, stating "I arranged to have a forensic image – it's like a snapshot – before and after they did this trusted build….I'm so grateful that I took the action that I did." She further asserted, in reference to the "trusted build" update to the Mesa County voting equipment performed in May 2021, that, "This was indeed one of if not the worst crimes in America. If we don't get these election problems fixed, I don't see fair elections going forward." *See*

https://www.youtube.com/watch?app=desktop&v=gshZtZHdHU8&feature=youtu.be (at 1:40 and 3:40).

- During a November 18, 2021 FacebookLive broadcast, Clerk Peters stated, again in reference to the routine actions by the Secretary of State's Office to maintain the security of Mesa County's voting system equipment, "They're the ones that cheated. They're the ones that destroyed election records. They're the ones that are allowing influences to come into our computers changing votes and doing all these things." *See* https://www.facebook.com/watch/live/?ref=watch_permalink&v=900957210533726 (at 44:30).

- During a December 1, 2021 Truth and Liberty Rally in Grand Junction, Clerk Peters again indicated that she would take the same actions if faced with the same situation: "So I did what any business person would do and anyone that is elected by the people, and one of their main jobs is to protect election records, that doesn't fall on anyone else, that falls on me and I will keep fighting." *See* https://www.facebook.com/watch/live/?ref=watch_permalink&v=623559359002526 (at 57:27).

- During a January 6, 2022 FacebookLive broadcast, Clerk Peters stated, "We're not backing down. If we don't get this election irregularity solved, problem solved, there's not going to be any fair elections. . . . We've got to get those machines so that they are transparent to the people and, they're not able to do what they're designed to do." *See* https://fb.watch/aomqK7a6n5/ (at 36:30).

### Use of Dominion Voting System Equipment for the Upcoming 2022 Elections in Mesa County

Under section 1-5-603, C.R.S., the Mesa County Board of County Commissioners ("Board") has the authority to "adopt for use at elections any kind of voting machine fulfilling the requirements for voting machines set forth in" the Uniform Election Code of 1992 ("Code"), §§ 1-1-101, *et seq.* C.R.S.

In reliance on that statutory authority, Mesa County requested and received approval from the Secretary of State to use Dominion Voting Systems Democracy Suite voting system and voting equipment, which is certified by the Secretary of State's Office for use in elections to which the Code applies. To implement that decision, Mesa County, by and through the Board, entered into a contract with Dominion Voting Systems, Inc. on March 21, 2016, as amended on August 1, 2020, for the purchase of voting equipment and licensing of software for use with that equipment.

Following the Secretary's issuance of Election Order 2021-02 in which Mesa County's voting system equipment was decertified from use because of the security breaches that Clerk Peters facilitated and participated in, Mesa County negotiated a new agreement with Dominion Voting Systems, Inc. to acquire certified replacement voting equipment to be used during the November 2021 Coordinated Election, at substantial cost to Mesa County. A copy of the superseding agreement between Mesa County and Dominion Voting Systems, Inc. dated August 24, 2021 is included in the Secretary of State's approval of the use of the replacement equipment, attached here as **Exhibit C**.

The certified replacement voting equipment acquired from and software licensed by Dominion Voting Systems, Inc. also will be used in all 2022 elections to which the Code applies that are conducted in Mesa County. In order for Mesa County's certified replacement voting system and voting equipment to remain certified, they must continuously be maintained in a secure manner and the failure to do so, whether as a result of neglect or wrongful act, will result in their decertification by the Secretary of State.

Any decertification of Mesa County's certified replacement voting system and voting equipment may jeopardize the timely conduct of one or more 2022 elections to which the Code applies, impose substantial financial costs on the taxpayers of Mesa County, and cause Mesa County to violate the accessibility requirements of the federal Help America Vote Act of 2002 ("HAVA"), 52 U.S.C. §§ 20901, *et seq*., and the Code.

## ORDER

Pursuant to my authority as the Chief State Election Official under state and federal law, including sections 1-1-107(1), 1-1-110(1), 1-1.5-104(1), and 1-7.5-104, C.R.S., as well as section 10 of the National Voter Registration Act of 1993, ("MVRA"), 52 U.S.C. § 20509, and section 253(e) of HAVA, 52 U.S.C. § 21003(e), and in furtherance of my duty under state and federal law to ensure the secure, accurate, and timely conduct of any 2022 election to which the Code applies in Mesa County, I order as follows:

1. The Secretary of State hereby exercises her authority to supervise the conduct of upcoming elections in 2022 in Mesa County, including all activities related to the upcoming June 28 Primary Election and the November 8 General Election.

2. Clerk Peters will be provided with a copy of this Elections Order 2022-01 immediately upon its issuance, and she is hereby required to execute under penalty of perjury the Certifications and Attestations of Compliance that accompany this Order within seventy-two (72) hours of service of same on her.

3. Immediately upon resuming duties as the DEO for Mesa County ("Mesa DEO"), Clerk Peters must deliver a full copy of this 2022-01 Election Order to each employee of the Mesa County Clerk and Recorder's Office, and she must ensure that any new employee hired for her office during 2022 also is provided with a copy.

4. For purposes of this Order, as used herein, the term "voting equipment" has the same meaning as defined in section 1-1-104(50.7) of the Code.

5. For purposes of this Order, as used herein, the term "election-related" means any substantive, non-*de minimis* matter pertaining to the conduct of Mesa County elections, including without limitation voter registration systems, records, or practices; voting equipment or supplies; candidate or voter qualifications; voting and drop box locations, maintenance, and access; election procedures; and, any other conduct related to the administration of Mesa County's elections.

6. At a future time prior to the expiration of the current Mesa County District Court order, *see* Exhibit A, the Secretary of State will appoint an Election Supervisor with authority to oversee all decisions made and actions taken by Clerk Peters in connection with any election-related matter related to the 2022 Primary Election and 2022 General Election in Mesa County.

7. In addition, the Secretary will designate such staff within her office as she deems appropriate to serve as her Designees with full authority to act in her behalf in all matters relating to this Election Order 2022-01.

8.  Before any proposed election-related decision by Clerk Peters or any deputy clerk she may appoint is implemented, Clerk Peters must submit any proposed election-related decision in writing to the Election Supervisor or the Secretary's Designee[s], and no action may be taken by Clerk Peters or anyone under her supervision to implement the proposed decision unless and until the Election Supervisor or the Secretary's Designee[s] explicitly approves the proposed decision in writing.

9.  Clerk Peters must provide the Secretary of State's Office on a daily basis, no later than 4:00 p.m. each work day, a full and complete copy of every written election-related communication, both internal and external, that Clerk Peters makes in her capacity as Mesa Clerk or Mesa DEO.

10. Clerk Peters is prohibited from being physically present in an area where any Mesa County voting equipment is stored unless the Elections Supervisor also is physically present and accompanies Clerk Peters at all times.

11. Clerk Peters is prohibited from being physically present in locations where any Mesa County voting equipment is in use—including without limitation in the Mesa County elections office should it be used as a voter service and polling place, all other voter service and polling places, or in transit when such equipment and devices are moved for setup and use before and throughout an election—unless the Elections Supervisor also is physically present and accompanies Clerk Peters at all times.

12. Unless and until Clerk Peters has successfully completed the training made available by the Secretary of State's Office for use of the centralized statewide voter registration system known as "SCORE" and thereafter submitted a signed SCORE Acceptable Use Policy as required by Election Rule 2.17.2, or any successor version of that Election Rule, Clerk Peters is prohibited from accessing the SCORE voter registration system or any other system with confidential voter information, or any reports with confidential voter information. If Clerk Peters is allowed access to the SCORE system as a result of compliance with the foregoing requirements, she may do so only under supervision by the Election Supervisor who must be physically present and accompanies Clerk Peters at all times.

13. Clerk Peters is prohibited from directing, instructing, suggesting, participating with, or assisting any other person—including without limitation any employee, vendor, or agent of the Mesa County Clerk & Recorder's Office—in connection with any action involving or affecting Mesa County's voting equipment, the SCORE system, any other system with confidential voter information, or any reports with confidential voter information without first receiving express written permission from the Election Supervisor or the Secretary's Designee[s].

14. Neither Clerk Peters nor any person under her direction may approve or grant key-card badge access to the rooms where voting system equipment is located without first providing the Election Supervisor or the Secretary's Designee[s] with a copy of a current criminal background check of that person and receiving approval in writing from the Election Supervisor or the Secretary's Designee[s] that such person is approved to have access to the rooms where voting system equipment is located.

15. Clerk Peters must deliver to the Secretary of State's Office on a daily basis, no later than 4:00 p.m. each work day, true and correct copies of all electronic logs for the key-card swipes of each door in the Mesa County Elections Division for the period covering back to the last prior log.

16. Clerk Peters must ensure that video surveillance of Mesa County's Elections Division and any room in which voting equipment is stored or located, the entrances to those rooms, and the voting equipment itself is continuously available to the Secretary of State's Office on a 24-hour/day, 7-day/week basis without interruption for the duration of her service as Mesa DEO. She must further ensure that the Secretary of State's Office is provided either with log-in access to the storage of such video or the video files are delivered on a daily basis so that they may be reviewed at any time.

17. Clerk Peters must ensure that at no time is any single person—including without limitation any employee, vendor, or agent of the Mesa County Clerk & Recorder's Office—alone in any room where Mesa County's voting equipment is stored or located, and that whenever one person is present in a room where voting equipment is stored or located, at least one other employee of the Mesa County Elections Division who is authorized by the Election Supervisor or Secretary's Designee[s] to be present is also physically present and accompanies that person at all times.

18. Clerk Peters must submit weekly written progress reports not later than 4 p.m. on the Friday of each week to the Secretary of State's Office concerning any and all election-related matters, including but not limited to timelines, procedures, and policies. She must ensure that these reports describe in detail every election-related activity undertaken by Mesa County Elections Division staff that week, all interactions with any election-related vendor involving her or any employee, vendor, or agent of the Mesa County Clerk & Recorder's Office, and any other election topic requested by the Election Supervisor or Secretary's Designee[s]. These reports also must confirm in detail that Clerk Peters' office is meeting each statutory or administrative milestone and requirement related to any upcoming election subject to the Code in Mesa County.

19. Clerk Peters must make herself and any Mesa County Elections Division staff available to consult with the Elections Supervisor and/or any staff person of the Secretary of State's Office to discuss any election-related matters at the request and convenience of the Elections Supervisor or the Secretary's staff.

20. Clerk Peters is prohibited from directing or authorizing any employee, vendor, or agent of the Mesa County Clerk & Recorder's Office, or any other person, to take or perform any action that Clerk Peters herself is prohibited from taking or performing under this Election Order 2022-01, provided however that any employee of the Mesa County Elections Division who is otherwise authorized to take or perform any action may continue to do so in consultation with and subject to direction by the Elections Supervisor.

21. Clerk Peters must conduct all 2022 elections to which the Code applies using Mesa County's certified Dominion Voting Systems Democracy Suite voting system and voting equipment, pursuant to the contracts for use of such equipment with Dominion Voting Systems, Inc. and the approval issued by the Secretary of State for use of the Dominion Voting Systems Democracy Suite voting system and voting equipment.

22. Clerk Peters is prohibited from acting or failing to act, encouraging any other person to act or fail to act, or enabling any other person to act or fail to act in a manner that compromises the continuous security and certification of Mesa County's Dominion Voting Systems Democracy Suite voting system and voting equipment, understanding that any decertification of the Dominion Voting Systems Democracy Suite voting system and voting equipment resulting from a violation of this Election Order 2022-01 may jeopardize the timely conduct of one or more 2022 elections to which the Code applies, impose substantial financial costs on the taxpayers of Mesa County, may cause Mesa County to violate the accessibility requirements of HAVA and the Code, and may constitute a breach of Clerk Peters' fiduciary duty as Clerk & Recorder.

23. Sandra Brown and Belinda Knisley are prohibited from any involvement with the Mesa County Elections Division and being physically present at any facilities of the Mesa County Elections Division.

24. Clerk Peters must repudiate, in writing, both the statement she made on January 6, 2022, in a FacebookLive broadcast indicating her willingness to compromise voting equipment, that is, her assertion that "We've got to get those machines so . . . they're not able to do what they're designed to do," and further all other statements she has made indicating a willingness to compromise voting system equipment.

25. Clerk Peters must notify all current and future employee of the Mesa County Elections Division in writing that they must promptly report any actual or potential violations of this Election Order 2022-01 or of the Election Code to the Elections Supervisor or the Secretary's Designee[s].

Attachments:

- Exhibit A – Copy of Order Re: Verified Petition For Relief Under C.R.S. § 1-1-113, in Mesa County District Court Case No. 21CV30214, entered Oct. 13, 2021
- Exhibit B – Copy of Order of Court, in Colorado Supreme Courts Case No. 2021SA307, entered Oct. 20, 2021
- Exhibit C – Copy of Secretary of State Approval of Voting System Acquisition by Mesa County from Dominion Voting Systems, dated Sept. 3, 2021
- Form – Attestation and Certification of Tina M. Peters to the Secretary of State

Executed at **11:13 a.m.** this **10th** day of January, 2022

_Jena Griswold_

Jena M Griswold
Colorado Secretary of State

Case No. 1:23-cv-03014-SKC   Document 10-15   filed 11/27/23   USDC Colorado   pg 1 of 2

9/19/23, 5:08 PM   McSweeney, Cyrker & Kachouroff, PLLC Mail - Fwd: RELEASE: Secretary of State Griswold Files Lawsuit to Bar County Clerk T...

Appellate Case: 24-1013   Document: 0101056667   Date Filed: 07/18/2024   Page: 282

Plaintiff's Motion for Preliminary Injunction

 Gmail

Patrick McSweeney <patrick@mck-lawyers.com>

---

### Fwd: RELEASE: Secretary of State Griswold Files Lawsuit to Bar County Clerk Tina Peters from Overseeing 2022 Elections after Peters Refuses to Certify Compliance with Election Security Protocol

2 messages

---

**Tina Peters** <tm.peters@live.com>
To: patrick@mck-lawyers.com

Tue, Sep 12, 2023 at 3:32 PM

Begin forwarded message:

**From:** "CO Secretary of State" <ColoSecofState@public.govdelivery.com>
**Subject: RELEASE: Secretary of State Griswold Files Lawsuit to Bar County Clerk Tina Peters from Overseeing 2022 Elections after Peters Refuses to Certify Compliance with Election Security Protocol**
**Date:** January 18, 2022 at 9:17:41 AM MST
**To:** tina.peters@mesacounty.us
**Reply-To:** ColoSecofState@public.govdelivery.com



## Colorado
# Secretary of State

## FOR IMMEDIATE RELEASE

**Media Contact:**
Annie Orloff
Annie.Orloff@ColoradoSOS.gov

Steve Hurlbert
Steve.Hurlbert@ColoradoSOS.gov

January 18, 2022

# Secretary of State Griswold Files Lawsuit to Bar County Clerk Tina Peters from Overseeing 2022 Elections after Peters Refuses to Certify Compliance with Election Security Protocol

*Secretary Griswold announces plans to appoint former Secretary of State Wayne Williams and current Mesa County Treasurer Sheila Reiner as election supervisors*

DENVER, Colo— Today, Colorado Secretary of State Jena Griswold proceeded with a lawsuit to bar Mesa County Clerk and Recorder Tina Peters from overseeing the 2022 elections. The lawsuit asks a judge to remove Peters as the Designated Election Official (DEO) during 2022.

# Exhibit R

In the filing, the Secretary of State's office requests the Court to appoint Brandi Bantz as the DEO for Mesa County to ensure the smooth and secure operations of the 2022 Primary and General elections. Both the Mesa County Commissioners and the Secretary of State's office support the appointment of Bantz. The Secretary announced that she will also then appoint former Secretary of State Wayne Williams (R) and current Mesa County Treasurer Sheila Reiner (R) as election supervisors to provide expertise and assistance to Ms. Bantz as needed.

"Every eligible Coloradan – Republican, Democrat, and Independent alike – has the right to make their voice heard in safe and secure elections. As Clerk Peters is unwilling to commit to following election security protocols, I am taking action to ensure that Mesa County voters have the elections they deserve," said Secretary Griswold. "I will continue to provide the support and oversight needed to ensure the integrity of Colorado's elections."

This legal action follows the refusal of Peters to certify under penalty of perjury that she would comply with the security protocols as the Mesa County DEO. On January 10, 2022, Secretary Griswold issued an Election Order and accompanying Certification and Attestation of Compliance requiring Clerk Peters to certify, within 72 hours, under penalty of perjury that she would comply with election related security protocols. Clerk Peters declined to sign the Certification and Attestation of Compliance.

Neither the Secretary of State nor the county is authorized under Colorado law to remove a sitting county clerk from serving as a county's DEO, so this legal action is necessary. As was the case last fall, the Secretary has asked the Mesa County District Court to exercise the Court's authority to assign the DEO responsibilities. A DEO is the person responsible for running elections for a local government, like a municipality or a county. They make determinations regarding elections issues for their municipality or county.  The Secretary of State does have the authority to appoint election supervisors.

Williams currently serves as DEO, and was appointed as such when Mesa County Court Judge Robison ruled in favor of barring Tina Peters from 2021 election oversight as DEO after she allowed breaches to election security, disregarded election rules and orders of the Secretary of State, and risked the integrity of Mesa County elections. The Court's decision legally barred Peters from serving as DEO until the completion of all 2021 election related activities. That completion is expected to be reached sometime in early February.

Last October, Judge Robison made specific findings that Clerk Peters' actions allowed a "security vulnerability" to be created with Mesa County's voting system equipment; that Clerk Peters had been "untruthful with the Secretary and her staff," that Clerk Peters "failed to follow the rules and orders of the Secretary," that Clerk Peters had "failed to take adequate precautions to ensure that confidential information would be protected," and that in light of the uncontroverted factual record, Clerk Peters had breached her duties, neglected her duties, and committed other wrongful acts sufficient to justify her removal as the Designated Election Official for Mesa County.

Clerk Peters' actions constituted one of the nation's first insider threats where an official, elected to uphold free, fair, and secure selections risked the integrity of the election system in an effort to prove unfounded conspiracy theories.

Bantz has worked in Colorado elections for over 20 years, including serving as the Director of Elections in Mesa County since May of 2020 and serving under then Clerk Wayne Williams in El Paso County for four years as a Senior Elections Specialist.

###

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limitation of FED.R.APP.P. 27(d)(2)(A) because, excluding the parts of the document exempted by FED.R.APP.P. 32(f), this document contains 5,181 words.

2. This document complies with the typeface requirements of FED.R.APP.P. 32(a)(5)(A) and the type style requirements of FED.R.APP.P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Windows 11 Pro in 14-point font in Times New Roman.

Date: January 19, 2024

/s/ *Robert J. Cynkar*
Robert J. Cynkar
*Counsel for Tina Peters*

# CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2024, I electronically filed the foregoing

using the CM/ECF system which will send notification of such filing to the

following:

Todd Starr
Mesa County Attorney
Todd.starr@mesacounty.us
*Counsel for Mesa County District Attorney Daniel Rubinstein*

I hereby certify that on January 19, 2024, I served the foregoing by email to

the following:

Michael Kotlarczyk
Senior Assistant Attorney General
Mike.Kotlarczk@coag.gov

LeeAnn Morrill
First Assistant Attorney General, Public Officials Unit
LeeAnn.Morrill@coag.gov
*Counsel for Secretary of State Jena Griswold*

Jennifer Lake
Assistant United States Attorney
United States Attorney's Office, District of Colorado
Jennifer.Lake@usdoj.gov
*Counsel for the United States and U.S. Attorney General Merrick Garland*

/s/ *Robert J. Cynkar*
Robert J. Cynkar
*Counsel for Tina Peters*